LJW/MTP: USAO # 2020R00698

DISTRICT OF MARYLAND

## IN THE UNITED STATES DISTRICT COURT 1: 26
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Criminal No.** GLR-20-0337 |
| **v.** | **(Extortion, 18 U.S.C. §§ 1951 and 2;** |
| **STEPHEN L. SNYDER,** | **Travel Act, 18 U.S.C. § 1952)** |
| **Defendant** | |

## INDICTMENT

The Grand Jury for the District of Maryland charges that at all times relevant to this

Indictment:

## COUNT ONE
### (Extortion)

### Relevant Persons and Entities

1. The University of Maryland Medical System (UMMS) was a not-for-profit university-
   based regional health care system focused on serving the health care needs of Maryland.

2. As one of the largest private employers in Maryland, UMMS's 25,000 employees and
   4,000 affiliated physicians provided primary and specialty care in more than 150
   locations and at 13 hospitals. In 2019, UMMS generated $4.2 billion in annual revenue.

3. University of Maryland Medical Center (UMMC) was the largest medical center within
   UMMS and included an 806-bed downtown Baltimore campus and a 180-bed midtown
   campus one mile north. The medical staff comprised nearly 1,200 attending physicians
   who were faculty members at the University of Maryland School of Medicine, as well as
   more than 900 residents and fellows in all medical specialties.

4. For more than 50 years, UMMC's Division of Transplantation has transplanted organs and provided post-operative care to patients. UMMC's Division of Transplantation was the largest kidney transplant program in Maryland and has performed more than 6,000 kidney transplants since 1988.

5. Dr. 1 was UMMC's Chief of Surgery and UMMS's Chief Medical Officer. Dr. 1 performed transplant surgeries at UMMC.

6. Maryland Medicine Comprehensive Insurance Program (MMCIP) insured UMMS and its faculty physician groups.

7. Dr. 2 was an attorney and medical doctor. Dr. 2 was the Chief Executive Officer of MMCIP.

8. Lawyer 1 was an attorney and Senior Vice President of Claims Litigation and Risk Management at MMCIP.

9. Lawyer 2 was an attorney and partner at a Baltimore-area law firm. Lawyer 2 acted as outside counsel to MMCIP and UMMS.

10. STEPHEN SNYDER was an attorney admitted to the Bar of Maryland in 1970. SNYDER was the senior partner at a Baltimore-based law firm specializing in plaintiff-side medical malpractice litigation.

11. In January 2017, Client 1 underwent a pancreas transplant at UMMC. Following surgery, Client 1 experienced a "spinal cord infarction" that left Client 1 permanently paralyzed from the trunk down. Client 1 retained SNYDER in April 2017. On February 28, 2018, SNYDER and UMMS reached an agreement to settle the Client 1 case.

12. Also in January 2017, Client 2 underwent kidney transplant surgery at UMMC. In the year following the surgery, Client 2's blood vessels calcified, he suffered a heart attack, and one of his legs had to be amputated. In January 2018, Client 2 and his spouse,

retained SNYDER.  The agreement between Client 2 and his spouse and SNYDER

provided that SNYDER would receive 45 percent of any recovery. On February 28, 2018,

Client 2 died.  As a result of Client 2's death, SNYDER could pursue a wrongful death

action against UMMS on behalf of Client 2's spouse and Client 2's estate.

### Purpose of the Scheme

13. The purpose of the extortion scheme was for **SNYDER** to obtain $25 million from

UMMS for himself, separate and apart from any claim by one of his clients, by using

threats of economic and reputational harm to UMMS and its organ transplant program.

### Manner and Means of the Scheme

14. It was part of the extortion scheme that **SNYDER** threatened that if UMMS did not pay

him $25 million for himself and not for any client, **SNYDER** launch a public relations

campaign against UMMS that alleged, among other things, that UMMS transplanted

diseased organs into unsophisticated patients without informing them of the quality of the

organs they were receiving in order to generate revenue.  That campaign would include:

a.  a front-page article in *The Baltimore Sun*;

b.  other national news stories;

c.  a press conference;

d.  advertisements on the Internet, including one that would run every time someone

accessed UMMS's transplant site; and

e.  at least two videos that SNYDER produced and would air if his demand for a $25

million payment were not met.

