# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA     **:**

         **v.**            **:**     **Criminal No. 1:20-cr-00337-GLR**

STEPHEN SNYDER,         **:**

      **Defendant.**        **:**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM IN SUPPORT OF
## FIRST MOTION OF STEPHEN L. SNYDER, DEFENDANT,
## TO DISMISS INDICTMENT WITH PREJUDICE

Arnold M. Weiner, Bar No. 01605
Stuart A. Cherry, Bar No. 28012
RIFKIN WEINER LIVINGSTON LLC
2002 Clipper Park Road, Suite 108
Baltimore, MD 21211
Phone:  (410) 769-8080
Fax:  (410) 769-8811

*Counsel for the Defendant.*

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................1

STATMENT OF FACTS.................................................................................................5

    A.    Background .................................................................................................5

    B.    The Federal Investigation .........................................................................7

        (1).    The August 16th, 20th and 22nd Telephone Calls ........................7

        (2).    The August 23rd Meeting ............................................................8

        (3).    The Subsequent Telephone Conversations ................................13

            (a).    The August 24th Kinter/Snyder Call ...............................13

            (b).    The August 25th Kinter/Snyder Call ...............................16

            (c).    The August 27th Kinter/Snyder Call ...............................16

            (d).    The August 27th Magdeburger/Graham Call ...................17

            (e).    The August 28th Kinter/Snyder Call ...............................17

            (f).    The August 30th Kinter/Snyder Call ...............................18

    C.    The Government's Directions To Kinter That She Refuse To Meet
        With Graham .........................................................................................19

    D.    The Settlement Of The ███ Case .........................................................21

    E.    The End Of The Government's Investigation...........................................22

    F.    The 2020 Indictment ..............................................................................22

ARGUMENT...................................................................................................................23

    I.    THE GOVERNMENT'S OUTRAGEOUS MISCONDUCT
        VIOLATED FUNDAMENTAL LEGAL PRINCIPLES ......................................23

    II.    BY ANY MEASURE, THE GOVERNMENT'S OUTRAGEOUS
        MISCONDUCT REQUIRES THAT THE INDICTMENT BE
        DISMISSED WITH PREJUDICE ..........................................................30

A.    The U.S. Attorney's Office (In Collaboration With The F.B.I.) Acted In Bad Faith And For The Improper Purpose Of Gaining An Unwarranted Tactical Advantage Over Snyder ..................................................................................31

B.    The Same Facts Prove That The U.S. Attorney's Office Prevented Snyder From Having The Benefit Of Material Exculpatory Evidence And That Snyder Has Suffered Real, And Not Speculative, Prejudice ................................................33

C.    Snyder Cannot Obtain Comparable Evidence By Any Means ..................................................................................34

CONCLUSION ....................................................................................35

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Arizona v. Youngblood,*
    488 U.S. 51 (1989) …………………………………………………………26, 27, 33

*Barber v. Dunn,*
    2019 WL 1098486 (N.D. Ala., Mar. 8, 2019) ………………………………………27-28

*Berger v. United States,*
    295 U.S. 78 (1935) …………………………………………………………………23

*California v. Trombetta,*
    467 U.S. 479 (1984) ………………………………………23, 25, 26, 27, 28-29, 32, 33

*Giglio v. United States,*
    405 U.S. 150 (1972) ………………………………………………………………..28

*Hall v. Lane,*
    804 F.2d 79 (7th Cir. 1986)…………………………………………………………24

*Illinois v. Fisher,*
    540 U.S. 544 (2004) ………………………………………………………..27, 28, 33

*Jean v. Collins,*
    221 F.3d 656 (4th Cir. 2000) ………………………………………………………29

*Lovitt v. True,*
    403 F.3d 171 (4th Cir. 2005) ………………………………………………………29

*Mesarosh v. United States,*
    352 U.S. 1 (1956)…………………………………………………………………23

*People v. Kladis,*
    934 N.E.2d 58 (Ill. App. 2010) …………………………………………………28, 30

*Sherman v. United States,*
    356 U.S. 369 (1958)…………………………………………………………………24

*State v. Benson,*
    788 N.E.2d 693 (Ohio App. 2003) …………………………………………29, 30, 35

*United States v. Agurs,*
   427 U.S. 97 (1976) ……………………………………………………………..26, 28

*United States v. Annappareddy,*
   1:13-cr-00374 GLR (D. Md. Sept. 1, 2016) …………………………………………..29

*United States v. Belcher,*
   762 F. Supp. 666, (W.D.Va. 1991) …………………………………………………..30, 35

*United States v. Bohl,*
   25 F.3d 904 (10th Cir. 1994)…………………………………………………………27, 30

*United States v. Cooper,*
   983 F.2d 928 (9th Cir. 1993) ………………………………………………………29, 30, 33

*United States v. Dennison,*
   2014 WL 7140044 (D. Utah, Dec. 12, 2014)……………………………………………27, 30

*United States v. Donaldson,*
   915 F.2d 612 (10th Cir. 1990)…………………………………………………………28

*United States v. Gomez,*
   191 F.3d 1214 (1999) ………………………………………………………………27

*United States v. Gouveia,*
   467 U.S. 180 (1984) …………………………………………………………………23-24

*United States v. Grammatikos,*
   633 F.2d 1013 (2d Cir. 1980) ………………………………………………………28

*United States v. Harrison,*
   716 F.2d 1050 (4th Cir. 1983)…………………………………………………………28

*United States v. Hawkins,*
   531 F. App'x. 342 (4th Cir. 2013)……………………………………………………28, 29

*United States v. Larkin,*
   978 F.2d 964 (7th Cir. 1992) ………………………………………………………24

*United States v. Lovasco,*
   431 U.S. 783 (1977)…………………………………………………………………26

*United States v. Mack,*
   455 F. App'x. 323 (4th Cir. 2011)……………………………………………………28, 29

iv

*United States v. Marion*,
404 U.S. 307 (1971) …………………………………………………………26, 29

*United States v. Montgomery,*
676 F. Supp. 2d 1218 (D. Kan. 2009) ……………………………………………30

*United States v. Rastelli*,
870 F.2d 822 (2d Cir. 1989)………………………………………………………30

*United States v. Rosen*,
487 F. Supp. 2d 703 (E.D.Va. 2007)…………………………………………… 33

*United States v. Soriano*,
401 F. Supp. 3d 396 (E.D.N.Y. 2019)………………………………………..29, 30

*United States v. Steele*,
390 F. App'x. 6 (2d Cir. 2010)…………………………………………………... 29

*United States v. Stein*,
541 F.3d 130 (2d Cir. 2008)…………………………………………………24, 25

*United States v. Valenzuela-Bernal*,
458 U.S. 858 (1982)…………………………………………………………25, 26

## Constitutions

U.S. Const. amend. V…………………………………………………………23, 25, 26

U.S. Const. amend. VI………………………………………………………………24, 25

U.S. Const. amend. XIV……………………………………………………………25

## Statutes

18 U.S.C. § 1951 (2021) (the "Hobbs Act") ……………………………………………22

Md. Code Ann., Title 19, Professional Responsibility  ………………………………14, 22

## <u>INTRODUCTION</u>

The Indictment in this case must be dismissed with prejudice because the prosecution intentionally tampered with, interfered with and destroyed Defendant, Stephen L. Snyder ("Snyder)'s opportunity to have the benefit of evidence confirming the Defendant's innocence beyond all doubt and because the prosecution subsequently brought this case in bad faith through an Indictment dominated by false allegations that cover up the government's efforts that denied Snyder the benefit of the exonerating evidence. As a result, Snyder has suffered, and will continue to suffer, irreparable prejudice. Under these circumstances, common notions of fairness and decency would be offended if the government were permitted to continue to invoke judicial processes to obtain a conviction.

Snyder is a prominent Maryland malpractice lawyer. In 2017 and 2018, Snyder represented two former patients of the University of Maryland Medical System ("UMMS") who had suffered catastrophic injuries, and, in one instance, an agonizing death, as a result of grossly inappropriate organ transplants. With the support, knowledge and approval of the widow of the client who had died, Snyder offered to resolve the matter for a $██████ settlement with the client and a ten-year, $25 million consulting/retainer agreement, pursuant to which Snyder would be disqualified from asserting further claims. If UMMS refused the proposal, Snyder stated, he would file the client's case, for negligence and fraud, and with attendant publicity, he would advertise for additional transplant cases in commercials that would refer to the circumstances of the client's case and the dysfunctional and chaotic operation of the UMMS transplant department.

