# RWL | RIFKIN WEINER LIVINGSTON LLC **Exhibit 18**
### ATTORNEYS AT LAW

Alan M. Rifkin
M. Celeste Bruce (MD, DC)
Patrick H. Roddy
Brad I. Rifkin
Edgar P. Silver (1923-2014)
†Of Counsel

Arnold M. Weiner
Charles S. Fax (MD, DC, NY)
Eric L. Bryant
Camille G. Fesche (MD, DC, NY, NJ)

Scott A. Livingston (MD, DC)
Jamie Eisenberg Katz (MD, DC, NY)
Michael D. Berman (MD, DC)
Christopher J. Olsen (MD, DC)

Michael V. Johansen
Barry L. Gogel
Michael S. Nagy
Michael A. Miller†

Joel D. Rozner (MD, DC)
Aron U. Raskas (MD, DC)
Liesel J. Schopler (MD, DC)
Laurence Levitan†
Lance W. Billingsley†
John C. Reith (Nonlawyer/Consultant)

January 4, 2019

Lydia E. Lawless, Bar Counsel
Attorney Grievance Commission
 of Maryland
200 Harry S. Truman Parkway, Suite 300
Annapolis, Maryland 21401-7479

**RECEIVED**

JAN 04 2019

Attorney Grievance
Commission

RE: File No. 2018-1929
Susan D. Kinter, JD BSN & DePriest Whye, Jr., JD MD

Dear Ms. Lawless:

### K.    The June 22, 2018 Meeting

The participants at the June 22, 2018 meeting were nearly the same as those who attended the April 30th meeting. Mr. Snyder was there with Mr. Stern. UMMS was represented by Ms. Kinter, Ms. Magdeburger and Ms. Reynolds. Dr. Whye, however, was absent.

Early in the meeting, Mr. Snyder stated that, according to the UMMS website, more transplant surgeons had left the hospital since the April 30th meeting. In particular, it appeared Dr. William Hutson, who had participated in ▇▇▇▇▇▇ care, was no longer at UMMS. Other transplant surgeons had departed UMMS in the last few weeks, including Dr. Soo Yi, Dr. Beje Thomas and Dr. Manju Mavanur. Neither Ms. Kinter nor any of the other UMMS representatives at the meeting could offer an explanation for what was now becoming an exodus of UMMS transplantation surgeons.[7]

Mr. Snyder discussed the problems and potential liability that the UMMS transplantation program had brought upon itself and that UMMS was likely to face when its fraudulent and reckless practices became known. He played two videos containing news reports from the CBS affiliate in Houston, Texas, reporting on the June 1, 2018 suspension of the heart transplantation program at Baylor St. Luke's Medical Center in Houston. The problems at the Baylor Hospital, as reported in the telecasts, were strikingly similar to those at the UMMS transplantation program.

Mr. Snyder also handed out copies of prominent news articles that had recently appeared in the Houston Chronicle about the suspension of the Baylor St. Luke's Medical Center transplant program. According to the article, the closure of that transplant facility had followed a decline in successful outcomes and recent deaths of transplant recipients. Most recently, as the Houston newspaper reported, the transplant division had experienced its "WORST NIGHTMARE: A heart transplant, a medical mishap and a drawn-out death" (emphasis in original). The newspaper also reported that the hospital had recently lost two of its prominent transplant surgeons. The newspaper invited hospital employees, patients and family members of patients to contact the newspaper and "tell us your story." The article also reported that three other transplant programs across the country had been suspended after patient deaths, the discovery that weak donor organs had been used for transplantation or the departure of surgeons or other staff.

Mr. Snyder also played an updated version of the video that he had shown at the April 30th meeting. The updated material included Dr. Bartlett's April 10th text, admitting liability for fraud and punitive damages, and a graphic showing the UMMS transplant surgeons who, the video

---

[7] Mr. Stern told Ms. Kinter that he had seen a video on the UMMS website featuring a Dr. Rolf N. Barth and proclaiming that the transplantation division now had "a new state of the art facility." Ms. Kinter said that she knew of no such new facility. It was later determined that the advertised "state of the art facility" was merely a refurbished waiting room.

stated, had recently been fired, left the UMMS service voluntarily or had been demoted. The updated version of the video was formatted as a television commercial.

Ms. Kinter commented that the updated version of Mr. Snyder's video was not entirely accurate because one or two of the physicians who were named in the video as having been demoted were still in their jobs. She also stated that the video had misinterpreted some of the scientific data. She did not, however, dispute the accuracy of anything else depicted in the video. Ms. Magdeburger asked for a copy of the videos and other materials. Mr. Snyder agreed to provide a copy, and it was delivered to her on June 26th.

