IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| v. | : |
| **STEPHEN SNYDER,** | :   Criminal No. 1:20-cr-00337-GLR |
| **Defendant.** | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**SUMMARY OF DEFENDANT'S MOTIONS TO DISMISS WITH PREJUDICE, AND STATEMENT OF REASONS FOR PROMPT HEARING THEREON, PURSUANT TO THE COURT'S DIRECTION AT THE JANUARY 5, 2021 CONFERENCE**

On January 5, 2021, counsel conferred with the Court about the trial date and motions schedule in this case. The Court scheduled a motions deadline for June 3, 2022, and trial to commence October 31, 2022. Counsel for Snyder stated that this case presented highly unusual circumstances that Snyder desired to bring to the Court's attention through motions to dismiss the Indictment long before those dates and asked the Court to hear those motions as soon as they had been fully briefed. The Court directed that, in the event that Snyder should file early Motions and request a prompt hearing thereon, Snyder should accompany the Motions with a statement explaining why an early hearing was justified. This Summary of Defendant's Motions to Dismiss and Statement of Reasons for Prompt Hearing is intended to provide that explanation.

1. **The Background Of This Case**

As described in the motion papers, the present case is a resurrection of an investigation of Snyder that had been conducted by the U.S. Attorney's office two years previously, in the late summer and early fall of 2018. At that time, and in response to the complaint by University of

Maryland Medical System ("UMMS") that it was the victim of an attempted extortion by Snyder, the U.S. Attorney's Office, along with the F.B.I., conducted an intensive investigation. Among other things, the F.B.I. surreptitiously recorded at least nineteen telephone conversations between Snyder and UMMS lawyers and executives and surreptitiously recorded a key meeting with Snyder in which UMMS directed Snyder to repeat, for the alleged benefit of an important UMMS executive, a presentation that Snyder had made at a meeting two months earlier - the occurrence of which had allegedly motivated UMMS to report Snyder to the federal authorities.

At the end of 2018, and based primarily on Snyder's statements captured by the F.B.I. recordings, the U.S. Attorney's Office determined that there was no extortion case to be prosecuted, and, accordingly, it terminated the investigation and declined to prosecute. The recordings had established two important sets of facts that showed that Snyder had not committed any crime. First, Snyder made his request for a ten-year, $25 million consulting agreement at the insistence of a client whose husband had died as a result of an ill-advised organ transplant and as part of her requirements for settlement of her case. Under these circumstances, there was an unbreakable nexus between the client's settlement demand and Snyder's proposal for a consulting agreement. Second, Snyder had revealed that he had consulted with Andrew Graham, Esq., a highly respected ethics counsel, in connection with his proposal to UMMS, and he repeatedly requested that the UMMS representatives meet with Mr. Graham. Most importantly, Snyder stated that he would not go forward with his proposal for a consulting agreement if the UMMS representatives, after meeting with Mr. Graham, were not satisfied that Snyder's proposed arrangement was ethical, moral and proper.

Before the government reached its decision that there was no case to prosecute, however, the UMMS representatives, at the direction of the government, repeatedly parried Snyder's request

that they meet with Mr. Graham.  When they could not defer Snyder's request any longer, the UMMS lawyers agreed to a meeting to be attended by Snyder and Mr. Graham.  On the instruction of the U.S. Attorney's Office, however, UMMS told Snyder that they would not permit Mr. Graham to attend the meeting, and, the next day they canceled the meeting.  A year later, when a State Investigator from Bar Counsel's Office interviewed Susan Kinter, a UMMS officer and attorney, Kinter revealed that the U.S. Attorney's Office had instructed her to cancel the meeting and that the government had explained to her, at that time, that they did not want to create a recording of Mr. Graham speaking to UMMS.

