**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**STEPHEN L. SNYDER,**<br><br>**Defendant** | | **Criminal No. GLR 20-337** |

**UNITED STATES' OMNIBUS OPPOSITION TO DEFENDANT'S
<u>MOTIONS TO DISMISS AND RELATED MOTIONS</u>**

The United States of America, by its undersigned counsel, submit this Opposition to:

(1) First Motion of Stephen L. Snyder, Defendant, to Dismiss Indictment with Prejudice, ECF. No. 52;

(2) Second Motion of Stephen L. Snyder, Defendant, to Dismiss Indictment with Prejudice, ECF No. 53;

(3) Summary of the Defendant's Motion to Dismiss with Prejudice, and Statement of Reasons for Prompt Hearing Thereon, Pursuant to the Court's Direction at the January 5, 2021, Conference, ECF. No. 54; and

(4) Motion of Stephen L. Snyder, Defendant, to Compel Government to Produce Brady Information, ECF No. 69.

**Table of Contents**

I.      INTRODUCTION ................................................................................................... 3

II.     PROCEDURAL AND FACTUAL BACKGROUND ...................................................... 6

        A.      The Federal Indictment Alleged that Snyder Made Extortionate Demands to
UMMS through Its Representatives and Kinter and Bartlett Personally ............................ 7

        1.      Snyder Asked to Speak with Dr. Bartlett in the Hallway for a Private Conversation .. 7

        2.      Snyder Meets with Dr. Bartlett on March 21, 2018 ........................................ 7

        3.      April 30, 2018, Snyder Meets with UMMS Representatives ............................ 8

        4.      June 22, 2018, Snyder Meets with UMMS Representatives ............................ 9

        5.      August 23, 2018, Snyder Meets with UMMS Representatives ........................ 11

III.    THE COURT SHOULD DENY THE DEFENDANT'S FIRST MOTION TO DISMISS
BECAUSE THE EVIDENCE HE CLAIMS THE GOVERNMENT TAMPERED WITH
NEVER EXISTED AND COULDN'T HAVE EXONERATED THE DEFENDNAT EVEN IF
IT HAD ................................................................................................................... 15

        A.      The Government Did Not Destroy or Manipulate Evidence that Never Existed,
Because It Cannot. ................................................................................................. 16

                A second recording of Graham would not have been material and exculpatory. 19

        C.      The Government did not deprive Snyder of the ability to defend himself. ........ 23

IV.     THE COURT SHOULD DENY THE DEFENDANT'S SECTION MOTION TO
DISMISS BECAUSE THE GOVERNMENT DID NOT "CORRUPT" THE INDICTMENT ... 24

        A.      The Purpose of an Indictment is to Put the Defendant on Notice of the Charges
He Faces, Which the Indictment Undoubtedly Does. ................................................... 25

        B.      The Defendant's Motion to Dismiss Asks for Summary Judgement Based on
Facts Not Contained in the Indictment, Something the Federal Rules of Criminal Procedure Do
Not Allow…… ....................................................................................................... 30

        C.      The Court Should Not Consider Evidence Outside the Allegations in the
Indictment to Determine Whether the Allegations in the Indictment will be Proven. ........ 31

        D.      The Factual Allegations in the Indictment Are Accurate and, In Any Event, it is
Up to a Jury to Decide Whether there is Evidence that the Defendant Committed the Charged
Offenses……… ..................................................................................................... 40

        E.      Whether the Defendant's Conduct is Covered by the Litigation Exception, And it
is Not, is a Question of Fact for the Jury. ................................................................. 53

V.      THE COURT SHOULD DENY THE DEFENDANT'S MOTION TO COMPEL THE
PRODUCTION OF BRADY MATERIAL .................................................................... 63

VI.     STATEMENT AS TO DEFENDANT'S FILING, ECF NO. 53 ...................................... 66

VII.    REQUEST TO EXCEED PAGE LIMITATIONS ....................................................... 66

VIII.   CONCLUSION .................................................................................................. 66

## I.      INTRODUCTION

The Defendant's litigation strategy in this case, including his most recent motions, brings to mind the quote from Carl Sandburg: "If the facts are against you, argue the law. If the law is against you, argue the facts. If the law and the facts are against you, pound the table and yell like hell."         https://www.brennancenter.org/our-work/analysis-opinion/when-shouting-replaces-substance.  And what the Defendant keeps yelling is prosecutorial misconduct. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ And now he has done it in not one but two motions

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

to dismiss the Indictment.  He has done it in every substantive piece of litigation in this case and in practically every filing.  He has even hired three different "experts," to attack the Government, reflecting the even more familiar adage that you get what you pay for.

To be clear, the Government has acted honorably and professionally in its investigation and prosecution of this case.  The Defendant's ability to dream up accusations of misconduct is not a substitute for the law or the facts, neither of which support his motions to dismiss or his *Brady* motion.

All three motions should be denied.

In his first Motion to Dismiss, Snyder argues that the Government "destroyed" evidence. The evidence he claims the Government destroyed, however, never existed.  And even if it did, it would not have exonerated Snyder.  Specifically, the Defendant claims that Andrew Graham, an attorney in private practice, could have completely exonerated Snyder if he had met with representatives of UMMS in September 2018, more than eight months after Snyder's extortion attempts began.  Simply put, unless Mr. Graham was bringing a time machine to this meeting in September 2018, nothing he could have said at that time would have "exonerated" Snyder.  Snyder had already committed the crime.

In his second Motion to Dismiss, Snyder contends that the Government "corrupted" the Indictment, an argument that is as incomprehensible as it is wrong, because the Government failed to include recorded statements made by Snyder that he argues are favorable to him.  Mem. in Support of Sec. Mot. to Dismiss at 1.  He also accuses the Government of presenting a "falsified" version of the recording because of the use of various introductory and transition words and ellipses in the Indictment.  These arguments fail because they ignore the purpose of an indictment which is to put Snyder on notice of the charges against him and because the Government did not

4

misrepresent, in any way, the recording summarized and at times quoted in the factual allegations contained in the Indictment.  As his motions themselves demonstrate, Snyder fully understands the charges against him and he was not misled – he has every audio recording cited in the Indictment.  Further, any dismissal of an indictment based on the use of transition words and ellipses would be unprecedented and contrary to the law.

Also in his second motion to dismiss, Snyder contends that he did not "wrongfully" attempt to obtain $25 million from UMMS because the $25 million demand had a "nexus" to M.S.'s medical malpractice claim, in other words, that his conduct is covered by the litigation exemption to extortion charges. However, as the facts at trial will show, Snyder said the opposite during his June and August 2018 meetings with UMMS.  He repeatedly stated that the consultancy was separate from M.S.'s medical malpractice claim, and that M.S.'s case "wasn't worth that much." And his reliance on the Michael Avenatti case is telling, as Avenatti recently received a two-and-a-half year sentence for doing exactly what Snyder did.

As for Snyder's *Brady* Motion, the Government has complied with its *Brady* obligations. Snyder's entire *Brady* argument is predicated on the erroneous assertion that the Government committed misconduct.  Since that argument is meritless, his claims for information related to that misconduct, which he calls *Brady* material even though it is not, are similarly meritless.  Finally, his assertion that a prosecutor's opinions are *Brady* would transform every negative thought a prosecutor had about a case into a disclosable event.  For that reason no court has ever endorsed his position and nor should this one.

## II.       PROCEDURAL AND FACTUAL BACKGROUND

On October 5, 2020, the Grand Jury for the District of Maryland indicted Stephen L. Snyder ("Snyder") for attempted extortion, in violation of 18 U.S.C. §§ 1951 and 1952. *See United States v. Snyder*, 1:20-cr-00337-GLR, ECF No. 1 (hereafter "Indictment").

The charges stemmed from Snyder's attempt to extort $25 million from the University of Maryland Medical System ("UMMS") disguised as a sham consulting arrangement.  Specifically, from January 2018 to August 2018, Snyder threatened to launch a negative publicity campaign falsely accusing UMMS of transplanting diseased organs into unsuspecting poor and unsophisticated patients to generate revenue for UMMS unless UMMS paid Snyder $25 million. Snyder claimed to have arranged for *The Baltimore Sun* to run a front-page story on his invented scandal and threatened to hold a press conference and run internet advertising repeating his false accusations.  Snyder even went so far as to produce two television commercials that repeated his false claims, one of which was made to look like a public service announcement.  While the extortionate threats arose in the context of potential claims by two clients Snyder represented who had received transplants at UMMS, Snyder repeatedly made clear that the $25 million payment was for him personally, separate and apart from any settlement with his clients.  And Snyder specifically asked that the payment to him be disguised as a sham consulting arrangement.

UMMS concluded that the $25 million demand was extortionate. UMMS retained Gregg L. Bernstein and John J. Connolly of Zuckerman Spaeder LLP as outside counsel to advise them on UMMS's ethical and legal obligations.  UMMS, on the advice of Gregg Bernstein, decided to bring the matter to the attention of law enforcement. The Federal Bureau of Investigation ("FBI"), without Snyder's knowledge, recorded several telephone calls between Snyder and a

representative of UMMS and others related to Snyder and recorded an August 23, 2018, meeting between Snyder and representatives of UMMS.

### A.  The Federal Indictment Alleged that Snyder Made Extortionate Demands to UMMS through Its Representatives and Kinter and Bartlett Personally

In April 2017, L.B. retained Snyder to represent her in a medical malpractice claim against UMMS for injuries she sustained after undergoing a pancreatic transplant at UMMC. *See* Indictment ¶ 11. In April 2018, a husband and wife, M.S. and J.S., retained Snyder to represent them in a malpractice claim against UMMS stemming from J.S.'s injuries following a kidney transplant at UMMC. *Id.* ¶ 21. J.S. later died from his injuries. *Id.*

#### 1.  *Snyder Asked to Speak with Dr. Bartlett in the Hallway for a Private Conversation*

On January 21, 2018, Snyder and a lawyer representing UMMS, Sue Kinter ("Kinter"),[2] met for a settlement conference in L.B.'s case. *Id.* ¶ 18. Stephen Bartlett, M.D. ("Dr. Bartlett"), the Chief Medical Officer for UMMS, attended the conference. *Id.* ¶¶ 5, 18. During the settlement conference, Snyder asked Dr. Bartlett to step into the hallway for a private conversation. *Id.* ¶ 18. During that conversation, Snyder told Dr. Bartlett that Snyder had another client or clients who wanted to file suit against UMMS over allegations relating to kidney transplants. *Id.* Snyder told Dr. Bartlett that UMMS had better settle L.B.'s claim for the amount Snyder was requesting or Snyder would file suit in other cases involving kidney transplants. *Id.* Snyder told Dr. Bartlett that Dr. Bartlett seemed like a "nice guy" and that he "did not want to do that" to Dr. Bartlett. *Id.*

#### 2.  *Snyder Meets with Dr. Bartlett on March 21, 2018*

On March 21, 2018, Snyder and his fiancée and Dr. Bartlett and his wife met for dinner at the Capital Grille in Baltimore. *Id.* ¶ 21. When both couples arrived, Snyder and Dr. Bartlett met

---

[2] Kinter worked for the Maryland Medicine Comprehensive Insurance Program, which insures UMMS, and she acts as in-house counsel for UMMS.  *See id.* ¶ 8.

privately at the bar. *Id.* ¶ 22. The maître d' delivered a file to Snyder. *Id.* It contained photographs of J.S. among other documents. *Id.* Snyder told Dr. Bartlett that he planned to a make a video that was "really bad." *Id.* Snyder repeated several times that he felt "bad" because he and Dr. Bartlett "were friends" and that the transplant program at UMMC would be "destroyed" unless Dr. Bartlett helped Snyder obtain $25 million. *Id.* Snyder told Dr. Bartlett that he wanted to become an employee of UMMS in order to obtain the $25 million. *Id.* Snyder told Dr. Bartlett that if Dr. Bartlett helped him obtain $25 million, Snyder would not use the video but that if Dr. Bartlett did not help him the video "could do a lot of damage" to UMMS and to Dr. Bartlett personally. *Id.*

Later during dinner, Snyder told Dr. Bartlett's wife, "as long as your husband does what he is supposed to do, he will be okay." *Id.* ¶ 23. Snyder repeated this phrase as many as ten times. *Id.* ¶ 23. Dr. Bartlett tried to redirect the conversation, however, no matter what topic he and his wife tried to introduce, Snyder would return to his warning that "we are going to be friends as long as [Dr. Bartlett] takes care of this," and "everything is going to be okay as long as [Dr. Bartlett] does what [he] needs to do" and "this all depends on [Dr. Bartlett] and what he does." *Id.* ¶ 23.

### 3. *April 30, 2018, Snyder Meets with UMMS Representatives*

On the morning of April 30, 2018, Snyder delivered a demand letter to Kinter seeking $25 million on behalf of M.S. shortly before a settlement conference scheduled for that day. *Id.* ¶ 25. During the settlement conference, Snyder told the UMMS representatives that the M.S. case created significant reputation issues for UMMS. *Id.* ¶ 26. Snyder said that it would take $25 million to silence Snyder about what he had developed in his investigation into UMMS's transplant program. *Id.* Snyder claimed that he liked Dr. Bartlett but that he could do a great deal of damage to his reputation. *Id.* ¶ 27. Snyder claimed that UMMS convinced unsophisticated and uneducated patients in need of a transplant into accepting diseased kidneys. *Id.* ¶ 28.

Snyder told the UMMS representatives that he had already confirmed that *The Baltimore Sun* would write a front-page article about organ donor fraud and that vulnerable and unsophisticated people were receiving diseased organs at UMMS. *Id.* ¶ 30. Snyder told the UMMS representatives that he also planned to give a press conference and that the resulting publicity would be devastating for the hospital. *Id.* ¶ 31.

Snyder then played a commercial he had developed and intended to air if his demands were not met. *Id.* ¶ 32. It stated that UMMS did not tell patients that organs UMMS transplanted were bad organs or that they accepted organs that other institutions rejected. *Id.* The commercial said that J.S. was told by the surgeon that transplanted his kidney that the surgeon would have transplanted the same organ into his wife but wasn't told that 250 institutions had rejected the same kidney. *Id.* The video showed images of J.S. with necrotic fingertips and an amputated leg. *Id.*

Snyder told the UMMS representatives that he would launch advertisements for his firm directed at transplant recipients if a deal was not struck and that he would attach an "Internet bomb" to anyone looking at UMMS's transplant site which would cause an ad for Snyder's law firm to come up on the viewer's Internet stream if the viewer looked at UMMS's site. *Id.* ¶ 33.

Snyder concluded the meeting by saying that he wanted to resolve the case but that UMMS needed to pay him $25 million. Snyder said he did not want to hurt the hospital or Dr. Bartlett but that he would do so if a deal was not struck. *Id.* ¶ 34.