15. It was further part of the extortion scheme that SNYDER demanded that UMMS disguise

the $25 million payment as a sham consulting arrangement between SNYDER and

UMMS.

16. It was further part of the extortion scheme that SNYDER threatened Lawyer 1 by telling her that she would lose her job if she did not aid SNYDER in obtaining the $25 million payment for SNYDER.

17. It was further part of the extortion scheme that SNYDER threatened to harm the professional reputation of Dr. 1 if he did not aid SNYDER in obtaining the $25 million payment for SNYDER.

**Acts in Furtherance of the Scheme**

*SNYDER Asked to Speak with Dr. 1 in the Hallway for a Private Conversation*

18. On January 21 2018, SNYDER and Lawyer 1 met for a settlement conference of Client 1's case.  Dr. 1 attended.  During the settlement conference, SNYDER asked Dr. 1 to step into the hallway for a private conversation.  During that conversation, SNYDER told Dr. 1 that SNYDER had another client or clients who wanted to file suit against UMMS over allegations relating to kidney transplants. SNYDER told Dr. 1 that UMMS had better settle Client 1's claim for the amount SNYDER was requesting or SNYDER would file suit in other cases involving kidney transplants.  SNYDER told Dr. 1 that Dr. 1 seemed like a "nice guy" and that SNYDER "did not want to do that" to Dr. 1.  SNYDER asked Dr. 1 for his cell phone number, which Dr. 1 provided to him.

*SNYDER Communicated with Dr. 1 Directly After the Conference*

19. After the January 21, 2018, settlement conference in the Client 1 matter, Dr. 1 and SNYDER spoke on the telephone and exchanged text messages.

20. In these calls and texts, SNYDER told Dr. 1 that he had another case involving a kidney transplant and that he expected Dr. 1 to push for the amount of money that SNYDER wanted in the Client 1 case or SNYDER would "go all out" on the kidney transplant case. SNYDER told Dr. 1 that if Dr. 1 did not get Lawyer 1 to pay the money he requested in

the settlement of the Client 1 matter, SNYDER would feel that Dr. 1 had not "helped

him"; however, if Dr. 1 helped SNYDER, SNYDER would "hold back" on the other

case. SNYDER told Dr. 1 that his client in the kidney transplant case was a "nut case"

and wanted revenge by "shutting down" the transplant service.

*SNYDER Meets with Dr. 1 on March 21, 2018*

21. On March 21, 2018, SNYDER and his fiancée and Dr. 1 and his wife met for dinner at

the Capital Grille in Baltimore.

22. When both couples arrived, SNYDER and Dr. 1 met privately at the bar. The maître d'

delivered a file to SNYDER. It contained photographs of Client 2 among other

documents. SNYDER told Dr. 1 that he planned to a make a video that was "really bad."

SNYDER repeated several times that he felt "bad" because he and Dr. 1 "were friends"

and that the transplant program at UMMC would be "destroyed" unless Dr. 1 helped

SNYDER obtain $25 million. SNYDER told Dr. 1 that he wanted to become an

employee of UMMS in order to obtain the $25 million. SNYDER told Dr. 1 that if Dr. 1

helped him obtain $25 million, SNYDER would not use the video but that if Dr. 1 did not

help him the video "could do a lot of damage" to UMMS and to Dr. 1 personally.

SNYDER told Dr. 1 that the kidney transplanted into Client 2 had been a "bad kidney"

and should not have been used. Dr. 1 told SNYDER that the kidney was a good kidney

and that Dr. 1 had personally looked at the donor kidney biopsy histology and confirmed

it was a good kidney for transplant.