On August 13, 2018, two months after Snyder had made his proposal at a June 22 meeting with Susan Kinter, Esq., and other UMMS lawyers, UMMS complained to the U.S. Attorney that it was the victim of an attempted extortion. At an August 23, 2018 meeting that the government

1

surreptitiously recorded, UMMS representatives suggested to Snyder that his proposal might be extortionate.  Ex. 3, Tr. 50:16-51:7.  Snyder explained that he was being represented by Andrew J. Graham, Esq., a leading member of the Maryland Bar and an expert on legal ethics, "to make sure" that Snyder's proposal for the consulting/retainer was proper.  *Id.,* Tr. 52:12-18.  Snyder later added that he would not enter into any arrangement with UMMS unless UMMS and Snyder were both satisfied that the proposed arrangement could be accomplished "ethically, morally, comfortably... ."  *Id.,* Tr. 164:16-165:17.

Snyder insisted that Kinter and the other UMMS lawyers meet with Mr. Graham and Snyder.  Snyder repeatedly emphasized that he would not go forward with his proposal unless he and UMMS, guided by Mr. Graham, were satisfied that they could "do it the right way."  Snyder added that, "if it can't be done, I don't want to do it."  *Id.,* Tr. 63:16-17; 70:10-71:15.  Snyder acknowledged that UMMS had raised the question, "can it be done appropriately" and that, "[w]e may or may not be able to figure it."  *Id.,* Tr. 151:5-152:16, 162:14-163:7.  Snyder concluded the meeting by declaring yet again that, "if it can't be done then it can't be done," and, "[t]hat's - that's just the bottom line."  *Id.,* Tr. 171:10-172:16.

Snyder continued to push for the UMMS lawyers to meet with Mr. Graham and Snyder to determine the propriety of Snyder's proposal.  In an August 24th recorded telephone call, for example, Snyder told Kinter that he had spoken to Mr. Graham and that, "[a]ll four of us should meet;" that, "[y]ou want to do it the right way and, believe me, so do I. So do I;" and that, "I wouldn't want to do anything that jeopardizes my career at this stage of my life either."  Ex. 6, Tr. 36:15-38:16; *see also, id.,* (8/25/18), Tr. 45:14-16 (Mr. Graham "thinks we all should meet ... because he wants you to be comfortable with the process"); *Id.,* (8/27/18), Tr. 56:11-57:4 (Snyder suggested to Kinter that she should hear from Graham "firsthand").

2

Despite Snyder's prodding, UMMS hesitated to schedule the meeting with Mr. Graham, and, only then, agreed to an in-person meeting that would take place on September 6th in the same room as the August 23rd videotaped meeting.  On the evening of September 5th, however, at the direction of the U.S. Attorney's Office, Kinter informed Snyder that she would not permit Mr. Graham to attend.  Ex. 17, K000009-13.  Early the next morning, she canceled the meeting altogether.  Kinter later admitted to a State investigator that the U.S. Attorney's Office had directed her to refuse to meet with Mr. Graham and to state that "she did not need to hear from Andy Graham at the planned meeting," because the members of the U.S. Attorney's Office "were uncomfortable with Mr. Graham attending the meeting because it would be recorded."  Ex. 9, p. 3.

Kinter's cancellation of the scheduled meeting with Mr. Graham and Snyder amounted to an egregious instance of government destruction of, and tampering with, evidence.  As Kinter herself admitted, Kinter did so at the express direction of the U.S. Attorney's Office and for the specific purpose of depriving Snyder of a contemporaneous video recording of Mr. Graham's assessment of Snyder's proposal.  The meeting would have afforded the UMMS attorneys the unfiltered opportunity to review all of the facts with Mr. Graham.  Mr. Graham would have stated, for the benefit of all present, his views as to whether, under all the circumstances, it was proper for Snyder and UMMS to enter into a consulting/retainer agreement.

Regardless of the determination that Mr. Graham would have made, Snyder would have been exonerated.  Snyder had already informed the UMMS attorneys that he would follow Mr. Graham's advice and would not pursue his proposal unless Mr. Graham approved it and unless UMMS, after its lawyers' meeting with Mr. Graham, was satisfied that Snyder's proposal was "ethical[ ]" and "moral[ ]." Ex. 3, Tr. 165:10.  The meeting would have confirmed irrefutably Snyder's lack of criminal intent.  In addition, the proposal would simply have died if either

3

Mr. Graham had stated that it could not be effectuated legally and ethically or if Mr. Graham had told the UMMS attorneys that he endorsed the proposal but the UMMS attorneys had nevertheless said that Mr. Graham had not convinced them that Snyder's proposal was appropriate.

Shortly thereafter, the U.S. Attorney's Office terminated the investigation and informed UMMS that it was doing so because of a lack of evidence of criminal intent and because of Snyder's obvious reliance upon Mr. Graham. Ex. 9. At about the same time, Snyder settled his client's case for $███████ including the $███████ maximum amount recoverable for a wrongful death case plus a $1.5 million premium. Ex. 12. An attorney for UMMS also contacted Mr. Graham and informed him that UMMS would have no further communications with Snyder about a consulting/retainer agreement. Ex. 18, p. 29. The government did not inform Snyder that he had been under investigation on account of his dealings with UMMS or that the investigation had been dropped for lack of evidence of criminal intent.

Two years later, however, on October 5, 2020, and without any advance warning, the government obtained an Indictment of Snyder for alleged attempted extortion in his 2018 communications with UMMS. Indictment, (ECF 1). In an obvious effort to avoid the consequences of the government's cancellation of the meeting that would have proven Snyder's innocence, the draftsman of the Indictment set forth an outrageously false version of the facts that, among other things, pretended that the critical interactions between Snyder and UMMS had never occurred. *See id.,* ¶¶ 56-74. *See also* Memo in Support of Second Motion to Dismiss, pp. 11-20; Ex. 4 (Chart); Ex. 5 (Guberman Declaration). If the U.S. Attorney's Office had not deliberately, and for an improper purpose, canceled the meeting that would have established Snyder's innocence beyond peradventure, the government would never have been able to mount this prosecution.

Under these circumstances, the Indictment must be dismissed because the continued prosecution of this case offends common notions of fairness and decency.

## STATEMENT OF FACTS

### A.   Background

Snyder is a prominent medical malpractice attorney who is known for his assertive style, exceptional successes and widespread advertising in which he uses the slogan, "Don't just sue them, Snyder them."  Throughout most of his 50-year career, Snyder has successfully pursued claims and brought cases against UMMS.  In recent years, Snyder had recovered more than $100 million from UMMS, and, in just the two medical malpractice cases that he settled with UMMS as part of the events on which this prosecution is purportedly based, he recovered $13.5 million on behalf of his clients.[1]

In 2017, Snyder began pursuing malpractice and fraud claims against UMMS on behalf of clients who had suffered grievous injuries and painful deaths as a result of failed organ transplants performed by surgeons in the UMMS transplant department.  There can be no dispute that, as a result of his investigation of his clients' claims, Snyder had assembled evidence that the UMMS transplant department, under the leadership of Stephen Bartlett, M.D., had deliberately put its profits over the safety of its patients.  Among other things, Snyder concluded that UMMS was: performing these expensive and highly profitable procedures upon persons too fragile to endure them; transplanting into its patients diseased and otherwise unacceptable organs that other

---

[1] Over the past two decades, Snyder dealt repeatedly with Kinter, who is the principal UMMS claims counsel, and with Natalie C. Magdeburger ("Magdeburger"), one of various outside counsel engaged by UMMS.  Snyder has also litigated against another prominent plaintiff's attorney whom UMMS has placed on retainer and whom UMMS designated to defend one of Snyder's cases. Throughout this period, Snyder developed a cordial, friendly relationship with Kinter; they communicated on a first-name basis; and, as shown by the recordings of their conversations, they frequently discussed matters and events in their personal lives.

physicians and hospitals had rejected; and misrepresenting to its patients the suitability of the transplanted organs and the outcomes that UMMS had achieved.[2]

In February 2018, UMMS settled for $█████ the case on behalf of the first of Snyder's clients, a young woman named █████ █████ who had been left paralyzed after transplant surgery.  Ex. 19.  Snyder also began discussing the settlement of his second case, on behalf of █████ and █████ █████ and, with Ms. █████ full support and encouragement, he also discussed the prospect of simultaneously entering into a consulting or retainer agreement with UMMS as part of the settlement.  Snyder's client had wanted the settlement of her case to be combined with Snyder's proposed consulting/retainer agreement, and, with her authority, Snyder made clear that, without both, Snyder would pursue the █████ case with attendant publicity and would engage in an advertising campaign for additional transplant cases in which the facts of the █████ case and the misconduct of the transplant department would be emphasized.[3]

At a June 22, 2018 meeting with the UMMS lawyers, Snyder discussed his proposal, showed a video of the type of advertising he would run if his proposal were not accepted and asked that he be permitted to make the same presentation to the UMMS Board.  Snyder also informed UMMS that he was being advised by Mr. Graham, and he asked the UMMS attorneys to contact Mr. Graham to discuss whether and how the parties might implement Snyder's proposal.  The UMMS attorneys did not do so.  Ex. 18, pp. 20-22.