Mr. Snyder had expected to discuss settlement of the ▮▮▮ case. Ms. Magdeburger stated, however, that she was still investigating the medical issues in the ▮▮▮ case and that she was not yet prepared to discuss settlement. She said that she had not completed her interviews of the UMMS surgeons who had cared for ▮▮▮▮▮ and that she had not yet seen the Johns Hopkins records for the last days of ▮▮▮▮ life. Ms. Magdeburger did agree, however, to schedule a mediation which would take place after Ms. Magdeburger had presented the ▮▮▮ case to the UMMS risk management committee on September 5th.

Mr. Snyder then turned to the proposed retainer/consulting agreement that he and Dr. Bartlett had been discussing during the previous four months and of which Ms. Kinter had been aware since the time when Dr. Bartlett reported to her about his February 15th dinner meeting with Mr. Snyder. Ms. Magdeburger asked Mr. Snyder to confirm her understanding that the proposed ▮▮▮ ten-year consulting arrangement was to be in addition to the settlement of the ▮▮▮ case. Mr. Snyder stated that Ms. Magdeburger was correct.

Mr. Snyder said that he had asked Mr. Graham to assist him in the negotiation and preparation of the retainer/consulting agreement. He suggested that Ms. Kinter and/or Ms. Magdeburger contact Mr. Graham and speak with him if they had any questions. Neither Ms. Kinter nor Ms. Magdeburger expressed any interest in doing so.

Ms. Kinter's Complaint Letter contains a lengthy but inaccurate exposition of the discussion that took place at the June 22nd meeting. Much of what Mr. Snyder explained about the UMMS fraud scheme had been said at the April 30th meeting and was only repeated, in a somewhat abbreviated form, on June 22nd.

While Ms. Kinter quibbles over what Mr. Snyder said about the donor kidney in the ▮▮▮ case having a 97 KDPI score, she goes on to admit that, "KDPI...is intended to predict the donated kidney's success as a transplanted organ;" that "A higher number reflects a reduced life expectancy of the kidney," and that, "In [▮▮▮ case the transplanted kidney had a KDPI of 97, meaning 97 percent of kidneys would have a better predicted longevity." (Cpt. at p. 4). She also makes no reference to the fact that the transplanted kidney was also infected with three deadly viruses. *(Id.)*.

Ms. Kinter alleges that Mr. Snyder stated at the June 22nd meeting that any settlement of the ███████ case was conditioned on the ███████ retainer/consulting agreement. Ms. Kinter fails to mention, however, that she stated that, "For me to take the ███████ forward, we will need to resolve the ███████ case first – not together." Accordingly, the participants agreed that: Ms. Kinter would take the ███████ case to her claims committee on September 5th; mediation of the ███████ case would be scheduled for September 7th; and Mr. Snyder would present the proposal for the ███████ retainer/consulting agreement to a committee of the UMMS Board of Directors on September 12th.

Most importantly, Ms. Kinter concedes that it was evident that Mr. Snyder believed that the proposed retainer/consulting agreement was lawful and in accordance with the Rules of Professional Conduct. In the penultimate paragraph of her description of the June 22nd meeting, she states:

> Evidently [Mr. Snyder] believed the employment arrangement would not violate that rule [Rule 5.6, MRPC], and he directed UMMS counsel to contact a prominent local law firm, Kramon & Graham LLP, whom Mr. Snyder said would negotiate the agreement on his behalf.

Cpt., p. 4. It goes without saying that Mr. Snyder would never have hired a prominent and well-respected attorney, or asked UMMS to contact that attorney about negotiating a retainer/consulting agreement, if Mr. Snyder had believed that what he was doing was unlawful or improper.





U.    **Mr. Bernstein's Surfacing and the Present Complaint**

On September 10, 2018, Mr. Bernstein telephoned Mr. Graham and came to see him the next day. Mr. Bernstein stated that the parties had settled the ▇▇▇ case on September 7th. Mr. Bernstein expressed the unfounded concern that Mr. Snyder might not let the ▇▇▇ settlement be finalized. He also made the same accusations against Mr. Snyder that Ms. Kinter later made in her Complaint Letter. (Ex. 21).

Mr. Bernstein told Mr. Graham that Mr. Snyder was to have no further contact with Ms. Kinter, Dr. Bartlett or any other UMMS representative. Mr. Snyder's September 12th expected meeting with a committee of the UMMS Board, would not take place. Mr. Bernstein added that Mr. Snyder remained free to communicate with Ms. Magdeburger for the purposes of finalizing the ▇▇▇ settlement.

## CONCLUSION

We respectfully submitted that, for the reasons expressed herein, this matter should be closed.

Very truly yours,

Arnold M. Weiner

Andrew Jay Graham

AMW:emk