In October 2020, the government reopened its file and secured the Indictment of Snyder without first issuing grand jury subpoenas for documents or interviewing critical witnesses or even informing Snyder that he was again of interest to the government.  The U.S. Attorney's Office did have the benefit of Bar Counsel's investigative file, but that file revealed even more impediments to a prosecution for attempted extortion than were evident at the time of the 2018 investigation.  The Indictment does not come to grips with any of the fatal flaws in the case, and instead, describes a set of alleged facts that contradict, in their most fundamental aspects, the dialogue between Snyder and UMMS that is memorialized in the F.B.I. tapes and on which the Indictment purports to be based.

   2.   **The Motions To Dismiss The Indictment With Prejudice**

Defendant Snyder has filed two Motions to Dismiss the Indictment With Prejudice.  Both Motions allege outrageous government misconduct in the investigation and in the Indictment process in this case.  The First Motion avers that the government manipulated and tampered with the evidence during the 2018 investigation so that Snyder would not have the benefit of an electronic recording exonerating him.  The Second Motion avers that the government has charged

Snyder in an Indictment that contains a falsified description of the key meeting in this case and that, once the falsification is remedied, the Indictment should be dismissed for failure to charge a crime. Together, the Motions aver that this is one of those rare cases where the government investigators, in their zeal to put together a plausible criminal case, impermissibly "cross[ed] the constitutionally significant divide from factfinder to adversary," *United States v. Larkin,* 978 F.2d 964, 969 (7th Cir. 1992), *cert. denied* 507 U.S. 395, and where the prosecutors, unfortunately, have failed to adhere to the injunction that, "It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States,* 295 U.S. 78, 88 (1935).

### A.     **The First Motion To Dismiss**

The basis for the Defendant's First Motion to Dismiss is that the government engaged in deliberately wrongful conduct, amounting to manipulation and tampering with the evidence, during the investigation of the case, and that the misconduct prejudiced Snyder irreparably. Specifically, a member of the U.S. Attorney's Office instructed UMMS not to meet with Andrew Graham, Esq., Snyder's lawyer, and, further, to forbid Mr. Graham from attending a scheduled meeting. The government prevented UMMS from meeting with Mr. Graham after learning that Snyder had assured UMMS that he would not go forward with his proposal for a consulting agreement if UMMS, after meeting with Mr. Graham, was not satisfied that Snyder's proposal was ethical, moral and proper.

Snyder's efforts to have UMMS meet with Mr. Graham began at least as early as Snyder's June 22nd meeting with UMMS. They also appear prominently and repeatedly throughout the F.B.I. recordings, as do Mr. Graham's offers to meet with UMMS. *See* Memorandum in Support

of First Motion to Dismiss, pp. 7-20.  Among other things, the F.B.I. recordings captured Snyder's statements that:

- The challenge is to determine **"a legitimate"** or **"a right way"** to effectuate the proposal.
- **"The question is how do we do this and feel that we did the right thing ... .  How do we do it and do it the right way?"**
- **"I'll set up a call and a meeting [with Mr. Graham] ... .  Look, if it can't be done, I don't want to do it."**
- **"I consulted [Mr. Graham] because I want to do it the right way."**
- **"It's just a question of can it be done and can it be done appropriately."**
- **"[T]ry to figure it out ethically, morally, comfortably, to see if there's a solution how to do it."**
- **"You think I wanna do something that's wrong ... now, at this stage of my ... [career] - absolutely not."**
- **"[H]opefully ... we'll figure it out.  And if it can't be done then it can't be done.  That's - that's just the bottom line."**
- **"We think the next step is ... to get together with Andy."**
- **"I think the four of us should meet."**
- **"You want to do it the right way, and, believe me, so do I."**
- **"So you know, again, I've been a lawyer since 1970, and I wouldn't want to do anything that jeopardizes my career at this stage of my life, either.  So I mean, why do you think I went to Andy?**
- **"So I mean, if [Mr. Graham's] a proponent of this and he'll, right, put his neck out for me and believes it's manageable, then you guys should be cool with it.  So I think we should have a global meeting, the four of us ... ."**
- **"But [Mr. Graham] also thinks we all should meet.  So because he wants you to be comfortable with the process."**
- **"Sue, you should talk to Andy,"** and **"we should meet."**
- **"Can I bring Andy Graham to the meeting.  I think you would feel better with him?"**
- **"Andy is available [to meet with UMMS] (what do you think),"** and, **"I think it's a good idea but it's your call."**

5

(Emphasis added).