### 4.   *June 22, 2018, Snyder Meets with UMMS Representatives*

On June 22, 2018, Snyder again met with representatives of UMMS, including Kinter and UMMS's outside counsel, Natalie Magdeburger ("Magdeburger").  *Id.* ¶ 35. Snyder began by stating that he had found new information which made him want to increase his demand to $50 million. *Id.* ¶ 36. Snyder asked the UMMS representatives whether they were aware of the "Baylor case" referring to Baylor St. Luke's Medical Center, a hospital affiliated with the Baylor College

of Medicine, and the effects the allegations made against their transplant program had on Baylor. *Id.* Snyder told the UMMS representatives that Baylor almost went out of business. *Id.* Snyder also told Kinter that she would lose her job if Snyder went forward with his allegations against the transplant program. *Id.* ¶ 37.

Snyder said that UMMS would have to enter into an agreement with him separate from M.S.'s case. *Id.* ¶ 39. Specifically, Snyder told the UMMS representatives that he wanted to enter into a consulting agreement with UMMS so that Snyder would be "conflicted out" of any future case. *Id.* Snyder told the UMMS representatives that they should settle the M.S. case for whatever that case was worth and then pay Snyder $25 million to act as a consultant. *Id.* Kinter told Snyder that she thought the $25 million was the demand for the J.S. / M.S. case. *Id.* ¶ 40. Snyder said that M.S. does not "deserve" that much money for her case. *Id.* Snyder stated that the $25 million was for him. *Id.*

Snyder told the UMMS representatives that Dr. Bartlett was in a "shit load" of trouble and that Snyder did not want to hurt him. *Id.* ¶ 43. Kinter told Snyder that his comments were making her very uncomfortable and that she felt like she was being threatened. *Id.* ¶ 45. Kinter told Snyder it sounded like he wanted to destroy the UMMS transplant program. *Id.* Snyder responded that he did not want to destroy the program but that if UMMS called his bluff, he would do what he needed to do because he was a plaintiffs' lawyer and that is what he does. *Id.*

Snyder then asked his associate, who was with him at the meeting, to play a new video Snyder had prepared and that Snyder said he would distribute if UMMS did not pay Snyder $25 million. *Id.* ¶ 47. Snyder said he was the "king of taking crazy statements people say and twisting them around" and that the video had statements in it made by members of the transplant department. *Id.*

Kinter asked Snyder why he wanted $25 million and Snyder said, "because that is what you have to pay me" and that it could have been "$100 million." *Id.* ¶ 48. Magdeburger asked Snyder what he thought he could do to earn a $25 million consulting fee. *Id.* ¶ 50. Snyder responded, "I could be the janitor." *Id.* Snyder said it would be a tragedy if UMMS did not pay. *Id.* ¶ 51. Snyder said that Kinter would get fired and the hospital would say "how the fuck did you let this happen" and told the UMMS representatives they were playing with fire with his client. *Id.*

Snyder then played the new video. *Id.* ¶ 52. It started with the words, in red, "PUBLIC SERVICE ANNOUNCEMENT" as well as an alert sound associated with emergency alerts. *Id.* It then showed a text message that Dr. Bartlett had sent Snyder on April 10, 2018, that read: "Sue and I just spoke. She understands on hook for fraud and punitive damages. Ball is in your court." *Id.* The video then showed pictures of several doctors which the video claimed had left UMMS or had been demoted and were no longer performing surgery. *Id.* Dr. Bartlett was pictured with the words: "DEMOTED NO LONGER DOING SURGERY – relegated to executive work." *Id.*

Snyder told the UMMS representatives that if they said no to his demand for a $25 million payment separate from any payment to M.S. then he would hold a press conference, get an article placed on the front page of *The Baltimore Sun*, solicit interest in national articles, distribute commercials and launch a campaign on Google and Facebook as well as advertise on the Internet. *Id.* ¶ 54. Snyder claimed there were "devastating" e-mails from the Nephrology Department that confirmed they did not like high-risk kidneys and questioned why UMMS was using them. Snyder told the UMMS representatives the only way to keep the e-mails from the public would be to pay Snyder $25 million. *Id.* ¶ 55.

### 5.   *August 23, 2018, Snyder Meets with UMMS Representatives*

On August 23, 2018, Snyder met with UMMS representatives including Kinter, Magdeburger, and Dr. DePriest Whye, Jr. ("Dr. Whye"), who was the head of MMCIP. *Id.* ¶ 56.

11

Ironically, Snyder began by asking if the meeting was being recorded. *Id.* ¶ 57. This meeting was recorded by the FBI without Snyder's knowledge. Snyder repeated his demands from the June 22, 2018 meeting:

> You hire my firm as a consultant. You hire me to do certain set-out things, to keep the hospital on the straight and narrow, to be involved with the Transplant Department as much as necessary. The – the effect of that would be, is that I'm doing work for the hospital, okay? If, in the event something arises in the future, related to the Transplant Department, well, I would be conflict—conflicted out, by way of implication. You – you – you follow that? . . .

*Id.* ¶ 58. Dr. Whye asked Snyder, "So what specifically would you be doing?" *Id.* ¶ 59. Snyder responded, "Well, who knows? . . ." *Id.* ¶ 60.  Snyder then continued:

> … but what happened was, when we investigated [the M.S.] case, we found a shitload of – of information of what's going on in this department; and that's really different, from her case. In other words, if I'm going to – and I – I get cases against University of Maryland all the time. I mean Let's – let's not be – let's be clear on that. I'm, by this agreement, I'm conflicting myself out of future cases, again – you know, against this department; not only me, but my sons as well, and that's – that's not a small thing. . .

*Id.* ¶ 61. Kinter responded, "I guess what it looks like is this consulting agreement on paper, right?" to which Snyder responded, "Correct." *Id.* ¶ 62. Kinter then asked, "And then, in your mind, whether you do work or whether you don't do work is to be determined, I guess, or," to which Snyder responded, "Yeah, I don't care if I don't do anything. It's up to – I don't care at all." *Id.* ¶ 63. Dr. Whye asked Snyder why what he was saying wasn't extortion. *Id.* ¶ 65. Snyder responded:

> That's fine. May I – may I answer that? Yeah, ju - just so you're clear, I – I wanted to make sure it is not perceived as extortion.
>
> I mean, I have a set of facts, I mean, in every case that I have, you're - I'm saying to you - or to - to Sue, you have to pay X, Y, Z - X, or the case is going forward and you're gonna be exposed. That's every single case - uh, you know, a - a set of facts.

> So, is that extortion, that a lawyer has a case and he's saying, uh, you know –

*Id.* ¶ 66. Dr. Whye then interrupted Snyder, "But you're asking for 25 million," to which Snyder responded:

> Well, because there's a different component to this. The – the component is that there are facts independent of her case, that came out of her case through investigation, that relate to the hospital generally. And you're getting an agreement where I'm allegedly doing some form of work for you. Uh, it's not extortion. Because the – the – the – the – I'm not using any facts that aren't-or, excuse me, I'm gonna talk like goofy Giuliani, uh – uh, make – the truth is not the truth. Uh, but I'm using things that I've developed. So, if – what you're saying – these are the key things, the – how do we do this where it's not perceived as extortion? Because I– again, I – I'm – I'm not gonna– you know, if you – if– if you accuse me of extortion, which it's not, and I've fully hired a lawyer to – to look into that, to make sure it's not that, then –

*Id.* ¶ 67.

> Later in this exchange Snyder posed the following question:

> So – so again, I – I don't – I understand it's a unique thing. But – but again, you don't want to shut her up, which is not extortion, and not shut me up. You – you want me not to go forward. So, the question is, how do we do it and how is it not perceived as extortion? And how is it perceived as in compliance with the rules, isn't that right? Isn't that what we're talking about?

*Id.* ¶ 68. Later still, Kinter asked Snyder:

> The only reason we are where we are at, now, right, having this conversation, is because – and you'll show Dr. Whye the video, is you've got in your mind damaging things, and that if you didn't have these damaging things and you didn't have the ability to make an ad and go on TV, you wouldn't be here today talking to us about a consulting agreement…right?–

to which Snyder responded, "Correct." *Id.* ¶ 69.

Snyder then repeated, "The critical thing is, how do we implement an agreement that doesn't let these things surface, that's not extortion and not– and– and – and – and prevents Steve from handling the cases, that – that's the key to this." *Id.* ¶ 70.

Snyder then suggested abandoning the pretense of a consulting agreement and instead paying a lump sum payment to M.S. Snyder said, "pay the 30 million or, you know, 31 million to [M.S.], as a one-time settlement. I'm not a consultant to the hospital. And I'll deal with her[.]" *Id.* ¶ 72.  Kinter responded, "but her – her case isn't worth 30 million dollars," to which Snyder responded, "It doesn't matter whether it's worth – you get – that's a solution, to get rid of everything."  *Id.* ¶ 73.

Two days later, in a telephone call on August 25, 2018, Snyder repeated that he had no expectation that he would do any work for UMMS under the phony consulting arrangement. *Id.* ¶ 74. Snyder told Kinter in a phone call:

> And you'll use – and you'll use me when you want me, if at all. You know, when you need me, you know, you'll call me once a month, or you'll have lunch with me once and month, and you'll – and you'll get advice from me. Hopefully, nothing will ever surface, no cases or anything. I don't think they will.

*Id.*





### III.   THE COURT SHOULD DENY THE DEFENDANT'S FIRST MOTION TO DISMISS BECAUSE THE EVIDENCE HE CLAIMS THE GOVERNMENT TAMPERED WITH NEVER EXISTED AND COULDN'T HAVE EXONERATED THE DEFENDNAT EVEN IF IT HAD

In his First Motion to Dismiss, the Defendant asks for the radical relief of dismissal of the

Indictment, with prejudice, because, according to the Defendant,

> … during the investigation of this case, [the Government] manipulated and tampered with the evidence for the specific purpose of depriving Snyder of the benefit of evidence that would have exonerated him of any potential charge of extortion or other wrongdoing and, by its very existence, would have prevented the government from bringing the present case.

First Mot. to Dismiss at 1.   How did the Government, according to the Defendant,

"manipulate[] and tamper[] with evidence"?   In his 235 pages of filings in support of this claim,

the only act on the part of the Government that the Defendant points to is described in an interview

report by an investigator with the Bar Counsel Office.   Here is what the report says:

> The Complainant [Kinter] was asked about her September 5 text message to the Respondent [Snyder] in which she stated that she did not need to hear from Andy Graham at the planned meeting. **The Complainant [Kinter] explained that the USAO [U.S. Attorney's Office] was pushing to have the Respondent appear and present before the Board and that they were  uncomfortable with Mr. Graham attending the meeting because it would be recorded.**

First Motion to Dismiss at ¶ 12.  That's it.  So, when one looks at the actual conduct that is the basis for the Defendant's motion, his argument is nonsensical.  Snyder's motion centers on an event that never happened.  Evidence can only be "tampered with" and "manipulated" if it exists.  A meeting that didn't occur isn't evidence of anything.  The motion should be denied on this basis alone.

### A.   The Government Did Not Destroy or Manipulate Evidence that Never Existed, Because It Cannot.

Snyder cites Supreme Court *dicta* that states that the bad faith *destruction* of evidence may violate the Constitution, but those cases do not apply here because no evidence was destroyed.  Further, in each of the cases, the Court found that the Government had not acted in bad faith and therefore there was no constitutional violation.  In *California v. Trombetta*, 467 U.S. 479, 485 (1984), the Supreme Court held that the State of California did not have an obligation to preserve breath samples from a breath testing device that was used to prove intoxication.  In *Arizona v. Youngblood*, 488 U.S. 51, 57 (1989), the Supreme Court held that the failure to preserve and test semen samples was, at most, negligent, but did not violate the Constitution.  In *Illinois v. Fisher*, 540 U.S. 544, 547 (2004), the Supreme Court found that there was no due process violation when cocaine was destroyed by police in accordance with established procedures.  Although the Supreme Court found in favor of the state in each of these cases, Snyder relies on *Trombetta*, *Youngblood*, and *Fisher* for the proposition that the actions by the Government that arguably prevented the creation of potentially useful evidence for the defense violates a defendant's due process rights.  But none of those circumstances are present here.

First, Snyder attempts to replace phrases like "destruction" and "failure to preserve," which is what the authority he cites actually discusses, with phrases like "unavailable evidence" and "missing evidence" and "destroyed the opportunity" to create evidence, which is what he claims,

wrongly, occurred here.  But no court has ever found that the government subverted a Defendant's due process rights, pre-indictment, by failing to create evidence.  The law holds the opposite.  The Fourth Circuit and every other circuit that has considered this issue has held that the Government is not required to create evidence that is helpful to the defense.  In *Werth v. United States*, 493 Fed. Appx. 361, 366 (4th Cir. 2012), the defendants argued that the government had an obligation to investigate *Giglio*-related incidents involving two ATF agents, and turn over the results of that investigation.  *Id.* at 365-66.  The Fourth Circuit stated, "This argument is without merit.  While the government is obligated to disclose favorable evidence in its possession, it is not required to create evidence that might be helpful to the defense."  *Id.* at 366.  In stating its conclusion, the Fourth Circuit cited the Seventh Circuit's decision in *United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011) and the First Circuit's decision in *United States v. Alverio-Melendez*, 640 F.3d 412, 424 (1st Cir. 2011), both of which concluded that the government does not have an obligation to create exculpatory evidence.  *Id.* (citing *Gray*, 648 F.3d at 567 ("We find the proposed extension of *Brady* difficult even to understand.  It implies that the state has a duty not merely to disclose but also to create truthful exculpatory evidence."); *Alverio-Melendez*, 640 F.3d at 424 ("The failure to create exculpatory evidence does not constitute a *Brady* violation.")).  The Fifth Circuit and Eighth Circuit have reached the same conclusion.  *See United States v. Rodarte*, 596 F.2d 141, 145-46 (5th Cir. 1979) (the government "is under no duty to 'seek out' evidence that would be helpful to the defense."); *United States v. Riley*, 657 F.2d 1377, 1386 (8th Cir. 1981).  District courts in this Circuit have also held that the government has no obligation to seek out exculpatory evidence.  *See Estate of Bryant v. Baltimore Police Dep't*, 2020 WL 673571, *22 (D. Md. Feb. 10, 2020); *United States v. Ducore*, 309 F. Supp. 3d 436, 439 (D. Md. 2018).