23. SNYDER and Dr. 1 left the bar and joined SNYDER's fiancée and Dr. 1's wife at a table

for dinner. Toward the end of the meal, SNYDER told Dr. 1's wife, "as long as your

husband does what he is supposed to do, he will be okay." SNYDER repeated this phrase

as many as ten times. Dr. 1's wife felt very uncomfortable with SNYDER's comments.

Dr. 1 tried to redirect the conversation, however, no matter what topic he and his wife tried to introduce, SNYDER would return to warning that "we are going to be friends as long as [Dr. 1] takes care of this," and "everything is going to be okay as long as [Dr. 1] does what [he] needs to do" and "this all depends on [Dr. 1] and what he does."

*April 10, 2018, Snyder Exchanges Texts with Dr. 1*

24. On April 10, 2018, SNYDER and Dr. 1 exchanged text messages. SNYDER would later attempt to use one of those messages from Dr. 1 against UMMS.

    a.  On 11:02 a.m., Snyder texted Dr. 1, "This debacle at your hospital, at your helm, must be taken extremely serious otherwise, I cannot help you!!!"

    b.  Dr. 1 responded immediately texting, "Steve, [Lawyer 1] and I just spoke. I explained that we are in jeopardy for fraud and punitive damages. She understands. The ball is in your court. [Dr. 1]."

    c.  At 12:21 p.m., Snyder texted Dr. 1, "I will take a deep breathe [sic] and continue to try on your behalf. Please believe me, if it wasn't for my friendship with you, I would pursue this GOLDMINE!!!"

*April 30, 2018, Snyder Meets with UMMS Representatives*

25. On the morning of April 30, 2018, SNYDER delivered a demand letter to Lawyer 1 shortly before a settlement conference in the Client 2 matter. The letter concluded with a $25 million settlement demand on behalf of Client 2's spouse, individually and as personal representative of Client 2's estate.

26. During the settlement conference, SNYDER told the UMMS representatives, including Lawyer 1, Lawyer 2 and Dr. 2, that the Client 2 case created significant reputation issues for UMMS. SNYDER said that it would take $25 million to silence SNYDER about what he had developed in his investigation into UMMS's transplant program.

6

27. SNYDER claimed he had received three cases against UMMS's transplant program in the last six months and that UMMS would have to pay a premium for his confidentiality. SNYDER claimed he had a longstanding relationship with Lawyer 1 and that he liked Dr. 1 but that he could do a great deal of damage to Dr. 1's international reputation.

28. SNYDER claimed he had a number of experts at his disposal and that he was sitting on a "treasure trove" of information. SNYDER claimed that he had learned that there was a culture and a strategy that had gone undetected at UMMS whereby UMMS put profits over safety. SNYDER claimed that there was a greater statistical chance of death and graft failure at UMMS and that it was well above the national average. SNYDER claimed the culture at UMMS was to use diseased high-risk kidneys and convince unsophisticated and uneducated people into accepting them or else lose the chance of a transplant.

29. SNYDER claimed that Dr. 1 had already admitted that "they screwed up the underlying case."

30. SNYDER told the UMMS representatives that he had already confirmed that The Baltimore Sun would write a front-page article about organ donor fraud and that vulnerable and unsophisticated people were receiving diseased organs at UMMS. SNYDER told the UMMS representatives that no one would want to come to UMMS even if he couldn't prove fraud.

31. SNYDER told the UMMS representatives that he also planned to give a press conference and that the resulting publicity would be devastating for the hospital. SNYDER told the UMMS representatives that he was the "key" to confidentiality. SNYDER claimed that he could calm his client, Client 2's spouse, and that he would need to "control" her with a clause that would prevent her from talking further about the case.

32. SNYDER then played a commercial for his law firm that he had developed and intended to air if his demands weren't met. It stated that UMMS did not tell patients that organs UMMS transplanted were bad organs or that they accepted organs that other institutions rejected. The commercial said that Client 2 was told by the surgeon that transplanted his kidney that the surgeon would have transplanted the same organ into his wife but wasn't told that 250 institutions had rejected the same kidney. The video showed images of Client 2 with necrotic fingertips and an amputated leg.