---

[2] Snyder's conclusions were so accurate that Dr. Bartlett had told Kinter that Snyder must have an inside source of information.  Ex. 20, p. 4.  With the approval of claim counsel, Bartlett had met with Snyder in February 2018 in an effort to find out how Snyder had learned so much.  Ex. 21.

[3] By the summer of 2018, the transplant department was in complete turmoil.  Six or more transplant surgeons had left UMMS, either voluntarily or at the request of UMMS, and UMMS had removed questionable, and assertedly false, claims from its website.  At the end of the year, Dr. Bartlett would resign under pressure from the UMMS Board of Directors.

B.     **The Federal Investigation**

On August 13, 2018, two months after the June 22nd meeting, UMMS complained to the U.S. Attorneys' Office and the F.B.I. that it was the victim of attempted extortion.

Under the direction of Assistant U.S. Attorney Kathleen Gavin, the F.B.I. undertook an investigation that included the surreptitious video recording of a key meeting on August 23, 2018 between Mr. Snyder and representatives of UMMS and surreptitious audio recordings of various telephone conversations between August 16th and September 5th.  One or the other of Kinter and Magdeburger participated individually in the telephone calls.  The government representatives instructed Kinter and Magdeburger as to when and where to meet with Snyder, as to when to make the telephone calls and as to what to say in the meeting and calls.

(1).     **The August 16th, 20th and 22nd Telephone Calls**

On August 16th, at the direction of the F.B.I., Kinter invited Snyder to a meeting that would be attended by Dr. DePriest Whye, the COO of the UMMS insurance subsidiary, who, she said, would be recommending whether the UMMS Board should meet with Snyder.  Ex. 6, Tr. 4:16-24.  Kinter told Snyder that "it's important that you present the case to him the way you presented it to us" on June 22nd, to "kind of get him squared away that way, and then he can go to who he needs to go to to talk about why it's important that they meet with you."  *Id.,* Tr. 8:1-5, 9:12-17.

In follow-up conversations on August 20th and 22nd, Kinter stressed the need for Snyder to "say the same stuff" to Dr. Whye that Snyder had said two months earlier at the meeting with Kinter and other UMMS attorneys.  *Id.,* Tr. 13:8-24, 15:20-23.  In response to Kinter's questions, Snyder also said that he would repeat his proposal that, "you settle with [Ms. ███████ confidential, and you get a consulting agreement with me, a consulting agreement that sets out some responsibilities, and it means I'm conflicted out and I can't take cases against [the transplant

department]. *Id.,* Tr. 18:1-6. Snyder also repeated that the two components of his proposal were two parts "of the equation" and that "the two issues are intertwined." *Id.,* Tr. 29:20-30:1.

### (2).   The August 23rd Meeting

At the August 23rd meeting, Snyder reiterated his belief that he had uncovered systemic fraud in the UMMS organ transplant department and that, by putting profits ahead of patient safety, UMMS had performed unwarranted and reckless surgeries that had resulted in catastrophic injuries to two of Snyder's clients and the agonizing death of one of them. Ex. 3, Tr. 62:1-7, 136:4-6. Snyder also referred to a text that he had received from Bartlett, acknowledging that UMMS was potentially liable for fraud and admitting that there were other patients who might bring cases similar to the two that Snyder had pursued. *Id.,* Tr. 109:6-9, 122:9-19, 126:10-13.

The recording of the August 23rd meeting also shows that Snyder had proposed that (1) UMMS settle the case of his second failed transplant client, ███████ ████ for approximately $ ██████ (from which Snyder would not take any fee) and (2) enter into a ten year consulting or retainer agreement with Snyder for $25 million. *Id.,* Tr. at 48, 52-55. ████ ██████ ██████ ████ surviving wife, was of the opinion that UMMS had "killed her husband," and she was "an advocate" for Snyder's proposed consulting/retainer agreement. *Id.,* Tr. 41, 50. "So what I'm talking about here," Snyder said, "is settling her case and getting confidentiality - and doing a $25 million-dollar consulting contract with me." *Id.,* Tr. 35-36. Snyder offered to "do whatever you want me to do" and pointed out that he knew "all the players ... in my field" ... and that "most of them" had "work[ed] for" him. *Id.,* Tr. 25. He also stressed that, as a consultant to UMMS, he would be conflicted from representing other transplant claimants. *Id.,* Tr. 24:13-17, 30:8-10, 40:7-9.

Snyder informed the UMMS representatives that he did not think that Ms. ███ would settle her claim without UMMS agreeing to the consulting agreement, but that he knew that she would settle her case "if we kn[e]w that we're going forward" with the consulting agreement. Magdeburger acknowledged that settlement of the ███ case and the consulting agreement **"were intertwined."** *Id.,* Tr. 31:7-13, 41:1-5, 66:6-7. Dr. Whye likewise stated that **"they go hand-in-hand;"** that **"they're in tandem;"** and **"we can't sort of resolve one without the other."** *Id.,* Tr. 150:3-5.

In the absence of the settlement, Snyder stated, he would file and publicize the ███ case and would use the ███ case in a press conference, contacts with journalists and other advertisements for additional transplant cases. *Id.,* Tr. 33:15-18, 173:13-173:6. Snyder played a sample video for the UMMS representatives to view. *Id.,* Tr. 108:4-116:16. The video featured the ███ case, the turmoil in the UMMS transplant department that had led to the recent departure or reassignment of six transplant surgeons and Dr. Bartlett's admission of potential liability for fraud. *Id.*, Tr. 61:15-21; 108:4-116:16, 126:10-13.

Dr. Whye and the other UMMS representatives questioned whether the terms proposed by Snyder were proper because they did not want Snyder to perform consulting services. *Id.,* Tr. 28:23-30:10, 43:21-47:21, 50:11-57:2. They stated that they were entertaining Snyder's proposal, and might enter into the arrangement, to avoid the economic and reputational harms that would result from a highly publicized lawsuit and from an advertising campaign for additional cases that would feature the ███ case and Snyder's version of the systematic wrongdoing of the transplant department. *Id.,* Tr. 17:17-19:17, 57:3-63:17.

The record establishes that Snyder took to heart the concerns that Dr. Whye expressed about the propriety of the proposed arrangement. With the apparent agreement of the UMMS

representatives, Snyder stated that he would only pursue his proposal if it could be done **"morally"** and **"ethically."**  *Id.,* Tr. 165:10.  Snyder emphasized that he had consulted Mr. Graham for guidance in connection with his proposal, and he suggested repeatedly that Kinter and Magdeburger meet with Mr. Graham and Snyder to determine whether the parties could legally and ethically enter into the proposed consulting agreement.  *Id.,* Tr. 63:6-17, 70:10-71:5, 163:11-16, 170:21-171:22.

Snyder stated, and the UMMS representatives voiced agreement, that the challenge was to determine whether there was **"a legitimate"** or **"a right way"** to effectuate Snyder's proposal:

> **The question is, how do we do this and feel that we did the right thing, okay?**  Isn't that really, like a - a (inaudible) course?  **How do we do it and do it the right way?**
>
> MS. MAGDEBURGER: **I think if it's legitimate, is** -
>
> DR. WHYE: **Is there a way**
>
> MR. SNYDER: Huh?
>
> MS. MAGDEBURGER: - **there a right way to do it?**
>
> DR. WHYE: **right way to get it done?**

*Id.,* Tr. 60:6-16 (emphasis added).

A few minutes later, Snyder reiterated that he had consulted Mr. Graham about the proposed consulting arrangement; that Snyder wanted to schedule a meeting between Mr. Graham and the UMMS representatives; and that Snyder would not do the consulting agreement if it could not be done properly.  Snyder said:

> The critical thing is, **how do we implement an agreement** that doesn't let these things surface, **that's not extortion** and not - and - and - and - and **and prevents Steve from handling the cases,** that - that's the key to this.

10

**Andy believes it can be done.**  So, you know, **An - Andy's a very well-respected lawyer.  Agree?**

MS. KINTER: **Absolutely.  Yeah, he knows -**

MR. SNYDER: **And an ethics guy.**

MS. KINTER: He - but he - he knows about the -

MR. SNYDER: **Well, you can call him, if - if you want.  I'll set up a call and a meeting.  You know?  Look, if it can't be done, I don't want to do it.**  What?

*Id.,* Tr. 63:1-17 (emphasis added).

Moments later, Snyder emphasized again that he had consulted Mr. Graham, because Snyder wanted to know that he was making his proposal to UMMS **"the right way."**

MR. SNYDER: **He's really the dean of the lawyers.**  I mean I'm - I'm a different type of lawyer.  I'm - I'm a trial lawyer.  I'm a trench lawyer.  I'm a client lawyer.  He is not; **he's a lawyers' lawyer.**  Do you agree?  **I mean he's respected by the bar, he's an ethical guy.**

He goes before - before - he lectures before the Court of Appeals.  I mean, so **he's a very well-respected ethics guy.**

DR. WHYE: Mm-hm.