The F.B.I. recordings also show that Mr. Graham proposed directly that he meet with UMMS' lawyers and executives to "talk through" Snyder's proposal. In an August 27, 2018 telephone call with a UMMS lawyer, Mr. Graham offered that:

- **"[L]ook, I'd be happy to sit down with you and [Snyder] and whoever if we - if that would help, just to - you know, everybody sit at a table and talk it through."**
- **"[W]hat I suggest is we -- if we need more details, we all sit down together and hash them out."**

(Emphasis added).

The UMMS lawyer, awaiting further direction from the U.S. Attorney's Office, replied only that "we may take you up on that," and that, "I need to get back to my folks at Maryland and sort of, you know --"

The motion also alleges that the U.S. Attorney's directions that Kinter avoid meeting with Mr. Graham, and that Kinter cancel a scheduled meeting that Snyder had wanted Mr. Graham to attend, amounted to egregious government tampering with evidence during a criminal investigation, all to gain an unwarranted tactical advantage if and when Snyder were charged with extortion. Kinter herself has admitted that she refused to meet with Mr. Graham at the express direction of the U.S. Attorney's Office and that she was instructed by the U.S. Attorney's Office that the prosecutors' specific purpose for canceling the meeting was to circumvent the need to make a contemporaneous video recording of Mr. Graham discussing Snyder's proposal with UMMS. The government prevented any meeting with Mr. Graham from taking place precisely because the government knew that the meeting would have afforded the UMMS attorneys the unfiltered opportunity to voice their concerns to Mr. Graham and to review all of the facts with him. Mr. Graham would have stated, for the benefit of all present, his views as to whether, under

all the circumstances, it was proper for Snyder and UMMS to enter into a consulting/retainer agreement.

The Motion further alleges that, if the government had not prevented UMMS from meeting with Mr. Graham, Snyder would have been exonerated regardless of any determination that Mr. Graham may have made about the propriety of Snyder's proposal. As the government knew from its surreptitious recording of the August 23rd meeting, Snyder had already informed UMMS that he would not go forward with his proposal if UMMS, after meeting with Mr. Graham, was not satisfied that it could be accomplished ethically, morally and properly. The proposal would simply have died if either Mr. Graham had opined that it could not be effectuated legally and ethically or if Mr. Graham had endorsed the proposal but the UMMS attorneys had said that they were not convinced. In either event, there would have been an unimpeachable record, in the form of another F.B.I. recording, that would have proven Snyder's innocence. However, the government prevented Mr. Graham from meeting with UMMS because it knew that the meeting would be devastating to any potential prosecution and did not want a recording of such a meeting to be part of its investigative file.

The Motion also avers that the government misconduct amounted to a due process violation at the time that it occurred and also two years later when Snyder was indicted. The government's misconduct would have ripened into a constitutional violation when Snyder was charged, even if it had not been a constitutional violation earlier, because the government compounded its misconduct by setting forth an outrageously false version of the facts in the Indictment and because Snyder was faced with the reality of having to defend himself without having the benefit of the evidence proving his innocence. The government had understood what it was doing, back in 2018, when it had prevented the meeting so that there would be no recording of Mr. Graham having a

7

frank discussion with the UMMS representatives. And, as any experienced lawyer knows, there is no comparable substitute for the frank discussions and the contemporaneous recording that would have taken place. After-the-fact testimony by witnesses who have separate agendas would be colored by the witness' conflicting self-interests, but no such deficiencies would have been present if UMMS had met with Mr. Graham and the F.B.I. would have recorded the meeting, just as they recorded Snyder conversations for which they wanted to have evidence, for their purposes that would be beyond legitimate dispute.