17

Second, there is no evidence of bad faith on the part of the government.  Snyder theorizes that the Government cancelled the meeting with Graham to preserve the prosecution against Snyder.  But that argument is directly contradicted by the arguments Snyder makes in his Second Motion to Dismiss.  In his Second Motion to Dismiss, Snyder asserts that prior Government counsel concluded in 2018, even without the meeting with Graham that never happened, that "Snyder had not been shown to have committed a prosecutable offense."  Mem. in Support of Sec. Mot. to Dismiss at 6.  Now he claims that in 2018 prior counsel subverted his due process rights to preserve the prosecution against him. Snyder's lack of consistency in his own claims of misconduct shows that they are unmoored from the facts and are, instead, situational empty rhetoric.

Finally, none of the remaining cases cited by Snyder support his argument.  In *Berger v. United States*, 295 U.S. 78 (1935), the Supreme Court found that the prosecutor engaged in improper questioning and argument at trial.  In *United States v. Gouveia*, 467 U.S. 180 (1984), the Supreme Court found that holding inmates in administrative detention without counsel while the government investigated murder charges against the inmates did not violate the Sixth Amendment. In *United States v. Larkin*, 978 F.2d 964, 969 (7th Cir. 1992), the Seventh Circuit found that the government did not violate the Constitution when the defendants' counsel were not granted access to a pre-indictment lineup where witnesses identified the defendants as the perpetrators of a bank robbery.  In *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008), the Second Circuit Court of Appeals affirmed the dismissal of an indictment when the government forced KPMG to deny the advance of legal fees to KPMG employees under investigation, thereby depriving the individuals of the right to their counsel of choice under the Sixth Amendment.  None of these cases are similar to the facts here, and they provide no basis for this Court to deviate from established Fourth Circuit

18

precedent stating that the government has no obligation to create evidence that might be useful to the defense.

### B.  A second recording of Graham would not have been material and exculpatory.

Snyder claims that the Government "manipulated and tampered with the evidence for the specific purpose of depriving Snyder of the benefit of evidence that would have exonerated him." First Mot. at 1.  And how would a meeting in September 2018 "exonerate" Snyder of conduct he committed prior to the meeting?   The Defendant asserts that, "[a]ny opinion that Mr. Graham would give the participants at the meeting would exonerate Snyder."  First Mot. to Dismiss 4.

It would not because it could not.  Any meeting between UMMS' representatives and Snyder and Graham would have occurred no earlier than September 6, 2018.  By that point, as the Indictment alleges, the Defendant had been making extortionate threats to UMMS and at least two of its employees since January of that year including at meetings in January, March, April, June and August.

What is noticeably absent from the Defendant's voluminous filing is any mention that Snyder was acting on advice of counsel when he made his extortionate demands from January 2018 through September 2018.  If he had been, that would be a defense.  And he wouldn't need a meeting between UMMS and Graham if he had an advice of counsel defense.  "To establish the advice-of-counsel defense, a defendant must show the (a) full disclosure of all pertinent facts to [counsel], and (b) good faith reliance on [counsel's] advice."  *United States v. Mallory*, 988 F.3d 730, 739 (4th Cir. 2021) (internal quotations omitted). However, "consultation with a lawyer confers no automatic immunity from the legal consequences of conscious fraud." *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 381 (4th Cir. 2015) quoting *United States v. Painter,* 314 F.2d 939, 943 (4th Cir.1963) (holding, in a case involving fraud, that "[i]f in good faith reliance

19

upon legal advice given him by a lawyer to whom he has made full disclosure of the facts, one engages in a course of conduct later found to be illegal, the trier of fact may in appropriate circumstances conclude the conduct was innocent because 'the guilty mind' was absent").

The Defendant cannot claim an advice of counsel defense because he had not disclosed his conduct to Graham. During an August 27, 2018 recorded phone call between Graham and UMMS's outside counsel, Natalie Magdeberger, Graham confirmed that Snyder had not disclosed to him that he had threatened to cause economic harm to UMMS if UMMS did not pay him $25 million. When asked if he knew of Snyder's plan, Graham made statements like "I don't know much," "I don't know any details," "I don't really have any details at all," "I don't have enough detail to, you know, sign off, particularly meaningfully," that Snyder had not given him any "specifics," and that Graham "honestly [didn't] even know who suggested – who suggested it in the first place." First Mot., Ex. 6 at 60, 61, 62, 65, 66. Magdeberger twice asked Graham if he knew the proposed amount of the payments, and Graham said he did not. *Id.* at 63, 76. Graham also said that he was not aware of the connection between the consulting agreement and M.S.'s malpractice claim. That portion of the conversations went as follows:

17      MS. MAGDEBURGER:  When he talked to you, did you

18  talk to you  about that it's in conjunction with an ongoing

19  case?

20      MR. GRAHAM:  I think he -- no, I think he viewed

21  it as -- I don't know if he's still got an ongoing case or

22  what, but again, I'm quite sure he's had cases against

23  Maryland, but no, I don't know that it would be tied to a

24  specific -- you mean, part of an ongoing case?

25      MS. MAGDEBURGER:  Right.

Page 65

1      MR. GRAHAM:  No, I don't -- I don't -- I --

2  whether that would -- whatever that case involves would be

3  discussed and resolved at the same time I don't know, but my

4  impression is this thing wouldn't -- this agreement wouldn't

5  have a condition in it that something in particular happened

6  with a particular case.

7      MS. MAGDEBURGER:  Because that's the part we're --

8  I mean, we're struggling with that a little bit, just this

9  whole concept and how it's envisioned, but in terms of how

10  it got here, that -- he didn't -- he didn't share those

11  details with you at all, in terms of --

12      MR. GRAHAM:  I don't really have any details at

13  all.  I know -- I think he's -- again, I'm really not clear

14  on who any clients are, exactly what their claims are or

15  anything else, but I gather that he's had claims against

16  Maryland.

Aug. 27, 2018 Transcript extract at 64-65, attached as Exhibit 2 (a clearer version of Snyder's

First Motion Exhibit 6).  Of course, Snyder wants to draw the Court's attention to a meeting

between UMMS and Graham that never happened, because the conversation that did happen shows

that Snyder never fully disclosed all of the facts to Graham.  Its also notable, that Graham is not

aware of any connection between the consulting arrangement and a particular case.  That is relevant

to the Defendant's claim that his conduct is covered by the litigation exemption, which will be discussed below.

Snyder claims the Government did not want Graham to attend a meeting between Snyder and UMMS on September 5, 2018, again months after the charged conduct began, because, according to Snyder "they did not want to create an unimpeachable recording of the meeting." First Mot. at 5.  What this argument ignores is that the Government had already made an unimpeachable recording of Graham in which he made clear that Snyder had not revealed to him that Snyder had made extortionate threats.

### C.  The Government did not deprive Snyder of the ability to defend himself.

Snyder argues that he cannot obtain comparable evidence to the non-existent Graham meeting.  Snyder writes, "[t]here is no evidence that could possibly be comparable to an electronic video recording of an actual meeting between Mr. Graham and UMMS in which the participants would have candidly discussed all aspects of Snyder's proposed consulting/retainer agreement." First Mot. Memo at 35.  Snyder committed extortion over eight months, and Snyder possesses text messages, contemporaneous notes, and recordings of nearly a dozen encounters with UMMS representatives.  He has all that evidence to use to defend himself.  And while he complains on the one hand that he lacks evidence to defend himself, on the other hand, he has declined to request discovery, in order to avoid triggering reciprocal discovery obligations under Rule 16.

Snyder's assertion about "no comparable evidence" is particularly astounding considering the entire August 23rd meeting is recorded.  Ironically, reflecting Snyder's guilty mind, Snyder began that meeting by asking "we're not recording this meeting, correct?"  First Mot., Ex. 3 at 13. So he evidently didn't want to record that meeting.  But now he claims he would have wanted a meeting with Graham to be recorded.  The former contradicts the latter.

And of course the August 27, 2018, recorded call between Magdeberger and Graham confirmed that Graham was unaware of the extortionate threats and demands that the Defendant had made.

The cases that he cites are also unhelpful.  In *State v. Benson*, 788 N.E.2d 693, 696 (Ct. App. Ohio 2003), a police officer lied about the existence of a video tape that recorded a stop and that was subsequently destroyed.  In *United States v. Belcher*, 762 F. Supp. 666, 672-73 (W.D. Va. 1991), the court found a due process violation when two defendants were charged with manufacturing and distributing marijuana and the marijuana plants were destroyed pre-indictment. Here, the government did not destroy or otherwise fail to preserve evidence.

## IV.   THE COURT SHOULD DENY THE DEFENDANT'S SECTION MOTION TO DISMISS BECAUSE THE GOVERNMENT DID NOT "CORRUPT" THE INDICTMENT

In his Second Motion to Dismiss, the Defendant demands that:

> The Indictment must be dismissed with prejudice because the government has set forth in the Indictment a falsified version of the most important meeting in this case, a meeting between Snyder and representatives of University of Maryland Medical System ("UMMS") on August 23, 2018, and because an F.B.I. recording of that meeting, from which the government purportedly quoted, establishes that the falsifications are designed to exclude, as if they never existed, the wealth of statements by Snyder that preclude any finding that he committed the acts, or possessed the criminal intent, necessary to meet the requirements of the criminal extortion statutes under which he has been charged.

Sec. Motion to Dismiss at 1.  This is the "prosecutorial misconduct" that the Defendant complains of—the factual allegations contained in the Indictment that concern the August 23, 2018, meeting. He even goes so far as to make the nonsensical claim that the government by the manner in which it summarized, paragraphed and quoted from the transcript of the August 23, 2018, meeting.

The Defendant claims that this conduct violates the U.S. Constitution and the Federal Rules of Criminal Procedure, specifically:

24

- "The government has deprived Snyder of his constitutional due process right to reasonable notice of the charges and to his due process right to a criminal process free of government misconduct, all in violation of the Due Process Clause of the Fifth Amendment to the Constitution of the United States." *Id* at 6-7.

- "The government has also violated the mandate of Rule 7(c) of the Federal Rules of Criminal Procedure that the Indictment be "a plain, concise, and definite written statement of the essential facts constituting the offense charged." *Id.* at 7.

- The government's outrageous misconduct is also an obvious "defect in instituting the prosecution" and a "defect in the indictment," for which Snyder is entitled to relief under Rule 12(b)(3)(A) and (B) of the Federal Rules of Criminal Procedure. *Id*.

Further, the Defendant asks the Court to take judicial notice of the entire transcript of the August 23, 2018, meeting between Snyder and representatives of UMMS "in determining whether Snyder is charged with a crime." *Id.* Specifically, the Defendant claims that (1) "the entire recordings establish, as a matter of law, that Snyder lacked the necessary criminal intent for extortion;" and (2) the recordings also "establish, as a matter of law, that Snyder's conduct is protected by the litigation exemption to extortion and that, by virtue of the litigation exemption, Snyder's conduct was not "wrongful" within the meaning of that term in either the Hobbs Act or the Maryland extortion statute." *Id*.

### A. The Purpose of an Indictment is to Put the Defendant on Notice of the Charges He Faces, Which the Indictment Undoubtedly Does.

The Defendant's Rule 12 arguments are the easiest to dispense with. While the Defendant claims that the Government's "outrageous misconduct" is also an "obvious 'defect in instituting the prosecution' and a 'defect in the indictment,' for which Snyder is entitled to relief under Rule

12(b)(3)(A) and (B) of the Federal Rules of Criminal Procedure," he cites no authority for the proposition that a defendant's argument that if factual allegations in an Indictment are inaccurate that is a "defect in instituting the prosecution" or a "defect in the indictment." Sec. Mot. to Dismiss at 5. And there is none.

More fundamentally, all of the Defendant's claims involve contested issues of fact. Therefore, Rule 12 offers no basis for relief. "A district court may dismiss an indictment under Rule 12 where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial." *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012) (quotation omitted). "A court cannot grant the motion to dismiss under Rule 12 if a defendant's legal contentions are inextricably bound up with the facts of the case." *United States v. Pinson*, No. 2:19-CR-00250, 2020 WL 2601659, at *2 (S.D.W. Va. May 21, 2020) (unpublished) (quotation omitted); *United States v. Regaldo*, 497 F. Supp. 3d 56, 58 (E.D.N.C. 2020). A 12(b) motion is permissible only when it "involves a question of law rather than fact." *United States v. Shabbir*, 64 F. Supp. 2d 479, 481 (D. Md. 1999) (quoting *United States v. Nukida,* 8 F.3d 665, 669 (9th Cir.1993) (citation omitted)). Accordingly, Snyder's 12(b) motion cannot be used as a summary judgment mechanism, nor can the court grant Snyder's motion if his legal contentions are inextricably bound up with the facts of the case.

"An indictment constituted by a legal and unbiased grand jury, . . . if valid on its face, is enough to call for trial on the merits." *Costello v. United States*, 350 U.S 359, 363 (1956). An indictment is valid on its face if the Indictment "set[s] forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be

punished.'"  *Hamling v. United States*, 418 U.S. 87, 100 (1974).  Echoing these long-established

and basic principles, the Fourth Circuit explained most recently in *United States v. Burks*,

> Federal Rule of Criminal Procedure 12(b)(3) allows a defendant to move
> before trial to dismiss the indictment for failure to state an offense. To overcome
> such a motion, the indictment must include every essential element of the
> offense.  *See United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014). In general,
> it is "sufficient that an indictment set forth the offense in the words of the statute
> itself." *Id.* (internal quotation marks omitted).

746 F. App'x 191, 198 (4th Cir. 2018) (*quoting United States v. Wills*, 346 F.3d 476, 488-

89 (4th Cir. 2003)).  "When the words of a statute are used to describe the offense generally, they

'must be accompanied with such a statement of the facts and circumstances as will inform the

accused of the specific offense, coming under the general description, with which he is

charged.'" *United States v. Kingrea*, 573 F.3d 186, 191 (4th Cir. 2009) (quoting *United States v.

Brandon*, 298 F.3d 307, 310 (4th Cir. 2002)). *See also* Fed. R. Crim. P. 7(c)(1) ("The indictment

... must be a plain, concise, and definite written statement of the essential facts constituting the

offense charged ...").

The Indictment charges the Defendant with attempted economic extortion in violation of

the Hobbs Act, 18 U.S.C. § 1951 and the Travel Act, 18 U.S.C. § 1952.  The text of the Hobbs Act

is as follows:

> Whoever in any way or degree obstructs, delays, or affects commerce or the
> movement of any article or commodity in commerce, by robbery or extortion or
> attempts or conspires so to do, or commits or threatens physical violence to any
> person or property in furtherance of a plan or purpose to do anything in violation
> of this section shall be fined under this title or imprisoned not more than twenty
> years, or both.