33. SNYDER told the UMMS representatives that he would launch the advertisements for his firm directed at transplant recipients if a deal was not struck and that he would attach an "Internet bomb" to anyone looking at UMMS's transplant site which would cause an ad for SNYDER's law firm to come up on the viewer's Internet stream if the viewer looked at UMMS's site.

34. SNYDER concluded the meeting by saying that he wanted to resolve the case but that UMMS needed to pay him $25 million in order to do so. SNYDER said he did not want to hurt the hospital or Dr. 1 but that he would do so if a deal was not struck. SNYDER told the UMMS representatives that he could work out a deal where he would be conflicted out of any future cases to confirm confidentiality on his end—as a consultant—and a liquidated damages clause with Client 2.

*June 22, 2018, Snyder Meets with UMMS Representatives*

35. On June 22, 2018, SNYDER met with representatives of UMMS, including Lawyer 1 and Lawyer 2, for a second time.

36. SNYDER began the meeting by telling the participants that he "had not rushed" them and that he had found new information which made him want to increase his demand to $50 million. SNYDER asked the UMMS representatives whether they were aware of the

"Baylor case" and the effects the allegations made against their transplant program had

on Baylor.  SNYDER told the UMMS representatives that Baylor almost went out of

business.

37. SNYDER also told Lawyer 1 that she would lose her job at MMCIP if SNYDER went

forward with his allegations against the transplant program.

38. SNYDER told the UMMS representatives that they should not analyze the case like a

lawyer.  SNYDER told the UMMS representatives that this case was not about remedial

action and when the UMMS representatives say that SNYDER cannot prove fraud, that is

not the correct analysis.  SNYDER told the UMMS representatives that he had uncovered

problems with the transplant department independent of the Client 2 case and UMMS

could not shut SNYDER down.  SNYDER called what he had learned a "gold mine," and

told them that he was not giving it up.

39. SNYDER told the UMMS representatives that UMMS would have to enter into an

agreement with SNYDER separate and apartment from the Client 2 case.  Specifically,

SNYDER told the UMMS representatives that he wanted to enter into a consulting

agreement with UMMS so that SNYDER would be "conflicted out" of any future case

involving transplants.  SNYDER told the UMMS representatives that they should settle

the Client 2 case for whatever that case was worth and then pay SNYDER $25 million to

act as a consultant in the future to conflict him out of any future case.

40. Lawyer 1 questioned what SNYDER told the UMMS representatives and told him that

she thought the $25 million was the demand for the Client 2 case.  SNYDER said that

Client 2's spouse does not "deserve" that much money for her case.  SNYDER stated that

the $25 million was for SNYDER.

41. SNYDER then played video recordings of press coverage of the Baylor case. SNYDER stated that if UMMS did not agree to his terms, SNYDER would have a national article akin to the articles written about Baylor written about UMMS and that SNYDER would also run advertisements about problems in the UMMS transplant program.

42. SNYDER told the UMMS representatives that Johns Hopkins Hospital (JHH) was UMMS's most immediate competitor and that everyone would go to JHH and not UMMS when SNYDER's advertisements came out. SNYDER asserted that JHH used kidneys in their transplant program with a specific rating in keeping with national averages while UMMS used ones that deviated from that average and had a greater chance of failure. Lawyer 1 told SNYDER that the statistics he was citing were public. SNYDER responded that "no one" pays attention to the public statistics and that UMMS would get "destroyed" if his story gets out. SNYDER told the UMMS representatives that there were disgruntled employees who would talk to him and that SNYDER suspected that there were e-mails saying "what are we doing here," from employees in the transplant program.

43. SNYDER told the UMMS representatives that Dr. 1 was in a "shit load" of trouble and that SNYDER did not want to hurt him.

44. SNYDER told the UMMS representatives that he knew there were a lot of wealthy donors to the hospital and that they would be shocked by his allegations. SNYDER asserted that UMMS would lose goodwill and its reputation if these allegations came to light.