MR. SNYDER: He just is.  **That's the reason I consulted him.  I consulted him because I want to do it the right way.**

DR. WHYE: Mm-hm.

*Id.,* Tr. 70:10-71:6 (emphasis added).  Addressing an earlier comment by Dr. Whye that Snyder's proposal might be seen as extortionate, Snyder added that "the reason" he consulted Mr. Graham was because, **"I don't want anybody saying to me, 'This is extortion,' or - or you're - 'You're doing something wrong'** ..." *Id.,* Tr. 71:7-10.

Snyder repeatedly emphasized that he and UMMS should act on Snyder's proposal only if it could be accomplished properly.  At one point he stated that, "...the bottom line is, **we have to**

11

**figure it out, how can we do it and sleep at night.”**  *Id.,* Tr. 129:1-2.  Sensing, mistakenly, that

Dr. Whye was willing to recommend that the Board accept his proposal, Snyder nevertheless asked

that Dr. Whye caution the Board that he **“want[s] to figure it out”** and that, **“It’s just a question**

**of can it be done, and can it be done appropriately.”**  *Id.,* Tr. 151:24-152:2.

Snyder suggested that there be three steps going forward: Snyder would make his

presentation to the Board; the parties would settle the ▮▮▮▮▮ case; and the lawyers, with

Mr. Graham’s assistance, would try to find a solution to whether the consulting/retainer agreement

could properly be effectuated.  Snyder made it clear that he would continue to press for such an

agreement only if it could be done morally and ethically:

> MR. SNYDER: Okay.  **So - so it’s to go before the Board, get the**
> **okay, and then let her settle and then we’ll - we’ll figure out the**
> **rest.**
>
>        *        *        *        *        *
>
> MR. SNYDER: Okay.  **How to do the 25 million component** -
>
> MS. MAGDEBURGER: **To you.**
>
> MR. SNYDER: **- to me; try to figure it out ethically, morally,**
> **comfortably, to see if there’s a solution how to do it.**
>
> DR. WHYE: Mm-hm.
>
> MR. SNYDER: And so I don’t think you have to - I would have
> liked to have solved it today, in the form of consulting, if we - maybe
> they’ll agree to it.  **Maybe Andy will make Natalie comfortable**
> **that it could be done.**

*Id.*, Tr. 164:16-165:17 (emphasis added).

Shortly after those statements, and as the meeting was about to conclude, Snyder was

emphatic that there should be a meeting with Mr. Graham; that Snyder had no intention of ending

his career and ruining his reputation by doing something wrong; and that Snyder would abandon

the notion of a consulting/retainer agreement "if it can't be done":

> MR. SNYDER: That's fine.  However you think the next step, that's fine.  And I think the goal ought to be - **look, I don't want to do it the wrong way either, you know?**
>
> Just so you're clear, **it's not just the hospital, it's me.  I've been a lawyer in good standing since 1970.  So I - you know, and I have a good reputation.**
>
> **You think I wanna do something that's - that's - that's wrong, now, at this stage of my - absolutely not, so I - I - I don't.**  And this is unique and it's unusual, and we've known that from Day One.
>
> \*     \*     \*     \*     \*
>
> MR. SNYDER: - maybe it gets re - you know, we say, "All right. We want to do it, **but we have to figure it out."**
>
> **I mean, hopefully, before that time, we'll - we'll figure it out. And if it can't be done then it can't be done.  That's - that's just the bottom line.**

*Id.*, Tr. 171:10-172:16 (emphasis added).

### (3).   The Subsequent Telephone Conversations

#### (a).   The August 24th Kinter/Snyder Call

The next day, August 24th, Kinter telephoned Snyder to state that the next step was to get

together with Mr. Graham.  Snyder made it clear that he wanted Kinter, as well as Magdeburger,

to attend a meeting with Mr. Graham and Snyder:

> MS. KINTER: Oh, okay.  So anyhow, so we debriefed.  **We think the next step is, you know, to get together with Andy, whether it's - - I don't know.**  Have you had any conversations with Andy since yesterday?
>
> MR. SNYDER: Yeah.
>
> MS. KINTER: And do you think he'd meet with Natalie?

MR. SNYDER: **Oh, I think the four of us should meet.**

MS. KINTER: **Oh, you think all four of us should meet?**

MR. SNYDER: **Yeah, I want you in the loop.**

Ex. 6, Tr. 36:13-24.  Once again, Snyder told Kinter that, "...**(Y)ou want to do it the right way,**

**and, believe me, so do I. So do I.**"  *Id.,* Tr. 37:11-12.

Snyder informed Kinter that he had spoken to Mr. Graham about the previous day's

meeting:

> And **I told Andy yesterday** the knee-jerk reaction was they don't want the - - what's it called?  The fox in the henhouse.  And the word that - -
>
> MS. KINTER: Yeah.
>
> MR. SNYDER: Huh?
>
> MS. KINTER: Yes, the fox in the henhouse.  Not the wart on the pickle.
>
> MR. SNYDER: **Yeah, and I said they're worried about creating an agreement where I'm really not doing anything,** and he - - I mean, he was at the Court of Appeals yesterday on the -- dealing with the Rules Committee.  So he would never -- **and he said, "That's bullshit.  He goes, "There you comply with the rules." He goes, "So you'll do little things for them every once in a while, and if they need you, you're there."** He goes, "You're protecting the rule and the ethics and the Rules of Professional Responsibility, and this conflicts you out, and there's nobody that's going to complain," he said.
>
> So I'm perfectly cool with it.  And then I also thought, Sue, - - I shouldn't tell you this, but **I thought I would get an expert opinion from some national expert, if that would make everybody more comfortable.  So you know, again, I've been a lawyer since 1970, and I wouldn't want to do anything that jeopardizes my career at this stage of my life, either.  So I mean, why do you think I went to Andy?**
>
> MS. KINTER: No, no, I - -

> MR. SNYDER: You know?
>
> MS. KINTER: No, I get it it, and, yeah, no, **he's a stand up guy.  He's a stand up guy.**  So I - -

*Id.,* Tr. 37:17-38:20.  At Snyder's continued insistence, Kinter agreed that she and Magdeburger would meet with Snyder and Graham, and she stipulated that the meeting be held at the same site as that of the surreptitiously videotaped August 23rd meeting:

> MR. SNYDER: **So I mean, if he's a proponent of this and he'll, right, put his neck out for me and believes that it's manageable, then you guys should be cool with it.  So I think we should have a global meeting, the four of us, or you - - you know, I don't care.  Believe me, I would prefer Natalie not being there, but if you need to have her there, that's fine.**  Right?  That's your call.
>
> MS. KINTER: **No, that's good.  Can we meet in our office?**
>
> MR. SNYDER: **In your office?**
>
> MS. KINTER: **Yeah.**

*Id.,* Tr. 38:21-39:6 (emphasis added).

Snyder asked if Dr. Whye could attend, but Kinter replied that **she didn't "want to bombard Andy with a bunch of people** ..." *Id.,* Tr. 40:22-25.  Kinter asked if Magdeburger could "reach out to Andy just a little bit and just kind of touch base with [him] and kind of frame it," and that, after "they've kind of gotten through some things that **then we could meet with them?**" *Id.,* 41:12-17.  Snyder restated the agreement that Magdeburger would call Mr. Graham on Monday, August 27th, and that Mr. Graham and Snyder would subsequently meet with Kinter and Magdeburger. *Id.,* Tr. 41:18-43:8.

**(b).**   **The August 25th Kinter/Snyder Call**

On the next day, Saturday, August 25th, Snyder told Kinter that Mr. Graham was amenable

to speaking with Magdeburger but also wanted to go forward with the meeting with Snyder, Kinter

and Magdeburger:

> MR. SNYDER: How are you doing?  **I spoke to Andy, and he's
> amenable to - - he's fine for Natalie to call him.**
>
> *      *      *      *      *
>
> MR. SNYDER: **But he also thinks we all should meet.  So because
> he wants you to be comfortable with the process.**

*Id.,* Tr. 45:4-5 and 11-16 (emphasis added).

Kinter stated that, "I think it's great that Natalie and Andy can talk and, you know,

depending on what they work out, we can decide if we even have - - even if we need to have a

meeting."  *Id.,* Tr. 45:21-24.   Kinter also told Snyder that it was **"absolutely right"** that

Mr. Graham is **"a respected ethics guy."** *Id.,* Tr. 46:11-14.  She added that **"we can regroup
maybe after Natalie and Andy talk"** and that she was **"around next week."** *Id.,* Tr. 46:21-22.

**(c).**   **The August 27th Kinter/Snyder Call**

On Monday, August 27th at 12:50 p.m., when Snyder called Kinter to inform her that,

"Natalie never called Andy," Kinter told Snyder that he should not "worry" whether Magdeburger

would call Mr. Graham.  *Id.* at 56:4-5.  Snyder, in reply, prodded Kinter to call Mr. Graham to get

**"firsthand"** Mr. Graham's opinion of the proposed consulting arrangement:

> MR. SNYDER: - - **Andy's very - - Andy's very - - do you - - if
> you want to call Andy, you could call him.**  I mean, you're the one
> that's - -
>
> MS. KINTER: No.