### B. The Second Motion to Dismiss

The basis for the Defendant's Second Motion to Dismiss is that the government has set forth in the Indictment a deliberately falsified version of the most important meeting in the case, the August 23rd meeting. The falsifications are so blatant that they require that the Court not be confined to the four corners of the Indictment but look also at the unimpeachable F.B.I. transcript that the Indictment purports to quote. The motion avers that, when the Court has remedied the government misconduct by taking the entire transcript into account, the Indictment, as remedied, fails to charge Snyder with attempted extortion under either the Hobbs Act (Count One) or under the Maryland extortion statute (Counts Two through Eight).

The Motion demonstrates the many ways in which the government has gone beyond any arguably proper omission of exculpatory statements to create the fictitious narrative. The various means by which the government corrupted the allegations of the Indictment include quoting statements by Snyder that are alleged to be "responses" to specific questions by UMMS personnel. In actuality, Snyder's quoted "responses" appear many pages later than the statements to which they allegedly respond, and, when put back into proper sequence are entirely innocent. The government employed another deceptive device by alleging in the Indictment that Snyder made a

long string of continuous comments in which he made one comment, "then stated" another and "then stated" yet another. By creating the illusion of a continuous dialogue, the Indictment also deceptively excises intervening statements by Snyder in which he repeatedly demonstrated his lack of any criminal intent.  In one particularly notable instance, the Indictment falsely alleges that Snyder followed one statement with another when, in fact, the second statement appears 89 pages after the first.  The Indictment also employs the fraudulent technique of presenting parts of statements by Snyder as if they were the entire statements but deleting the essential parts of those same statements that negate any suggestion of wrongdoing.  By employing these artifices and others, the Motion alleges, the Indictment purports to charge a crime when honest quotations from the F.B.I. recordings establish that none was committed.

The Motion also states that, before making so serious a charge as deliberate falsification of an Indictment, Snyder provided the key documents to Ross Guberman, Esq., one of the country's preeminent experts on legal writing.  Mr. Guberman lectures extensively on the essentials of legal writing, including to all newly appointed federal judges, personnel of the U.S. Department of Justice and attorneys at other federal agencies and leading law firms.  Mr. Guberman has provided a Declaration in which he finds that the Indictment employs a wide variety of deceptive techniques, including those described above.  Evaluating the Indictment under standards favorable to the government, Mr. Guberman finds that the Indictment is false: "Under the standards detailed below, and based on the transcripts that the Indictment itself cites, the Indictment misrepresents Snyder's actions and state of mind in relation to his ongoing settlement discussions with UMMS about a proposed $25 million consulting arrangement."  Mr. Guberman also provides a detailed explanation of the "two main ways" in which "the account is false," the first by employing deceptive devices and the second by ignoring passages that directly contradict the passages that

the indictment references. Motion, Ex. 5 (Guberman Declaration). (For more details, see pages 12 through 20 of the Memorandum in Support of the Second Motion to Dismiss. *See also* Motion, Ex. 3 (chart of falsifications).

The Motion also reviews the events that led from the 2018 terminated investigation to the 2020 falsified Indictment. In early 2020, in the widely publicized prosecution of celebrity lawyer Michael Avenatti for attempting to extort Nike, the court issued an opinion upholding the sufficiency of the indictment. *United States v. Avenatti,* 2020 WL 70951 (S.D.N.Y. Jan. 6, 2020). The court acknowledged the general rule that a lawyer who is pursuing a claim for a client, and who simultaneously makes a claim for a consulting agreement for himself, is protected from prosecution for extortion by the so-called litigation exemption if there is a nexus between the client's claim and the benefit that the lawyer seeks for himself. The court held that there was no nexus between the client's claim and the benefits that Avenatti sought for himself because Avenatti made the demands for himself "without his client's knowledge" and "to his client's detriment." For this reason, Avenatti could not claim the benefit of the litigation exemption.