18 U.S.C. § 1951(a).  The Hobbs Act further defines "extortion" as "the obtaining of property from

another, with his consent, induced by wrongful use of actual or threatened force, violence or fear,

or under color of official right." 18 U.S.C. § 1951(b)(2).  "Such extortion can be based on the use

of fear of economic harm." *Corp. Healthcare Fin., Inc. v. BCI Holdings Co.*, 444 F. Supp. 2d 423, 431 (D. Md. 2006) *citing U.S. v. Billups,* 692 F.2d 320, 330 (4th Cir.1982); *United States v. Price*, 507 F.2d 1349 (4th Cir. 1974).

Count One is valid on its face.  First, it tracks the language of the Hobbs Act, including all its elements.  Specifically, it charges that:

> Between in or about January and October 2018, in the District of Maryland and elsewhere, the defendant,

> **STEPHEN L. SNYDER,**

> willfully and knowingly, did attempt to commit extortion as that term is in defined in Title 18, United States Code, Section 1951(b)(2), and thereby would and did obstruct, delay and affect commerce and the movement of articles and commodities in commerce, as that terms is defined in Title 18, United States Code, Section 1951(b)(3), to wit, SNYDER used threats of economic harm in an attempt to obtain a $25 million payment from the University of Maryland Medical System for himself.

Indictment, Count One, ¶ 75.[3]  Second, the preceding 74 paragraphs of Count One, which take up 15 pages in the Indictment, contain, "a statement of the facts and circumstances as will inform the

---

[3] Counts Two through Eight are also valid on their face because they track the language of the Travel Act and re-allege and incorporate paragraphs 1 through 74 of Count One. Specifically, Count Two charges that the Defendant:

> traveled in interstate commerce and used a facility in interstate commerce, as specifically alleged below, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, to wit: extortion in violation of Maryland Criminal Law § 3-701 (Extortion); and thereafter did perform and attempt to perform acts to promote, manage, establish and carry on, and to facilitate the promotion, management, establishment and carrying on of said unlawful activity.

Maryland's extortion statute prohibits obtaining money, property, or anything of value from another person with the person's consent, if the consent is induced by "wrongful threat of economic injury." Md.Code, Crim. Law, § 3–701.  *Corp. Healthcare Fin., Inc. v. BCI Holdings Co.*, 444 F. Supp. 2d 423, 431 (D. Md. 2006).

accused of the specific offense, coming under the general description, with which he is charged.'" *Kingrea*, 573 at 191.  Under the heading, "Purpose of the Scheme," the Indictment alleges that:

> The purpose of the extortion scheme was for **SNYDER** to obtain $25 million from UMMS for himself, separate and apart from any claim by one of his clients, by using threats of economic and reputational harm to UMMS and its organ transplant program.

Indictment Count One ¶ 13.   Under the heading, "Manner and Means of the Scheme," the Indictment alleges:

14. It was part of the extortion scheme that **SNYDER** threatened that if UMMS did not pay him $25 million for himself and not for any client, **SNYDER** launch a public relations campaign against UMMS that alleged, among other things, that UMMS transplanted diseased organs into unsophisticated patients without informing them of the quality of the organs they were receiving in order to generate revenue.  That campaign would include:
     a. a front-page article in *The Baltimore Sun*;
     b. other national news stories;
     c. a press conference;
     d. advertisements on the Internet, including one that would run every time someone accessed UMMS's transplant site; and
     e. at least two videos that SNYDER produced and would air if his demand for a $25 million payment were not met.
15. It was further part of the extortion scheme that SNYDER demanded that UMMS disguise the $25 million payment as a sham consulting arrangement between SNYDER and UMMS.
16. It was further part of the extortion scheme that SNYDER threatened Lawyer 1 by telling her that she would lose her job if she did not aid SNYDER in obtaining the $25 million payment for SNYDER.
17. It was further part of the extortion scheme that SNYDER threatened to harm the professional reputation of Dr. 1 if he did not aid SNYDER in obtaining the $25 million payment for SNYDER.

Indictment, Count One, ¶¶ 14-17.  Under the heading, "Acts in Furtherance of the Scheme," the Indictment makes various allegations in 56 numbered paragraphs under the following sub-headings:

- "*SNYDER Asked to Speak with Dr. 1 in the Hallway for a Private Conversation*" referring to a meeting on January 1, 2018 (Indictment, Count One ¶18)
- "*SNYDER Communicated with Dr. 1 Directly After the Conference*" (Indictment, Count One ¶¶ 19-20)

29

- *"SNYDER Meets with Dr. 1 on March 21, 2018"* (Indictment, Count One ¶¶ 21-23)
- *"April 10, 2018, Snyder Exchanges Texts with Dr. 1"* (Indictment, Count One ¶¶ 24-34)
- *"June 22, 2018, Snyder Meets with UMMS Representatives"* (Indictment, Count One ¶¶ 35-55); and
- "*August 23, 2018, Snyder Meets with UMMS Representatives* (Indictment, Count One ¶¶ 56-73)

The Defendant does not claim that the Indictment fails to allege the elements of the offense or fails to provide him with "a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged," as *Kingrea* requires, because he cannot. Indeed, the Defendant's Second Motion to Dismiss itself is the best evidence that he is on notice of the offense with which he is charged. He discusses the charges at length in his motion and vigorously denies them.

Thus, the case should proceed to trial.

> **B.  The Defendant's Motion to Dismiss Asks for Summary Judgement Based on Facts Not Contained in the Indictment, Something the Federal Rules of Criminal Procedure Do Not Allow.**

The Defendant's Second Motion to Dismiss reads like a motion for summary judgment. The problem for the Defendant, however, is that the federal rules of criminal procedure, unlike the civil rules of criminal procedure, do not allow for such motions. He devotes nearly all of his arguments to pointing to facts and evidence that are *not* in the Indictment, which is *not* a basis for dismissing an indictment. In the very beginning of his motion he writes, again and again, "The Bar Counsel file contained …" pointing to various pieces of evidence collected by the Bar Counsel during her investigation that he thinks exonerates him. And the Defendant attaches approximately 16 exhibits to his Second Motion to Dismiss, which consume more than 100 pages of his filing, and all of which are factual in nature including recordings, transcripts, text messages, emails, interview reports, and others. He asks the Court to treat these exhibits as evidence and to reach

the conclusion that the Defendant is not guilty. And he doesn't cite a single instance where a court in a criminal case has done what he is asking this Court to do.

For example, he claims that the transcript of the August 23, 2018, includes "statements by Snyder that preclude any finding that Snyder committed acts or possessed the criminal intent necessary to meet the requirements of the criminal statutes under which he is charged." Mem. in Support of Sec. Mot. to Dismiss at 1. This argument ignores the fact that the Indictment alleges that Snyder made extortionate threats during the April 30, 2018, meeting, Indictment Count One ¶¶ 25-34, and during the June 22, 2018, meeting, Indictment Count One, ¶¶35-55, both of which obviously occurred before August 23, 2018. In any event, the Defendant is asking the Court to do something only the jury can do—determine, based on the facts, whether the Government has met its burden.

### C. The Court Should Not Consider Evidence Outside the Allegations in the Indictment to Determine Whether the Allegations in the Indictment will be Proven.

The Defendant concedes that "A 'challenge to the sufficiency of the indictment ... is ordinarily limited to the allegations contained in the indictment.'" *United States v. Pratt*, 2013 WL 310565, *2 (D. Md. Jan. 24, 2013), *quoting United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012) (emphasis added). Mem. in Support. of Sec. Mot. to Dismiss at 20 quoting *Pratt*, 2013 WL 310565 at *4. He cites no authority for the proposition that a court should review various pieces of evidence submitted by a Defendant to determine whether an indictment should be dismissed because, in the Defendant's view, the evidence outside the allegations in the Indictment establish his innocence. He cites *Pratt* for the principle that a defendant is entitled to "reasonable notice" of the charges, which is of course is true, but nothing in *Pratt* supports the Defendant's argument that a Defendant is not on "reasonable notice" if the Defendant believes there is evidence, outside

the Indictment, that exonerates him.  His citations to *United States v. Brandon*, 298 F.3d 307, 310

(4th Cir. 2002) and *United States v. Rendelman*, 641 F.3d 36, 44 (4th Cir. 2011) similarly do not

support his arguments.  *Brandon* is consistent with the Fourth Circuit's holdings in *Burks* and

*Kingrea*, cited above which were decided after *Brandon*, describing what constitutes a sufficient

indictment.  Specifically:

> "[A]n indictment is sufficient if it, first, contains the elements of the offense
> charged and fairly informs a defendant of the charge against which he must defend,
> and, second, enables him to plead an acquittal or conviction in bar of future
> prosecutions for the same offense." *Hamling v. United States,* 418 U.S. 87, 117, 94
> S.Ct. 2887, 41 L.Ed.2d 590 (1974). Usually "an indictment is sufficient if it alleges
> an offense in the words of the statute," *United States v. Wicks,* 187 F.3d 426, 427
> (4th Cir.1999), as long as the words used in the indictment "fully, directly, and
> expressly, without any uncertainty or ambiguity, set forth all the elements necessary
> to constitute the offence," *Hamling,* 418 U.S. at 117, 94 S.Ct. 2887 (internal
> quotation marks omitted). However, simply parroting the language of the statute in
> the indictment is insufficient. When the words of a statute are used to describe the
> offense generally, they "must be accompanied with such a statement of the facts
> and circumstances as will inform the accused of the specific offence, coming under
> the general description, with which he is charged." *Id.* at 117–18 (internal quotation
> marks omitted). Thus, the indictment must also contain a "statement of the *essential
> facts* constituting the offense charged." Fed.R.Crim.P. 7(c)(1) (emphasis
> added); *see United States v. Smith,* 44 F.3d 1259, 1263 (4th Cir.1995).

298 F.3d 307, 310 (4th Cir. 2002).  The *Rendelman* opinion, which quotes *Brandon*, says the same.

As described above, the Indictment contains everything *Brandon* and *Rendelman* say an indictment

should contain.  Thus, these decisions, far from supporting dismissal, support denying the

Defendant's motion.

The Defendant asserts that "falsification of the factual allegations of an indictment is also

an obvious "defect in instituting the prosecution" and a "defect in the indictment" for which the

Defendant may seek relief under Rule 12(b)(3)(A) and (B). F.R. Crim. Proc. [sic.]" but cites no

authority in support of that proposition.  Mem. in Support of Sec. Mot. to Dismiss at 20.  And there

is none.

The Defendant states that "there is *generally* no summary judgment procedure in criminal cases and that Fed. Crim. Rule 29 *usually* provides an adequate mechanism for resolution of legal issues."  Mem. in Support of Sec. Mot. to Dismiss at 21.  That statement is incorrect.  There is no summary judgment procedure in criminal cases, *general* or otherwise.  The Fourth Circuit opinion that the Defendant cites, *United States v. Weaver*, expressly states that.  659 F.3d 353 n* (4th Cir. 2011) ("there is no provision for summary judgment in the Federal Rules of Criminal Procedure").  The Defendant incorrectly asserts that:

> The Fourth Circuit declared in *Weaver* that cooperation by the government, to permit the court to determine whether the defendant's conduct was criminal, is to be encouraged, because, "There is no good reason to force the court to incur the expense and delay of a trial that would inevitably lead to the same outcome as its pretrial ruling." *Id.*

Mem. in Support of Sec. Mot. to Dismiss at 21 *citing Weaver*, 659 F.3d at 355 n*.  While the Court in *Weaver* stated what the Defendant quoted, it did not say that "cooperation by the government, to permit the court to determine whether the defendant's conduct was criminal, is to be encouraged." Indeed, the sentence immediately before the one the Defendant quoted in the opinion makes it clear that a district court *cannot* resolve whether a defendant's conduct was criminal when there are disputed facts.[4]  This is what the Defendant omitted:

> As circuit courts have almost uniformly concluded, a district court may consider a pretrial motion to dismiss an indictment where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise *does not dispute* the pertinent facts.

---

[4] In *Weaver*, the defendant was charged with a violation of 18 U.S.C. § 922(h) which prohibits a person from possessing a firearm while "employed for" a convicted felon.  The defendant moved to dismiss the indictment arguing that the term "employed" meant for some form of compensation.  The Government in that case apparently conceded that it could not prove that the Defendant received compensation and the district court dismissed the indictment.  On appeal, the Fourth Circuit reversed the district court's decision finding that "The statute, however, does not contain an inflexible requirement that compensation be involved."

659 F.3d 353, 355 n* (4th Cir. 2011) (emphasis added).  The Defendant claims there are statements in the August 23, 2018, meeting that exonerate the Defendant.  The Government disputes that contention.  Further, the Indictment alleges conduct beginning in January 2018, including meetings and phone calls where the Defendant made extortionate demands that predate the August 23, 2018, meeting.  Thus, even if there was no dispute as to what occurred during the August 23, 2018, and there is, the Court could not dismiss the Indictment because there are allegations that he made extortionate demands before the August 23, 2018, meeting.



The same conclusion applies here.

The Seventh Circuit case the Defendant cites, *United States v. Risk*, 843 F.2d 1059 (7th Cir. 1988), does not support his argument.  In *Risk*, the Government did not object to the district court considering various pieces of evidence, submitted in discovery, in deciding the motion to

dismiss until the case was on appeal.[5]  At that point, the Seventh Circuit held it was too late.  Here, the Government disputes the Defendant's claim that the August 23, 2018, transcript exonerates him, and, more generally, objects to the piecemeal and one-sided presentation of some of the evidence in this case that the Defendant invites the Court to rely on to declare him innocent.

The Fifth Circuit case the Defendant cites, *United States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005), is also unavailing.  In *Flores*, the defendant was charged with violating 18 U.S.C. § 922(g)(5)(A), which prohibits the possession of a firearm by "an alien illegally or unlawfully in the country."  The defendant moved to dismiss the indictment raising a purely legal issue, namely, that his receipt of "temporary treatment benefits" pursuant to 8 U.S.C. § 1254a meant he was not illegally or unlawfully in the United States.  The Government did not dispute the fact that the defendant had been granted temporary treatment benefits.  The district court granted the motion to dismiss.  The Government appealed and the Fifth Circuit reversed the district court.  The Fifth Circuit held that, as a matter of law:

> We read the phrase "illegally or unlawfully in the United States" in § 922(g)(5)(A) to include those aliens, like Flores, who entered the country illegally and subsequently qualified for temporary treatment benefits under 8 U.S.C. § 1254a. Our interpretation is informed by the administrative regulations promulgated by the ATF interpreting § 922(g)(5)(A). See 27 C.F.R. § 478.11.

*United States v. Flores*, 404 F.3d 320, 326 (5th Cir. 2005)

---

[5] As the Seventh Circuit noted,

> The government did not challenge the district court's authority to consider the undisputed facts disclosed by the government until *after* the district court granted Risk's motion to dismiss. Even then, the government did not object but proffered *additional* facts which it urged the court to consider upon reconsideration of Risk's motion.[4] It was not until this appeal that the government first objected to the district court's consideration of the undisputed facts voluntarily disclosed by the government to Risk during discovery. Now it is too late. Under the unusual circumstances of this case, we find that the district court acted properly.