45. Lawyer 1 told SNYDER that his comments were making her very uncomfortable and that she felt like she was being threatened. Lawyer 1 told SNYDER it sounded like he wanted to destroy the UMMS transplant program. SNYDER responded that he did not

10

want to destroy the program but that if UMMS called his bluff, he would do what he

needed to do because he was a plaintiffs' lawyer and that is what he does.

46. SNYDER then said that he thought the videos he had prepared would destroy the

transplant program.

47. At that point in the meeting, SNYDER asked an associate of his to play a new video

SNYDER had prepared and that SNYDER said he would distribute if UMMS did not pay

SNYDER $25 million.  SNYDER said he was the "king of taking crazy statements

people say and twisting them around" and that the video had statements in it made by

members of the transplant department.

48. Lawyer 1 asked SNYDER why $25 million and SNYDER said "because that is what you

have to pay me" and that it could have been "$100 million."

49. Lawyer 1 and Lawyer 2 then questioned SNYDER and confirmed from him that the $25

million payment would be made to SNYDER and would exclude Client 2's spouse.

SNYDER told the UMMS representatives that the Client 2 case was "not worth that

much money" and that Client 2's case was worth between $3 and $5 million. SNYDER

confirmed several times that the $25 million would be a payment made just to him and

would be in addition to the payment made to Client 2's spouse to settle her case.

50. Lawyer 2 asked SNYDER what he thought he could do to earn a $25 million consulting

fee.

"I could be the janitor," at UMMS SNYDER responded.

51. SNYDER said it would be a tragedy if UMMS did not pay.  SNYDER said that Lawyer 1

would get fired and the hospital would say "how the fuck did you let this happen" and

told the UMMS representatives they were playing with fire with his client.

52. SNYDER then played the new video.  It started with the words, in red, "PUBLIC

SERVICE ANNOUNCEMENT" as well as an alert sound associated with emergency

alerts.  It then showed the text that Dr. 1 had sent SNYDER on April 10, 2018, that read:

"Sue and I just spoke.  She understands on hook for fraud and punitive damages.  Ball is

in your court."  The video then showed pictures of several doctors which the video

claimed had left UMMS or had been demoted and were no longer performing surgery.

Dr. 1 was pictured with the words: "DEMOTED NO LONGER DOING SURGERY –

relegated to executive work" next to his picture.

53. The UMMS representatives advised SNYDER that the video contained inaccuracies,

such as the fact that Dr. 1 had not been demoted and that he was, in fact, still performing

surgeries.  SNYDER responded, "then I'm wrong."

54. SNYDER told the UMMS representatives that if they said no to his demand for a $25

million payment separate and apart from any payment to Client 2 then he would hold a

press conference, get an article placed on the front page of *The Baltimore Sun*, solicit

interest in national articles, distribute commercials and launch a campaign on Google and

Facebook as well as advertise on the Internet.

55. SNYDER claimed there were "devastating" e-mails from the Nephrology Department

that confirmed they did not like high-risk kidneys and questioned why UMMS was using

them.  SNYDER told the UMMS representatives the only way to keep the e-mails from

the public would be to pay SNYDER $25 million.

*August 23, 2018, Snyder Meets with UMMS Representatives*

56. On August 23, 2018, SNYDER met with UMMS representatives including Lawyer 1, Dr.

2 and Lawyer 2.

57. SNYDER began by asking if the meeting was being recorded.

12

58. SNYDER repeated his demands from the June 22, 2018 meeting:

> You hire my firm as a consultant. You hire me to do certain set-out things, to keep the hospital on the straight and narrow, to be involved with the Transplant Department as much as necessary. The – the effect of that would be, is that I'm doing work for the hospital, okay? If, in the event something arises in the future, related to the Transplant Department, well, I would be conflict— conflicted out, by way of implication. You – you – you follow that? . . .