16

MR. SNYDER: **You're the one who's the risk manager.  No, I'm serious.  He's very comfortable with the process, and he's an ethics guru.**

MS. KINTER: He said what?

MR. SNYDER: **He's very comfortable with the process.**

MS. KINTER: Okay.

MR. SNYDER: **So and I think you should - - you know, instead of getting it from Natalie, get it firsthand.  Just call him and introduce yourself, and just talk to him, if you want.**

*Id.,* Tr. 56:11-57:4.  Kinter, saying that she would call Magdeburger, parried Snyder's request that she call Mr. Graham directly.  *Id.,* Tr. 57:5-8.

### (d).    The August 27th Magdeburger/Graham Call

Later in the day, Ms. Magdeburger called Mr. Graham.  Instead of putting her cards on the table, Magdeburger refrained from sharing with Graham any of the concerns that UMMS had with Snyder's proposal.  *Id.*, Tr. 58-77.  Graham sensed that Magdeburger was holding back, and so he also played coy.  *Id.*

Believing that a face-to-face meeting, where the parties could be candid with one another was preferable, Graham told Magdeburger that, **"I'd be happy to sit down with you and [Snyder] and whoever if we -- if that would help, just to -- you know, everybody sit at a table and talk it through."**  *Id.,* Tr. 75:17-20.  Magdeburger was noncommittal, but Graham suggested again that **"if we need more details, we all sit down together and hash them out."**  *Id.,* Tr. 77:3-5.

### (e).    The August 28th Kinter/Snyder Call

On Tuesday, August 28th, Snyder telephoned Kinter.  Kinter said that Magdeburger had talked to Mr. Graham; that it, "[d]idn't seem like he knew a whole lot," but that Kinter was nevertheless arranging for Snyder to meet with "three or four members" of the Board of the UMMS

insurance subsidiary.  Snyder continued to insist, however, that "**Sue, you should talk to Andy**" and **"we should meet."**  *Id.,* Tr. 78:12, 16-21, 79:5-6.

Snyder also told Kinter that Mr. Graham had sent him an email about retainer agreements used by the "Skadden & Arps" law firm in New York by which the lawyers "are available to [the clients] if they ever need them, and they're conflicted out for cases that arise in these mergers." *Id.,* Tr. 83:2-11.  **"It's exactly what we're talking about,"** Snyder opined.  *Id.*

### (f).    The August 30th Kinter/Snyder Call

On August 30, 2018, Kinter called Snyder and made a suggestion that was obviously designed to induce Snyder to abandon the interests of his client in favor of his own.  Kinter proposed that UMMS immediately enter into the $25 million consulting agreement with Snyder, with the assurance that Snyder would not cause UMMS to suffer bad publicity, and that Snyder would thereafter handle the ▮▮▮▮ case in the ordinary course pursuant to a waiver of conflict of interest.  *Id.*, Tr. 97:1-7, 99:11-100:14.

Snyder rejected out of hand Kinter's proposal that he advance his own interests and defer those of his client.  Early in the conversation he told Kinter that, "**[Y]ou've got to make peace with her ▮▮▮▮▮▮ and then Natalie's got to work with Andy to, you know, formulate an agreement that everybody's comfortable with.**"  *Id.,* Tr. 96:19-23.  Pushing back on Kinter's suggestion, Snyder emphasized the need for UMMS to settle the ▮▮▮▮ case for a premium.  *Id.,* Tr. 101:7-102:25.  Snyder told Kinter that it would **kill the whole deal** if the ▮▮▮▮ case were not settled, and that, "I think you just have to pay what you have to pay for her." *Id.,* Tr. 102:4-6, 103:15-17.

18

### C.     The Government's Directions To Kinter That She Refuse To Meet With Graham

On August 23rd, Kinter acceded to Snyder's insistence that there be an in-person meeting (prior to a September 7th scheduled mediation of the ███ case) for the purpose of determining whether the parties could agree to the terms of a consulting/retainer agreement that they believed to be proper.  Kinter was to have called Snyder on September 4th to make final arrangements for the meeting, but she did not do so.  Ex. 6, Tr. 111:1-7.

On September 5th, Snyder called Kinter to confirm that the meeting to discuss the proposed consulting/retainer agreement would take place the following day.  *Id.,* Tr. 112:20-22.  After some resistance on Kinter's part, Kinter agreed to meet at her office the next day to discuss terms that they both might be **"comfortable with."**  *Id.,* Tr. 121:15-24.  Snyder told Kinter that Mr. Graham had drafted a **"very uncomplicated"** proposed consulting/retainer agreement that he would bring to the meeting.  *Id.,* Tr. 125:6-24.

Snyder went on to state that Mr. Graham was "100 percent comfortable with this," and he explained that Mr. Graham's proposed agreement drew on the type of retainer agreement used by "Skadden Arp[s]."  *Id.,* Tr. 125:25-26:2.  Referring to an article about Skadden Arps retainers that Mr. Graham had sent him, Snyder added that:

> And I'm going to bring the article.  What they do is they have -- and they brag about it.  They are in mergers and acquisitions.  **So they have companies retain them to do nothing, but they're conflicted out from the other -- you know, if someone else wants to call them** to be involved in that merger and acquisition, they're conflicted out by the party that hired them, and they don't do anything.

*Id.,* Tr. 126:12.  **"Yeah, bring him," Kinter replied, noting, further, that, "That would be helpful."**  *Id.,* Tr. 126:15-16.

19

Kinter concluded the call by stating that, **"So 11 o'clock tomorrow, you'll come. You'll have the agreement, and we'll -- we'll work out some details."** *Id.,* Tr. 129:9-11.  "Well, all right," Snyder replied, **"and let's try to work together to figure it out."**  *Id.,* Tr. 129:12-13. Kinter also reconfirmed that the meeting would be in the same room that was the site of the August 23rd meeting.  *Id.,* Tr. 129:15-16.

Later that afternoon, when Snyder attempted to speak further with Kinter, she texted that she was busy and that Snyder should text her.  Ex. 17, K000010.  Consistent with his prior requests and in accord with his previous agreement with Kinter, Snyder sent her a text in which he asked:

> **Can I bring Andy Graham to the meeting.  I think you would feel better with him there?**

*Id.*

Kinter, playing for time to get direction from the government, responded  that she **"need[ed] to think about that"** and would **"get back to you tonight ... ."**  *Id.*  Kinter stated that it was all right for Snyder to confirm with Mr. Graham that he was available to attend the meeting. She emphasized, however, that, **"...[I]f I am not comfortable you can let him know not to come,"** and that, **"I want to think about it."**  *Id.*  Snyder replied that, **"I had thought you would feel better hearing from him."**  *Id.,* K000012.

Three hours later, at 6:52 p.m., Kinter, at the direction of the U.S. Attorney's Office, wrote Snyder that, **"I don't need to hear from Andy,"** and that, **"I am fine."**  *Id.*  Snyder wrote in response, that, **"Andy is available (what do you think),"** and that, **"I think it's a good idea but it's your call."** *Id.*

At 8:30 the next morning, also at the direction of the government, Kinter canceled the meeting altogether.  "I have a personal emergency I need to take care of this am," she wrote, and, **"I can't meet with you today as the rest my day is completely shot."**  *Id.,* K000013.  Snyder

left messages for Kinter throughout the afternoon and evening but she did not respond.  *Id.,*

K000015.

A year later, on August 29, 2019, Kinter was interviewed by Maryland's Bar Counsel and

two State Investigators.  Kinter explained to them that the government had instructed her to refuse

to allow Mr. Graham to attend the scheduled September 6th meeting because the government did

not want there to be a recording of Mr. Graham's comments about Snyder's proposal.  The

Investigator's interview memorandum revealed that:

> The Complainant [Kinter] was asked about her September 5 text
> message to the Respondent [Snyder] in which she stated that she did
> not need to hear from Andy Graham at the planned meeting.  **The
> Complainant [Kinter] explained that the USAO [U.S.
> Attorney's Office] was pushing to have the Respondent appear
> and present before the Board and that they were uncomfortable
> with Mr. Graham attending the meeting because it would be
> recorded.**

Ex. 9.

**D.     The Settlement Of The ███████ Case**

On September 7th, Mr. Snyder and Ms. ████ attended a mediation with Ms. Kinter and

Ms. Reynolds.  Snyder presented a list of five terms that Ms. ████ wanted in addition to a

monetary settlement.  One was that Snyder "become a consultant to the University of Maryland

Department of Transplantation." Ex. 22.  The mediator stated that the negotiation of the consulting

agreement should take place outside the formal mediation.  Exs. 9, 22.  With Snyder's

participation, Ms. ████ settled her case for $████ including a premium for confidentiality.