The Motion also alleges that, later in 2020, when the U.S. Attorney's Office, through two new prosecutors, reopened Snyder's case, Bar Counsel shared her investigative file with the government. Instead of providing support for an extortion prosecution, where support had previously been lacking, Bar Counsel's file only presented more problems for the government. Among other things, the file contained an interview of Snyder's client, ███████, in which she confirmed: (i) that she had wanted Snyder to seek a consulting agreement from UMMS as part of the relief that she sought; (ii) that she believed that the $25 million was reasonable; (iii) that she would never have settled her case if she had known that UMMS would not hire Snyder; and (iv) that she trusted Snyder then and still trusts him. The file also contained information from UMMS

and its attorneys confirming that Snyder had not sacrificed his client's interests in his dealings with UMMS and, in fact, had obtained for her a settlement far greater than the maximum worth of her claim. These facts provided additional undeniable proof that: (i) there was an unbreakable nexus between ▮▮▮▮▮▮ claim and the proposed consulting/retainer agreement for Snyder; (ii) that Snyder would be entitled to the full benefit of the litigation exemption; and (iii) that, as a result, Snyder's communications with UMMS could not have constituted attempted extortion. In short, Snyder's situation is the polar opposite of Avenatti's.

      Bar Counsel's file also revealed that the State's Investigators had interviewed Susan Kinter and that Kinter had shared with them that she refused to meet with Mr. Graham because the U.S. Attorney's Office had instructed her not to meet with him. Kinter had also divulged that the U.S. Attorney's Office had not wanted a meeting between UMMS and Mr. Graham to occur because the government did not want to make, and thereby have in its files, a recording of Mr. Graham at such a meeting. Kinter's revelations only magnified the importance of Snyder's many statements, already on F.B.I. tapes, and known to the U.S. Attorney's Office when they instructed Kinter not to meet with Mr. Graham: (i) that he would abandon his proposal for the consulting agreement if there was not "a right way" to do it; (ii) that he and UMMS should discuss the facts with Mr. Graham and follow his opinions; and (iii) that, "If it can't be done then it can't be done. That's just the bottom line."

      The Motion further alleges that, despite the undeniable record that established Snyder's innocence as a matter of law, the government nevertheless decided to go forward with a prosecution based on a falsified Indictment that concealed the fatal flaws in the government's case. The Motion further explains that the government is plainly mistaken if it expects to prevent the Court from examining and assessing the falsifications through application of the general rule that

11

a court ordinarily does not go beyond the four corners of an indictment in determining whether the indictment charges an offense.  First, the Indictment's false allegations purport to be forthright quotations from the F.B.I. recording of the August 23rd meeting and from the F.B.I. recording of an August 25th telephone call.  Cases, including one from this District, hold that a court may take judicial notice of an entire document if its genuineness is not in doubt and if the government purports to quote from, or rely upon, part of the document in the indictment.  Second, by intentionally basing the Indictment on false allegations, the government violated Snyder's right to due process of law and his rights, under the Federal Rule of Criminal Procedure, to a charging process and to an indictment free of dishonesty.  Settled authority requires that when the government employs a "deliberate device" for the purpose of gaining an unfair advantage over the accused, "the conditions [must] be remedied at the earliest opportunity."  *Mesarosh v. United States,* 352 U.S. 1, 14 (1956).  In this case, the least onerous remedy is for the Court to take into account, in weighing the sufficiency of the charges, the full (and indisputable) F.B.I. recordings from which the government purports to quote.