*United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988)

In *Weaver*, *Risk* and *Flores*, there were no factual disputes between the parties.  Rather the defendants' motions to dismiss were based on purely legal issues.  That is not the case here.  Just the opposite—the Defendant's motion to dismiss is based on purely *factual* issues all of which are outside the allegations contained in the Indictment.

The Defendant urges the Court to take judicial notice of the transcript of the August 23, 2018, meeting claiming that if the Court did, the Court would conclude that no crime had occurred.  The Court could not reach such a conclusion and therefore should not take judicial notice of the August 23, 2018, transcript.  The Indictment alleges the Defendant's extortionate conduct began eight months earlier in January 2018 and that the Defendant met with UMMS representatives on at least two occasions, April 30, 2018, and June 22, 2018, both of which obviously occurred *before* the August 23, 2018, meeting.  The Defendant made extortionate threats at both of those earlier meetings.  Just as a meeting with Andrew Graham on September 6, 2018, could not exonerate the Defendant of the extortionate demands he made prior to September 6, 2018, nothing said on August 23, 2018, could change the fact that the Defendant had made extortionate demands on April 30, 2018, and June 22, 2018.

In support of his legally erroneous position, the Defendant tries to analogize this case to two cases involving criminal charges arising out of contractual relationships between private parties and the United States Government.  Contract interpretation was at the heart of both those cases.  That is obviously not so here.

The first is *U.S. v. General Dynamics Corp.*, a case where, as the Defendant describes it, a defense contractor was charged with filing false claims pursuant to a fixed price contract.  Mem. in Support of Sec. Mot. to Dismiss at 22 *citing* 644 F.Supp. 1497 (C.D. Cal. 1986) rev'd on other grounds, 828 F.2d 1356 (9th Cir. 1987).  The defendant in that case moved to dismiss the

indictment arguing that the contract at issue was ambiguous and asked the court to take judicial notice of the contract in deciding his motion.   The court did so on the basis that, "In the case at hand, the Contract is the very subject of the indictment. Its meaning and terms are referred to in the indictment, and neither party can or does take a different position. *Gen. Dynamics Corp.,* 644 F. Supp. at 1500.  That is where the analogy falls apart.

The August 23, 2018, meeting is not the "very subject of the indictment."  It is not like the contract in *General Dynamics*.  It is the last, chronologically, in a series of meetings and phone calls where the Indictment alleges that the Defendant made extortionate threats.  The Defendant acknowledges as much when he states,

> Since no recording had been made of the June 22nd meeting, the government staged the August 23rd meeting by having Kinter tell Snyder that an essential person, Dr. Whye, had been absent and that Snyder was to make the same presentation to him on August 23rd.

Mem. in Support of Sec. Mot. to Dismiss at 11.

Further, *General Dynamics* is a thirty-four year old case from the Ninth Circuit that relied on a Fourth Circuit's opinion, *United States v. Race,* 632 F.2d 1114 (4th Cir.1980), which is now bad law.  In *Race*, the defendant was prosecuted under 18 U.S.C. § 1001 for submitting false bills to the government.  The Court dismissed the indictment, finding that the contract at issue either authorized the payments or, as the Government argued, was ambiguous.  *Id*. at 1119.  If it was the later, the court held that, "it necessarily concedes that the defendants' construction" of the contract was "reasonable," and if the defendant's construction was reasonable, then the defendant could not be found guilty.  In *United States v. Sarwari*, the Fourth Circuit explained that it "disavow[ed]" *Race*:

> More than thirty years ago, we suggested, in dicta, that a false statement conviction "could not stand" if a defendant's statement accords "with a reasonable construction" of the information sought. *United States v. Race*, 632 F.2d 1114, 1120

(4th Cir.1980). But, both before and after issuing this dicta in *Race*, in other cases we interpreted *Bronston*, as our sister circuits have—to provide a defense only if a defendant's statement is literally true, not if simply a "reasonable construction." *See Good*, 326 F.3d at 591–92; *Earp*, 812 F.2d at 918–19; *Paolicelli*, 505 F.2d at 973. Given the clarity and narrowness of the *Bronston* defense, we must disavow the Race dicta.

669 F.3d 401, 407 (4th Cir. 2012). Like the Fourth Circuit, the Ninth Circuit has also rejected *Race*, and so *General Dynamics*, which relied on *Race*, is unpersuasive at this point, if not irrelevant. *See United States v. Camper*, 384 F.3d 1073, 1078 (9th Cir. 2004).

In the second case he cites, *United States v. Liberto*, the Government did not object to the court reviewing the contracts at issue. That of course distinguishes *Liberto* from this case. There is no contract that is the "very subject of the indictment," in this case as there was in *Liberto*. No. CR RDB-19-0600, 2020 WL 5994959, at *8 (D. Md. Oct. 9, 2020).[6] And, in any event, in *Liberto* the never took judicial notice of the contract. The *Liberto* court also distinguished *Race*, the case that *General Dynamics* relied on, and its reasoning applies equally well here, and noted *Race* was no longer good law, something the Defendant failed to do in his memorandum:

> In *Race*, the Fourth Circuit indicated that "whenever a defendant's statement or action under a contract accords with a reasonable construction of the enabling language of the contract, the Government will not have carried its burden of 'negativ(ing) any reasonable interpretation that would make the defendant's

---

[6] Further, the court in *Liberto* denied the motion to dismiss reasoning:

> It is the role of the jury, and not of this Court, to determine the materiality of Defendant's statements or omissions in furtherance of his alleged scheme to defraud. *See Neder v. United States*, 527 U.S. 1, 25 (1999). That determination in this case necessarily relies on the interpretation of the Supplier Agreements and the Addendum attached to them, which, in turn, relies on facts which must be determined by the jury. Defendant, relying on the United States Court of Appeals for the Fourth Circuit's dicta in *United States v. Race*, 632 F.2d 1114 (4th Cir. 1980), asserts that if he can show that his understanding of the contracts was a reasonable one, then he cannot be criminally liable under the wire fraud statute.

No. CR RDB-19-0600, 2020 WL 5994959, at *8 (D. Md. Oct. 9, 2020

statement factually correct.' " 632 F.2d at 1120. Defendant's reliance on this principle from *Race* is misplaced for several reasons. First, the Fourth Circuit rendered its decision *after* a trial and jury verdict, during which the Fourth Circuit noted "there [was] not evidence in the record to support a finding by the jury that the defendants did not believe in good faith" that their interpretation of the contract was reasonable. *Id.* at 1121. That is simply not the posture of this case. Second, the dicta from *Race* was explicitly rejected by the Fourth Circuit in *United States v. Sarwari*, 669 F.3d 401, 407 n.3 (4th Cir. 2012), where the Fourth Circuit "disavow[ed] the *Race* dicta" that "a false statement conviction 'could not stand' if a defendant's statement accords 'with a reasonable construction' of the information sought." As a result, it cannot be said that the Fourth Circuit mandates the dismissal of wire fraud charges when a Defendant can show that his understanding of the contracts at issue was a reasonable one.

No. CR RDB-19-0600, 2020 WL 5994959, at *8 (D. Md. Oct. 9, 2020).

The Defendant cites *Bank of Nova Scotia v. United States* in support of his argument that the Court should take judicial notice of the August 23, 2018, in order to determine if the defendant committed a crime. 487 U.S. 250. But *Bank of Nova Scotia* addressed claims of grand jury abuse, not the argument the Defendant is making here that the factual allegations in the Indictment concerning the August 23, 2018, meeting are inaccurate and that the full transcript establishes that the Defendant is innocent.

The Defendant's reliance on an Eleventh Circuit decision, *United States v. Sigma Intern, Inc.,* is similarly misplaced. 244 F.3d 841, 856 (11th Cir. 2001). *Sigma* also concerned a claim of grand jury abuse. The Defendant claims, without any factual support, that "the prosecutors here took it upon themselves to create and put before the grand jury a charging document they knew to be false." Mem. in Support of Sec. Mot. to Dismiss at 24. How does the Defendant know what "the prosecutors" knew? He doesn't. And to be clear, "the prosecutors" do not know that the Indictment is false. Just the opposite. At trial the evidence will establish that the factual allegations in the Indictment, all the factual allegations not just the ones that concern the August 23, 2018, meeting are true. The other cases that the Defendant cites alleging instances of grand jury abuse,

*United States v. Regan,* 103 F.3d 1072, 1082 (2nd Cir. 1997), and *United States v. Towne,* 705 F. Supp. 2d 125, 136 (D. Mass. 2010) are similarly inapposite.

The Defendant cites, *United States v. Bertoli*, for the proposition that "Case law ... establishes that the issue of whether the Government's misconduct is so outrageous as to require dismissal of an indictment is a question within the sole province of the court."  But, *Bertoli* involved a question of whether the defendant could argue vindictive prosecution to the jury, not whether an indictment could be dismissed pretrial.  854 F. Supp. 975, 1076 (D. N.J 1994).  Thus, it too offers his arguments no support.

### D.  The Factual Allegations in the Indictment Are Accurate and, In Any Event, it is Up to a Jury to Decide Whether there is Evidence that the Defendant Committed the Charged Offenses.

The Defendant claims, "By falsifying statements purportedly quoted in the Indictment, prosecutors have added a significant element to the analysis that compels the Court to go outside the four corners so the Indictment and to consider the entire recording which the government misused in making its false allegations."  Mem. in Support of Sec. Mot. to Dismiss at 24.  But the Defendant does not cite a single instance where the government misquoted something from the August 23, 2018, meeting in the Indictment.   He doesn't even claim that a comma is missing. Instead he objects to introductory phrases and transitional phrases, that were not quotes, things like "then continued," and "then responded."  The use of these phrases is the "outrageous conduct" that the Defendant complains of.

The Defendant asserts that, "The prosecutors falsified allegations about [the meeting on August 23, 2018, in several different ways."  Mem. in Support of Sec. Mot. to Dismiss at 12.

The Defendant is wrong.

As stated previously, the Government does not believe that the Court should take judicial notice of the full transcript of the August 23, 2018, meeting in order to rule on the validity of the Indictment because that single meeting could not and does not address the totality of the charges in the Indictment.  Furthermore, for the reasons cited above the Indictment is valid on its face and calls for a trial on the merits.  But the Defendant's accusations that the Government has presented a "falsified" version of the August 23, 2018, meeting cannot go unchallenged. The Government will cite the transcript of the August 23, 2018, meeting for the purpose of showing that the Defendant's allegations of prosecutorial misconduct are baseless.  In short, while the Defendant claims the Government misrepresented the August 23, 2018, in the Indictment, it is the Defendant who is making misrepresentations.

Before addressing each of *the Defendant's* false allegations about the Indictment, the Government notes the underlying infirmity of the Defendant's claims.  The Defendant argues, "The falsifications are so blatant, and the uses of deceptive techniques are so pervasive, that there can be no doubt that the government deliberately caused the Indictment to set forth a false version of what took place at the meeting." Sec. Mot. to Dismiss at 2.  Deceptive to whom?  The Defendant has the transcript of the August 23, 2018, summarized, paraphrased and quoted in the Indictment. Assuming for the sake of argument that his contentions about the Indictment are true, he hasn't been deceived.  So who has?  The short answer is no one.  So there is no justification for the radical remedy of dismissing the Indictment with prejudice.

In short, none of the allegations in the Indictment were "falsified."  Further, whether the allegations contained in the Indictment can be proven is a question for the jury.

The Indictment summarizes, paraphrases and at times quotes from memoranda of interviews and transcripts of recordings.  The Indictment is formatted as numbered paragraphs.  It

is not presented as a running transcript from the August 23, 2018, meeting or any other meeting or phone call.  Direct quotes are clearly set-off in the Indictment with quotation marks to distinguish them from allegations that are not direct quotes.  As stated above, the Defendant does not claim that a single quote is inaccurate.

The jury will hear the complete recordings in this case.  They will decide, after having been instructed by the Court, whether the Defendant broke the law.  The Government is reluctant to engage in a line-by-line rebuttal of the Defendant's false claims about the Indictment because, for the reasons articulated above, the Indictment is facially valid and thus this case should proceed to trial.  And Defendant's contention that the Court must engage in a line-by-line edit of an indictment returned by a lawfully constituted grand jury would be unprecedented.  But the Defendant's allegations of linguistic misconduct are all so baseless that the Government feels compelled to address them.  The Government will only address the accusations the Defendant levels in his Memorandum in Support of Second Motion to Dismiss.[7]

---

[7] The Defendant also submitted a document that appears to have been prepared by his paralegal, Exhibit 4, and which contains the paralegal's opinions on what parts of the indictment are "false" and which aren't.  The Defendant appears to have copied many of these opinions, word-for-word, in his brief.  Because this document is duplicative of the arguments the Defendant makes in his Memorandum in Support of His Second Motion to Dismiss the Government will not address it.  The Defendant also hired a writing consultant, Ross Guberman, Esq., to prepare a third and largely duplicative set of criticisms of the indictment.  Guberman's Declaration repeats many of the arguments that the Defendant makes in his Memorandum in Support of the Second Motion to Dismiss and, in fact, reads more like another brief on behalf of the Defendant than an expert report.  In any event, Mr. Guberman's declaration reveals a lack of understanding of the purposes of an indictment, much like the Defendant's Memorandum in Support of Second Motion to Dismiss.  Further, like the Defendant's brief, Mr. Guberman's declaration is full of factual conclusions that are irrelevant at this or any stage in the proceeding because they are matters only the jury can decide.  For example, Mr. Guberman asserts, without a citation to anything, that "Mr. Snyder believed that the proposed agreement could benefit UMMS."  Exhibit 5 to Defendant's Second Motion to Dismiss at 5.  Mr. Guberman's beliefs as to the Defendant's statement of mind are irrelevant.  Because much of it is dedicated to making erroneous factual conclusions and, overall, it is duplicative of the Defendant's own factually inaccurate arguments about the language in the Indictment, the Government will not address it.

The Defendant argues that:

> First, the Indictment consists of pairs of paragraphs in which one of the participants is alleged to have made a statement and the other participant, Snyder, is alleged to have responded or in which one statement by Snyder is alleged to have been a "continuance" of a previous statement by him.

Mem. in Support of Sec. Mot. to Dismiss at 12.

The Defendant's assertion is incorrect.

All of the statements by Snyder that are quoted in the Indictment were made by Snyder in the order in which they were made.  By their own text, they are plainly (1) in response to earlier comments by UMMS representatives or are (2) statements by Snyder that start new lines of dialogue with UMMS representatives or are (3) free-standing statements by Snyder.  None of the transitional words or phrases used in the Indictment mispresent the dialogue that occurred during the August 23, 2018, meeting.