59. Dr. 2 asked SNYDER, "So what specifically would you be doing?"

60. SNYDER responded, "Well, who knows? . . ."

61. SNYDER then continued:

> … but what happened was, when we investigated [the Client 2] case, we found a shitload of – of information of what's going on in this department; and that's really different, from her case. In other words, if I'm going to – and I – I get cases against University of Maryland all the time. I mean Let's – let's not be – let's be clear on that. I'm, by this agreement, I'm conflicting myself out of future cases, again – you know, against this department; not only me, but my sons as well, and that's – that's not a small thing. . .

62. Lawyer 1 responded, "I guess what it looks like is this consulting agreement on paper, right?" to which SNYDER responded, "Correct."

63. Lawyer 1 then asked, "And then, in your mind, whether you do work or whether you don't do work is to be determined, I guess, or," to which SNYDER responded, "Yeah, I don't care if I don't do anything. It's up to – I don't care at all."

64. Lawyer 2 then responded, "So the agreement is basically just to cover the rules?" to which SNYDER responded, "Yes. . . Yeah, it is. That's really what it is."

65. Dr. 2 asked SNYDER why what SNYDER was saying wasn't extortion.

66. SNYDER responded:

> That's fine. May I – may I answer that? Yeah, ju - just so you're clear, I – I wanted to make sure it is not perceived as extortion.

> I mean, I have a set of facts, I mean, in every case that I
> have, you're - I'm saying to you - or to - to Sue, you have to pay X,
> Y, Z - X, or the case is going forward and you're gonna be
> exposed. That's every single case - uh, you know, a - a set of facts.
>
> So, is that extortion, that a lawyer has a case and he's
> saying, uh, you know –

67. Dr. 2 then interrupted SNYDER, "But you're asking for 25 million, to which SNYDER

responded:

> Well, because there's a different component to this. The – the
> component is that there are facts independent of her case, that
> came out of her case through investigation, that relate to the
> hospital generally. And you're getting an agreement where I'm
> allegedly doing some form of work for you. Uh, it's not extortion.
> Because the – the – the – the – I'm not using any facts that aren't-
> or, excuse me, I'm gonna talk like goofy Giuliani, uh – uh, make –
> the truth is not the truth. Uh, but I'm using things that I've
> developed. So, if – what you're saying – these are the key things,
> the – how do we do this where it's not perceived as extortion?
> Because I– again, I – I'm – I'm not gonna– you know, if you – if–
> if you accuse me of extortion, which it's not, and I've fully hired a
> lawyer to – to look into that, to make sure it's not that, then –

68. Later in this exchange SNYDER posed the following question:

> So – so again, I – I don't – I understand it's a unique thing. But –
> but again, you don't want to shut her up, which is not extortion,
> and not shut me up. You – you want me not to go forward. So the
> question is, how do we do it and how is it not perceived as
> extortion? And how is it perceived as in compliance with the rules,
> isn't that right? Isn't that what we're talking about?

69. Later still, Lawyer 1 asked SNYDER:

> The only reason we are where we are at, now, right, having this
> conversation, is because – and you'll show Dr. 2 the video, is
> you've got in your mind damaging things, and that if you didn't
> have these damaging things and you didn't have the ability to
> make an ad and go on TV, you wouldn't be here today talking to
> us about a consulting agreement…right?–

to which SNYDER responded, "Correct."

70. SNYDER then repeated to the UMMS representatives, "The critical thing is, how do we implement an agreement that doesn't let these things surface, that's not extortion and not– and– and – and – and prevents Steve from handling the cases, that – that's the key to this."

71. Addressing his client's wishes, SNYDER admitted he was not acting in her best interest.  SNYDER told the UMMS representatives:

> Well, you have to understand, this is a client that really doesn't want to settle. So, when you talk about extortion, it's not a – it – this is a client that doesn't want to settle. This is a client that would like me to go forward. I'm the guy that has really, and – and truthfully, not provided undivided loyalty to her. I mean, if you want to call it the way it really is. If I was providing undivided loyalty to her I would have filed this claim a long time ago. She don't care about the six million dollars, or the five, or whatever the number is. She doesn't care. . .