Exs, 11, 13.  The UMMS representatives led Ms. ████ and Snyder to believe that UMMS would

continue to discuss the proposed settlement agreement with Snyder and that a scheduled meeting

between Snyder and members of the Board of the UMMS insurance subsidiary would take place

within a few days.

E.      **The End Of The Government's Investigation**

On or before September 10th, the U.S. Attorney's Office informed UMMS that the government had decided to terminate the investigation.  The U.S. Attorney's Office gave UMMS to understand that "the [G]overnment declined to prosecute because of Mr. Graham's involvement and [Snyder's] potential advice of counsel defense that may negate the intent prong of the criminal charge." Ex. 9.

On September 11th, Greg Bernstein, a lawyer for UMMS, told Mr. Graham that UMMS had no interest in pursuing the consulting agreement with Snyder.  Bernstein further informed Mr. Graham that Snyder was to have no further contact with Kinter or Magdeburger except to finalize the ███████ settlement.  Several days later, on September 27th, the parties finalized the ███████ settlement by the signing of a release and the payment of the $███████[4]

F.      **The 2020 Indictment**

Two years after declining to prosecute Snyder, and without giving Snyder notice that it had reopened its file, the U.S. Attorney's Office procured the Indictment that initiated the present case. (ECF 1).  The Indictment, returned on October 5, 2020, charges Snyder with attempting to commit extortion, in violation of the Hobbs Act (Count One) and with travel in interstate commerce and use of facilities in interstate commerce with intent to commit extortion under Maryland law (Counts Two through Eight).  *Id.*

As described and discussed at length in Defendant's Second Motion to Dismiss, submitted simultaneously herewith, the Indictment is replete with false allegations that cover up the

---

[4] On October 22, 2018, UMMS, through Kinter and Dr. Whye, filed a Complaint with the Attorney Grievance Commission of Maryland, accusing Snyder of attempted extortion and other, lesser infractions of the Maryland Code of Professional Responsibility.  Bernstein prepared the Bar Complaint after learning that the government had dropped the federal investigation.

government's bad faith action that prevented Mr. Graham, Snyder's lawyer, from meeting with the UMMS representatives and from discussing with the UMMS representatives whether Snyder's proposal for the consulting/retainer was lawful, proper and feasible.[5]

## ARGUMENT

### I.  THE  GOVERNMENT'S  OUTRAGEOUS  MISCONDUCT VIOLATED FUNDAMENTAL LEGAL PRINCIPLES

Snyder, the Defendant herein, is compelled to file the present motion because the prosecutors and F.B.I. agents, in investigating and subsequently bringing this prosecution, deliberately failed to adhere to the fundamental principle that, "It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States,* 295 U.S. 78, 88 (1935). The central theme of the body of law since *Berger* is that the government, at all stages of the criminal process, from the investigative period through post-conviction, must not engage in conduct that causes the defendant to be denied "a meaningful opportunity to present a complete defense." *California v. Trombetta,* 467 U.S. 479, 485 (1984).[6]

Government agents transgress this boundary when they commit acts during the investigative stage for the purpose of gaining an unfair advantage over the accused if and when he is subsequently charged.  "[T]he Fifth Amendment [due process clause] requires dismissal of an indictment ... [if the government employs] a deliberate device to gain an advantage over him ...

---

[5] Defendant incorporates herein the facts regarding the false allegations of the Indictment that are described in Defendant's Second Motion to Dismiss filed simultaneously herewith.

[6] When, as here, the prosecutor violates this basic standard to the prejudice of the defendant, the Court has the "duty ... to see that the waters of justice are not polluted," and, upon a finding of "[p]ollution having taken place," to see that "the conditions...be remedied at the earliest opportunity." *Mesarosh v. United States,* 352 U.S. 1, 14 (1956).

that ... caused him actual prejudice in presenting his defense." *United States v. Gouveia,* 467 U.S. 180, 192 (1984).  Actions by prosecutors to manipulate or corrupt evidence during investigations, so as to deprive the accused of exculpatory evidence that would otherwise be available to him for his defense, are particularly egregious.  In such circumstances, the government misuses its investigative power and impermissibly "crosse[s] the 'constitutionally significant divide from factfinder to adversary.'" *United States v. Larkin,* 978 F.2d 964, 969 (7th Cir. 1992), *cert. denied* 507 U.S. 395 (quoting *Hall v. Lane*, 804 F.2d 79, 82 (7th Cir. 1986))[7]

When the government commits acts pre-indictment with the objective of having, or with knowledge that they are likely to have, an unconstitutional post-indictment effect, the pre-indictment actions ripen into cognizable constitutional deprivations upon indictment.  This principle applies to due process violations, as described in *Gouveia* above, and to other constitutional violations as well.  In *United States v. Stein,* 541 F.3d 130 (2d Cir. 2008), for example, the U.S. Attorney's Office, prior to indictment, caused the employer of the later-indicted defendants to limit or withhold funds that would otherwise have been available to pay for their defense.  Affirming the dismissal of the indictment, the Second Circuit held that the government was responsible for the pre-indictment acts that it caused the employer to take, and, further, that the government's actions ripened into a Sixth Amendment violation upon indictment.

The appellate court set forth and adopted the analysis of the district court:

> "The fact that *events were set in motion prior to indictment with the object of having, or with knowledge that they were likely to have, an unconstitutional effect upon indictment* cannot save the government. This conduct, unless justified, violated the Sixth Amendment."

*       *       *       *       *

---

[7] Further, "The function of law enforcement is the prevention of crime and the apprehension of criminals.  Manifestly, that function does not include the manufacturing of crime." *Sherman v. United States,* 356 U.S. 369, 372 (1958).

> ... Although defendants' Sixth Amendment rights attached only upon indictment, the district court properly considered pre-indictment state action that affected defendants post-indictment. When the government acts prior to indictment so as to impair the suspect's relationship with counsel post-indictment, the pre-indictment actions ripen into cognizable Sixth Amendment deprivations upon indictment.

*Id.,* at 153 (emphasis in original).  The court also adopted the ruling of the district court that the government's "pre-indictment conduct [in that case] is separately constrained by the Fifth Amendment."  *Id.* at 158, n.12.

In a trio of cases, beginning with *Trombetta,* 467 U.S. 479, the Supreme Court articulated the current test for actions by investigators that hamper, diminish or otherwise interfere with a defendant's opportunity to have available, and to be able to use and present, evidence necessary for a complete defense.  Adverting to the defendant's due process right to evidence uncorrupted by government action, the Court declared that:

> Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness.  We have long interpreted this standard of fairness to require that **criminal defendants be afforded a meaningful opportunity to present a complete defense.**  To safeguard that right, the Court has developed "what might loosely be called **the area of constitutionally guaranteed access to evidence.**"  *United States v. Valenzuela-Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3447, 73 L.Ed.2d 1193 (1982).  Taken together, **this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system.**

*Id.* at 486 (emphasis added).

Reviewing the history of the cases that have applied and extended that right, including those that have imposed on the government "the additional responsibility of guaranteeing the

25

criminal defendants access to exculpatory evidence beyond the government's possession," the

Court went on to state that:

> On a few occasions, we have suggested that the Federal Government might transgress constitutional limitations **if it exercised its sovereign powers so as to hamper a criminal defendant's preparation for trial.** For instance, in *United States v. Marion,* 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971), and in *United States v. Lovasco,* 431 U.S. 783, 795, n. 17, 97 S.Ct. 2044, 2051 n. 17, 52 L.Ed.2d 752 (1977), we intimated that a due process violation might occur if the Government delayed an indictment for so long that the **defendant's ability to mount an effective defense was impaired.** Similarly, in *United States v. Valenzuela-Bernal, supra,* we acknowledged that the Government could offend the Due Process Clause of the Fifth Amendment if, by deporting potential witnesses, it **diminished a defendant's opportunity to put on an effective defense.** 458 U.S., at 873, 102 S.Ct., at 3450.

*Id.,* 485 (emphasis added).