The Motion also demonstrates that, because of the undeniable nexus between the client's demands and the proposed consulting agreement, Snyder is entitled to the benefit of the litigation exemption from extortion, and that Snyder's conduct falls squarely within that exemption.  Snyder made his statements as part of his efforts to settle a serious malpractice case that had obvious merit as proven by the millions of dollars that UMMS paid to settle it.  Even if there had been no merit to the case, Snyder would still be protected by the litigation exemption.  The overwhelming weight of authority is that threats to initiate ruinous litigation, and to publicize the litigation, if demands for settlement are not met, cannot be attempted extortion under the Hobbs Act, even if, unlike the present case, the threatened litigation is meritless, perjurious or fraudulent.  The Maryland Court

of Appeals has adopted this same rule for purposes of the Maryland extortion statute. *See State v. Rendelman,* 404 Md. 500 (2008). Under these authorities, Snyder's conduct cannot be deemed extortionate, and he committed no crime.

Finally, the Motion points out that the facts, as memorialized in the entire F.B.I. recordings of the August 23rd meeting and the August 25th telephone call, establish, as a matter of law, that Snyder did not possess the necessary criminal intent, *i.e., mens rea,* for an attempted extortion. The U.S. Attorney's Office was correct in 2018 when it concluded that Snyder did not have the criminal intent to commit extortion. Snyder's Second Motion asks that the Court reach the same conclusion.

### 3. Reasons For Prompt Hearing

As described above, Snyder's Motions to dismiss the Indictment With Prejudice accuse the government of outrageous misconduct, namely, manipulation of the evidence and falsification of the Indictment. Snyder urges in his Motions that, under the circumstances, common notions of fairness and decency would be offended if the government were permitted to continue to invoke judicial processes to obtain a conviction in Snyder. In *Mesarosh,* 352 U.S. at 14, the Supreme Court instructed that, "If the Court has any duty [in exercising its supervisory functions], it is to see that the waters of justice are not polluted, and, "Pollution having taken place..., *the condition should be remedied at the earliest opportunity."* (Emphasis added).

The continued prosecution of this case also has practical adverse consequences for Snyder. As soon as he was indicted, Snyder consented to suspension of his right to practice law, and agreed to shutter his practice, until this case was decided. Snyder had not expected that the COVID pandemic would cause such havoc to the judicial system that his trial could not take place until October 2022, two years after he was charged. The present Motions provide the Court with the

opportunity to determine whether the Indictment should be dismissed without waiting until next year. If Snyder is correct, and if the Indictment is dismissed, he will not have to wait another year to resume his life.

Quite apart from Snyder's right not to remain under the weight of charges that emanate from such wrongdoing, it is also in the broader interest of the government that the allegations of misconduct be promptly considered and ruled upon. To the extent that the government might dispute or deny the merits of Snyder's contentions, the government should want the Motions resolved without undue delay. It would be difficult to understand if the government were to deny the allegations of wrongdoing but, at the same time, resist a prompt hearing that would resolve Snyder's allegations.

Another important reason for holding a prompt hearing, and not waiting until trial, is that issues of whether the government committed misconduct, and, if so, whether the misconduct is sufficiently outrageous to warrant dismissal of the Indictment, are questions within the sole province of the Court. *See* the cases cited at pages 26 and 27 of the Memo in Support of Second Motion to Dismiss. Therefore, considerations of judicial economy also favor prompt disposition of the motions.

Respectfully submitted,

_____/s/_____
Arnold M. Weiner, Bar No. 01605
aweiner@rwllaw.com
Stuart A. Cherry, Bar No. 28012
scherry@rwllaw.com
RIFKIN WEINER LIVINGSTON LLC
2002 Clipper Park Road, Suite 108
Baltimore, MD 21211
Phone: (410) 769-8080
Fax: (410) 769-8811

*Counsel for the Defendant.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of June, 2021, the within Summary Of Defendant's Motions To Dismiss With Prejudice, And Statement Of Reasons For Prompt Hearing Thereon, Pursuant To The Court's Direction At The January 5, 2021 Conference was served on Government counsel via ECF electronic filing.

/s/
Arnold M. Weiner, Bar No. 01605