The Defendant objects to the following introductory and transitional phrases:

- Paragraph 61 beings with the phrase, "SNYDER *then continued* …"  Mem. in Support of Sec. Mot. to Dismiss at 12 (emphasis added).
- Paragraph 62 begins with the phrase, "Lawyer 1 *then responded* …"  *Id.* at 13 (emphasis added).
- Paragraph 70 begins with the phrase, "SNYDER *then repeated* …"  *Id.* (emphasis added).
- Paragraph 72 begins with the phrase, "SNYDER *then suggested* …"  *Id.*  at 14.  (emphasis added).

Every one of the Defendant's complaints about the transitional and introductory phrases in the Indictment is factually inaccurate.  The Government will address each of them, in turn.

The very first example the Defendant gives of an instance where "pairs of paragraphs in which one of the participants is alleged to have made a statement and the other participant, Snyder, is alleged to have responded or in which one statement by Snyder is alleged to have been a

"continuation" of a previous statement by him," is, paragraph 61 of the Indictment.  Mem. in

Support of Sec. Mot. to Dismiss at 12.

       Below is what appears in paragraph 61 of Count One:

> SNYDER then continued:
>     … but what happened was, when we investigated [the Client
> 2] case, we found a shitload of – of information of what's going on
> in this department; and that's really different, from her case. In other
> words, if I'm going to – and I – I get cases against University of
> Maryland all the time. I mean Let's – let's not be – let's be clear on
> that. I'm, by this agreement, I'm conflicting myself out of future
> cases, again – you know, against this department; not only me, but
> my sons as well, and that's – that's not a small thing. . .

Indictment Count One, ¶ 61.  This is what appears in the transcript from the August 23, 2018,

meeting.  The Defendant does not claim otherwise, because he cannot.  In the preceding paragraph,

Snyder is quoting as saying "Well, who knows? …." in response to a question by Dr. 2, "So what

specifically what you be doing?"  Paragraph 60 is clearly a response to paragraph 59.  Paragraph

61 is not a response to anything.  It is a statement by Snyder.  The phrase, "SNYDER then

continued," signals that the statements Snyder made in paragraph 61 came after the statement he

made in paragraph 60, which is true.  The Indictment does not say that the statements in paragraph

*immediately* followed Snyder's statement in paragraph 60.  Nor is the statement by Snyder in

paragraph 61 alleged to be in response to anything said by a UMMS representative.  Put another

way, paragraphs 60 and 61 both contain statements by Snyder in the chronological order in which

they occurred.  That is what "SNYDER then continued," indicates.  There is nothing inaccurate

about that transitional phrase.

       The Defendant next claims that "Paragraph 61 purports to quote a statement by Snyder to

which Kinter is alleged to have "responded" by a statement quoted in paragraph 62."  Mem. in

Support of Sec. Mot. to Dismiss at 12.  By its plain text, the statement by Kinter in paragraph 62

is in response to what Snyder said in paragraph 61. Nothing that was said in the six pages between paragraph 61 and 62 changes that conclusion. The Defendant does not cite a single statement or line of dialogue in those six pages which indicate that the consulting agreement was anything other than a "consulting agreement on paper" as Kinter is accurately quoted as saying. And the best evidence that it was a "consulting agreement on paper," is the fact that Snyder agreed with Kinter's characterization of it in that way. Below is a screenshot from the transcript:

```
18        MS. KINTER: Right. And that's what —
19  I — and I don't mean to for -- you know, I guess what
20  it looks like is this consulting agreement on paper,
21  right?
22        MR. SNYDER: Correct.
```

Transcript Extract at 45: 18-22, attached as Exhibit 3. Put another way, paragraph 61 quotes Snyder describing a "consulting agreement on paper," which is how Kinter, in paragraph 62, summarized Snyder's statements in paragraph 61. And Snyder himself agrees with her characterization. There is nothing inaccurate about the transition phrase, "Lawyer 1 responded," or the quotes that followed that transitional phrase.

The Defendant next claims that "Paragraph 70 falsely alleges that, after agreeing with a statement by Kinter, as alleged in paragraph 69, Snyder "then repeated" a statement that is quoted in the latter paragraph." Mem. in Support of Sec. Mot. to Dismiss at 13. Paragraph 70 doesn't falsely allege anything. The full text of paragraph 70 is as follows:

> SNYDER then repeated to the UMMS representatives, "The critical thing is, how do we implement an agreement that doesn't let these things surface, that's not

> extortion and not– and– and – and – and – and prevents Steve from handling the
> cases, that – that's the key to this."

Indictment, Count One ¶70.  The Defendant argues that "In truth, there are six pages of dialogue

between the statements in paragraph 69 and the statement in paragraph 70 that Snyder is alleged

to have 'then repeated.'"  Mem. in Support of Sec. Mot. to Dismiss at 13.  This argument ignores

the plain text of paragraph 70.  The statement, "SNYDER then repeated," in paragraph 70 is not a

reference to anything said in paragraph 69 because paragraph 69 does not quote Snyder.  Rather,

paragraph 69 quotes Lawyer 1:

> Later still, **_Lawyer 1_** asked SNYDER:

>> The only reason we are where we are at, now, right, having
>> this conversation, is because – and you'll show Dr. 2 the video, is
>> you've got in your mind damaging things, and that if you didn't have
>> these damaging things and you didn't have the ability to make an ad
>> and go on TV, you wouldn't be here today talking to us about a
>> consulting agreement…right?–

Indictment, Count One ¶ 69 (emphasis added).

> The phrase "SNYDER then repeated," in paragraph 70 is a reference to paragraph 68.

A side-by-side comparison of paragraph 68 and paragraph 70 makes clear that, in paragraph 70,

Snyder is repeating what he said in paragraph 68.

**Table 1: Comparison of Paragraphs 68 and 70**

| Indictment, Count One, ¶68 (emphasis added) | Indictment, Count One, ¶70 (emphasis added) |
|---|---|
| So – so again, I – I don't – I understand it's a unique thing. But – but again, you don't want to shut her up, **which is not extortion**, and **not shut me up**. You – you want me not to go forward. So the question is, how do we do it **and how is it not perceived as extortion**? And how is it perceived as in compliance with the rules, isn't that right? Isn't that what we're talking about? | SNYDER then repeated to the UMMS representatives, "The critical thing is, how do we implement an agreement that **doesn't let these things surface, that's not extortion** and not– and– and – and – and – and prevents Steve from handling the cases, that – that's the key to this." |

In paragraph 68, the Defendant asserts, "you don't want to shut her up, which is not extortion, and not shut me up."  This statement has two parts: (1) Snyder is trying to sell UMMS on suppressing the information he claims to have obtained, in other words shutting up his client and shutting him up, and (2) he asserts, incorrectly, that his demand isn't extortion.  He then repeats both those things, in paragraph 70 when she says, ""The critical thing is, how do we implement an agreement that doesn't let these things surface, that's not extortion."  Shutting him and his client up and "not letting things surface," is the same thing.  And so are his claims that doing so doesn't amount to extortion.  So, the introductory phrase in paragraph 70 to which the Defendant objects, "SNYDER then repeated," is accurate because Snyder was repeating what he said in paragraph 68.

The Defendant next objects to paragraph 72 claiming that "Paragraph 72 falsely alleges that, after Snyder made a statement quoted in paragraph 71 that this client's desire was not to settle, Snyder 'then suggested' abandoning the idea of a consulting agreement."  Mem. in Support of Sec. Mot. to Dismiss at 14.  The full text of Paragraph 72 is as follows:

> SNYDER then suggested abandoning the pretense of a consulting agreement with him altogether and instead paying a large lump sum payment to Client 2 and that he would then obtain the money from Client 2.  SNYDER told the UMMS representatives:
>
> > Let me ask you a question. And I don't know if I'm willing to do this. But, [Lawyer 1] maybe a solution is we – we pay one payment just to [Client 2's spouse], whatever the number is, if it's 30 or what–
> >
> > * * *
> >
> > That's – I'm not say – pay the 30 million or, you know, 31 million to [Client 2's spouse], as a one-time settlement. I'm not a consultant to the hospital. And I'll deal with her, you know–

Indictment, Count One ¶ 72.  The Defendant's argument rests on the notion that the phrase "then suggested," can only mean that what Snyder suggested was the very next thing out of his mouth after the statement quoted in paragraph 71.  While that may be one way to use "then," the Merriam Webster dictionary defines "then" as meaning, among other things, "as a necessary consequence."

https://www.merriam-webster.com/dictionary/then.   The use of the introductory phrase "then suggested," in paragraph 72 means that what Snyder said in paragraph 72 was a "necessary consequence" of what he said in paragraph 71.  It was not meant to indicate that what Snyder said in paragraph 72 was the very next thing that Snyder said after the statement he made in paragraph 71.  A comparison of the two paragraphs makes that clear.  The full text of paragraph 71 is as follows:

> Addressing his client's wishes, SNYDER admitted he was not acting in her best interest.  SNYDER told the UMMS representatives:
>
> > Well, you have to understand, this is a client that really doesn't want to settle. So, when you talk about extortion, it's not a – it – this is a client that doesn't want to settle. This is a client that would like me to go forward. I'm the guy that has really, and – and truthfully, not provided undivided loyalty to her. I mean, if you want to call it the way it really is. If I was providing undivided loyalty to her I would have filed this claim a long time ago. **She don't care about the six million dollars, or the five, or whatever the number is. She doesn't care. . .**

Indictment, Count One ¶71 (emphasis added).  The full text of paragraph 72 is as follows:

> SNYDER then suggested abandoning the pretense of a consulting agreement with him altogether and instead paying a large lump sum payment to Client 2 and that he would then obtain the money from Client 2.  SNYDER told the UMMS representatives:
>
> > Let me ask you a question. And I don't know if I'm willing to do this. But, [Lawyer 1] maybe a solution is we – we pay one payment just to [Client 2's spouse], whatever the number is, if it's 30 or what–
> >
> > \* \* \*
> >
> > That's – I'm not say – **pay the 30 million or, you know, 31 million to [Client 2's spouse],** as a one-time settlement. I'm not a consultant to the hospital. **And I'll deal with her**, you know–

Indictment, Count One ¶72 (emphasis added).   In paragraph 71, Snyder tells the UMMS representatives that his client "don't care" about the settlement in her case.  As a consequence, Snyder proposes, in paragraph 72, simply paying a single lump sum of $30 million to his client, rather than paying Snyder $25 million separate and apart from his client's claim, and that Snyder

would then be able to get his $25 million payment from her.  *Id*.  Because the statement in paragraph 72 was a necessary consequence of the statement in paragraph 71, it is not inaccurate.

The next set of editorial attacks the Defendant launches are that "the prosecutors falsified the allegations by lifting out parts of the statements of Snyder and by falsely presenting them in the Indictment as if they were Snyder's entire statements or by misusing ellipses to signify that only inconsequential words were left out."  Mem. in Support of Sec. Mot. to Dismiss at 15.

Snyder objects that in paragraph 61 "the prosecutors misused ellipses to screen out Snyder's next sentence," after a portion of his statement that is quoted in Paragraph 61.  Merriam-Webster describes ellipsis this way:

> Ellipsis points are periods in groups of usually three, or sometimes four. They signal either that something has been omitted from quoted text, or that a speaker or writer has paused or trailed off in speech or thought.

https://www.merriam-webster.com/words-at-play/ellipses-definition-uses.  Ellipsis were used in paragraph 61 to indicate that sentence following the quoted material was omitted.  There is nothing improper about using ellipses in that way.  What is clear from the quote in paragraph 61 is that there is dialogue that follows the quoted statement.

Defendant next objects to the fact that the quote in paragraph 67 ended when Lawyer 1 interrupted Snyder, but that is exactly what is reflected in the transcript.  Below is a side-by-side comparison of paragraph 67 and the transcript:

**Table 2: Comparison of Paragraph 67 and the Transcript**

| Indictment, Count One ¶ 67 | Transcript 51:21 to 52:16. |
| --- | --- |
| [SNYDER]: Well, because there's a different component to this. The – the component is that there are facts independent of her case, that came out of her case through investigation, that relate to the hospital generally. And you're getting an agreement where I'm allegedly doing some form | 21        MR. SNYDER:  Well, because there's a<br>22  different component to this.  The – the component is<br>23  that there are facts independent of her case, that<br>24  came out of her case through investigation, that |

| | Page 52 |
|---|---|
| of work for you. Uh, it's not extortion. Because the – the – the – the – I'm not using any facts that aren't-or, excuse me, I'm gonna talk like goofy Giuliani, uh – uh, make – the truth is not the truth. Uh, but I'm using things that I've developed. So, if – what you're saying – these are the key things, the – how do we do this where it's not perceived as extortion? Because I– again, I – I'm – I'm not gonna– you know, if you – if– if you accuse me of extortion, which it's not, and I've fully hired a lawyer to – to look into that, to make sure it's not that, then – | 1 relate to the hospital generally.<br>2       And you're getting an agreement where<br>3 I'm allegedly doing some form of work for you.  Uh,<br>4 it's not extortion.  Because the – the – the – the –<br>5 I'm not using any facts that aren't – or, excuse me,<br>6 I'm gonna talk like (Juliano), uh – uh, make – the<br>7 truth and not the truth.<br>8       Uh, but I'm using things that I've<br>9 developed.  So, if – what you're saying – these are<br>10 the key things, the – how do we do this where it's not<br>11 perceived as extortion?<br>12       Because I – again, I – I'm – I'm not<br>13 gonna – you know, if you – if – if you accuse me of<br>14 extortion, which it's not, and I've totally hired a<br>15 lawyer to – to look into that, to make sure it's not<br>16 that, then – |

Transcript Extract at 51-52, Exhibit. 3.  As Table 2 makes clear, the transcript itself cuts off at "then –."  Thus, there is nothing inaccurate about paragraph 67.

Snyder next objects to the quote in Paragraph 70, claiming that:

The Indictment quotes only part of what Snyder said was "critical," and, tellingly, cuts out the last two sentences of the statement, as well as the follow-up statements that Mr. Graham's approval of the proposed arrangement was "critical" and that, "if it can't be done," Snyder "did not want to do it:"

Mem. in Support of Sec. Mot. to Dismiss at 16.  The Defendant is incorrect.  The Indictment quotes the entire sentence where Snyder says what is "critical."  That phrase appears only in the quoted sentence.  Further, nowhere in any "follow-up statements" does the Defendant say that Mr. Graham's approval was critical.  Below is a side-by-side comparison of paragraph 71 and the transcript.