72. SNYDER then suggested abandoning the pretense of a consulting agreement with him altogether and instead paying a large lump sum payment to Client 2 and that he would then obtain the money from Client 2.  SNYDER told the UMMS representatives:

> Let me ask you a question. And I don't know if I'm willing to do this. But, [Lawyer 1] maybe a solution is we – we pay one payment just to [Client 2's spouse], whatever the number is, if it's 30 or what–
>
> * * *
>
> That's – I'm not say – pay the 30 million or, you know, 31 million to [Client 2's spouse], as a one-time settlement. I'm not a consultant to the hospital. And I'll deal with her, you know–

73. Lawyer 1 responded, "but her – her case isn't worth 30 million dollars," to which SNYDER responded, "It doesn't matter whether it's worth – you get – that's a solution, to get rid of everything. You don't have to worry about Steve [SNYDER] being a consultant. . ."

74. Two days later, in a telephone call on August 25, 2018, SNYDER repeated that he had no

expectation that he would do any work for UMMS under the phony consulting

arrangement.  SNYDER told Lawyer 1 in a phone call:

> And you'll use – and you'll use me when you want me, if at all.
> You know, when you need me, you know, you'll call me once a
> month, or you'll have lunch with me once and month, and you'll –
> and you'll get advice from me. Hopefully, nothing will ever
> surface, no cases or anything. I don't think they will.

### The Charge

75. Between in or about January and October 2018, in the District of Maryland and

elsewhere, the defendant,

### STEPHEN L. SNYDER,

willfully and knowingly, did attempt to commit extortion as that term is in defined in

Title 18, United States Code, Section 1951(b)(2), and thereby would and did obstruct,

delay and affect commerce and the movement of articles and commodities in commerce,

as that terms is defined in Title 18, United States Code, Section 1951(b)(3), to wit,

SNYDER used threats of economic harm in an attempt to obtain a $25 million payment

from the University of Maryland Medical System for himself.


18 U.S.C. § 1951 and 2.

## COUNTS TWO THROUGH EIGHT
### (Travel Act)

The Grand Jury for the District of Maryland further charges that at all times relevant to this Indictment:

1.      Paragraphs 1 through 74 of Count One of this Indictment are re-alleged and incorporated herein by reference.

2.      On or about the dates referenced below, in the District of Maryland and elsewhere, the defendant,

### STEPHEN L. SNYDER,

traveled in interstate commerce and used a facility in interstate commerce, as specifically alleged below, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, to wit: extortion in violation of Maryland Criminal Law § 3-701 (Extortion); and thereafter did perform and attempt to perform acts to promote, manage, establish and carry on, and to facilitate the promotion, management, establishment and carrying on of said unlawful activity.

| COUNT | DATE | TRAVEL OR USE OF INTERSTATE FACILITY |
|---|---|---|
| 2 | 2/10/2018 | Text message from SNYDER to Dr. 1, "Important meeting for your Dept and the hospital. (unless you want to come as my guest at Fisher Island, Miami." |
| 3 | 2/15/2018 | SNYDER flew from Miami, Florida, to Baltimore Washington International Airport |
| 4 | 2/21/2018 | Email from Lawyer 1 to SNYDER responding to his request for a meeting to discuss the Client 2 case |
| 5 | 4/10/2018 | Text message from SNYDER to Dr. 1, "This debacle at your hospital, at your helm, must be taken extremely serious otherwise, I cannot help you !!! |
| 6 | 6/26/2018 | Lawyer 2 called SNYDER returning SNYDER's call |
| 7 | 7/30/2018 | Telephone call from SNYDER to Lawyer 2 |
| 8 | 8/7/2018 | Telephone call from SNYDER to Lawyer 2 |

18 U.S.C. § 1952(a)(3) and (b)(2).

17

ROBERT K. HUR
UNITED STATES ATTORNEY

A TRUE BILL:

Oct 5, 2020
Date

Foreperson

18