Applying these principles to the further question of the government's "duty to take

affirmative steps to preserve evidence on behalf of criminal defendants," the Court determined

that:

> [T]he Constitution imposes on the States [the duty] to preserve evidence ... that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, see *United States v. Agurs,* 427 U.S., at 109-110, 96 S.Ct. at 2400, **evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.**

*Id.,* 488-89.[8]

In the second case, *Arizona v. Youngblood,* 488 U.S. 51, 57 (1989), the police followed

established procedures and protocols in testing and handling evidence but did not take

---

[8] *Cf. United States v. Agurs,* 427 U.S. 97, 110 (1976) ("If evidence highly probative of innocence is in [prosecutor's] file, he should be presumed to recognize its significance...").

extraordinary measures to preserve the condition of the evidence for further examination.  The Court "stressed the importance for constitutional purposes of good or bad faith on the part of the Government when the claim is based on loss of evidence" or based on government action "to gain some tactical advantage over [defendants] or to harass them."  (quoting cases).  "[R]equiring a defendant to show bad faith on the part of the police," the Court reasoned, "confines [the obligation to preserve evidence] to that class of cases where the interests of justice most clearly require it, *i.e.,* those cases in which **the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant."** *Id.,* 58.  "We therefore hold," the Court concluded, "that unless a defendant can show bad faith on the part of the police, failure to preserve **potentially useful evidence** does not constitute a denial of due process of law."  *Id.*

In the third case, *Illinois v. Fisher,* 540 U.S. 544, 549 (2004), the Court explained the difference between the *Trombetta* and *Youngblood* requirements, holding that, "[T]he applicability of the bad-faith requirement in *Youngblood* depended ... on **the distinction between 'material exculpatory' evidence and 'potentially useful' evidence."**  Adhering to the teaching of *Fisher,* lower federal courts have since made the same distinction:

> "In order to establish a due process violation under *Trombetta*, [Defendant] must show that the [computer] **evidence had exculpatory significance that would have been 'apparent before' its destruction, and that it was 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'"** *Gomez,* 191 F.3d at 1218. The Supreme Court "in *Youngblood* extended *Trombetta* to provide that, if the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was 'potentially useful' for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence." *U.S. v. Bohl,* 25 F.3d 904, 910 (10th Cir. 1994) (citing *Youngblood,* 488 U.S. at 58).

*United States v. Dennison,* No. 2:13CR805DAK, 2014 WL 7140044, *4 (D. Utah, Dec. 12, 2014); *see also Barber v. Dunn,* Case No. 5:16-cv-00473-RDP, 2019 WL 1098486, *38 (N.D. Ala. Mar.

8, 2019); *People v. Kladis,* 934 N.E. 2d 58, 63-64 (Ill. App. 2010). *Cf. United States v. Donaldson,* 915 F.2d 612 (10th Cir. 1990) (making same distinction prior to *Fisher*.)

In determining whether the lost or unavailable evidence was "material" and "exculpatory" evidence, on the one hand, or merely "potentially useful" evidence, on the other, a court examines the evidence's "significance when viewed in light of its nature, its bearing upon the critical issues in the case and the strength of the government's untainted proof." *United States v. Grammatikos,* 633 F.2d 1013, 1020 (2d Cir. 1980).[9]   Missing evidence is material and exculpatory if it is something that "might be expected to play a significant role in the suspect's defense." *Trombetta,* 467 U.S. at 488.  It is also material and exculpatory if, in the context of the case, it would have been sufficient to create a reasonable doubt.  "It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed." *Agurs,* 427 U.S. at 112-13.  Where the government's other evidence in the case is not strong, moreover, "additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* at 113; *see also, Giglio v. United States,* 405 U.S. 150, 154 (1972).

There is no due process violation, of course, when the unavailable proof is neither "material and exculpatory" nor "potentially useful," because, in such circumstances, the defendant suffers no prejudice. *See, e.g., United States v. Hawkins,* 531 F. App'x 342, 344 (4th Cir. 2013); *United States v. Mack,* 455 F. App'x 323, 326-27 (4th Cir. 2011).

In general, the government acts in bad faith when an investigator or prosecutor intentionally destroys, fails to retain or interferes with the defendant's ability to have the benefit of exculpatory evidence (or otherwise to defend himself). *Trombetta,* 467 U.S. at 488 (bad faith

---

[9] *Cf. United States v. Harrison,* 716 F.2d 1050, 1051-52 (4th Cir. 1983) (same test for determining prejudice resulting from misconduct at trial).

when there is "conscious effort to suppress exculpatory evidence"); *Hawkins,* 531 Fed. App'x 342, 344 (4th Cir. 2014) (bad faith when "'officer...withheld the evidence for the purpose of depriving the [defendant] of the use of that evidence during his criminal trial'") (quoting *Jean v. Collins,* 221 F.3d 656, 663 (4th Cir. 2000)); *Mack,* 455 F. App'x at 327 (same); *United States v. Steele,* 390 F. App'x 6, 9 (2d Cir. 2010) (evidence "intentionally destroyed"); *United States v. Soriano,* 401 F. Supp. 3d  396, 401 (E.D.N.Y. 2019) ("government's failure to retain potentially exculpatory evidence is done in bad faith when the circumstances under which the evidence is discarded negate any innocent explanation for the government's conduct"); *United States v. Cooper,* 983 F.2d 928, 931 (9th Cir. 1993) (bad faith where exculpatory value of evidence "was repeatedly suggested to government agents" before they allowed it to be destroyed); *Marion,* 404 U.S. at 324 (bad faith upon proof that government "intentionally delayed to gain some tactical advantage over [defendants] or to harass them"); *Lovitt v. True,* 403 F.3d 171, 186-87 (4th Cir. 2005) (no bad faith when clerk of State court discarded trial exhibits to make space after trial had concluded and State Supreme Court had affirmed defendant's conviction).[10]

Courts, in a number of cases, have held that after-the-fact testimony, particularly when it is likely to be disputed, does not constitute a comparable alternative to missing or destroyed recordings or physical evidence.  In *State v. Benson,* 788 N.E.2d 693 (Ohio App. 2003), for example, the state failed to preserve an arresting officer's tape recording of field sobriety testing

---

[10] *But see: United States v. Annappareddy,* No. 1:13-cr-00374 GLR (D. Md. Sept. 1, 2016) (unreported) (court dismissed counts of indictment when government, during pendency of motions for new trial, destroyed records of defendants' sales, where the government's case depended on the volume of the defendant's sales and when the prosecutors knew that there were problems with the proof of sales that had been presented at trial.)The transcript of the Court's oral opinion in *Annappareddy* is attached hereto as Exhibit 23.

during a DUI arrest.  In holding that the charges should have been dismissed, the appellate court

declared:

> The testimony of [defendant] and his two eyewitnesses disputed
> much of the testimony that the officer gave at the suppression
> hearing and again at trial relating to the stop and the DUI charge.  In
> our view, the tape would have provided **the only possible objective
> evidence of the events** on the night [defendant] was stopped.
> Further, the evidence was **unique and not obtainable by other
> means.**

*Id.* at 696 (emphasis added).  *See also United States v. Cooper,* 983 F.2d 928 (9th Cir. 1993);

*Soriano,* 401 F. Supp. 3d at 402, 404; *United States v. Montgomery,* 676 F. Supp. 2d 1218, 1221,

1245 (D. Kan. 2009); *Bohl,* 25 F.3d at 913-14; *United States v. Belcher,* 762 F. Supp. 666, 672-73

(W.D. Va. 1991) (State officers who made marijuana arrest destroyed the seized plants without

performing tests; testimony of the officers, based on visual inspection, that the plants were

marijuana, was not an acceptable alternative); *Dennison,* 2014 WL 7140044 at *6-7 (government

agents corrupted business hard drives; lost documents were necessary "to challenge" government

witnesses and "to corroborate" defense  witnesses).[11]

## II.   BY ANY MEASURE, THE GOVERNMENT'S OUTRAGEOUS MISCONDUCT REQUIRES THAT THE INDICTMENT BE DISMISSED WITH PREJUDICE

By any standard or measure, the conduct of the United States Attorney's Office, in

forbidding and preventing UMMS from meeting with Mr. Graham, violated Snyder's rights to due

process of law and require that the Indictment in this case be dismissed.

---

[11] *Cf. Kladis,* 934 N.E.2d 58 (police officer precluded from testifying about events that had been recorded on lost tape) (case decided on equivalent State grounds); *United States v. Rastelli,* 870 F.2d 822, 833-34 (2d Cir. 1989) (comparable evidence for lost tape recordings existed because F.B.I. agent who monitored the conversations made **contemporaneous** summaries of the conversations).

A.    **The U.S. Attorney's Office (In Collaboration With The F.B.I.) Acted In Bad Faith And For The Improper Purpose Of Gaining An Unwarranted Tactical Advantage Over Snyder**

The government knew from its surreptitious taping of the August 23rd meeting, that Snyder had repeatedly stated that he would not continue to pursue his proposed $25 million consulting/retainer agreement with UMMS if it could not be accomplished "ethically, morally, comfortably." Ex. 3, Tr. 165. Snyder also made it clear that "the bottom line" was that, "if it can't be done then it can't be done." *Id.* 172. Snyder also emphasized that, "I consulted [Mr. Graham] because I want to do it the right way." *Id.* 71. He reiterated that he "went to" Mr. Graham because, "I've been a lawyer since 1970, and I wouldn't want to do anything that jeopardizes my career at this stage of my life, either." Ex. 6, Tr. 38.