[this space intentionally left blank]

50

**Table 3: Comparison of Paragraph 71 and the Transcript**

| Indictment, Count One ¶71 | Transcript 62:21 to 63:17 (highlighted) |
|---|---|
| SNYDER then repeated to the UMMS representatives, "The **critical** thing is, how do we implement an agreement that doesn't let these things surface, that's not extortion and not– and– and – and – and – and prevents Steve from handling the cases, that – that's the key to this." | 21        MR. SNYDER:  No, that's fine.  I think, <br> 22 again, I – I have to be convinced that you all are not <br> 23 stupid, here, that you – that the money is not the <br> 24 critical thing. <br><br>                                      Page 63 <br> 1        The critical thing is, how do we <br> 2 implement an agreement that doesn't let these things <br> 3 surface, that's not extortion and not – and – and – <br> 4 and – and – and prevents Steve from handling the <br> 5 cases, that – that's the key to this. <br> 6        Andy believes it can be done.  So, you <br> 7 know, An – Andy's a very well-respected lawyer. <br> 8 Agree? <br> 9        MS. KINTER:  Absolutely.  Yeah, he <br> 0 knows – <br> 1        MR. SNYDER:  And an ethics guy. <br> 2        MS. KINTER:  He – but he – he knows <br> 3 about the – <br> 4        MR. SNYDER:  Well, you can call him, if <br> 5 – if you want.  I'll set up a call and a meeting.  You <br> 6 know?  Look, if it can't be done, I don't want to do <br> 7 it.  What? |

Transcript Extract at 63, Exhibit. 3.  Thus, it is not the case that paragraph 71 is a partial quote, as the Defendant claims, nor does the Defendant ever state that Mr. Graham's approval of the arrangement was "critical."  Thus, paragraph 71 is not inaccurate.  Furthermore, it is worth noting that while the Defendant claims he wants an agreement that "is not extortion," that is exactly what he had been doing up to and including in this meeting—trying to extract a $25 million sham consulting arrangement for himself by making threats of economic harm.  And this statement makes clear this agreement has nothing to do with his client's case, as he had repeatedly told the UMMS representatives.

Finally, the third unfounded set of criticisms that the Defendant makes of the Indictment is

that:

> prosecutors wrote paragraphs 73 and 74 to convey the false message that
> substantive discussions ended on August 23rd with Snyder's suggestion that the
> entire $30 million sum be paid to and that, "two days later," with nothing having
> occurred in the interim, Snyder reverted to "the phony consulting arrangement.

Mem. in Support of Sec. Mot. to Dismiss at 17.  First, the Defendant does not reveal how he knows

that undersigned counsel "wrote paragraphs 73 and 74 to convey the false message that substantive

discussions ended on August 23rd."  In any event, we did not.  Second, paragraphs 73 and 74

convey only what is contained within them.  The full text of those paragraphs are as follows:

73. Lawyer 1 responded, "but her – her case isn't worth 30 million dollars," to which SNYDER
    responded, "It doesn't matter whether it's worth – you get – that's a solution, to get rid of
    everything. You don't have to worry about Steve [SNYDER] being a consultant. . ."
74. Two days later, in a telephone call on August 25, 2018, SNYDER repeated that he had no
    expectation that he would do any work for UMMS under the phony consulting
    arrangement.  SNYDER told Lawyer 1 in a phone call:
    > And you'll use – and you'll use me when you want me, if at
    > all. You know, when you need me, you know, you'll call me once a
    > month, or you'll have lunch with me once and month, and you'll –
    > and you'll get advice from me. Hopefully, nothing will ever surface,
    > no cases or anything. I don't think they will.

Indictment Count One, ¶¶73 and 74. The Defendant's argument again evidences a

misunderstanding of the purpose of an Indictment.  In his Memorandum, the Defendant cites

additional facts that occurred on August 24 and after August 25, 2021.  But an indictment is not

meant to be a catalog of all the facts in a case like report and recommendation from a Magistrate

Judge or Special Master.  It is meant to put the Defendant on notice of the charges he faces.

### E. Whether the Defendant's Conduct is Covered by the Litigation Exception, And it is Not, is a Question of Fact for the Jury.

The Defendant's final argument is that his conduct is covered by the "litigation exemption." Mem. in Support of Sec. Mot. to Dismiss at 26. Whether or not that is the case, is a factual question that only the jury can decide.

The Defendant attempts to contrast his case with the one against Michael Avenatti. Avenatti was charged with attempting to extort Nike. The Indictment charged Avenatti with conspiracy, Hobbs Act Extortion, and the interstate communication of extortionate demands, in violation of 18 U.S.C § 875. Avenatti was convicted after trial in the Southern District to of New York. The facts in the *Avenatti* case are remarkably similar to the ones alleged in the Indictment. Below is a partial summary of these facts from the Indictment charging Avenatti:

> Specifically, AVENATTI and CC-1 threatened to hold a press conference on the even of Nike's quarterly earnings call and the start of the annual National Collegiate Athletic Associations ("NCAA") men's college basketball tournament, at which AVENATTI would make allegations of misconduct by Nike employees, unless Nike agreed to make a payment of $1.5 million to a client of AVENATTI's ("Client-1") in possession of  information damaging to Nike, and further agree to "retain" AVENATTI and CC-1 to conduct an "internal investigation" that Nike had not requested and for which AVENATTI and CC-1 demanded to be paid, at a minimum, between $15 and $25 million. Alternatively, and in lieu of such a retainer agreement, AVENATTI and CC-1 demanded a total payment of $22.5 million from Nike to resolve any claims Client-1 might have and additionally to buy AVENATTI and CC-1's silence.

Avenatti Indictment ¶ 1, attached as Exhibit 4.

Nike, like UMMS, approached law enforcement after Avenatti made his demands and recorded him in meetings and telephone calls. Nike, like UMMS, did not pay Avenatti in response to his demands.

Unlike Snyder, who did not propose to do any work in exchange for the payment he demanded, Avenatti evidently intended to actually conduct an internal investigation at Nike and bill for the time he spent on it.  The Indictment states:

> AVENATTI stated, in substance and in part, that he and CC-1 would require a $12 million retainer to be paid immediately and to be "deemed earned when paid," with a minimum guarantee of $15 million in billings and a maximum of $25 million, "unless the scope changes."  During the meeting, AVENATTI and CC-1 also stated, in substance and in part, that an "internal investigation" could benefit Nike, by, among other things, allowing Nike to "self-report" any misconduct, and that it would be Nike's choice whether to disclose its alleged misconduct.

Avenatti Indictment ¶ 18(a).

After the Nike representatives indicated an uneasiness with Avenatti's proposal to get paid to conduct an internal investigation, Avenatti, like Snyder, offered to instead take a lump sum payment, payable to his client.

> c.      Attorney-1 also reiterated, at the direction of law enforcement, that Attorney-1 did not think paying AVENATTI's client $1.5 million would be a "stumbling block," but asked whether there would be any way to avoid AVENATTI carrying out the threatened press conference without Nike retaining AVENATTI and CC-1. In particular, Attorney-1 asked, in substance and in part, whether Nike could resolve the demands just by paying Client-1, rather than retaining AVENATTI and CC-1. CC-1 said that he understood that Nike might like to get rid of the problem in "one fell swoop," rather than have it "hanging over their head." AVENATTI stated that he did not think it made sense for Nike to pay Client-1 an "exorbitant sum of money . . .  in light of his [Avenatti's] role in this." AVENATTI and CC-1 then left the room to confer privately.

> d.      After AVENATTI and CC-1 returned to the conference room, AVENATTI told Attorney-1 and Attorney-2, in part, "If [Nike] wants to have one confidential settlement and we're done, they can buy that for twenty-two and half million dollars and we're done. Full confidentiality, we ride off into the sunset. . ."

Avenatti Indictment ¶ 18(c)-(d).

The Defendant claims that his case is distinguishable from Avenatti, because (1) "Snyder's demand for a consulting agreement was at his client's request and with her knowledge;" (2) Snyder's demand "was in conjunction with a settlement for an amount far in excess of the

maximum worth [sic.] the case"; and (3) Snyder's demands were based on information Snyder "had developed through his investigation and from experts."  Mem. in Support of Sec. Mot. to Dismiss at 26.

In sum, Snyder claims his demands were not extortionate because they were made in the context of litigation and related settlement negotiations.

Avenatti raised this very issue in a motion to dismiss the indictment in his case and it was rejected by the district court.  Specifically, Avenatti asserted that the conduct he was alleged to have committed was not wrongful because he

> had the right to publicly expose truthful information about Nike's misconduct. He had the right to demand from Nike a settlement of his client's claims. . . . He had the right to demand a settlement on terms that may seem extraordinary to some. . . . He had the right to demand attorney's fees for himself as part of the overall settlement of his client's claims.

Mem. Denying Mot. to Dismiss at 14, attached as Exhibit 5.

The district court rejected all of Avenatti's arguments:

> Avenatti's argument ignores both the factual allegations in the Indictment and critical language in *Jackson I* and *Clemente*. While the Jackson I court states that "a threat to cause economic loss [or reputational harm] is not inherently wrongful," the court goes on to hold that such a threat "becomes wrongful . . . when it is used to obtain property to which the threatener is not entitled." *Jackson I,* 180 F.3d at 70 (emphasis added); *see also Clemente*, 640 F.2d at 1077 ("the use of fear of economic loss to obtain property to which one is not entitled is wrongful"); *see also Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 579 (S.D.N.Y. 2014), aff'd, 833 F.3d 74 (2d Cir. 2016) ("[t]he element of wrongfulness may be supplied by (1) the lack of a plausible **claim of entitlement** to the property demanded, or (2) the lack of a good faith belief of entitlement, or (3) the lack of a nexus between the threat and the claim of right. It may be supplied also, in this Court's view, by inherently wrongful conduct."
> The core of the Indictment's factual allegations is that Avenatti used threats of economic and reputational harm to demand millions of dollars from Nike, for himself, **to which he had no plausible claim of right**.

Mem. Denying Mot. to Dismiss at 16 (emphasis added).

The same logic applies to the Defendant.  Snyder had not been harmed by the UMMS transplant program.  He, therefore, had no claim of right against the hospital.  His client, M.S., did have a claim against the hospital because her husband had died after his transplant but M.S.'s medical malpractice claim cannot include Snyder's sough-after consultancy.  Tort damages in Maryland are limited to the injuries caused by the "natural and probable" consequence of the defendant's negligence and must be monetary in nature.  *See Dobbins v. Washington Suburban Sanitary Comm'n*, 338 Md. 341, 349-50 (1995); *Anne Arundel County v. Reeves*, 252 A.3d 921, 932 (2021).  Even the punitive damages that Snyder considered are monetary in nature.  M.S. could not have, however, sought to impose any compliance program at the UMMS transplant department as part of her damages.  As for Snyder's brief attempt to funnel his $25 million demand through M.S.'s settlement, that too would have been unlawful because that amount exceeded the amount authorized under Maryland's cap on damages in medical malpractice cases.  *See* Md. Code Ann., Cts & Jud., 3-2A-09.  Despite Snyder's insistence, there cannot be a nexus between M.S.'s tort claim and Snyder's consultancy.

Further, despite the fact that Snyder claimed at the very end of the extortionate scheme that M.S. had authorized his demand for the sham consulting arrangement, he had previously told UMMS representatives on multiple occasions that the $25 million payment was for him, not for M.S. As alleged in the Indictment and summarized above, at the June 22, 2018 meeting, Snyder said that UMMS would have to enter into an agreement with him separate from M.S.'s case. Indictment. ¶ 39. Specifically, Snyder told the UMMS representatives that he wanted to enter into a consulting agreement with UMMS so that Snyder would be "conflicted out" of any future case. *Id.* Snyder told the UMMS representatives that they should settle the M.S. case for whatever that case was worth and then pay Snyder $25 million to act as a consultant. *Id.* Kinter told Snyder that

she thought the $25 million was the demand for the J.S. / M.S. case. *Id.* ¶ 40. Snyder said that M.S. does not "deserve" that much money for her case. *Id.* Snyder stated that the $25 million was for him. *Id.* At that same meeting, Snyder told the UMMS representatives that if they said no to his demand for a $25 million payment separate from any payment to M.S. then he would hold a press conference, get an article placed on the front page of *The Baltimore Sun*, solicit interest in national articles, distribute commercials and launch a campaign on Google and Facebook as well as advertise on the Internet.  *Id.* ¶ 54. Snyder claimed there were "devastating" e-mails from the Nephrology Department that confirmed they did not like high-risk kidneys and questioned why UMMS was using them. Snyder told the UMMS representatives the only way to keep the e-mails from the public would be to pay Snyder $25 million. *Id.* ¶ 55.

And critically, on August 22, 2018, Snyder sent a revised demand letter to Kinter in the J.S. case seeking $6 million.  This revised demand was made the day before the August 23, 2018, meeting where Snyder repeatedly demanded $25 million for himself.

During the meeting that occurred on the following day, Dr. Whye questioned Snyder about why he was asking for $25 million, and this is how responded, "Well, because there's a different component to this. The – the component is that there are facts **independent of her case**, that came out of her case through investigation, that relate to the hospital generally. *Id.* ¶ 67 (emphasis added).  Later in this exchange Snyder again made it clear that the $25 million was for him and was separate and apart from the settlement he was seeking for his client:

> So – so again, I – I don't – I understand it's a unique thing. But – but again, **you don't want to shut her up**, which is not extortion, **and not shut me up**. You – you want me not to go forward. So, the question is, how do we do it and how is it not perceived as extortion? And how is it perceived as in compliance with the rules, isn't that right? Isn't that what we're talking about?

*Id.* ¶ 68. During that meeting, Snyder also made clear, as he had done earlier, that the $25 million payment was to stop him from launching a negative public relations campaign against UMMS, not to settle any litigation.  During the meeting Kinter asked Snyder:

> The only reason we are where we are at, now, right, having this conversation, is because – and you'll show Dr. Whye the video, is you've got in your mind damaging things, and that if you didn't have these damaging things and you didn't have the ability to make an ad and go on TV, you wouldn't be here today talking to us about a consulting agreement…right?–

to which Snyder responded, "Correct." *Id.* ¶ 69.

The Defendant further argues that otherwise extortionate threats made in the context of litigation are not wrongful.  Mem. in Support of Sec. Mot. to Dismiss at 28.  The Defendant cites *United States v. Pendergraft,* in support of his argument.  297 F.3d 1198 (11th Cir. 2002). *Pendergraft* is distinguishable, however, because, as the Eleventh Circuit noted, it involved a governmental entity:

> Moreover, in this case, we are not dealing with a typical threat to litigate. Instead, we are dealing with a threat to litigate against a county government. The right of citizens to petition their government for the redress of grievances is fundamental to our constitutional structure. *See* U.S. Const. amend. I.[7] A threat to file suit against a government, then, cannot be "wrongful" in itself.