Snyder beseeched UMMS "to get together" with Mr. Graham - and stated over and over again that Kinter and Magdeburger "should meet" with him and Mr. Graham. *Id.* Tr. 36. Snyder explained that the purpose for having the meeting was that, "You want to do it the right way, and, believe me, so do I." *Id.*, Tr. 37. Snyder drove home the message that:

> "[H]opefully ... we'll figure it out.  And if it can't be done then it can't be done.  That's - that's just the bottom line."

Ex. 3, Tr. 172. Adding to Snyder's insistence that UMMS meet with Mr. Graham, so that they could have the benefit of Mr. Graham's long experience in ethics matters, Mr. Graham extended his own offer to Magdeburger, one of the UMMS lawyers, that he'd be "happy to sit down with you and [Snyder] and whoever, if we -- if that would help, just to -- you know, everybody sit at a table and talk it through." Ex. 6, Tr. 75. Mr. Graham suggested that, "if we need more details, we all sit down together and hash them out." *Id.*, tr. 77.

Snyder and Mr. Graham made it clear to UMMS (and to the members of the U.S. Attorney's Office and the F.B.I. agents who were listening in), that they wanted Mr. Graham to

31

meet with UMMS so that the UMMS representatives could have the opportunity to make a candid presentation of their concerns (while "everybody [sat] at a table and talk[ed] it through").  From the number of times that he reiterated it, Snyder left no doubt that he would abandon his proposal if Mr. Graham, at the meeting with UMMS, did not express the opinion that Snyder's proposal was proper or if UMMS, after listening to Mr. Graham, was unpersuaded.

The government agents who overheard Snyder at the meeting, and who overheard Mr. Graham in his telephone call, promptly acted to prevent UMMS from meeting with Graham. The government agents knew that, if the meeting took place, the F.B.I. would have to memorialize that meeting, the same as they had memorialized the August 23rd meeting and the many telephone calls.  This time, however, the recording would be of a meeting that would confirm Snyder's complete lack of criminal intent and his determination to rely upon whatever opinions Mr. Graham would offer after learning all of UMMS' concerns.  It was only by chance that Kinter revealed to State investigators a year later (1) that the U.S. Attorney's Office had instructed her to forbid Snyder from bringing Mr. Graham to a scheduled meeting and (2) that the U.S. Attorney's Office had informed Kinter that they did not want any such meeting to occur because they did not want to make, and have in their files, a video recording of what Mr. Graham might say at the meeting.

The government's instruction to Kinter that UMMS representatives not meet with Mr. Graham, in the face of Snyder's expressed willingness to give up his proposal for the consulting agreement if Mr. Graham did not provide a way to accomplish it properly, proves that the U.S. Attorney's Office and the other federal investigators acted intentionally and in bad faith to deprive Snyder of exonerating evidence.  The government agents clearly understand that if Snyder were later charged, the loss of the exonerating evidence would deprive Snyder of a "meaningful opportunity to present a complete defense." *Trombetta,* 467 U.S. at 479, 485.  They

also acted in bad faith because "the exculpatory value" of the meeting with Mr. Graham "was apparent to the government agents before" they "destroyed" the opportunity for the meeting. *Id.* at 488-89. Here, as in *Youngblood,* 488 U.S. at 58, the U.S. Attorney's Office and the F.B.I. "themselves by their conduct indicate[d] that the evidence could form a basis for exonerating the defendant." As the Supreme Court also held in *Fisher,* 540 U.S. at 549, the government agents acted in bad faith because the "exculpatory significance [of the meeting with Mr. Graham] 'would have been apparent' before [the agents'] destruction" of the opportunity for the meeting. The government's bad faith is also established by the fact that the exculpatory value of the meeting with Mr. Graham "was repeatedly suggested to the government agents" by Snyder's own statements at the August 23rd meeting. *Cooper,* 983 F.2d at 931. Here, too, the government agents acted in bad faith in misusing their investigative power to thwart the meeting with Mr. Graham because, in so doing, they "crossed the constitutionally significant divide from factfinder to adversary.'" *United States v. Rosen,* 478 F. Supp. 2d 703, 721 (E.D.Va. 2007).

      **B.**    **The Same Facts Prove That The U.S. Attorney's Office Prevented Snyder From Having The Benefit Of Material Exculpatory Evidence And That Snyder Has Suffered Real, And Not Speculative, Prejudice**

The U.S. Attorney's Office prevented Snyder from having the benefit of "material exculpatory evidence" when it instructed UMMS not to meet with Mr. Graham and prevented the meeting between Mr. Graham and UMMS from taking place. Evidence is "material" and "exculpatory" if it "might be expected to play a significant role in the suspect's defense." *Trombetta,* at 488.

The evidence would have been material and exculpatory because the meeting with Mr. Graham would have provided UMMS the opportunity to provide all of the facts to Mr. Graham and to share with Mr. Graham all of UMMS' claimed concerns about Snyder's proposal. Armed

with knowledge of the facts from the UMMS perspective, Mr. Graham would have given UMMS and Snyder his unvarnished assessment and opinion about Snyder's proposal.  The F.B.I. was recording all communications with Snyder as part of the investigation, including the August 23rd meeting.  Before she was instructed by the F.B.I. to refuse to meet with Mr. Graham, Kinter had selected the same room for the meeting that would have been attended by Mr. Graham.  The F.B.I. was already set up to record meetings in that room.  In fact, the U.S. Attorney's Office informed Kinter that the reason why the government was prohibiting the meeting from taking place was because the F.B.I. would have been required to record it.  The recording would have been a permanent, unimpeachable record of what took place.

If the meeting with Mr. Graham had gone forward, and had not been blocked by the government's misconduct, Snyder would have been exonerated by any discussion that would have taken place.  The fact that Snyder would have put Mr. Graham together with the UMMS representatives would have proven that Snyder genuinely desired that UMMS communicate all of its concerns to Mr. Graham and, likewise, that Mr. Graham provide his fully informed assessment directly to UMMS.  If Mr. Graham had given the opinion that Snyder's proposal was proper and legal, this would have confirmed Snyder's good faith in making the proposal in the first place.  On the other hand, if Mr. Graham, after hearing UMMS' concerns, had opined that Snyder's proposal was not ethical or legal, Snyder's efforts to secure the consulting/retainer agreement would have come to an end.  Snyder had repeatedly assured UMMS that he would abandon his proposal if it could not be accomplished legally and that he was counting on Mr. Graham to guide him and UMMS in the right direction.  Snyder could not have made it clearer that, unless UMMS, after meeting with Mr. Graham, was satisfied that Snyder's proposal was proper, Snyder's effort to obtain a consulting/retainer agreement from UMMS would be over.

###### C.    Snyder Cannot Obtain Comparable Evidence By Any Means

There is no evidence that could possibly be comparable to an electronic video recording of an actual meeting between Mr. Graham and UMMS in which the participants would have candidly discussed all aspects of Snyder's proposed consulting/retainer agreement.  The government knew the singular value of such evidence when it directed Kinter to refuse to meet with Mr. Graham for the specific purpose of preventing such evidence from coming into being.

Now that the government prevented the meeting from taking place, and relieved itself of the need to record the event, the government has reserved for itself the ability to assert that the meeting would have been insignificant and inconsequential and that Snyder could not have been prejudiced by the fact that it never occurred.  The government has also enabled itself to argue, albeit incorrectly, that Snyder is merely speculating about what would have occurred at the meeting and that such speculation does not amount to actual prejudice.

While we have already made the point that the meeting would have exonerated Snyder regardless of what advice and assessment Mr. Graham would have voiced, the government can be expected to disagree.  Any after-the-fact testimony, about what would have been said, cannot be a comparable substitute because the testimony of the witnesses, years after the thwarted meeting, would surely be colored by the witnesses' conflicting agendas and self-interests.  Such self-interested testimony, by persons with divergent interests, cannot possibly be an adequate replacement for an unimpeachable recording made while the actual event was taking place.  *See Benson,* 788 N.E.2d at 696 (testimony no comparable substitute for "the only possible objective evidence of the events"); *Belcher,* 762 F. Supp. at 672-73; and other cases cited above.

### CONCLUSION

Stephen L. Snyder, the Defendant, respectfully submits that the Court should enter an

Order dismissing the Indictment in this case with prejudice for the reasons set forth above.

Respectfully submitted,

                    /s/
           _____
           Arnold M. Weiner, Bar No. 01605
           aweiner@rwllaw.com
           Stuart A. Cherry, Bar No. 28012
           scherry@rwllaw.com
           RIFKIN WEINER LIVINGSTON LLC
           2002 Clipper Park Road, Suite 108
           Baltimore, MD 21211
           Phone:  (410) 769-8080
           Fax:  (410) 769-8811

           *Counsel for the Defendant.*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 22nd day of June, 2021, the within Memorandum In

Support Of First Motion Of Stephen L. Snyder, Defendant, To Dismiss Indictment With Prejudice

was served on government counsel via ECF electronic filing.

                    /s/
           _____
           Arnold M. Weiner, Bar No. 01605