*Id*. at 1207 (11th Cir. 2002).

The Defendant next cites *Kimberlin v. National Bloggers Club*, No. GJH-13-3059, 2015 WL 1242763, at *8 (D. Md. Mar. 17, 2015) and *State v. Rendelman,* 404 Md. 500, 519-22 (2008) both of which cite *Pendergraft*, for the proposition that meritless litigation is not extortion. However, in this case, the Defendant did not threaten litigation.  Rather, he threatened a negative public relations campaign, including  a front-page story in *The Baltimore Sun*, a press conference where he would make the claim that UMMS' transplanted diseased organs into unsuspecting patients, an "internet bomb" attached to UMMS's website and two television commercials, one of

which was made to look like a public service announcement.  That is a far cry from any claim of litigation, meritless or otherwise.

Apart from the Avenatti case, a number of courts have addressed whether the fact that a demand is made in the context of litigation means it cannot be wrongful.  They have all rejected that argument.

In *Viacom Int'l Inc. v. Icahn*, the district court explained,

> "The Supreme Court held in *Enmons* that a person employs 'wrongful means' not necessarily by employing means that are illegal unto themselves, but by exploiting one of the means identified in the statute ("actual or threatened force, violence, or fear") to obtain property to which "the alleged extortionist has no lawful claim." 410 U.S. at 400, 93 S.Ct. at 1010; *Clemente*, 640 F.2d at 1076. Under the *Enmons* framework, when the objective is wrongful (i.e., to obtain property to which one "has no lawful claim"), then the means (e.g., exploitation of fear) is also wrongful. Stated another way, both elements of extortion occur whenever one exploits fear to obtain property to which one has no lawful claim.

747 F. Supp. 205, 211–12 (S.D.N.Y. 1990), aff'd, 946 F.2d 998 (2d Cir. 1991) *citing United States v. Clemente*, 640 F.2d 1077-78 1076 (2d Cir.1981).

In *United States v. Godwin-Painter*, the defendant filed a malpractice suit against his former attorney and threatened, during settlement negotiations, to release damaging information unless the victim settled the suit. No. CR415-100, 2015 WL 5838501, at *1 (S.D. Ga. Oct. 6, 2015). The defendant moved to dismiss the indictment, arguing that his "actions occurred in the context of civil litigation and could not be considered 'wrongful.'" *Id*. That court rejected the argument, concluding that the indictment was sufficient and the court could not engage in a pretrial sufficiency-of-the-evidence analysis. *Id*. at *1-2. That court went on to explain that even if it could evaluate the evidence, it would not dismiss the indictment, as the law did not permit an individual

to make extortionate threats "but then avoid prosecution by cloaking that wrongful threat in civil litigation." *Id*. at 2.[8]

In *United States v. Curley*, the defendant, who had interviewed for an entry-level job with a corporation, threatened to sue the company for sexual harassment unless he was paid $130,000 (the defendant falsely alleged he had been solicited during the interview).  (Curly II), No. 1:13-CR-00058-JAW, 2015 WL 1539619 at *2 (D. Me. Apr. 6, 2015).  In pretrial litigation, the district rejected the argument that the threat of litigation could not be a basis for a § 875(d) conviction. *United States v. Curley*, No. 1:13-CR-00058-JAW, 2014 WL 199948, at *6 (D. Me. Jan. 16, 2014) ("Mr. Curley is free to argue that threats of litigation do not constitute extortion, but that legal question cannot be reached by the Court on this 12(b)(3)(B) motion to dismiss.").  The defendant pled guilty and was sentenced to twenty-four months' imprisonment.

Similar circumstances were presented in a civil extortion suit in *La Suisse, Societe D'Assurances Sur La Vie v. Kraus*, No. 06 Civ. 4404 (CM) (GWG), 2014 WL 3610890 (S.D.N.Y. July 21, 2014) (report and recommendation). There, the court considered whether the defendants committed extortion by initiating a lawsuit on behalf of insurance policyholders as a threat to force the victim to pay the defendants in exchange for withdrawing the suit. *Id*. at *4. In other words, the defendants used threats of legitimate litigation to extract payments for themselves. Because the defendants "could not have any claim of right to the proceeds of the . . . suit," the demand "to negotiate a payment directly to [themselves] in exchange for the withdrawal of all policyholder lawsuits" was extortionate. *Id*. at *10.

---

[8] Charges were later dismissed against the defendant in Godwin-Painter upon motion of the government, after the defendant disclosed that he had a valid advice-of-counsel defense. See Order, *United States v. Godwin-Painter*, No. CR415-100 (S.D. Ga. Nov. 18, 2015) (Dkt. No. 75).

The Defendant claims that his threats to publicly accuse UMMS of transplanting diseased organs into unsuspecting patients cannot be deemed "wrongful" because "the threatened acts, publicizing and advertising, are not unlawful."  Mem. in Support of Sec. Mot. to Dismiss at 32.  In support of that assertion he cites two decisions, *In re Finkelstein,* 901 F.2d 1560 (11th Cir. 1990) and *Sussman v. Bank of Israel,* 56 F.3d 450 (2d Cir. 1995).  Both of those cases involved questions of whether lawyers should be disbarred for various threats they made in the course of litigation. Neither one addressed charges of extortion nor held that the attorneys that were subject to disbarment hadn't acted in a way that was wrongful.  In fact, the word "wrongful" never appears in either decision.

The Defendant cites a number of decisions of state and federal courts for the proposition that there is a "value to a defendant of having a successful plaintiff's lawyer sidelined from brining similar cases in the future.  Mem. in Support of Sec. Mot. to Dismiss at 27 citing *Feldman v. Minars*, 658 N.Y.S. 2d 614, 230 A.D. 356 (1st Dep't, 1997); *Blue Cross and Blue Shield of N.J. v. Philip Morris, Inc.*, 53 F. Supp. 2d 338, 342-44 (E.D.N.Y. 1999*); Shebay v. Davis*, 717 S.W.2d 678, 682 (Tex. App. 1986*); Lee v. Florida Dept. of Ins. And Treasurer*, 586 So. 2d 1185, 1189 (Fla. App. 1991); and *Feiner & Lavy, P.C. v. Zohar*, 2021 WL 2196723, *2 (1st Dep't, June 1, 2021). However, in none of these cases, did the defendant threaten to cause economic harm to the victim like Snyder did if the victim chose not to hire the defendant.

Relatedly, the Defendant asserts that "UMMS would have received substantial value from acceptance of Snyder's combined proposal."  Mem. on Support of Sec. Mot. to Dismiss at 27. This statement is of course contradicted by the fact that the Defendant never actually told UMMS what he could do for them and instead told them "I could be the janitor," Indictment ¶ 50.  Further, on August 27, 2018, Snyder made it clear that he didn't really intend to do anything:

> And you'll use – and you'll use me when you want me, if at all. You know, when you need me, you know, you'll call me once a month, or you'll have lunch with me once and month, and you'll – and you'll get advice from me. Hopefully, nothing will ever surface, no cases or anything. I don't think they will.

Indictment ¶74.  So the "value" that Snyder would confer on the hospital, in exchange for $25 million, would be a phone call, once a month, or maybe lunch.  That's an expensive lunch. And in any event, this argument ignore the fact that Snyder wasn't just offering his services to UMMS.  He threatened to destroy their transplant program and the hospital's reputation if they didn't take him up on his offer.  In other words, he tried to make them an offer they couldn't refuse.

Finally, the Defendant claims that he lacked criminal intent because he had a subjective belief that he was entitled to make a claim, citing *United States v. Sturm*, 870 F.2d 769, 774 (1st Cir. 1989).  In *Sturm*, the First Circuit reversed the defendant's conviction because of a defect in the jury instructions, not because it found that the defendant had a subjective belief that the defendant was entitled to the property he demanded.  Indeed, the First Circuit held that the evidence showed that the defendant did not have a subjective belief that he was entitled to the money he demanded from the victim:

> Although there was sufficient evidence for the jury to conclude that Sturm knew he had no legal right to the $20,000 fee, we can not be certain that the jury actually made such a finding. The conviction on this count must be vacated because the trial court did not instruct the jury that in order to convict the defendant of attempted extortion, it would have to find that Sturm knew that he was not legally entitled to a fee to help WCIS recover the logbooks.

*Id*. at 775.

In contrast to all of the cases that the Defendant mischaracterizes as supportive of his arguments, the facts alleged in the Indictment are similar to the *United States v. Teplin*, 775 F.2d 1261 (4th Cir. 1985).  In *Teplin*, the Fourth Circuit affirmed a conviction for traveling in interstate

commerce with the intent to facilitate extortion, in violation of the Travel Act (18 U.S.C. § 1952(a)(3)) and for attempted Virginia's extortion statute as assimilated by federal law (in violation of 18 U.S.C. § 13, assimilating Va. Code §§ 18.2–26 and 18.2–59).

In *Teplin*, the defendant had been an attorney for a prominent businessman, through which he had been tasked with a revocation agreement that nullified a prenuptial agreement between the client and his wife.  775 F.2d at 1262.  After the client's death, the wife used the revocation to claim part of the deceased's estate.  During the probate process, the defendant contact the wife and "threatened to tell others involved in the probate proceedings that the revocation agreement was fraudulent unless Mrs. Eaton agreed to pay him money" in the amount of $100,000.  *Id*.

On appeal, Teplin argued that the district court had improperly ruled that "claim of right" is not a defense to extortion under Virginia law, and that he had a legitimate claim of right to the money.  *Id*. at 1263.  While affirming the lower court's interpretation of Virginia law, the Fourth Circuit also concluded the legal issue was moot: "[W]e fail to see what claim of right the defendant had to the money which he demanded from Mrs. Eaton. He was clearly demanding 'hush money' to remain silent about the alleged invalidity of the revocation agreement." *Id*. at 1263–64.

The same logic applies to Snyder.  He didn't have a claim against UMMS because he hadn't been harmed by UMMS.  He was demanding hush money just like the defendant in *Teplin*.

## V.    THE COURT SHOULD DENY THE DEFENDANT'S MOTION TO COMPEL THE PRODUCTION OF BRADY MATERIAL

Snyder's Motion to Compel Brady material seeks, essentially, two categories of information: (1) four requests are for communications between government agents and representatives of UMMS that occurred in advance of the recorded meetings and calls with Snyder and Graham; and (2) the fifth request is for documents related to the government's investigation into Snyder.

Snyder's Motion to Compel is based on false allegations of misconduct.  Snyder writes, "The requested information concerns the misconduct by government agents that form the basis for Snyder's First Motion to Dismiss the Indictment."  Memo, Motion to Compel at 1.  As explained previously, the government did not engage in any misconduct; the government had no obligation to record a second meeting with Graham, and there is no reason to believe that the second meeting would have been exculpatory.

The individual requests are also based on dubious, if not impossible assumptions.  As to his first two requests, which seeks documents related to the decision to cancel a second meeting with Graham, Snyder contends the government cancelled the meeting because Snyder was willing to "abandon[] his proposal" if Graham did not think the consultancy was lawful.  Memo, Motion to Compel at 4.  This assertion is based on the legal impossibility that Graham could have wiped away the extortion that had already occurred.  And Snyder's assertion that cancelling the meeting deprived him of his due process rights is contrary to established Fourth Circuit precedent.  *See Werth v. United States*, 493 Fed. Appx. 361, 366 (4th Cir. 2012).

As to his third request, Snyder vaguely asserts that he "has reason to seek other favorable information about the government's role," and that Magdeburger's August 27, 2018, call with Graham was "peculiar." Memo, Mot. to Compel at 6.  Aside from these conspiratorial assertions, which are difficult to understand, Snyder has not offered any credible basis for the potential existence of *Brady* material.

As to his fourth request, Snyder claims that the government planned the August 30, 2018 call to "destroy the nexus" between M.S.'s claim and Snyder's proposed consultancy.  *Id.* at 7. But the lack of any nexus was never in dispute.  Reading from the transcript that Snyder attached to his Second Motion to Dismiss, Snyder admitted during the August 23, 2018 meeting, "they're

probably not supposed to be lumped together.  They are two separate distinct things."  Second Mot. to Dismiss, Ex. 3 at 42.  Snyder's willingness to make arguments that are contradicted by his own statements and his own exhibits shows that there is no reason to believe that any contact between government agents and UMMS representatives is exculpatory.

As to Snyder's last request, for "statements documenting or explaining the closure of the investigation of Snyder in 2018,"

federal courts have found that a prosecutor's opinion is not *Brady*.  *See Morris v. Ylst,* 447 F.3d 735, 742-43 (9th Cir. 2006) ("The Gumz status report is best characterized as a statement of the prosecutor's opinion . . . . So understood, it is not *Brady* material."); *United States v. Whyte*, 2018 WL 847784, *2 (W.D. Va. Feb. 13, 2018) ("Defendant believes *Brady* required the government to turn over the prosecutor's opinions.  It does not.")  Federal courts have observed that requiring disclosure of a prosecutor's opinion would "displace" the adversary system, "greatly impair the government's ability to prepare for trials," and would encourage "inefficiency, unfairness and

sharp practices . . . in the preparation of cases for trial." *Morris,* 447 F.3d at 742-43 (citations and quotations omitted); *Williamson v. Moore*, 221 F.3d 1177, 1182 (11th Cir. 2000) (citations and quotations omitted).  As the saying goes, reasonable minds can differ, and prosecutors should be free to discuss their views or opinions about cases without fear that a defendant might, one day, be able to take a poll of the U.S. Attorney's Office to see if any prosecutors disagreed with another prosecutor.  To do so would lead to the consequences that federal courts have warned against.

## VI.     STATEMENT AS TO DEFENDANT'S FILING, ECF NO. 53

Snyder has requested that the Court expedite its resolution of this Motion and promptly schedule a hearing.  As explained throughout this Motion, Defendant has not cited any basis to dismiss the Indictment, no hearing is necessary, and the Court should resolve these Motions in the ordinary course, without a hearing.

## VII.    REQUEST TO EXCEED PAGE LIMITATIONS

The Government chose to respond to four filings in a single response, which required the Government to exceed the 35-page limit in Local Rule 105.3.  The Government requests permission to exceed the page limit rather than separate this single filing into four separate filings.

## VIII.   CONCLUSION

WHEREFORE, the United States respectfully requests that the Court deny Snyder's two Motions to Dismiss and his Motion to Compel.

Respectfully submitted,

Jonathan F. Lenzner
Acting United States Attorney

____/s/_____
Leo J. Wise
Matthew P. Phelps
Assistant United States Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that this filing was served on defense counsel via ECF electronic filing.


_____/s/_____
Matthew P. Phelps
Assistant United States Attorney