## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - **X**

**UNITED STATES OF AMERICA**      **:**

       **v.**      **:**

                      **Criminal No. 1:20-cr-00337-GLR**

**STEPHEN SNYDER,**      **:**

     **Defendant.**      **:**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - **X**


**CONSOLIDATED REPLY OF STEPHEN L. SNYDER, DEFENDANT, TO GOVERNMENT'S OPPOSITION TO (1) SNYDER'S FIRST MOTION TO DISMISS INDICTMENT, (2) SNYDER'S MOTION TO COMPEL PRODUCTION OF BRADY  INFORMATION, (3) SNYDER'S SECOND MOTION TO DISMISS INDICTMENT AND (4) SNYDER'S <u>SUMMARY AND STATEMENT FOR PROMPT HEARING</u>**

**Arnold M. Weiner**, Bar No. 01605
aweiner@rwllaw.com
**Stuart A. Cherry**, Bar No. 28012
scherry@rwllaw.com
**Devon L. Harman,** Bar No. 21936
dharman@rwllaw.com
RIFKIN WEINER LIVINGSTON LLC
2002 Clipper Park Road, Suite 108
Baltimore, MD 21211
Phone:  (410) 769-8080
Fax:  (410) 769-8811

*Counsel for the Defendant.*

## **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................1

ARGUMENT IN REPLY .........................................................................................6

    I.     THE COURT SHOULD GRANT SNYDER'S FIRST MOTION
         TO DISMISS BECAUSE THE GOVERNMENT HAS BEEN
         UNABLE TO PROVIDE A SATISFACTORY RESPONSE FOR
         ITS EMPLOYMENT OF IMPROPER DEVICES THAT
         ENABLED IT TO GAIN AN UNFAIR ADVANTAGE OVER
         SNYDER AND CAUSED IRREPARABLE PREJUDICE TO
         SNYDER'S DEFENSE .......................................................................6

         A.     The Government's Opposition Skirts The Issues Presented
             in Snyder's First Motion ......................................................6

         B.     The First Motion Explains That The Government
             Improperly Employed A Deliberate Device To Gain An
             Unfair Advantage Over Snyder ............................................7

         C.     The Facts Alleged By Snyder Are Fully Supported By The
             Record And Virtually Undisputed By The Government .........................9

         D.     The Government Cannot Take Issue With The Settled Legal
             Principles, Enunciated In The Leading Supreme Court
             Cases, That The Misconduct Of The Government's Agents
             Here Violates Due Process.....................................................14

         E.     The Same Constitutional Principles That Apply When
             Government Agents Fail To Preserve Or Destroy Evidence
             Apply To All Other Cases In Which Government Agents
             Improperly Employ Devices To Gain Unfair Advantage
             Over An Accused ..................................................................16

         F.     The Government Relies On Cases In Which Defendants
             Mistakenly Claimed That *Brady* Requires The Government
             To Conduct Investigations For The Benefit Of The
             Defendant And Not Cases, Such As The Present Case, In
             Which Government Agents Actively Committed
             Misconduct That Prejudiced The Defendant ..........................20

i

G.     Snyder Was Substantially And Irreparably Prejudiced Because The Meeting Between UMMS And Mr. Graham Would Have Proven Conclusively That Snyder's Conduct, Throughout The Indictment Period, Was Not Committed With Criminal Intent ..............................................................25

H.     The Prejudice To Snyder Is Irreparable Because There Is No Evidence That Could Be Comparable To The Unimpeachable Recording That Would Have Been Made....................31

II.    THE COURT SHOULD GRANT SNYDER'S *BRADY* MOTION BECAUSE SNYDER SEEKS EXCULPATORY INFORMATION NECESSARY FOR CONSIDERATION OF HIS FIRST MOTION TO DISMISS THE INDICTMENT ....................................................35

A.     Snyder's First Two *Brady* Requests Go To The Heart Of The Misconduct That Is The Subject Of Snyder's First Motion To Dismiss ...............................................................37

B.     Snyder's Third And Fourth *Brady* Requests Concern Other Investigative Misconduct In Connection With Two Important Conversations That Mr. Graham And Snyder Had With UMMS Representatives .................................................39

C.     The Government Must Disclose Its Improper Instructions To UMMS Representatives, Even If Those Instructions Were Given Orally And Not Subsequently Reduced To Writing ...................41

D.     The U.S. Attorney's Closing Memorandum, Memorializing The Closing Of The Investigation Of Snyder In 2018, Is Discoverable Under *Brady*......................................................43

E.     Snyder's *Brady* Rights Supersede The Prosecutors' Work Product Interests In The U.S. Attorney's 2018 Closing Memorandum .........................................................45

F.     At The Very Least, The Government Must Provide The U.S. Attorney's 2018 Closing Memorandum To This Court For *In Camera* Inspection............................................................47

III.   THE COURT SHOULD GRANT SNYDER'S SECOND MOTION TO DISMISS BECAUSE THE GOVERNMENT HAS NO VALID EXCUSE FOR THE PROSECUTORS' FALSIFICATIONS ............................48

A.  The Government Contends Erroneously That This Court Is Powerless To Remedy Prosecutorial Misconduct Consisting Of Falsification Of The Allegations Of An Indictment ..........................48

    1.  General Principles Governing Dismissal For Prosecutorial Misconduct In Connection With Grand Jury Proceedings, As Well As Those Governing Dismissal For Prosecutorial Misconduct At Other Stages Of The Criminal Process, Require That The Court Dismiss The Falsified Indictment With Prejudice ...................................................................49

    2.  Rule 12 Not Only Allows A Pretrial Motion To Dismiss Based On Prosecutorial Misconduct - It Requires It ..................................................................53

    3.  Under The Authorities Previously Cited In Support Of Snyder's Second Motion To Dismiss, The Court May, But Need Not, Include In The Order Dismissing The Indictment A Determination That Snyder Is Not, And Cannot Legally Be Charged With, Attempted Extortion..........................................................57

B.  There Is No Justification For The Indictment's Falsified Narrative ................................................................................59

    1.  The Prosecutors Do Not Assist The Court When They Refuse To Address Either The Findings In Mr. Guberman's Expert Declaration Or The Falsifications Catalogued And Graphically Demonstrated In The Exhibit Comparing The Indictment To The Actual Transcripts ........................................59

    2.  The Government's Explanations Do Not Hold Water ....................................................................................62

    3.  The Government Would Have This Court Give Its Approval To A Charging Document Riddled With Half-Truths..................................................................64

C.  The Present Case Is As Different From *Avenatti* As Day Is From Night................................................................................67

1.     Avenatti's client was complicit with Nike's wrongdoing, meaning that publicity and litigation were not in the client's best interests, whereas Snyder's client was a tort victim with a claim for a catastrophic injury, who had a strong interest in potential litigation and attendant publicity and whose claim Snyder negotiated along with the consultancy.................68

2.     Avenatti's client knew nothing about Avenatti's proposal for himself and Avenatti sacrificed his client's interests, whereas Snyder's client was an advocate for Snyder to be a consultant to UMMS and Snyder achieved a great success for his client...........................69

3.     The publicity threatened by Avenatti was adverse to the interests of his own client and had no relationship to any litigation, whereas the publicity threatened by Snyder was publicity that would attend the filing of suit and was reasonably expectable from a plaintiff's lawyer pursuing a claim for egregious injury such as that held by his client...................................................70

4.     Nike offered to make the entire payment to Avenatti's client, but Avenatti rejected it, whereas Snyder suggested that UMMS pay the entire sum to his client but UMMS rejected it...................................71

5.     Avenatti obtained the assistance of another lawyer to act as a confederate in the wrongdoing whereas Snyder engaged a premier ethicist whom he wanted to meet with UMMS to ensure that any arrangement between Snyder and UMMS would be ethical, moral and legal....................................................................71

D.     All Of The Counts In The Present Indictment Are Governed By The Law Of Extortion As Declared In The *Pendergraft* Case And Not In Accordance With The Second Circuit's Minority View.......................................................................72

REQUEST TO EXCEED PAGE LIMITATION ......................................77

CONCLUSION........................................................................................78

# **TABLE OF AUTHORITIES**

**Cases**

*Ademil v. PennyMac Mortg. Inv.,* 929 F. Supp. 2d 502 (D. Md. 2013)........................................ 71

*Arizona v. Youngblood,* 488 U.S. 51 (1989) ........................................................... 17, 18

*Bank of Nova Scotia v. United States,* 487 U.S. 250 (1988)................................................... 54, 55

*Berger v. United States,* 295 U.S. 78 (1935) ........................................................... 14, 16

*Brady v. Maryland*, 373 US 83 (1963) ........................................................... passim

*California v. Trombetta,* 467 U.S. 479 (1984)........................................................... 15

*Camm v. Faith,* 937 F.3d 1096 (7th Cir. 2019)........................................................... 26

*Chevron Corp. v. Donziger,* 974 F. Supp. 2d 362 (S.D.N.Y. 2014)........................................... 82

*Douglas v. Workman,* 560 F.3d 1156 (10th Cir. 2009).................................................... 46

*Elonis v. United States,* 575 U.S. 723 (2015) ........................................................... 27

*Estate of Bryant v. Balt. Police Dep't.,* 2020 WL 673571 (D. Md. Feb. 10, 2020).......... 25, 26, 45

*Fontenot v. Crow,* 4 F.4th 982 (10th Cir. 2021) ........................................................... 49

*Giglio v. United States,* 405 U.S. 150 (1972) ........................................................... 33

*Gusow v. United States,* 347 F.2d 755 (10th Cir. 1965) ................................................... 71

*Hallmark Hardwoods, Inc. v. Omni Wood Product, LLC,* 2011 WL 13176098 (E.D. Calif., Dec. 14, 2011) ........................................................... 73

*Illinois v. Fisher,* 540 U.S. 544 (2004) ........................................................... 17

*Juniper v. Zook,* 876 F.3d 551 (4th Cir. 2017) ........................................................... 41

*Kimberlin v. National Bloggers Club,* 2015 WL 1242763  (D.Md. Mar. 17, 2015) ................... 81

*Kyles v. Whitley,* 514 U.S. 419 (1995)........................................................... 41

*LaSuisse, Société D'Assurances Sur La Vie v. Kraus,* 2014 WL 361890 (S.D.N.Y. July 21, 2014) ........................................................... 82

*Linden v. United States,* 254 F.2d 560 (4th Cir. 1958) ........................................................ 70, 71

*Loeffel Steel Products, Inc. v. Delta Brands, Inc.,* 2005 WL 8178971 (N.D. Ill. Sept. 8, 2005) . 73

*Love v. Johnson,* 57 F.3d 1305 (4th Cir. 1995).................................................................... 51, 52

*Lustiger v. United States,* 386 F.2d 132 (9th Cir. 1967)............................................................. 71

*Mesarosh v. United States,* 352 U.S. 1 (1956)......................................................................... 37

*Mincey v. Head,* 206 F.3d 1106 (11th Cir. 2000) ..................................................................... 51

*Morissette v. United States,* 342 U.S. 246 (1952)..................................................................... 28

*Morris v. Ylst,* 447 F.3d 735 (9th Cir. 2006)............................................................................ 48

*Napue v. Illinois,* 360 U.S. 264 (1959) ................................................................................... 33

*Paradis v. Arave,* 240 F.3d 1169 (9th Cir. 2001) ..................................................................... 50

*Pennsylvania v.  Ritchie,* 480 U.S. 39 (1987) .......................................................................... 52

*R.R. Donnelley & Sons, Inc. v. Vanguard Transp. Systems, Inc.,* 641 F. Supp. 2d 707 (N.D. Ill. 2009) ..................................................................................................................... 73

*Rodriguez v. Pan American Health Organization,* 502 F. Supp. 3d 200 (D.D.C. 2000)............. 72

*See United States v. Godwin-Painter,* 2015 WL 1375432 (S.D. Ga. Aug. 15, 2015) ................. 84

*Smith v. Sec'y of New Mexico Dep't of Corrections,* 50 F.3d 801 (10th Cir. 1995)................... 45

*State v. Rendelman,* 404 Md. 500 (2008)........................................................................... 81, 86

*Strickler v. Greene,* 525 U.S. 263 (1999) ........................................................................... 16, 44

*United States  v. King,* 628 F.3d 693 (2011)............................................................................ 52

*United States v. Agurs,* 427 U.S. 97 (1976) .................................................................. 16, 33, 38

*United States v. Alverio-Melendez,* 640 F.3d 412 (1st Cir. 2011) ............................................ 24

*United States v. Armstrong,* 517 U.S. 456 (1996) .................................................................... 49

*United States v. Avenatti,* 2021 WL 2809919 (S.D.N.Y. July 6, 2021)................................ passim

*United States v. Bagley,* 473 U.S. 667 (1985) ......................................................................... 38

*United States v. Balint,* 258 U.S. 250 (1922) ................................................................. 27

*United States v. Brumel-Alvarez,* 991 F.2d 1452 (9th Cir. 1992) ................................. 50

*United States v. Bryant,* 655 F.3d 232 (3rd Cir. 2011) ................................................. 72

*United States v. Curley,* 2014 WL 199948 (D. Me. Jan. 16, 2014) .............................. 83

*United States v. Didonna,* 866 F.3d 40 (1st Cir. 2017) ................................................. 83

*United States v. Ducore,* 309 F. Supp. 3d 436 (D. Md. 2018) ...................................... 24

*United States v. Duncan,* 896 F.2d 271 (7th Cir. 1990) ................................................ 61

*United States v. Edwards,* 777 F. Supp. 2d 985 (E.D. N.C. 2011) ............................... 50

*United States v. Feurtado,* 191 F.3d 420 (4th Cir. 1999) ........................................ 54, 55

*United States v. General Dynamics Corp.,* 644 F. Supp. 1497 (C.D. Cal. 1986)............... 63, 64

*United States v. Godwin-Painter,* 2015 WL 5838501 (S.D. Ga. Oct. 6, 2015) ............................. 84

*United States v. Goldman,* 439 F. Supp. 337 (S.D.N.Y. 1977) ..................................... 49

*United States v. Gouveia,* 467 U.S. 180 (1984) ....................................................... 7, 15

*United States v. Gray,* 648 F.3d 562 (2nd Cir. 2011) .............................................. 23, 24

*United States v. Gutierrez,* 2007 WL 3026609 (W.D. Tex. 2007) ................................ 50

*United States v. Harris,* 551 Fed. Appx. 699 (4th Cir. 2014) ...................................... 15

*United States v. Jackson,* 196 F.3d 383 ....................................................................... 82

*United States v. Johnson,* 187 F.3d 1129 (9th Cir. 1999) ............................................. 73

*United States v. Kahlon,* 38 F.3d 467 (9th Cir. 1994) .................................................. 60

*United States v. Liberto,* 2020 WL 5994959 (D.Md. Oct. 9, 2020) ............................. 64

*United States v. Lovasco,* 431 U.S. 783 (1977) .......................................................... 15

*United States v. Marion,* 404 U.S. 307 (1971).............................................................. 15

*United States v. Mason,* 41 Fed. Appx. 612 (4th Cir. 2002).......................................... 71

*United States v. Mausali,* 590 F.3d 1077 (9th Cir. 2010) ........................................ 60, 61

*United States v. Mickens,* 2021 WL 3136083 (2nd Cir. July 26, 2021) ....................................... 46

*United States v. Nebel,* 856 F. Supp. 392 (M.D. Tenn. 1993) ................................................ 57, 58

*United States v. Nunez-Rios,* 622 F.2d 1093(2nd Cir. 1980)....................................................... 60, 61

*United States v. Omni Intern. Corp.,* 634 F. Supp. 1414 (D. Md. 1986)................................................ 57

*United States v. Pendergraft,* 297 F.3d 1198 (11th Cir. 2002)................................................. 80, 86

*United States v. Pitt,* 193 F.3d 751 (3rd Cir. 1999) ...................................................... 60, 62

*United States v. Rigas,* 2011 WL 1330531 (M.D. Pa. Sept. 20, 2011)....................................... 50

*United States v. Riley,* 657 F.2d 1377 (8th Cir. 1981) ...................................................... 24

*United States v. Robinson,* 627 F.3d 941 (4th Cir. 2010) ............................................... 44

*United States v. Rodarte,* 596 F.2d 141 (5th Cir. 1979) ................................................. 24

*United States v. Rodriguez,* 496 F.3d 221, 226 (2nd Cir. 2007)................................................. 45

*United States v. Russell,* 221 F.3d 615 (4th Cir. 2000)................................................ 33

*United States v. Salahuddin,* 765 F.3d 329 (3rd Cir. 2014)........................................... 61

*United States v. Shaffer,* 789 F.2d 682 (9th Cir. 1986)................................................ 45

*United States v. Skeddle,* 989 F. Supp. 873 (N.D. Ohio 1997) ..................................... 71

*United States v. Stein,* 541 F.3d 130 (2nd Cir. 2008) ............................................. 37

*United States v. Sturm,* 870 F.2d 769 (1st Cir. 1989), .................................................. 83

*United States v. Teplin,* 775 F.2d 1261 (4th Cir. 1985) ............................................ 83

*United States v. Warren,* 788 F.3d 805 (8th Cir. 2015) ........................................... 61, 62

*United States v. Woods,* 335 F.3d 993 (9th Cir. 2003) ......................................... 71

*Universal Health Services v. United States,* 136 S.Ct. 1989 (2016)........................................... 72

*Viacom Int'l Inc. v. Icahn,* 747 F. Supp. 205 (S.D.N.Y. 1990) .................................... 82

*Wearry v. Cain,* 577 U.S. 385 (2016) ........................................................................ 33

*Werth v. United States,* 493 Fed. Appx. 361 (4th Cir. 2012)................................. 22, 23

*Wisehart v. Davis,* 408 F.3d 321 (7th Cir. 2005) ........................................................ 45

## Other Authorities

*Ellipsis,* <u>Black's Law Dictionary</u> (5th ed. 1979)........................................................... 65

*Ellipsis*, Merriam-Webster Dictionary, Unabridged (2021) ......................................... 65

*Ellipsis*, Oxford Learner's Dictionary (2021) ............................................................. 65

*Justice Manual*, United States Department of Justice ...................................... 42, 44, 45

## Rules

Fed. R. Crim. P. 12 .................................................................................................. 58, 63

Fed. R. Crim. P. 7 ......................................................................................................... 62

## Treatises

Laurie Levenson, Federal Criminal Rules Handbook (2020 ed) ............................ 54, 57

Wright & Miller, Fed. Prac. & Proc. Crim., § 254 (4th ed. 2021)................................ 45

## INTRODUCTION

The government has failed to provide credible answers to the disturbing issues raised by Snyder in his Motions to Dismiss the Indictment with Prejudice.[1]  Despite its strident tone, the government's Opposition provides only a weak and unpersuasive defense to the flagrant and pervasive prosecutorial misconduct that Snyder describes meticulously in his Motions and for which Snyder has provided substantial *prima facie* proof.  While the government pleads with this Court not to hear Snyder's Motions, and beseeches the Court to shield from disclosure the remaining evidence of its misconduct that has not yet seen the light, there should be no doubt that the issues raised by Snyder require a prompt hearing under settled constitutional principles and pursuant to the provisions of Rule 12(b)(3) and (d).  Fed. R. Crim. P. 12.  If the government truly believed that it could vindicate itself, there would be no reason for the prosecutors to resist a public motions hearing so stubbornly and with such obvious anxiety.

As explained in this Reply, the government's Opposition is unsound, and not worthy of acceptance, for the following reasons, among others:

***First,*** the government leads with an attack on opposing counsel who brought to this Court's attention the pattern of misconduct that permeated the government's investigation and led to the falsification of the narrative the Indictment alleges.  Despite having the opportunity to dispute

---

[1] The First Motion of Stephen L. Snyder, Defendant, to Dismiss Indictment With Prejudice is referred to herein as the "First Motion;" the Second Motion of Stephen L. Snyder, Defendant, to Dismiss Indictment With Prejudice is referred to as the "Second Motion;" the Motion of Stephen L. Snyder, Defendant, to Compel Government to Produce *Brady* Information is referred to as the "*Brady* Motion."  The memoranda filed in support of the Motions are referred to as the "First Memo," "Second Memo" and "*Brady* Memo," respectively.  The "Summary of Defendant's Motions to Dismiss With Prejudice, and Statement of Reasons for Prompt Hearing Thereon, Pursuant to the Court's Direction at the January 5, 2021 Conference," is referred to as "Summary," and the "Memorandum in Support of The United States Omnibus Opposition to Defendant's Motions to Dismiss and Related Motions" is referred to as the government's "Opposition" or "Gov't Memo."

Snyder's averments in the First Motion, however, the government does not deny that the U.S. Attorney's Office and the FBI instructed UMMS representatives that they were not to agree to attend any meeting with Andrew Graham, Esq., Snyder's ethics counsel.  Further, the government does not dispute the fact that it gave these improper instructions, thereby wrongfully intervening in communications between Snyder and UMMS, after government agents had overheard Snyder imploring UMMS to meet with Mr. Graham to air any objections or reservations that they might have about Mr. Snyder's consulting/retainer proposal and after the agents also heard Mr. Snyder promise UMMS that he would abandon his proposal if Mr. Graham did not express the fully informed opinion that Snyder's proposal was ethical, moral and legal.  The government also does not deny that Snyder, for months, encouraged UMMS to meet with Mr. Graham and that, in his discussions with UMMS about a proposed consulting/retainer agreement, Snyder acted with the same intent with which he acted throughout the government's investigation.

***Second,*** the government does not deny that, in September 2018, after a month of surreptitiously listening to and recording all of Snyder's meetings and conversations with UMMS, the United States Attorney's Office declined to prosecute Snyder, terminated the investigation and closed its file.  The government does not dispute that the investigation was led by an experienced and highly regarded prosecutor or that the decision not to prosecute Snyder was because of Mr. Graham's involvement and because the evidence did not prove that Snyder acted with criminal intent.  Despite these undeniable facts, the government nevertheless refuses to provide Snyder the Memorandum that the U.S. Attorney's Office was required to write when it found in 2018 that there was no prosecutable case to be brought against Snyder.  The government tries to hide the Memorandum from Snyder by claiming that it represents non-discoverable work product, even though a host of federal courts have held that due process requires prosecutors to divulge such

Memoranda when, as in this case, they contain information and facts that are favorable to the defendant and valuable to his defense.  The government's resistance to reasonable disclosure reinforces the evidence of prosecutorial impropriety that is already in the record and further suggests that the government continues to have something to hide.

*Third,* the government's reaction to evidence demonstrating falsification of the narrative in the Indictment demonstrates that prosecutors can find no plausible explanation for that misconduct.  Snyder provided the Court with a thoughtful declaration from Ross Guberman, Esq., one of the country's preeminent authorities on legal writing, that describes the improper methods employed by prosecutors to create their false narrative.  For more than a decade, Mr. Guberman has taught legal writing to all new federal judges and, within the past month, he has provided programs on the subject to judges and lawyers of the Fourth Circuit and to lawyers at the U.S. Justice Department.  Instead of responding to Mr. Guberman's analysis, the prosecutors attack Mr. Guberman as a paid hack and declare that "the Government will not address it."  Gov't Memo, pp. 4, 42 n.7.  Even if Mr. Guberman had not been a prominent and highly respected authority on the very subject at issue, the prosecutors' attack on his Declaration, as something that Snyder "got what he paid for," would be unseemly.  The prosecutors demean themselves by such an inappropriate assault and demonstrate that they have no real defense for the falsifications that Mr. Guberman highlights.  Mr. Guberman has provided a Supplemental Declaration in reply to the government's Opposition, and he describes in the Supplemental Declaration how the government's Opposition fails to provide any acceptable justification for the prosecutors' falsifications.

*Fourth,* the government asks this Court to salvage the Indictment by holding that, so long as an indictment correctly quotes words pulled from a transcript, it does not matter that the draftsman of the indictment misrepresents the context in which the words appear, misrepresents

the meaning of the quoted words by concealing material qualifiers before and after the quoted words and further misrepresents the speaker's meaning by deliberately misusing ellipses and other grammatical devices.  In essence, the government asks this Court to endorse the unethical and fraudulent practice of stating only half-truths in an indictment's narrative, even though the law does not tolerate such half-truths in ordinary commercial dealings among ordinary citizens, in commercial dealings between citizens and the government or in any other pleading or filing with a court.  If anything, the government and its prosecutors must be held to a higher standard, not a lesser one, when invoking the majesty of the law to exercise the most consequential power that the government has over its own citizens.

*Fifth,* the present case against Snyder is as different from the case against Michael Avenatti as day is from night.  The prosecutors leave no doubt that they wish that the cases were the same, and, as explained in Snyder's Second Memo, that wish was a substantial motivation for the prosecutors' falsification of the Indictment to make the two cases look alike.  But here, unlike *Avenatti,* there is a nexus between the medical malpractice case that Snyder was pursuing for ▮▮▮▮▮▮▮▮▮ and Snyder's proposal for a consulting/retainer agreement.  That nexus brings Snyder within the litigation exemption from prosecution for extortion and provides him complete protection from the charges that the government levels against him.  The latest opinion in the *Avenatti* case, which the government does not bring to this Court's attention, makes clear that, under facts and circumstances such as those in the present case, there is a firm nexus between the client's litigation demands and the lawyer's demands for himself, and that, under such facts and circumstances, the litigation exemption protects the lawyer from prosecution.  *See United States v. Avenatti,* 2021 WL 2809919 (S.D.N.Y. July 6, 2021).  Here, Snyder enumerates the facts and circumstances of the present case that are opposite from those in *Avenatti* and establish that Snyder

cannot be prosecuted for extortion.  No amount of wishing by the prosecutors, and no set of falsifications reflecting those wishes, can wipe away the dispositive facts that prove that this case is the opposite of *Avenatti* and that there is no case of extortion to be brought against Snyder.

**Sixth,** the government claims that Snyder sought only a "sham" consulting/retainer agreement, for which he would not have provided services and from which UMMS would not have derived any value.  However, the government does not – and cannot – deny the facts that put the lie to that claim.  Among other things, contemporaneous notes kept by UMMS personnel, as well as FBI recordings, confirm that Snyder repeatedly offered to provide advice to UMMS, based on what he had uncovered, so as to assist UMMS in remediation efforts that it initiated as a result of Snyder's information and to keep UMMS "on the straight and narrow."  Snyder also proposed that, because of the unique insight that he had gained through his pursuit of two failed transplant cases, he would undertake to defend UMMS in actions brought by other persons who had suffered from failed kidney transplants.  Dr. Bartlett, who was then UMMS's Chief of Surgery, admitted to Snyder that he anticipated other cases being brought and that he believed that UMMS' practices had made UMMS vulnerable for fraud and punitive damages.  Snyder pointed out that UMMS already had in place a consulting/retainer arrangement with ████████████████ another prominent plaintiffs' attorney, and that Snyder was proposing an arrangement that was no different.  Snyder also stressed that his defense services would be particularly valuable because he had trained most of the plaintiff medical malpractice lawyers who were likely to be representing the new plaintiffs.  Snyder further offered to enter into a retainer arrangement with UMMS based on the type pioneered by Skadden Arps, a prominent New York firm, and is universally accepted as ethical and reasonable.  Under such a retainer agreement, the lawyer commits to stand by until called upon by the client.  The effect, if not the dominant purpose of the agreement, is to disqualify

the lawyer from taking matters adverse to the client.  In that connection, Snyder pointed out to UMMS that it would derive unique value from a consulting or retainer agreement with Snyder because Snyder would be disqualified from taking transplant cases against UMMS for the ten-year term of his proposed consulting agreement.  Snyder reminded UMMS that, in just the few months of 2018 during which they were discussing Snyder's proposed arrangement, Snyder settled two failed transplant cases with UMMS for a combined amount of $13.5 million, more than half the $25 million that UMMS would pay Snyder over a decade.  The government cannot escape the important facts, already confirmed in UMMS' documents and the FBI recordings, simply by attaching a pejorative label to Snyder's proposal and incorrectly calling it a "mere sham."

## ARGUMENT IN REPLY

**I. THE COURT SHOULD GRANT SNYDER'S FIRST MOTION TO DISMISS BECAUSE THE GOVERNMENT HAS BEEN UNABLE TO PROVIDE A SATISFACTORY RESPONSE FOR ITS EMPLOYMENT OF IMPROPER DEVICES THAT ENABLED IT TO GAIN AN UNFAIR ADVANTAGE OVER SNYDER AND CAUSED IRREPARABLE PREJUDICE TO SNYDER'S DEFENSE**

### A. The Government's Opposition Skirts The Issues Presented in Snyder's First Motion

The government, for the most part, does not dispute the facts presented in Snyder's First Motion to Dismiss and, by its silence, admits that its agents engaged in misconduct for the improper purpose stated.  In an effort to avoid consequences of that misconduct, the government attempts to defend itself by: (1) pretending that the legal issue does not concern the consequences of the agents' active misconduct but whether agents had an affirmative duty to conduct an investigation to assist Snyder; (2) ignoring the substantial body of law that governs conduct of prosecutors and investigators and forbids actions, like those taken in this case, to tip the scales unfairly in favor of the prosecution; (3) claiming, contrary to decades of settled law, that the government suffers consequences only if agents destroy evidence after it has been created; (4)

asserting that there should be no adverse consequences for the prosecution when its agents indulge in misconduct other than destroying existing evidence, even if that conduct is for the purpose of depriving a prospective defendant of the means or opportunity to have the benefit of a complete defense, and even if the government agents succeed in accomplishing that objective; (5) maintaining that the government agents, despite their deliberate and intentional interference with Snyder's ability to show that he was not acting with criminal intent, did not act in bad faith; and (6) contending, without basis, that Snyder's defense is not prejudiced by the agents' actions.  The government is wrong in each of these contentions.

### B.  The First Motion Explains That The Government Improperly Employed A Deliberate Device To Gain An Unfair Advantage Over Snyder

Snyder's First Motion to Dismiss presents the classic situation for which "the Fifth Amendment requires the dismissal of [the] indictment" because government agents, during their investigation, took improper actions that amounted to the employment of "a deliberate device to gain an advantage over [Snyder] that [has] caused him actual prejudice in presenting his defense." *United States v. Gouveia,* 467 U.S. 180, 192 (1984).  Specifically, the First Motion explains that "a member of the U.S. Attorney's Office instructed UMMS not to meet with Andrew Graham, Esq., Snyder's lawyer, and further, to forbid Mr. Graham from attending a scheduled meeting." Summary, p. 4.  The government's instructions to UMMS were given in bad faith and for an improper purpose because, "The government [thereby] prevented UMMS from meeting with Mr. Graham after learning that Snyder had assured UMMS that he would not go forward with his proposal for a consulting agreement if UMMS, after meeting with Mr. Graham, was not satisfied that Snyder's proposal was ethical, moral and proper."  *Id.* "The government prevented any meeting with Mr. Graham from taking place precisely because the government knew that the meeting would have afforded the UMMS attorneys the unfiltered opportunity to voice their

concerns to Mr. Graham and to all of the facts with him." *Id.*, p. 6. "Mr. Graham would have stated, for the benefit of all present, his views as to whether, under all the circumstances, it was proper for Snyder and UMMS to enter into a consulting/retainer agreement." *Id.*, pp. 6-7. "The proposal would simply have died if either Mr. Graham had opined that it could not be effectuated legally and ethically or if Mr. Graham had endorsed the proposal but the UMMS attorneys had said that they were not convinced." *Id.*, p. 7. "However, the government prevented Mr. Graham from meeting with UMMS because it knew that the meeting would be devastating to any potential prosecution and did not want a recording at such a meeting to be part of its investigative file." *Id.* The government compounded its misconduct, which ripened into a denial of due process, when "the prosecution subsequently brought this case in bad faith" through an Indictment that "cover[s] up the government's efforts that denied Snyder the benefit of the exonerating evidence*."* First Memo, p. 1.

The government's misconduct, in willfully destroying Snyder's opportunity to have the benefit of evidence that would have exonerated him, was a device employed for the purpose of gaining an unfair advantage over Snyder and meets requirements for dismissal of the pending indictment with prejudice: (1) the government agents manipulated and tampered with the evidence, and deprived Snyder of the evidence that would have exonerated him, in bad faith and with the intent to prejudice Snyder if he was ever charged with extortion; (2) Snyder lost "material exculpatory" evidence; (3) there is nothing speculative or undetermined about the prejudice that Snyder has suffered; and (4) there is no reasonably comparable substitute for the evidence that the government caused Snyder to lose.  First Motion, ¶ 16.

### C.  The Facts Alleged By Snyder Are Fully Supported By The Record And Virtually Undisputed By The Government

The facts underlying the First Motion establish the government's misconduct, are fully supported by the record, and are essentially undisputed by the government. The detailed exposition in the First Memo, supported by references to transcripts of FBI recordings of conversations and meetings with Snyder, credible investigative memoranda and contemporaneous memoranda authored by UMMS representatives,[2] establish that the government's misconduct was employed for the sole purpose of gaining unfair advantage of Snyder, which amounts to the denial of due process of law and irreparably prejudices Snyder as a result.  First Memo, pp. 1-23.

The facts demonstrate that the government misconduct occurred during the federal investigation of Snyder, initiated on August 13, 2018, when Greg Bernstein, Esq., a lawyer for UMMS, reported to the U.S. Attorney's Office that his client might be the victim of attempted extortion. Bernstein was accompanied by Susan Kinter, Esq., the Senior Vice President for Claims of the UMMS insurance subsidiary, and Natalie Magdeburger, Esq., an outside counsel who defended claims for UMMS.

According to Bernstein and the UMMS representatives, UMMS was "stunned," when, at a meeting with Snyder on June 22, 2018, Snyder requested the opportunity to present to the UMMS Board of Directors a proposal for a ███████ settlement for his client, ██████████, the widow of a UMMS transplant patient, and a $25 million consulting/retainer agreement for himself. Ex. 30, p. 5; Ex. 25 pp. 2, 3.  Snyder had previously informed the UMMS representatives that he was represented by Mr. Graham and, at the June 22nd meeting, he asked them to communicate with Graham about the proposal.  Ex. 27, p. 3; Ex. 28, p. 4.  Rather than contact Mr. Graham in June,

---

[2] These unimpeachable source documents are attached as Exhibits to the First Motion. Additional source and supporting documents are also submitted herewith.  Exs. 24 – 36.

UMMS hired Bernstein on August 10, 2018.  Bernstein and his client complained to the U.S. Attorney's Office, which opened a federal investigation with the assistance of the FBI.

On August 16th, at the government's direction, Kinter telephoned Snyder and induced him to appear at an August 23rd meeting to make the same presentation that he had made in June.  The ostensible reason for the duplicate meeting was that DePriest Whye, head of the UMMS insurance subsidiary, needed to hear what Snyder previously presented.  In the course of the August 23rd meeting, when UMMS representatives questioned the propriety of Snyder's proposal, Snyder reiterated that he had engaged recognized ethics expert, Mr. Graham, and he expected that UMMS and Mr. Graham would work together to craft an appropriate and legal consulting agreement.

The FBI recording of the August 23rd meeting shows that Snyder repeatedly emphasized that he wanted and expected UMMS representatives to voice any concerns that they might have directly to Mr. Graham and that Snyder would abandon his proposal for a consulting agreement if UMMS, after hearing Mr. Graham's reaction, was not satisfied that Snyder's proposal was ethical, moral and legal.  First Memo, pp. 8-13.  Among other things, Snyder declared:

- The challenge is to determine **"a legitimate"** or **"a right way"** to effectuate the proposal.  (Ex. 3, Tr. 60:6-16).
- **"The question is how do we do this and feel that we did the right thing ... .  How do we do it and do it the right way?"**  (*Id.*)
- **"I'll set up a call and a meeting [with Mr. Graham] ... .  Look, if it can't be done, I don't want to do it."**  (Tr. 63:1-17)
- **"I consulted [Mr. Graham] because I want to do it the right way."**  (Tr. 70:10-71:6)
- **"It's just a question of can it be done and can it be done appropriately."**  (Tr. 151:24 - 152:2)
- **"[T]ry to figure it out ethically, morally, comfortably, to see if there's a solution how to do it."**  (Tr. 165:9-11)
- **"You think I wanna do something that's wrong ... now, at this stage of my ... [career] - absolutely not."**  (Tr. 171:18-22)

- **"[H]opefully ... we'll figure it out.  And if it can't be done then it can't be done.  That's - that's just the bottom line."**  (Tr. 172:13-16)

At the further direction of the government, Kinter called Snyder the next two days, August 24th and 25th. *Id.* In both conversations, Snyder repeated his request for a meeting between UMMS and Mr. Graham.  Snyder emphasized that he did not want to do anything improper; he wanted Mr. Graham to have the benefit of hearing UMMS' concerns; and he expected UMMS to "be comfortable with the process" and to go forward with the proposal only if Mr. Graham was a "proponent" of the arrangement and believed that it was "manageable."  Snyder emphasized:

- **"We think the next step is ... to get together with Andy."**  (Ex. 6, Tr. 36:13-24)

- **"I think the four of us should meet."**  (*Id.*)

- **"You want to do it the right way, and, believe me, so do I."**  (Tr. 37:11-12)

- **"So you know, again, I've been a lawyer since 1970, and I wouldn't want to do anything that jeopardizes my career at this stage of my life, either. So I mean, why do you think I went to Andy?**  (Tr. 38:13-16)

- **"So I mean, if [Mr. Graham's] a proponent of this and he'll, right, put his neck out for me and believes it's manageable, then you guys should be cool with it.  So I think we should have a global meeting, the four of us."**  (Tr. 38:21-24)

- **"But [Mr. Graham] also thinks we all should meet.  So because he wants you to be comfortable with the process."**  (Tr. 45:4-5, 11-16)

The government agents, at that time eavesdropping and surreptitiously recording every meeting and conversation, "knew just how much Snyder wanted UMMS to meet with Mr. Graham;" that "such a meeting would give UMMS the opportunity to share all the facts with Mr. Graham;" and that Mr. Graham would give his opinions about the propriety of Snyder's proposal based on all facts."  First Motion, ¶ 7.  "Acutely aware of the significance of a UMMS/Graham meeting," and knowing that "[a]ny opinion that Mr. Graham would give to the participants at the meeting would exonerate" Snyder, "the government agents took steps to assure that such a meeting would not occur" and "instructed UMMS not to meet with Mr. Graham."  *Id.,*

¶¶ 8, 9.  *See* First Memo, pp. 3-4.  "Despite Snyder's prodding," and following the government's instructions, "UMMS hesitated to schedule the meeting with Mr. Graham."  First Memo, p. 3.

On August 27th, Magdeburger telephoned Mr. Graham at the instruction of the government. "Instead of putting her cards on the table," at the direction of the government, Magdeburger "merely refrained from sharing any of the concerns that UMMS had with Snyder's proposal" and questioned Mr. Graham about his knowledge of Snyder's communications with UMMS.  First Memo, p. 17.  Mr. Graham disclaimed detailed knowledge, but in accord with Snyder's wishes, reiterated the request for "a face-to-face meeting where the parties could be candid with one another."  *Id.*  He told Magdeburger:

- **"[L]ook, I'd be happy to sit down with you and [Snyder] and whoever if we - if that would help, just to - you know, everybody sit at a table and talk it through."** (Ex. 6, Tr. 75:18-20)
- **"[W]hat I suggest is we -- if we need more details, we all sit down together and hash them out.** (Ex. 6, Tr. 77:3-5)

On August 30th, Kinter called Snyder and, instructed by the government, suggested that Snyder act on his own behalf and to the detriment of his client by entering into the $25 million consulting agreement immediately and deferring his client's case indefinitely.  First Memo, p. 18. Snyder told Kinter that:

> **[Y]ou've got to make peace with [the client], and then Natalie's got to work with Andy to, you know, formulate an agreement that everybody's comfortable with.**

Ex. 6, Tr. 96:19-23.  He also rejected Kinter's suggestion out-of-hand. First Memo, p. 18.

The government's campaign to prevent any meeting with Mr. Graham and UMMS was fully effectuated on September 5th when Snyder and Kinter agreed to meet the next day to discuss a proposed consulting/retainer agreement that they would both be **"comfortable with."** Ex. 6, Tr. 125:6-24. Snyder told Kinter that Mr. Graham prepared a draft agreement and sent him an article

about similar retainer agreements employed by Skadden Arps, a prominent law firm. *Id.*, Tr. 112:20-22, 125:25-126:16. In accord with his prior requests, Snyder texted Kinter that day:

> **Can I bring Andy Graham to the meeting.**
> **I think you would feel better with him there?**

Ex. 17. Kinter, playing for time to get direction from the government, responded that she **"need[ed] to think about that"** and would "get back to [Snyder] tonight." *Id.* Three hours later, at the direction of the U.S. Attorney's Office, Kinter wrote Snyder, "I don't need to hear from Andy," and that, **"I am fine."** *Id.* Snyder responded, **"Andy is available (what do you think),"** and, "**I think it's a good idea but it's your call.**" *Id.* The next morning, also at the direction of the government, Kinter canceled the meeting altogether.

On or about September 10th, after a month of near-daily eavesdropping on Snyder's interactions with UMMS representatives, the government terminated the investigation and closed the case. First Memo, p. 22. AUSA Kathleen Gavin made UMMS to understand that "the government declined to prosecute because of Mr. Graham's involvement and [Snyder's] potential advice of counsel defense that may negate the intent prong of the criminal charge." Ex. 9.

The next day, Bernstein contacted Mr. Graham and "told him that UMMS had no interest in pursuing the consulting agreement with Snyder" and that Snyder was to have no further contact with Kinter or Magdeburger except to finalize ███████████' settlement.[3] *Id.* Eleven days later, UMMS filed a complaint against Snyder with the Attorney Grievance Commission of Maryland, drafted by Bernstein and signed by Kinter and Whye. Ex. 30, n. 6.

On August 29, 2019, in an interview by State investigators, Kinter revealed that the government did not want her or any UMMS representatives to meet with Mr. Graham and had, in

---

[3] On September 7th, Snyder and UMMS had settled ███████████' case for ██████.

fact, instructed her not to do so.  Ex. 9, p. 3.  Throughout the investigation, the FBI recorded every meeting and conversation with Snyder and UMMS representatives, as well as the carefully constrained call that Magdeburger made to Mr. Graham.  However, they "were uncomfortable" about the prospect of having to record the frank discussion that Snyder and Mr. Graham proposed. *Id.*  In answer to the question why Kinter refused Snyder's September 5th request for a meeting with Mr. Graham, she told the State investigators that she was following the government's orders:

> [Kinter] was asked about her September 5 text message to [Snyder] in which she stated that she did not need to hear from Andy Graham at the planned meeting.  **[Kinter] explained that the [U.S. Attorney's Office] was pushing to have [Snyder] appear and present before the Board and that they were uncomfortable with Mr. Graham attending the meeting because it would be recorded.**

*Id.*

On October 5, 2020, two years after declining prosecution, the U.S. Attorney's Office procured the Indictment for the present case.  Having deprived Snyder of the meeting with Mr. Graham that would have demonstrated his lack of criminal intent beyond all doubt, the government now marches forward with a case in which Mr. Graham is relegated to the role of a supernumerary – or less.

### D. The Government Cannot Take Issue With The Settled Legal Principles, Enunciated In The Leading Supreme Court Cases, That The Misconduct Of The Government's Agents Here Violates Due Process

In his First Memo, Snyder reviews the substantial body of law, beginning with *Berger v. United States,* 295 U.S. 78, 88 (1935), that require government attorneys and agents "to refrain from improper methods calculated to produce a wrongful conviction" and to confine their conduct to "legitimate means to bring about a just one."  First Memo, pp. 23-30.  Snyder also cites, and quotes from, a representative selection of the seminal Supreme Court cases that establish that, "The central theme of the body of law since *Berger* is that the government at all stages of the criminal

14

process, from the investigative period through post-conviction must not engage in conduct that causes the defendant to be denied 'a meaningful opportunity to present a complete defense.'"  First Memo, p. 23 (quoting review of cases in *California v. Trombetta,* 467 U.S. 479, 485 (1984)).

Snyder has called particular attention to the Supreme Court's condemnation of government action that amounts to "a deliberate device to gain an advantage" over a person under investigation and to the principle, enunciated by the Court, that "the Fifth Amendment requires dismissal of an indictment" when the government's employment of such a device "cause[s] him actual prejudice in presenting his defense."  *Id.,* pp. 23-24 (quoting *Gouveia,* 467 U.S. at 192 (citing *United States v. Marion,* 404 U.S. 307 (1971) and *United States v. Lovasco,* 431 U.S. 783 (1977)).[4]

These same cases, Snyder points out, define "actual prejudice in presenting [a] defense" in terms of the materiality of the information or evidence that government agents prevented the defendant from having.  First Memo, p. 28.  Evidence is "material and exculpatory," and the government violates due process by engaging in improper actions that deprive the prospective defendant of that evidence, whenever the evidence might have been expected to play a significant role in the defense and, particularly, if it might have been sufficient to create a reasonable doubt. *United States v. Agurs,* 427 U.S. 97, 112-113 (1976)

In its Opposition, the government reacts oddly to Snyder's governing principles enunciated in the seminal Supreme Court cases concerning government misconduct.  Instead of recognizing these leading authorities for what they are, or disputing any of the guiding principles that emanate from them, the government treats those cases as if they were a collection of narrow holdings that have no application to the present case.  Gov't Memo, p. 18.  Thus, the government describes

---

[4] *See also United States v. Harris,* 551 Fed. Appx. 699, 703 (4th Cir. 2014) (quoting *Marion,* 404 U.S. at 324 for same principle).

*Berger,* the iconic source of the most eloquent description of the role of the prosecutor, as a case that merely dealt with a "prosecutor engaged in improper questioning and argument at trial." *Id.* Seldom have *Berger* and the other leading Supreme Court misconduct cases been treated so dismissively[5].

### E. The Same Constitutional Principles That Apply When Government Agents Fail To Preserve Or Destroy Evidence Apply To All Other Cases In Which Government Agents Improperly Employ Devices To Gain Unfair Advantage Over An Accused

Snyder's First Motion draws the Court's attention to three Supreme Court cases that systematically set out the principles for determining whether improper government actions deprive the defendant of due process of law and require dismissal of the indictment.  Although these cases arose in the context of failure to preserve or destruction of evidence, the Supreme Court goes to great lengths to explain that those circumstances are governed by the same principles that apply to all other cases in which the government employed devices to gain an unfair advantage or otherwise "exercised its sovereign powers so as to hamper a criminal defendant's preparation for trial;" where, as a result of improper government actions "the defendant's ability to mount an effective defense was impaired;" or where the government misconduct has otherwise "diminished a defendant's opportunity to put on an effective defense."  First Memo, p. 26 (quoting *Trombetta,* 467 U.S. at 486).  *See also* First Memo, p. 27 (quoting *Arizona v. Youngblood,* 488 U.S. 51, 57-58 (1989) (declaring that the same principles apply whether "the claim is based on loss of evidence" or other government action "to gain some tactical advantage over [defendants] or to harass them.") (quoting the leading government misconduct cases)).

---

[5] One would not think that it would be necessary to remind the government of *Berger*'s injunction that a prosecutor may "strike hard blows" but "is not at liberty to strike foul ones." *Berger* at 85-88. *See also Strickler v. Greene*, 525 U.S. 263, 281 (1999) (quoting *Berger* at 88. To explain the "special role played by the American prosecutor"… "'whose interest, therefore, in criminal prosecution is not that it shall win a case, but that justice shall be done.'").

Snyder explains that, in the third of the trio, *Illinois v. Fisher,* 540 U.S. 544 (2004), the Supreme Court distinguishes between improper government action that deprives the defendant of the benefit of "material exculpatory evidence" and government action that deprives the defendant of evidence that is merely "potentially useful."  First Memo, p. 27.  In the first situation, such as the situation in the present case, the government violates due process irrespective of whether the agents acted in good or bad faith; but, in the second situation, a showing of bad faith is necessary. *Id.*  Bad faith is established when "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood,* 488 U.S. at 58.

The government asks this Court to disregard the declarations of the Supreme Court in this trio of cases that the same principles that apply to improper destruction of evidence also apply to cases where the government engages in misconduct that deprives a defendant of exculpatory or useful evidence or otherwise prejudices the defendant.  Gov't Memo, p. 16.  The principles enunciated in this trio of cases, however, are applicable here because the government employed an improper device for the purpose of gaining deliberate advantage over Snyder when the AUSA overseeing the investigation forbade the UMMS representatives from meeting with Mr. Graham after learning that: (i) Snyder repeatedly asked the UMMS representatives to meet with Mr. Graham to voice their reservations and concerns about Snyder's proposal; (ii) Snyder wanted Mr. Graham to give his opinion about the proposal after hearing from UMMS's representatives; and (iii) Snyder promised to abandon his proposal if Mr. Graham failed to give a favorable opinion that Snyder's proposal was ethical, moral and otherwise appropriate.  It is also significant that (as the U.S. Attorney's Office admitted to UMMS's representatives) an important reason for the government's manipulation was that the FBI recorded all of the conversations and meetings during the investigation and the agents did not want there to be a recording of a meeting at which UMMS

17

would articulate its concerns to Mr. Graham and Mr. Graham would give his opinion to both UMMS and Snyder.  Under the governing principles, and in light of the undisputed facts, the Constitution does not permit this Court to disregard the government's misconduct and its prejudicial effect upon Snyder's ability to defend himself.  Simply put, the government does a great disservice to due process of law when it asks this Court to dismiss Snyder's First Motion as a mere complaint about "a meeting ... that never happened."  Gov't Memo, p. 22.

A set of simple examples illustrate the fallacy of the government's argument.  The following examples illustrate that there is no difference, from a constitutional viewpoint, between destruction of evidence by a government agent, which the government admits to be a due process violation, and the tampering and manipulation of events and evidence by a government agent, which the government here claims not to be wrongful:

> **First example:** Government agents who are investigating a suspect receive a call from a third person who states that he, and not the suspect, committed the crime. The agents meet with the third person, supply him with pen and paper and he writes out the confession.  The agents tear up the confession, send the third person away and later prosecute the original suspect.

> **Second example:** The government agents are investigating the same suspect and are approached by the same third person who wishes to confess.  The third person asks for a pen and paper to write out his confession.  The agents refuse to provide the writing implements to prevent the confession from being written; they send the third person away; and later prosecute the original suspect.

> **Third example:** The government agents are investigating the same suspect, and they receive a call from the same third person.  The third person explains that he committed the crime and asks to meet with the agents so that he can write out his confession.  The agents refuse to meet with the third person and later prosecute the original suspect.

Under any rational analysis that adheres to the settled constitutional principles, the government misconduct in all three examples is equally violative of due process of law.  In each example, the government agents improperly and unlawfully employ a device to gain an unfair advantage over

the suspect.   Each device has the same effect – namely deprivation of material exculpatory evidence, *i.e.,* a confession from a third party.   In each example, government agents act in bad faith and with the same improper intent – to deprive the defendant of evidence that would be an important to his defense.   The defendant is harmed in the same way and suffers the same prejudice because the defendant is deprived the opportunity to present exonerating evidence.

The government essentially asks this Court to decide that only the first example above would constitute a violation of due process of law because only the first example involves the destruction of existing evidence by the government agents.   Gov't Memo, p. 16.   According to the government's argument the second and third examples do not violate due process because a defendant has no right to complain about evidence that "never existed" and because, in the prosecution's view, "the [g]overnment is not required to create evidence that is helpful to the defense."   Gov't Memo, pp. 4, 17.   The third example, in the government's view, could not constitute a due process violation because it only concerns "a meeting that never happened."   Gov't Memo, p. 22.

These examples, and the arguments that the government would make as to each, demonstrate that the government's primary argument is fundamentally flawed and without basis both in constitutional law, as declared by the Supreme Court, and in ordinary common sense.   The government's analysis would result in unjust outcomes and in convictions of innocent persons through the mechanical application of irrational distinctions.

**F.  The Government Relies On Cases In Which Defendants Mistakenly Claimed That *Brady* Requires The Government To Conduct Investigations For The Benefit Of The Defendant And Not Cases, Such As The Present Case, In Which Government Agents Actively Committed Misconduct That Prejudiced The Defendant**

The government, unable to dispute the fundamental principles established in the seminal Supreme Court cases, attempts to avoid the consequences of agents' misconduct by recasting the issues.  The government asks this Court to decide the First Motion as if the government did not actively engaged in misconduct but, instead, remained silent and did nothing when the agents overheard Snyder pleading with UMMS's representatives to meet with Mr. Graham.

In this case, however, the government did not sit idly by when Snyder, over multiple conversations, tried to get UMMS to meet with Mr. Graham to air its concerns and to obtain an opinion from Mr. Graham, he heard from UMMS, which Snyder and UMMS would follow.  The U.S. Attorney's Office and the FBI knew full well that a meeting with Mr. Graham would have deleterious consequences for any later prosecution of Snyder, as it would be a powerful demonstration of Snyder's good faith and be preserved in an FBI recording the same as every other conversation that took place after the government initiated its investigation.  To avoid these unwanted developments, government agents took it upon themselves to: forbid the UMMS representatives from meeting with Graham; direct UMMS representatives to ignore Snyder's requests; refuse to allow Graham to attend the meeting that Snyder had finally gotten UMMS to schedule; and instruct UMMS to cancel that meeting altogether.  Government agents also guided UMMS's representatives in the statements that they made to Snyder.  After causing Magdeburger, UMMS's lawyer, to call Mr. Graham, government agents instructed Magdeburger to refrain from informing Mr. Graham of UMMS' concerns, telling her only to question Mr. Graham about his knowledge of the proposed transaction.  When Mr. Graham asked Magdeburger to schedule a

meeting, for the purpose of allowing the parties to put all the facts on the table so that they could determine whether a proper agreement could be made, Magdeburger followed agents' instructions and ignored Mr. Graham's request.

The government miscasts the issue as one of whether the government had a duty to assist Snyder, instead of whether the government engaged in misconduct that prejudiced Snyder, no doubt to avoid the consequences that flow from active misconduct.  The government misleadingly cites a handful of cases that deal with the completely different issue of whether, and, if so, how *Brady v. Maryland*, 373 US 83 (1963) imposes an affirmative duty for a prosecutor to undertake an investigation to ferret out facts *after* a prosecution has already been initiated and the defendant seeks information or evidence in the government's possession favorable to the accused.  Gov't Memo at 17.

With one notable exception, the *Brady* cases cited by the government do not concern actions taken by government agents during an investigation to gain an unfair advantage over a suspect.  Except for providing the government the opportunity to quote occasional phrases out of context, there is not even a remote connection between those cases and the issues now before this Court.  In *Werth v. United States,* 493 Fed. Appx. 361 (4th Cir. 2012), for example, a RICO prosecution of a motorcycle gang, the government, complying with *Brady,* revealed that one of the government's undercover agents had been suspended nineteen years earlier when he had corroborated a false story about a speeding ticket received by his training officer.  *Id.* at 365.  The government also disclosed that another agent, while investigating the case, received citations for DUI, reckless driving and speeding but failed to report one of the citations to his superiors.  *Id.* Denying a *Brady* motion, the district judge ruled that there were no documents to produce relating to the 19-year old incident because they "had long been purged according to ATF protocol" and,

21

further, were not available to the government from any other source.  *Id.* at 366.  The court also examined, *in camera,* documents relating to the recent incident and provided defendants with all that could be determined to be useful for impeachment or otherwise exculpatory.  *Id.* at 365-366. The defendant nevertheless expressed dissatisfaction with the government's fulsome discovery and demanded that the government "conduct its own investigation of the incidents and turn over the results of that investigation to the defense."  *Id.* at 366.  The district judge, understandably, ruled that, "While the government is obligated to disclose favorable evidence in its possession, it is not required to create evidence that might be helpful to the defense."  *Id.*

Another of the government's cases, *United States v. Gray,* 648 F.3d 562 (2nd Cir. 2011), involved a prosecution for false Medicaid billing.  The defendant's billing records were kept on computers of a private company that was not a part of the prosecution team.  Prior to trial, the government obtained the billing records from the billing company and gave a copy to the defendant.  During the trial, "the government ran [a search] program ... and having done so, ... promptly turned over the results to the defendant because they were potentially exculpatory."  *Id.* at 565, 567.  After the defendant was convicted, he claimed that *Brady* required the government *to run additional searches* for the purpose of obtaining exculpatory material to provide to the defendant.  The appellate court, noting that the defendant had the same access to the records of the third-party company, held that the defendant should have conducted its own investigation and that, under those circumstances, the government "had no duty to go further and conduct the defendant's investigation for it."  *Id.*

Other cases cited by the government are similarly beside the point.  *See United States v. Alverio-Melendez,* 640 F.3d 412 (1st Cir. 2011) (*Brady* did not require government to provide fingerprint report because government did not do fingerprint analysis and no such report existed);

*United States v. Rodarte,* 596 F.2d 141 (5th Cir. 1979) (government gave defendant complete access to files; government could not have violated *Brady* by failing to provide memoranda of witness interviews when no such memoranda were made); *United States v. Riley,* 657 F.2d 1377 (8th Cir. 1981) (holding that government did not violate *Brady* by not supplying medical records for government witness because records were not in government's possession or control and defendant could have subpoenaed records himself); *United States v. Ducore,* 309 F. Supp. 3d 436 (D. Md. 2018) (defendant, charged with assaulting flight attendant, was given names and statements of witnesses interviewed by government; court held that defendant's further requests for telephone numbers of persons interviewed and for identifying information for passengers whom the government had not interviewed, was general discovery request and not *Brady* request; defendant did not allege that any passenger had information that was exculpatory or otherwise favorable to accused).

The one notable exception is *Estate of Bryant v. Baltimore Police Department,* 2020 WL 673571 (D. Md. Feb. 10, 2020) (Hollander, J.).   Unlike the other cases cited by the government, the investigators in *Bryant* actively engaged in misconduct.  *Bryant* was a civil rights action brought in this district on behalf of the estate of a man who had been wrongfully convicted of murder.  The evidence showed that a member of the police department interfered in a lineup by employing "suggestive tactics" to encourage witnesses to identify Bryant as the perpetrator.  Also, an analyst in the department's crime lab falsely reported that DNA testing of blood on the victim's fingernails could not be done because nail clippings taken from the victim no longer existed. Bryant moved for post-conviction relief, during which time his lawyers learned of the suggestive tactics at the lineup and the fact that the victim's fingernail clippings still existed.  The clippings

were sent to an outside lab for DNA analysis, and the analysis showed that the blood was not Bryant's.  After a further hearing in State court, Bryant was freed.

Judge Hollander, in the subsequent civil rights action, held that Bryant stated a cause of action for deprivation of his due process rights.  The police department had employed improper devices to gain an unwarranted advantage over the accused that caused him actual prejudice and interfered with his ability to defend himself.  *Bryant,* 2020 WL 673571 at *22.  The police department compounded this misconduct by failing to disclose the suggestive identification tactics or the false statements by the laboratory analysts, and these failures to make disclosure constituted a *Brady* violation.  *Id.* at *23 and *24.

This Court should also be aware of *Camm v. Faith,* 937 F.3d 1096, 1109-10 (7th Cir. 2019), where the Seventh Circuit, faced with facts nearly identical to those in *Bryant,* distinguished *Gray,* 648 F.3d 562, the Seventh Circuit case cited by the government and discussed above, and held that the government's failure to disclose such misconduct violated *Brady.*  The evidence was material to the defense, the Court explained, because the government's misconduct could also show that "this investigation was so shoddy" that it was unreliable.  *Id.* at 111.  Also, the undisclosed misconduct "would have eroded the jury's trust in both the prosecutor and the lead investigator." *Id.* at 1110.  Evidence of the government agents' improper actions, the appellate court added, "would have set up an argument that they were hiding crucial evidence because they thought it might undermine their case against [the defendant] ... ."  *Id.*

*Bryant* and *Camm* are significant because they demonstrate the very real difference between affirmative misconduct by government agents, which was present in those cases and is also present here, and the mere failure to fulfill some affirmative duty, which was not the issue in those two cases and is not the issue here.  The government's repeated affirmative actions and

24

instructions prevented a meeting that, as the government knew, would have exonerated Snyder. The agents took those actions for the sole purpose of gaining an advantage over Snyder if he were prosecuted.  Snyder has been severely prejudiced because he must now defend himself without having the benefit of that exonerating evidence.

### G. Snyder Was Substantially And Irreparably Prejudiced Because The Meeting Between UMMS And Mr. Graham Would Have Proven Conclusively That Snyder's Conduct, Throughout The Indictment Period, Was Not Committed With Criminal Intent

The government mistakenly argues that its misconduct in preventing UMMS from meeting with Mr. Graham could not have prejudiced Snyder because the government engaged in its misconduct during the months of August and September when the government was investigating Snyder and because Snyder met with UMMS representatives on four occasions before the investigation began.  The government's attempt to minimize the effect of the improper actions of its agents is grievously erroneous for at least four separate reasons:

*First,* the Indictment charges Snyder with having engaged in a single "extortion scheme," in the period "[b]etween in or about January and October 2018," for the alleged "purpose ... to obtain $25 million for himself ... ."  Indictment, ¶¶ 13, 75.  In various communications with UMMS representatives during that period, including communications that the government initiated and recorded during its investigation, Snyder discussed a $25 million consulting/retainer agreement. The government cannot successfully prosecute Snyder without proving that Snyder committed the acts of which he is accused and that he committed them with criminal intent.  *Elonis v. United States,* 575 U.S. 723, 734 (2015) ("the 'general rule' is that a guilty mind is 'a necessary element in the indictment and proof of every crime.'")  (quoting *United States v. Balint,* 258 U.S. 250, 251

(1922)).[6]   The government has not contended that Snyder acted with one intent when he participated in one meeting or communication with UMMS and with another intent when he engaged in a different meeting or communication with UMMS.  The Indictment avers, and the government maintains, that, "[b]etween in or about January and October 2018," Snyder pursued the single alleged scheme, and committed all of the alleged acts in execution of that alleged scheme, with the same criminal and extortionate intent.

The improper actions of the government agents wrongfully interfered with Snyder's efforts to convene a meeting that would have proven that, at all times, Snyder's intent in proposing and presenting the $25 million consulting/retainer agreement was neither extortionate nor otherwise criminal.  As Snyder repeatedly stated in the recorded conversations, Snyder wanted UMMS representatives to meet personally with Mr. Graham and to explain to him any of the objections or reservations that they might have with Snyder's presentations or proposal.  Snyder also wanted Mr. Graham to give his opinion, based in substantial part on what he heard from UMMS, as to whether Snyder's proposal was ethical, moral and otherwise appropriate.  Mr. Graham, at Snyder's lead, also asked UMMS's attorney for the opportunity to have a full and frank discussion.  Snyder also promised that he would abandon his proposal if Mr. Graham, after hearing from UMMS, did not give a favorable opinion to UMMS or if UMMS, after hearing from Mr. Graham, was not convinced that Snyder's proposal was appropriate.

Given the allegations of the Indictment, not to mention the obvious problems of proof that would ensue, the government has not contended that Snyder acted with one intent when he made his proposal for the $25 million consulting agreement at one given meeting with UMMS and with

---

[6] Importantly, the "basic principle [is] that 'wrongdoing must be conscious to be criminal.'"  *Id.* (quoting *Morissette v. United States,* 342 U.S. 246, 252 (1952)).

a different intent when he made the same proposal at a different meeting. Since it is obvious that there was only one intent on the part of Snyder to be discerned, *any* statement or conduct by Snyder at the time that bears on the intent with which he was promoting his proposal is proof of the intent with which he took all of the actions that the government has charged to be part of the same alleged extortionate scheme, and thus disproves the government's theory of the case.

**Second,** there is nothing unusual about the proposition that acts and statements late in a course of conduct, or even after the course of conduct has ended, are frequently probative of the intent with which the actor engaged in the entire course of conduct. In fact, the government made that very argument in an earlier stage of this case currently under seal. *See* ECF 25 (under seal), p. 7. At that stage of this case, the government argued that alleged acts and statements by Snyder at the end of 2018 or later, long after the government had closed its investigation, were probative of the intent with which Snyder had acted during the period of the alleged scheme. The ease with which the government now makes the opposite argument, in the very same case, is no less than remarkable. The only thing that has changed is that the government finds that it must now take the opposite position because it has nothing else to say about the prejudice caused by the agents' misconduct.

**Third,** there is nothing about Snyder's meetings with UMMS personnel prior to the government investigation that shows that Snyder acted with an intent more culpable than the innocent intent that Snyder exhibited during the government's investigation and would have been proven to be an innocent intent if government agents had not improperly forbidden UMMS from meeting with Mr. Graham and Snyder.

The government identifies four meetings between Snyder and UMMS prior to the government's investigation. The government's allegations and evidence concerning those

meetings are shot through with inconsistencies, but in none of the different versions does the government or UMMS claim that Snyder acted with greater criminal intent during the period prior to the government's investigation than during the investigation period:

> *January 21, 2018:* Snyder attended a settlement meeting for the ███████ ███████ with Susan Kinter and Dr. Stephen Bartlett. The █████ case was the first of two failed transplant cases that Snyder pursued during the period of the Indictment. In a hallway conversation, "Snyder told [Bartlett] that UMMS had better settle ████████ claim for the amount Snyder was requesting or Snyder would file suit in other cases involving kidney transplants." Indictment, ¶ 18. There was *no* discussion about a consulting/retainer contract for Snyder at that meeting.

> *March 21, 2018:* At Dr. Bartlett's invitation, Snyder and his fiancé had dinner with Dr. Bartlett and his wife. Prior to dinner, Snyder and Bartlett met briefly at the bar. Snyder showed Bartlett photographs of Snyder's second transplant patient, ████████. The Indictment alleges only that, "Snyder told [Bartlett] that he wanted to become an employee of UMMS to obtain the $25 million." Indictment, ¶ 22.

> June Bartlett, Dr. Bartlett's wife, has a different version of Snyder's alleged demand at the dinner meeting. On June 19, 2018, Mrs. Bartlett was interviewed by Natalie Magdeburger, Esq., UMMS's lawyer, as part of an internal investigation that UMMS was conducting of Dr. Bartlett. In her memorandum of that interview, Magdeburger wrote that, **"According to [June Bartlett's] recollection, Snyder wanted Dr. Bartlett to get the hospital to pay $25 million dollars to settle the ████████ ] case.** Ex. 24 (June Bartlett Interview), pp. 1-2. Kinter also insists that Bartlett never mentioned any discussion with Snyder about a $25 million consulting/retainer agreement. Ex. 25, p. 2.[7]

> *April 30, 2018:* On the morning of April 30th, in anticipation of a settlement conference for the █████ case later that day, Snyder delivered a demand letter to Kinter. The letter contained a demand for $25 million to be paid to ████████ ████████' widow, in settlement of her case. Indictment, ¶ 25. The Indictment does not aver that the letter contained any demand for a consulting/retainer agreement or any other separate benefit to be conferred on Snyder personally. *Id.* The letter itself contains no mention of any consulting/retainer agreement for Snyder. Ex. 26.

---

[7] The March 21st dinner meeting was the second of three meetings between Snyder and Bartlett. The first was a dinner meeting on February 15, 2018. Kinter asserts that Bartlett told her that he had dinner with Snyder on February 15th. Bartlett claims to have no recollection of meeting with Snyder on first occasion. The third meeting, on March 31st, was for drinks at Bartlett's country club.

That afternoon, Snyder met with Kinter, Alicia Reynolds (Kinter's associate), Magdeburger and Dr. DePriest Whye.  Snyder repeated the settlement demand that he had made in the letter.  Indictment, ¶¶ 26-34.  Kinter states that, "On April 30, 2018, ... [Snyder] was seeking $25 million for the ███████ case ... ." Ex. 25, p. 2.

***June 22, 2018:*** Snyder met with Kinter, Reynolds and Magdeburger.  The Indictment alleges that, "SNYDER told the UMMS representatives that they should settle the ███████ case for whatever that case was worth and then pay SNYDER $25 million to act as a consultant in the future to conflict him out of any future case."  Indictment, ¶ 39.

Kinter and the other UMMS representatives have stated that they were "stunned" by Snyder's June 22nd request for a $25 million consulting/retainer agreement because that was the first time, to their knowledge, that Snyder had made such a request. Ex. 30, p. 5; Ex. 25, pp. 2, 3 (Kinter was "shocked" by Snyder's June 22nd demand).

The UMMS representatives also made notes and a memorandum of the June 22nd meeting that reveal that Snyder informed the UMMS representatives that Mr. Graham was "helping" him and that he was "trying to help [Snyder] effectuate a deal that doesn't violate ethical rules."  Ex. 27, pp. 2, 3. Magdeburger recounted that Snyder "advised that Andy Graham was working on the case with him" and that "I was to work with Mr. Graham to figure out how to do the deal"). Ex. 28, pp. 2, 4.

In a follow-up conversation with Magdeburger on June 28th, Snyder asked Magdeburger to "start working" with Mr. Graham.  Snyder added that he sought Mr. Graham's advice about "whether a consulting agreement could be entered into with the hospital that did not violate the rules of professional responsibility ... ."  Ex. 29, p. 3.

UMMS' own version of the events, as recounted by the many statements given by UMMS officials over the past three years, is that Snyder's allegedly extortionate proposal for a $25 million consulting agreement for himself should be traced to the June 22nd meeting that Snyder attended with Kinter, UMMS's senior claims official, and Magdeburger, UMMS' outside lawyer.  The government's description of the June 22nd meeting reads very much like the government's

description of the August 23rd meeting that the FBI recorded.  Indictment, ¶¶ 35-55 and 56-74.[8]

The undeniable evidence establishes that, as early as the June 22nd meeting and continuously

through September 5, 2018, Snyder repeatedly implored UMMS representatives to meet with

Mr. Graham to determine, jointly, whether Snyder's proposal for the $25 million consulting

agreement was ethical, moral and proper.  Under these circumstances, any additional evidence that

Snyder could have presented to demonstrate his innocent intent during the investigation would

have been equally applicable to demonstrate his innocent intent prior to the investigation.  It should

be beyond debate that the meeting with Mr. Graham, which Snyder so insistently sought and which

the government agents deliberately and improperly prevented from occurring, would have

demonstrated that Snyder acted without criminal intent at all times throughout the period covered

by the Indictment, both before and during the government's investigation.

**Fourth,** Snyder is prejudiced severely and intolerably by the loss of the evidence, as the

government's case is already weak.  Even without the UMMS/Graham meeting that Snyder sought,

the U.S. Attorney's Office concluded in 2018 that there was insufficient proof of criminal intent

on Snyder's part to mount a successful prosecution.  First Memo, p. 22.  That a serious and

experienced prosecutor (with the approval of the hierarchy of the U.S. Attorney's Office) initially

declined prosecution is persuasive evidence that the government's case is far from strong.  This

fact alone establishes that discussions at the thwarted meeting would have been material and

---

[8] By government design, the August 23rd electronically recorded meeting was a replay of the June 22nd meeting.  On August 16th, at the direction of government agents, Kinter called Snyder and asked Snyder to make a presentation at the August 23rd meeting that would be attended by Dr. Whye, COO of UMMS's insurance subsidiary.  Kinter stressed that "it's important that you present the case to him the way that you presented it to us."  Ex. 6, Tr. 8:1-5.  In a conversation on August 20th, Kinter told Snyder that, "I just need you to talk to Dr. [Whye] the way you talked to me and Natalie;" that, "I need you to talk to Dr. [Whye] and say the same stuff to Dr. [Whye], just like you told Natalie --;" and that, "[Y]ou just have to talk to Dr. [Whye] the way you talked to Natalie and me, at the second meeting [on June 22]."  *Id.,* Tr. 13:11-18.

exculpatory.  Lost or omitted evidence is "material" if it is capable of creating reasonable doubt, particularly when the case "is already of questionable validity." *Agurs,* 427 U.S. at 112-113. Evidence also qualifies as material where there is "any reasonable likelihood" it could have "affected" the outcome.  *Wearry v. Cain,* 577 U.S. 385, 392 (2016) (quoting *Giglio v. United States,* 405 U.S. 150, 154 (1972); *Napue v. Illinois,* 360 U.S. 264, 271 (1959)).  In a weak or doubtful case, even "additional evidence of relatively minor importance might be enough to create a reasonable doubt." *Agurs* 427 U.S. at 113.  *See also United States v. Russell,* 221 F.3d 615, 622 (4th Cir. 2000).

*Fifth,* government agents, by their deliberate actions, and through their admissions, confirmed that they acted to prevent Snyder from having the benefit of a recorded meeting that would have been of great benefit to Snyder's defense.  The fact that government agents ventured so far outside the boundaries of acceptable conduct to deny Snyder evidence of a candid discussion between UMMS and Mr. Graham, and to deny Snyder the opportunity to abandon his proposal if that discussion had not yielded a favorable opinion, demonstrates, in and of itself, the extraordinary value that the meeting would have had for Snyder's defense.  Correspondingly, it proves the extreme prejudice that Snyder is now forced to suffer by its loss.

### H. The Prejudice To Snyder Is Irreparable Because There Is No Evidence That Could Be Comparable To The Unimpeachable Recording That Would Have Been Made

Snyder makes clear in his First Motion that the government misconduct severely prejudices him because there is no comparable substitute for an unimpeachable contemporaneous recording of a meeting at which the UMMS officials, at Snyder's urging, would have told Mr. Graham all of their complaints and reservations about Snyder's demands and Mr. Graham, in response, would have given Snyder and UMMS the benefit of his fully informed opinion whether Snyder's proposal

was ethical, moral and otherwise proper.  The recording would also have shown, as Snyder had promised at the August 23rd meeting, that Snyder would have abandoned his proposal if Mr. Graham did not approve of the proposal.

The government does not deny that the meeting with Mr. Graham would have taken place if the government had not prevented UMMS from attending such a meeting.  They do not dispute that, as Snyder and Mr. Graham both said when they asked UMMS for the meeting: UMMS's officials would have had the opportunity to voice their concerns to Mr. Graham freely and openly; Mr. Graham would have given attendees the benefit of his fully informed opinion; and Snyder would have obeyed Mr. Graham.  The government also admits that the FBI would have recorded the meeting (given that they committed themselves to recording all communications between Snyder and Mr. Graham, on the one hand, and UMMS representatives, on the other).

Significantly, the government does not deny that recording of the meeting, at which those events would have occurred, would have been powerful evidence of Snyder's good faith and innocent intent and that the government, even with new prosecutors, would not have reopened Snyder's case and brought the present Indictment.  Furthermore, the government does not take issue with the fact there is no comparable substitute for a recording of the meeting that the government thwarted because persons who would have been at the meeting are adverse to one another, have their own individual interests and agendas at stake and cannot be expected to give consistent and reliable after-the-fact testimony about what they would have said and done.  On this last point, the government does not dispute the validity of the cases cited by Snyder that hold that, when as here, the participants in a recorded meeting are adverse to one another, their after-the-fact testimony is no substitute for the recording.  First Memo, pp. 29-30, 35; Gov't Memo, p. 24.

Instead of confronting the issue, the government deflects by stating that Magdeburger telephoned Mr. Graham on August 27th and by contending that the recording of that conversation is all that Snyder needs.  Gov't Memo, p. 24.  Contrary to the government's contention, the August 27th recording actually shows why the agents took their further improper actions in preventing the subsequent face-to-face meeting with UMMS that Snyder and Mr. Graham both wanted.  In her August 27th call to Mr. Graham, Magdeburger, following the government's instructions, deliberately refrained from recounting to Mr. Graham what Snyder had said at the June 22nd or August 23rd meetings, and she carefully avoided making any reference to any objections or concerns that UMMS may have had about Snyder's proposal.  Magdeburger purposefully confined herself to questioning Mr. Graham about the current state of his knowledge.  Ex. 6, Tr. 58-77.  Mr. Graham disclaimed detailed knowledge, but asked Magdeburger for a meeting at which "everybody [would] sit at a table and talk it through," and added that, "if we need more details, we all sit down together and hash them out."  *Id.;* Tr. 75:17-20 and 77:3-5.

The government agents were content with the record that Magdeburger created at their direction because it gave the government a pretext for claiming, as the government has done in its Opposition, that Snyder did not want Mr. Graham to know all the facts and that Snyder had no interest in obtaining an informed opinion from Graham about Snyder's proposed consulting/retainer agreement.  Gov't Memo, pp. 19-20.  The government agents knew, however, that they could never make such an argument if Mr. Graham met directly with UMMS representatives for the purpose of sharing their concerns with Mr. Graham and for obtaining an informed opinion that Snyder would obey.  The fact that Snyder wanted such a free exchange between UMMS and Mr. Graham should have been sufficient to dispel any notion that Snyder was hiding information from Mr. Graham or acting with criminal intent requisite for attempted

extortion.   And, if the government had not blocked the meeting, the mere fact that it occurred would have established Snyder's innocence.

There can be no doubt that a meeting between the UMMS representatives and Mr. Graham would have exonerated Snyder.   UMMS would have shared all of its concerns and reservations about Snyder's proposal, and Mr. Graham would have given his fully informed opinion as to whether Snyder's proposal was legal and appropriate.   If Graham had opined that the proposal was proper, Snyder's good faith would have been confirmed.   If Graham had expressed a negative opinion, Snyder would have walked away from his proposal as he had promised UMMS on August 23rd.   In either event, Snyder would have been proven to have acted without the *mens rea* necessary for the commission of attempted extortion.

From the time that they first overheard Snyder's repeated requests for Snyder and Mr. Graham to meet with Kinter and other UMMS representatives, the government agents knew that dialogue at such a meeting would demonstrate Snyder's bona fides and dispel any notion that Snyder was acting with criminal intent.   The agents also knew that they would have to make an electronic record of that meeting, the same as they had done for all of the other meetings, because they could never provide a satisfactory explanation for having failed to record the one meeting that was most beneficial for Snyder.   As a member of the U.S. Attorney's Office later admitted to Kinter, and as Kinter later recounted to the investigators, government agents instructed Kinter and the other UMMS representatives that they were not to meet with Mr. Graham (Ex. 25, p. 3), and from August 23rd to the end of the investigation, UMMS representatives complied with the government's instructions.

In 2018, when government agents engaged in misconduct, Snyder was not adversely affected because the government dropped the investigation and declined to prosecute.   Two years

later, however, when new prosecutors decided to take a chance at prosecuting Snyder, the agents' misconduct ripened into a violation of Snyder's right to due process of law. *United States v. Stein,* 541 F.3d 130 (2nd Cir. 2008) (discussed in First Memo., pp. 24-25). The new prosecutors knew that government agents had deprived Snyder of the most persuasive evidence of his lack of criminal intent and that Snyder's ability to defend himself would be severely compromised by absence of that important evidence.

The prosecutors have demonstrated their awareness of these facts, and of the prejudice caused thereby, by their argument that Mr. Graham cannot be helpful to Snyder because UMMS' concerns were "not disclosed" to Mr. Graham. Gov't Oppos., p. 20. Under these circumstances, constitutional precedent and common notions of fairness and decency require that the Indictment be dismissed with prejudice. "When, as here, the prosecutor violates this basic standard to the prejudice of the defendant, the Court has the 'duty ... to see that the waters of justice are not polluted,'" and upon a finding of "pollution having taken place," to see that "the conditions ... be remedied at the earliest opportunity." *Mesarosh v. United States,* 352 U.S. 1, 14 (1956).

## II. THE COURT SHOULD GRANT SNYDER'S *BRADY* MOTION BECAUSE SNYDER SEEKS EXCULPATORY INFORMATION NECESSARY FOR CONSIDERATION OF HIS FIRST MOTION TO DISMISS THE INDICTMENT

Snyder invokes *Brady* and its progeny to obtain disclosure of information about government misconduct that forms the basis for his First Motion to Dismiss. *See Brady* Motion. On July 16, 2021, in an effort to obtain that information without the necessity for filing a Motion, counsel for Snyder sent a lengthy letter to prosecutors setting forth the circumstances that gave rise to his *Brady* requests and making five specific requests for that relevant information. *Brady* Motion Ex. "A."

Snyder was compelled to file his *Brady* Motion because prosecutors chose to ignore his letter. Even now, in their Opposition, they make no effort to defend their refusal to respond to Snyder's communication. By exhibiting such disdain for Snyder's legitimate requests, prosecutors made it obvious they had no intention to take seriously their *Brady* obligations. "'When the prosecutor receives a specific and relevant request,'" the Supreme Court has declared, "'the failure to make any response is seldom, if ever, excusable.'" *United States v. Bagley,* 473 U.S. 667, 681 (1985) (quoting *Agurs,* 427 U.S. at 106).

The government's Opposition to the *Brady* Motion displays the same disregard for the obligation to produce information favorable to Snyder, and has the feel and look of an effort to cover up evidence of government wrongdoing, as described in the preceding Section of this Memorandum. In its Opposition to Snyder's four *Brady* requests for information regarding the agents' instructions to UMMS that its representatives not meet with Mr. Graham and other improper instructions that they gave to UMMS to gain an unfair advantage, the government does not deny that its agents gave such instructions. Nonetheless, the government refuses to provide information by asserting, contrary to settled law, that its agents had the right to engage in such conduct. Gov't Memo, pp. 63-65. Similarly, in responding to Snyder's fifth *Brady* request for information about the facts that led the U.S. Attorney's Office to drop its investigation of Snyder in 2018, the government does not deny that the information would be exculpatory but asserts that the information is work product and claims, incorrectly, that the work product doctrine justifies withholding *Brady* information. *Id.,* pp. 65-66.

## A. Snyder's First Two *Brady* Requests Go To The Heart Of The Misconduct That Is The Subject Of Snyder's First Motion To Dismiss

The government does not deny that Snyder's first two *Brady* Requests go to the heart of the misconduct set forth in the First Motion to Dismiss.  Gov't Memo, p. 64.  Snyder's first two *Brady* Requests ask that the Court order the government to provide:

> 1.  All documents and information relating to all communications, on or about September 5, 2018, between any representative of the government (including any AUSA or FBI agent) and any representative of UMMS (including Gregg Bernstein, Esq. ("Bernstein"), Magdeburger or Kinter) concerning whether Kinter would or should permit Andrew Graham, Esq. ("Graham") to attend the meeting between Snyder and Kinter planned for September 6, 2018.

> 2.  All documents and information, not produced in response to Request 1 above, relating to all communications in the period between August 10, 2018 and September 30, 2018, between any representative of the government and any representative of UMMS concerning whether any representative of UMMS should meet or communicate with Graham.[9]

*Id.*

Important to the Court's consideration of these Requests is the fact that the government does not deny that the government agents instructed or requested that the UMMS representatives not meet with Mr. Graham.  The government also does not dispute that the agents knew, from the outset of their investigation, that Snyder had been imploring UMMS, from at least June 22nd, to work with Mr. Graham in an effort to determine whether Snyder's consulting/retainer proposal was proper and feasible.  Further, the government does not take issue with the fact that its agents,

---

[9] Each Request goes on to specify that, "The documents and information should include, as to each communication, the following: (a) the date and time of the communication; (b) the identities of the participants; (c) whether the communication was written or oral; (d) whether the communication, if oral, was in person or by other means, and, if the latter, the means of the communication; (e) the substance of any oral communication; (f) a copy of any written communication; and (g) a copy of any document memorializing any oral communication or describing the circumstances under which the written or oral communication took place."  *Id.*

while eavesdropping on the August 23rd meeting that they had caused UMMS to convene, overheard Snyder (1) repeatedly imploring UMMS representatives to contact and meet with Mr. Graham for the purpose of sharing their concerns with Mr. Graham, (2) stating that Snyder wanted Mr. Graham to hear from UMMS so that Mr. Graham could give a fully-informed opinion, and (3) promising to abandon the proposal if Mr. Graham was not of the opinion that Snyder's proposal could be effectuated ethically, morally and legally.

Without denying any of these crucial facts, the government asserts that this Court should not require the government to produce any information about the agents' actions that thwarted the UMMS/Graham meeting that Snyder had so assiduously sought. The government's justification for this assertion, and for refusing to provide the information, is that the government opposes Snyder's First Motion to Dismiss and asserts there is nothing in the law that would have forbidden the agents from interfering with Snyder's efforts to convene a meeting that would have confirmed his innocence. As Snyder has demonstrated in his First Memo and in the preceding Section of this Memorandum, however, schemes such as those employed by the agents here violate due process of law because they are perpetrated for the purpose of giving the government an unfair advantage over the accused and, when successful, inevitably prejudice the defense.

Moreover, the Fourth Circuit has held that evidence is material, and exculpatory, and is subject to disclosure under *Brady,* when it: is "inconsistent with the State's theory," "undermine[s] the government's theory," and, most importantly, "raise[s] opportunities to attack ... the thoroughness and even the good faith of the investigation." *Juniper v. Zook,* 876 F.3d 551, 570-71 (4th Cir. 2017) (quoting *Kyles v. Whitley,* 514 U.S. 419, 445 (1995) and citing cases from other Circuits to same effect). The information and evidence of the government's interference with Snyder's efforts to have UMMS meet with Mr. Graham meets every one of these separate criteria.

The evidence shows that, contrary to the government's theory, Snyder was not acting with extortionate intent because, but for the interference by the government agents, Snyder would have provided UMMS the opportunity to voice all of its concerns about Snyder's conduct and proposal directly to Mr. Graham, Mr. Graham would have given his opinion of Snyder's proposal directly to UMMS, and, if the opinion was unfavorable, Snyder would have abandoned his proposal. The evidence is also *Brady* information because it "raises opportunity" to show that investigators, by blocking Snyder's efforts to demonstrate his innocent intent, chose not to conduct their investigation in good faith and prejudiced Snyder's ability to defend himself in this subsequent prosecution.

### B. Snyder's Third And Fourth *Brady* Requests Concern Other Investigative Misconduct In Connection With Two Important Conversations That Mr. Graham And Snyder Had With UMMS Representatives

Snyder's Third and Fourth *Brady* requests ask for information and documents relating to instructions that government agents gave to Magdeburger and Kinter as to what each should say, and not say, in the telephone calls that Magdeburger made to Mr. Graham on August 24th and Kinter made to Snyder on August 30th.

After Snyder strenuously insisted in the August 23rd meeting and in the telephone calls of August 24th and 25th that UMMS officials meet with Mr. Graham to voice their concerns, UMMS could not credibly avoid all contact with Mr. Graham. Accordingly, the government staged the call from Magdeburger on August 27th. In that call, however, Magdeburger adhered to government instructions and deliberately refrained from telling Mr. Graham about UMMS's concerns. Without that information, of course, Mr. Graham was prevented from giving the fully-informed opinion to UMMS that Snyder had wanted UMMS to have. Mr. Graham suggested that Magdeburger schedule a meeting between Snyder and himself, on the one hand, and UMMS representatives, on

the other.  The purpose of the meeting, Mr. Graham explained, would be for "everybody [to] sit at a table and talk it through."  UMMS and Mr. Graham would be able to engage in a free-wheeling discussion of Snyder's proposal, and, after hearing Mr. Graham's opinion based on what UMMS told him, UMMS could determine whether the parties could appropriately enter into a consulting/retainer agreement.  Again, however, Magdeburger, at the government's direction, deliberately refrained from acting on Mr. Graham's suggestion.

Accordingly, Snyder's third *Brady* Request asks the Court to order the government to disclose:

> 3.  All documents and information relating to all communications, on or before August 27, 2018, between any representative of the government (including any AUSA or FBI Agent) and any representative of UMMS (including Bernstein, Magdeburger or Kinter) concerning whether Magdeburger, in her August 27th telephone call to Mr. Graham, would or should share with Mr. Graham any concerns that UMSM had about the propriety or legality of Snyder's proposal for a consulting/retainer agreement or any concerns about the propriety or legality of the presentations that Snyder had made to UMMS on June 22 or August 23, 2018.

*See* Ex. A, p. 5.

Snyder's fourth *Brady* Request concerns the government's instructions to Kinter in connection with her August 30th telephone call to Snyder.  In that conversation, at the government's direction, Kinter proposed that Snyder sacrifice the interests of his client, ███████████ in favor of his own interests, by entering into a consulting/retainer agreement with UMMS immediately and by deferring the resolution of the ████████ case to some undefined later time.  Snyder refused the proposal and insisted that both be resolved at the same time.[10]

Snyder's fourth *Brady* request asks the Court to order the government to disclose:

---

[10] The fact that the government agents instructed Kinter to make this proposal, demonstrates the government's awareness of the weakness of its case based on the nexus between Snyder's demand and his representation of ███████████.  The information sought by Snyder is clearly exculpatory.

4.      All documents and information relating to all communications, on or before August 30, 2018, between any representative of the government (including any AUSA or FBI Agent) and any representative of UMMS (including Bernstein, Magdeburger or Kinter) concerning whether Kinter, in her August 30th conversation with Snyder, would or should suggest to Snyder that UMMS and he move forward to consummate Snyder's proposal for a consulting/retainer agreement and defer to a later date the settlement of the ▮▮▮▮ case.

*See* Ex. A, p. 6.

The government responds to the third and fourth *Brady* Requests the same way that it responds to the first and second.  It does not deny that the government agents instructed Magdeburger and Kinter that they should not express their concerns to Mr. Graham in order to gain an unfair advantage over Snyder that would prejudice his defense.  Instead, the government claims that there is nothing in the law that prevented them from doing so.  The government's argument is plainly wrong and the information of the government's wrongful instructions is certainly "favorable" to Snyder, the accused.  *Brady* requires the government produce it.

## C. The Government Must Disclose Its Improper Instructions To UMMS Representatives, Even If Those Instructions Were Given Orally And Not Subsequently Reduced To Writing

While Snyder's first four *Brady* Requests ask for information that might be possessed by the FBI agents who have investigated the case, and while the wrongful instructions that were given to the UMMS employees may have been oral, *Brady* nevertheless requires that prosecutors make inquiry of investigators to assure themselves that they learn of information favorable to Snyder, whether it be in the possession of the U.S. Attorney's Office or of the FBI agents who have investigated Snyder, and that they disclose such favorable information.

It appears from Kinter's subsequent statements to State investigators that an AUSA and investigating FBI agents participated in giving improper instructions, but even if the FBI agents had acted alone, *Brady* would require the government to provide the information.  The Supreme

41

Court has emphasized that *Brady* "encompasses evidence 'known only to police investigators and not to the prosecutor,'" and that, "'In order to comply with *Brady*, therefore, the individual prosecutor has a duty to learn of any favorable evidence known to the other acting on the government's behalf in [the] case, including the police.'" *Strickler,* 527 U.S. at 280-81 (quoting *Kyles,* 514 U.S. at 437). *See United States v. Robinson,* 627 F.3d 941, 951 (4th Cir. 2010); *Bryant,* 2020 WL 673571, *21.

Furthermore, even if the agents' improper instructions to the UMMS representatives were oral, and even if they were never memorialized in any memorandum, *Brady* requires the government to disclose them. Exculpatory information "is no less discoverable" if it is oral than if the same information were in writing. *Justice Manual*, Department of Justice, https://www.justice.gov/jm/justice-manual (last visited October 25, 2021) (formerly known as the United States Attorneys' Manual), JM, 9-5.150. *See also United States v. Rodriguez,* 496 F.3d 221, 226 (2nd Cir. 2007) ("The obligation to disclose information covered by the *Brady* and *Giglio* rules exists without regard to whether that information has been recorded in tangible form"); *Smith v. Sec'y of New Mexico Dep't of Corrections,* 50 F.3d 801, 828 (10th Cir. 1995) ("No one could reasonably argue" that exculpatory "material learned orally and not memorialized in writing" need not be disclosed); *Bell v. Bell,* 512 F.3d 223, 233 (6th Cir. 2008) (fact that prosecutor and witness reached a "mutual understanding, albeit unspoken," must be disclosed); *Wisehart v. Davis,* 408 F.3d 321, 323-24 (7th Cir. 2005) ("tacit" agreement "would have to be disclosed to defense"); *United States v. Shaffer,* 789 F.2d 682, 690 (9th Cir. 1986) ("facts which imply an agreement" with witness "would have to be disclosed"); *Douglas v. Workman,* 560 F.3d 1156, 1186 (10th Cir. 2009) "Like the majority of our sister circuits, we conclude that *Brady* requires disclosure of tacit agreements between the prosecutor and a witness   A deal is a deal - explicit or tacit"); *United*

42

*States v. Mickens,* 2021 WL 3136083, *7 (2nd Cir. July 26, 2021) ("When no notes are taken during a witness interview, but material information favorable to a defendant emerges, *Brady* obligates the Government to provide that information .").

### D. The U.S. Attorney's Closing Memorandum, Memorializing The Closing Of The Investigation Of Snyder In 2018, Is Discoverable Under *Brady*

Snyder's fifth *Brady* Request seeks documents explaining the decision of the U.S. Attorney's Office in 2018 to terminate the investigation, to decline to prosecute Snyder and to close the file. These documents doubtlessly recount the facts favorable to Snyder, including the efforts by Snyder and Mr. Graham to convene a meeting with UMMS that Mr. Graham would attend and at which he would be able to give his fully-informed opinion about Snyder's proposal.

Accordingly, Snyder's fifth *Brady* Request asks the Court to order the government to disclose:

> 5. All statements documenting or explaining the closure of the investigation of Snyder in 2018, and/or documenting or explaining the U.S. Attorney's declination to prosecute Snyder at that time, concerning the willingness of Snyder and/or Mr. Graham to meet with representatives of UMMS. The government should provide, as to each document: (a) the date when it was written; (b) the identify of its author or authors; and (c) the identities of the recipients of any copy thereof; and (d) a copy of the document.

The government does not deny that AUSAs who were in charge of the investigation in 2018 wrote a closing memorandum explaining their reasons for declining prosecution and setting forth facts favorable to Snyder. The government contends, however, that a defendant must never be granted access to such a memorandum and it mistakenly invokes the work product doctrine as a reason for denying an otherwise valid *Brady* request.

The 2018 Closing Memorandum for the Snyder investigation is an important source of *Brady* information in the present case. A memorandum supporting the closure of an investigation

is a fertile place for exculpatory facts because such facts supply the basis for the U.S. Attorney's

declination of prosecution.  The Justice Manual (formerly the U.S. Attorney's Manual) provides:

> The United States Attorney is authorized to decline prosecution in
> any case referred directly to him/her by an agency unless a statute
> provides otherwise.  *See* JM9-2.111.  **Whenever a case is closed
> without prosecution, the United States Attorney's files should
> reflect the action taken and the reason for it.**

JM, 9.2.020 (as of 10/14/21) (emphasis added).  Additionally:

> Whenever an attorney for the government declines to commence or
> recommend federal prosecution, **he/she should ensure that his/her
> decision and the reasons therefore are communicated to the
> investigating agency involved** and to any other interested agency,
> **and are also reflected in the office files to ensure an adequate
> record of disposition of matters** that are brought to the attention of
> the government attorney for possible criminal prosecution, but that
> do not result in federal prosecution.

JM*., 9-27-250 (emphasis added).

The Closing Memorandum is just a small part of the file of so-called Substantive Case-

Related Communications that the U.S. Attorney's Office is required to preserve and to search for

information favorable to the accused when a *Brady* request is made:

> Substantive     Case-Related     Communications:     "Substantive"     case-related
> communications may contain discoverable information.  **Those communications
> that contain discoverable information should be maintained in the case file or
> otherwise preserved in a manner that associates them with the case or
> investigation.  "Substantive" case-related communications are most likely to
> occur (1) among prosecutors and/or agents, (2) between prosecutors and/or
> agents and witnesses and/or victims,** and (3) between victim-witness coordinators
> and witnesses and/or victims.  Such communications may be memorialized in
> emails, memoranda or notes.  **"Substantive" communications include factual
> reports about investigative activity, factual discussions of the relative merits
> of evidence, factual information obtained during interviews or interactions
> with     witnesses/victims,     and     factual     issues     relating     to     credibility.**
> Communications involving case impressions or investigative or prosecutive
> strategies **without more** would not ordinarily be considered discoverable, but
> **substantive case-related communications should be reviewed carefully to
> determine whether all or part of a communication (or the information
> contained therein) should be disclosed.**  Prosecutors should also remember that

with few exceptions (*see, e.g.,* Fed. R. Crim. P. 16(a)(1)(B)(ii)), **the format of the information does not determine whether it is discoverable. For example, material exculpatory information that the prosecutor receives during a conversation with an agent or a witness is no less discoverable than if that same information were contained in an email... .**

JM, 9.5.001 (emphasis added) (last sentence in section omitted as irrelevant to present issue).

### E. Snyder's *Brady* Rights Supersede The Prosecutors' Work Product Interests In The U.S. Attorney's 2018 Closing Memorandum

The government mistakenly invokes the work product doctrine to prevent disclosure of the exculpatory evidence and information in the U.S. Attorney's 2018 Closing Memorandum. It cites, as support for its argument, a Ninth Circuit case, *Morris v. Ylst,* 447 F.3d 735 (9th Cir. 2006). Contrary to the government's argument, the court in *Ylst* actually declared that, "[I]n general, a prosecutor's opinions and mental impressions of the case are not discoverable under *Brady unless* they contain underlying exculpatory facts." *Id.* at 742 (emphasis in original). Stated otherwise, memoranda containing opinions of a prosecutor or investigating agents *are* discoverable when they contain underlying exculpatory facts, and, in such cases, the courts require disclosure of both the underlying exculpatory facts and the opinions and conclusions that those facts generate. Two other Ninth Circuit cases, discussed in the next succeeding paragraph, further illustrate this rule.

The work product doctrine does not shield a prosecutor from his duty to disclose information and evidence favorable to an accused, even when that information is found in internal memoranda and notes made by a prosecutor or investigator to memorialize an interview or to summarize an investigation. Wright & Miller, Fed. Prac. & Proc. Crim., § 254 (4th ed. 2021) (while Rule 16(a)(2) provides generally that the government need not disclose "reports memoranda or other internal government documents made by the attorney for the government or other government agents," *Brady* "requires the disclosure of evidence favorable to the accused," and "[t]his is, of course, not changed by this rule."). *See also United States v. Armstrong,* 517 U.S.

456, 474-75 (1996) (Breyer concurring); *Fontenot v. Crow,* 4 F.4th 982, 1063-64 (10th Cir. 2021) (state prosecutor's prosecutorial report, containing handwritten notes of prosecutor's mental impressions, was work product but nevertheless required to be produced under *Brady;* Oklahoma courts, in which the defendant was prosecuted, "recognized that 'the work product privilege may not be applied in derogation of a criminal defendant's constitutional rights to disclosure of evidence favorable to the defendant'"); *United States v. Goldman,* 439 F. Supp. 337, 350 (S.D.N.Y. 1977) ("Of course, if [work product] material be of a *Brady* nature, then it must be produced"); *United States v. Rigas,* 2011 WL 1330531, *3 (M.D. Pa. Sept. 20, 2011) ("even if we were to agree with the government and find that the SEC [lawyer's] interview notes of [a prospective witness] are privileged as work product, we would still order the documents be produced pursuant to *Brady;"* court follows "the lead of other appellate courts to assume that because *Brady* is based on the Constitution it overrides court-made rules of procedure and therefore requires disclosure"); *United States v. Edwards,* 777 F. Supp. 2d 985, 995 (E.D. N.C. 2011) ("several courts, including the Supreme Court, have assumed that *Brady* requires disclosure despite work product protections," and, "This is because *Brady* is a constitutional right that overrides the statutorily created work-product privilege."); *Paradis v. Arave,* 240 F.3d 1169, 1173-77 (9th Cir. 2001) (requiring prosecutor's notes about medical examiner's material opinion as to time and location of victim's death be disclosed under *Brady*); *United States v. Brumel-Alvarez,* 991 F.2d 1452, 1458-1460 (9th Cir. 1992) (investigating agent's memorandum to Office of Professional Responsibility, setting out facts and opinions regarding misconduct of government informant during investigation and questioning informant's credibility, was *Brady* information government was required to disclose); *United States v. Gutierrez,* 2007 WL 3026609, *3-4 (W.D. Tex. 2007) (prosecutor's notes of conversation with government investigator, in which investigator conveyed "the

highlights" of the investigator's interview of defendant, was discoverable under *Brady,* though notes were work product, because they contained "favorable evidence"); *Mincey v. Head,* 206 F.3d 1106, 1133 n.63 (11th Cir. 2000) (cases collected).

### F.  At The Very Least, The Government Must Provide The U.S. Attorney's 2018 Closing Memorandum To This Court For *In Camera* Inspection

At the very least, the government must provide this Court, for *in camera* inspection, the U.S. Attorney's 2018 Closing Memorandum declining to prosecute Snyder for lack of sufficient evidence of criminal intent and containing the reasons for closing the Government's file.  The Closing Memorandum necessarily catalogues exculpatory facts supporting the decision that the government did not have a prosecutable case against Snyder.  The very nature of a Closing Memorandum, and the circumstances of this case as described in Section I of this Memorandum, are certainly sufficient to meet the threshold requirements for an *in camera* review of the Closing Memorandum and any accompanying documents such as communications with the FBI about the reasons for the declination.  *Love v. Johnson,* 57 F.3d 1305, 1313 (4th Cir. 1995).

In *Love,* the Fourth Circuit explained that, when the circumstances suggest, "but the accused may only suspect, that particular evidence exists which meets [the *Brady* materiality] requirements, he is not required, in order to invoke the right [to obtain *Brady* information] to make a particular showing of the exact information sought and how it is material and favorable.  Instead, he need only at that stage 'at least make some plausible showing' that it does exist and how it would be 'both material and favorable to his defense.'"  *Love,* 57 F.3d at 1313 (quoting *Pennsylvania v.  Ritchie,* 480 U.S. 39, 58 n. 15 (1987)).  "Upon making such a showing, the accused ... become[s] entitled, in order to secure the basic right, to have the information he has sufficiently identified submitted to the trial court for *in camera* inspection and a properly

reviewable judicial determination made whether any portions meet the material and 'favorable' requirements for compulsory disclosure." *Id.*

The 2018 Closing Memorandum meets the *Love* requirements because it was written at the end of the federal investigation of Snyder to support the determination of the U.S. Attorney's Office that the investigation had not revealed a prosecutable case for extortion against Snyder. Government standards required the U.S. Attorney's Office to list reasons for declining prosecution, to preserve the memorandum explaining those reasons and to inform the FBI of those reasons. The 2018 Closing Memorandum for the Snyder investigation undoubtedly contains a recitation of facts and, in particular, exculpatory facts that provided the basis for the decision that Snyder should not be prosecuted. These circumstances clearly constitute a "plausible showing" that the Closing Memorandum contains exculpatory information. If the Court does not order the immediate production of the Memorandum, the Court is obligated, at the very least, to inspect the Memorandum *in camera,* and upon finding exculpatory information in the Memorandum, to require that the Memorandum, or its exculpatory parts (if they can be separated from the whole), be provided to Snyder. *See also United States v. King,* 628 F.3d 693, 703 (2011).

## III.   THE COURT SHOULD GRANT SNYDER'S SECOND MOTION TO DISMISS BECAUSE THE GOVERNMENT HAS NO VALID EXCUSE FOR THE PROSECUTORS' FALSIFICATIONS

### A. The Government Contends Erroneously That This Court Is Powerless To Remedy Prosecutorial Misconduct Consisting Of Falsification Of The Allegations Of An Indictment

The government devotes nearly a third of its Response to Snyder's Second Motion to Dismiss to an argument that this Court is powerless to remedy prosecutorial misconduct involving intentional falsification of allegations of an indictment. Gov't Memo, pp. 24-40. The government's argument is plainly wrong because such misconduct is obviously prejudicial. While

misconduct of that sort is thankfully rare, it can and should be remedied by this Court through the exercise of its supervisory powers over the administration of justice, by the application of well-settled principles of due process of law and through adherence to the provisions of the Federal Rules of Criminal Procedure.

### 1. General Principles Governing Dismissal For Prosecutorial Misconduct In Connection With Grand Jury Proceedings, As Well As Those Governing Dismissal For Prosecutorial Misconduct At Other Stages Of The Criminal Process, Require That The Court Dismiss The Falsified Indictment With Prejudice

The cornerstone of the government's implausible argument that the Court is powerless to address misconduct of a prosecutor who falsifies allegations of an indictment is the preposterous notion that misconduct of a prosecutor in falsifying allegations of an indictment, presenting a falsified document to the grand jury and causing the grand jury to return it as a true bill, is somehow not to be viewed as prosecutorial misconduct in connection with grand jury proceedings. This argument has no supporting legal authority. Instead, it is well-settled that an indictment must be dismissed when a prosecutor or investigative agent commits deliberate misconduct in connection with grand jury proceedings and when, as here, it cannot be said that the grand jury's action was free from the influence, that the misconduct was designed to have. *United States v. Feurtado,* 191 F.3d 420, 425 (4th Cir. 1999).

In *Feurtado,* a drug prosecution, the case agent, relying in good faith on misinformation from a New York detective, testified mistakenly that the defendant was tied to persons in New York who had committed serious but unrelated crimes. *Id.* at 423-24. The testimony from two other grand jury witnesses was more than sufficient "to support the charges contained in the indictment," and other testimony from the case agent "provided independent corroboration for those witnesses." *Id.* at 424. The district court, beginning its analysis with the question of

prejudice, "concluded that it did not find that the defendants had established that improper testimony substantially influenced the grand jury's decision to indict, it did find that it had some doubt that the grand jury's decision to indict was free from the influence of that testimony." *Id.* The district court also found that the agent's misstatements constituted "unintentional misconduct" and that agent had "acted with the best of intentions." *Id.* at 424, n.2. Under those circumstances, the district court dismissed the indictment without prejudice. *Id.* at 423.

The Fourth Circuit, on appeal, held that "We are of the opinion the district court took the correct course." The appellate court affirmed the district court's finding of prejudice and endorsed the principle that it is sufficient to meet the prejudice requirement of *Bank of Nova Scotia v. United States,* 487 U.S. 250 (1988), that improper action of the agent or prosecutor generates "some doubt" that a grand jury's action was "free from the influence" of impropriety. The Fourth Circuit also ruled that the district court "correctly chose a more narrowly tailored remedy and dismissed the indictment without prejudice" because "the objectionable testimony" was "inadvertent." *Feurtado,* 191 F.3d at 425. If the agent had deliberately given false testimony, the Appellate Court stated, the case would have concerned "prosecutorial misconduct," and the defendant's motion would, "of course, [have] implied dismissal with prejudice." *Id.* at 423.

When, as in the present case, a prosecutor deliberately falsifies the factual allegations of an indictment and causes the grand jurors to return a true bill thereon, complete with the signatures of the foreman and the United States Attorney, the prosecutor engages in misconduct that is even more pernicious and unquestionably prejudicial. In *Bank of Nova Scotia,* for example, where defendants complained that IRS agents, testifying as grand jury witnesses, had unfairly and inaccurately summarized testimony given to a prior grand jury, the Supreme Court held that, "Because the record does not reveal any prosecutorial misconduct with respect to these summaries,

they provide no ground for dismissing the indictment," and that, "Although the Government may have had doubts about the accuracy of certain aspects of the summaries, this is quite different from having knowledge of falsity."  487 U.S. at 260, 261.

Employing that same analysis here, there is no escaping the conclusion that the Indictment in the present case *must* be dismissed.  Here: (1) the prosecutors themselves created the falsified narrative; (2) the prosecutors obviously knew the narrative in the Indictment was falsified because they had transcripts of the discussions between Snyder and UMMS's representatives before them when they created the falsified document; (3) the prosecutors used grammatical devices and other deceptions to change the meaning of what the defendant said and to misrepresent that the indictment incorporated a seamless narrative; and (4) the prosecutors personally presented the falsified document to the grand jury foreman, and by that action, falsely represented to the foreman that it was an accurate representation of the essential facts.  The prosecutors' misconduct was all the more aggravated and prejudicial to Snyder because prosecutors intended that the grand jury would rely upon the falsified Indictment in charging Snyder and knew, also, that they were falsifying the foundational pleading that would govern all future proceedings in the case.

The prosecutors' misconduct is also more flagrant and pervasive because prosecutors have actually used, and are continuing to use, their falsified narrative to obtain rulings favorable to the government in this case.  Thus, in describing the alleged facts on which the government asks this Court to deny Snyder's First and Second Motions to Dismiss, the government repeats, with some modifications, its expurgated version of the August 23rd Snyder/UMMS meeting.  Gov't Memo, pp. 11-14.  Similarly, the government continues to attempt to capitalize on its falsified Indictment narrative to make the false assertions, in opposition to Snyder's Second Motion to dismiss, that: (a) "the Defendant did not threaten litigation," (b) Snyder's alleged threats were not made in the

context of litigation, (c) "the Defendant never actually told UMMS what he could do for them" and (d) the case against Snyder is "exactly the same" as the recently concluded case against Michael Avenatti.  Gov't Memo, pp. 58, 61.  Compare Gov't Memo, pp. 4-5, 40-52, 54-58 with Motion Exs. 4 and 6, Tr. 18:1-19:16, 34:1-12.  There can be no doubt that government misconduct is all the more deserving of condemnation when the government fails to rectify the misconduct, and, instead, continues to engage in the misconduct or otherwise continues to exploit the misconduct to achieve the objective that inspired the misconduct in the first place.

A prosecutor's falsification of statements in a document, much less falsification of the basic charging document, is a serious matter that requires imposition of the strongest sanctions.  In *United States v. Omni Intern. Corp.,* 634 F. Supp. 1414 (D. Md. 1986), a frequently cited case, an AUSA assisted IRS agents in altering and creating interview memoranda to put the conduct of government personnel "in a better light."  *Id.* at 1423-28.  "Compounding the major error" in falsifying documents "was the Government's failure to admit its mistake ... and to minimize the harm done."  *Id.* at 1425-26.  When the AUSA was called as a witness at the evidentiary hearing on the government's conduct, she was also "not candid" in her testimony about a prior decision by the Justice Department to decline prosecution of the case for which the AUSA had later obtained charges.  *Id.* at 1435.  Dismissing the indictment over objection by the government that there was no reported case to support such a decision, this court declared that, "If no legal precedent presently exists in reported cases to proscribe such outrageous conduct, one needs to be added at this time." *Id.* at 1439.

While the court in *Omni* emphasized the need to exercise the court's supervisory powers, the government misconduct also violated the defendants' due process rights.  In *United States v. Nebel,* 856 F. Supp. 392, 394 (M.D. Tenn. 1993), the court observed that, in *Omni* and other similar

cases, "the violations of the defendants' constitutional rights were so great that it was impossible to excise the taint of the government's constitutional transgressions from the prosecution of the defendants," and, as in the present case against Snyder, "The fruit of the constitutional violations were the indictments themselves."   In such cases, "dismissal of the indictment [is] the only appropriate remedy."   *Id.*[11]

### 2. Rule 12 Not Only Allows A Pretrial Motion To Dismiss Based On Prosecutorial Misconduct - It Requires It

The government could not be more wrong in its assertion that the Federal Rules of Criminal Procedure do not provide a mechanism for Snyder to obtain relief from the Government's outrageous misconduct in falsifying allegations of the Indictment, and, in particular, that Rule 12 does not permit dismissal of the Indictment for prosecutorial misconduct.   The government also makes an untenable argument when it claims that Rule 12 does not allow dismissal motions that call upon the court to make findings of fact.

Contrary to the government's assertions - Rule 12 not only authorizes a pretrial motion to dismiss based on government misconduct - it **requires** it.   Subsection (b)(3)(A), in listing "Motions That Must Be Made Before Trial," specifies that motions based on "a defect in instituting the prosecution," including those based on "an error in the grand jury proceeding," are among those covered by that mandate. Fed. R. Crim. P. 12.   Further, and also contrary to the government's assertions, subsection (d) provides that, "The court must decide every pretrial motion before trial,

---

[11] For a recent declaration that *Omni* applied well-settled principles, *see United States v. Houdersheldt,* 2020 WL 7210993, *7 (S.D. W.Va. Dec. 3, 2020).  *See also United States v. Burns,* 2016 WL 3910273, *7 (W.D. Va. July 14, 2016) (court removed AUSA from case after defendant accused government investigator of misconduct in contact with a grand jury witness and AUSA "mischaracterized the contact and provided [defendant and court] truncated summaries that omitted important details").

unless it finds good cause to defer a ruling," and, "When factual issues are involved in deciding a motion, the court must state its essential findings on the record."

In Levenson, Federal Criminal Rules Handbook (2020 ed), p. 232, the author explains that Rule 12 "was designed to ensure that trials will be efficient and not based upon tactical delays in filing challenges to charges or evidence in criminal cases." Accordingly:

> Pursuant to this goal, **certain objections must be filed prior to trial or they are deemed waived.** These include: **(1) defects in bringing the prosecution, such as irregularities in the grand jury proceedings; (2) defects in the indictment** or information ... .

*Id.* (emphasis in original). Based on this "core concept," the author adds, Rule 12 provides that, among the "defenses, objection and motions [that] **must** be filed prior to trial or they are deemed waived," are:

1. **Challenges to the procedures leading to a prosecution**

2. **Defenses based upon defects in the indictment** or information (**other than** lack of jurisdiction or **failure to charge an offense**

*Id.* (emphasis in original). **"Common grounds"** for [such] motions to dismiss," the author explains, **include "[o]utrageous government misconduct."** *Id.* at 234, 235.

Because Rule 12 expressly requires that issues of prosecutorial misconduct be presented in a pretrial motion as a claim for dismissal based on "defects in the institution of the prosecution," and because defenses based on such misconduct are for the court to decide, a wide variety of courts have held that a defendant who waits until trial to assert his prosecutorial misconduct defense has waived his right to assert it. In *United States v. Mausali,* 590 F.3d 1077 (9th Cir. 2010), the Appellate Court declared that, "We hold today, as have the Second, Third, and Eighth Circuits, that a defendant waives his claim of outrageous government conduct of which he is aware if he fails to assert it in a pretrial motion to dismiss." *Id.* at 1078.

The defendant in *Mausali* claimed that government misconduct during the investigation had violated his right to due process.  *Id.* at 1080.  The Appellate Court held that the claim was untimely and had been waived because the defendant had not filed a Rule 12 motion to dismiss.  Citing cases from other Circuits that had ruled the same way, the Ninth Circuit explained:

> **The policy behind the rule is sound.  Outrageous government conduct claims involve alleged "'defects in the institution of the prosecution' itself," questions of law that the court should decide before trial.** *Nunez-Rios*, 622 F.2d at 1098 (quoting what is now Fed. R. Crim. P. 12(b)(3)(A)); *accord Pitt*, 193 F.3d at 760.  **Furthermore, pretrial assertion of the claim permits the trial court to "conduct a hearing with respect to any disputed issues of fact."**  *Nunez-Rios*, 622 F.2d at 1098.  Indeed, **the Federal Rules of Criminal Procedure require a defendant to "alleg[e] a defect in instituting the prosecution" before trial,** Fed. R. Crim. P. 12(b)(3)(A), **or else waive the objection on appeal,** Fed. R. Crim. P. 12(e); **we apply a similar waiver rule to untimely claims of irregularities in grand jury proceedings.**  *See United States v. Kahlon*, 38 F.3d 467, 469 (9th Cir. 1994) **("[I]rregularities in grand jury proceedings are considered to be defects in the institution of the prosecution within the meaning of Rule 12(b)**[] .... Failure to raise such defects before trial results in waiver of the objections." (internal quotations and citations omitted)).

*Id.* (emphasis added).[12]

While the government, in its Response here, argues that Rule 12 is not a rule that can be used when there are disputes of fact that may need to be resolved, that argument is contrary to both the express language of subsection (d) and is at odds with the relevant case law.  The same cases that have just been cited, which require pretrial filings of dismissal motions based on prosecutorial misconduct, also explain that the need to resolve disputed facts in connection with such motions is a reason militating ***in favor*** of allowing pretrial motions under Rule 12 and not a reason for forbidding them.  *See e.g., United States v. Nunez-Rios,* 622 F.2d 1093, 1098 (2nd Cir. 1980) ("under Rule 12(b)(2) [now 12(b)(3)], this defense should normally be raised prior to trial, **so that**

---

[12] Later decisions are to the same effect.  *See United States v. Warren,* 788 F.3d 805, 811 (8th Cir. 2015); *United States v. Salahuddin,* 765 F.3d 329, 349-350 (3rd Cir. 2014).

the trial court can conduct a hearing with respect to any disputed issues of fact")*; United

States v. Duncan,* 896 F.2d 271, 274 (7th Cir. 1990) (quoting *Nunez-Rios* with approval).

The government also scoffs at Snyder's argument that an important reason for allowing

(and requiring) the early filing of motions to dismiss based on prosecutorial misconduct, and for

encouraging courts to hold pretrial hearings thereon, is that issues of prosecutorial misconduct are

addressed to the court and not the jury.   Gov't Memo, p. 38.   The Third Circuit and other courts,

however, have made the very point that the government refuses to recognize:

> It is well established that the issue of outrageous government
> conduct is for the court, and not the jury to resolve... .   As a
> consequence, the necessity for the pretrial motion to dismiss is
> obvious unless the evidence supporting the claim of outrageous
> government conduct is not known to the defendant prior to trial.

*United States v. Pitt,* 193 F.3d 751, 760 (3rd Cir. 1999) (citing *Nunez-Rios,* 622 F.2d at 1098 and

*United States v. Nolan-Cooper,* 155 F.3d 221, 234 (3rd Cir. 1998)).  *See also Warren,* 788 F.3d at

811 (since the question is deemed one of law, for court to decide, court should decide motion

before trial).

Without acknowledging existence of any of these controlling authorities, the government

retreats to a body of case law that has nothing to do with motions to dismiss based on government

misconduct.   Gov't Memo pp. 36-38.   Those cases concern challenges to the **sufficiency** of an

indictment under Rule 7. Fed. R. Crim. P. 7. They stand for the unexceptional proposition that a

court, in assessing whether an indictment is **adequate** to charge a crime, justifiably looks to the

allegations that have been made.   None of those cases concern allegations of misconduct on the

part of the prosecutor, and, most significantly, the issue in this case is not whether the indictment,

on its face might otherwise appear sufficient, but whether the prosecutors deliberately falsified

allegations of the indictment to gain an unfair advantage to prejudice the accused.  In the words of

the author quoted above, Snyder's Second Motion to Dismiss the Indictment here, unlike the cases on which the government relies, properly raises **"[d]efenses based upon defects in the indictment ... other than failure to charge an offense."**  Levenson, p. 232 (emphasis added).  In this case, unlike those in which sufficiency is the issue, the Motion concerns misconduct of the prosecutors in falsifying allegations of the Indictment.  There can be no dispute that, under Rule 12(b) and (d), the Court may receive evidence of the misconduct, make findings about the misconduct and dismiss the Indictment with prejudice upon finding that the misconduct was deliberate and that doubt exists as to whether the case remains free of the prejudicial effects of that misconduct.

> **3. Under The Authorities Previously Cited In Support Of Snyder's Second Motion To Dismiss, The Court May, But Need Not, Include In The Order Dismissing The Indictment A Determination That Snyder Is Not, And Cannot Legally Be Charged With, Attempted Extortion**

As the preceding sections of this Memorandum demonstrate, most courts, in granting motions to dismiss indictments, do not opine whether the evidence, as a whole, establishes the defendant's innocence.  In this case, however, Snyder points out in his Second Memo that there is a vehicle for the Court to reach the merits because the Indictment in this case, in large measure, is based upon, and quotes from, transcripts of a meeting and numerous telephone conversations that were recorded by the FBI in the course of their investigation.

Snyder also invites this Court to rule that the Indictment fails to state a crime, and that prosecution of Snyder for attempted extortion would be a legal impossibility, by employing the same reasoning that courts have used in ruling on indictments based on written contracts.  Snyder called particular attention to *United States v. General Dynamics Corp.,* 644 F. Supp. 1497 (C.D. Cal. 1986), where the court granted a motion to dismiss a false statement prosecution of a

government contractor based on the contractor's agreement with the government.  The court ruled in that case that "judges should be able to and can consider matters which are the subject of judicial notice" and "without at the same time converting it into a kind of criminal summary judgment hearing." *Id.* at 1499-1500.  Snyder has further noted that, just one year ago, Judge Bennett of this District, in *United States v. Liberto,* 2020 WL 5994959, *7 (D.Md. Oct. 9, 2020), quoted *General Dynamics* with approval and relied upon a written contract in deciding a motion to dismiss an indictment.

The government, ignoring Judge Bennett's recent opinion, incorrectly questions the viability of *General Dynamics.*  Gov't Memo, pp. 37-38.  The government calls attention to the fact that, in *General Dynamics,* the court relied upon a Fourth Circuit case in deciding whether the defendant actually made a false statement and that the Fourth Circuit, the same as the Ninth Circuit, later adopted a different view on that unrelated subject.  *Id.*  The government's argument for disregarding *General Dynamics* is a red herring.

The government does not dispute the fact that courts are not constrained to the four corners of indictments when they decide questions of prosecutorial misconduct.  In this very case, the prosecutors make frequent references to the transcripts of the August 23rd meeting and to the August 27th Magdeburger/Graham telephone call as part of their efforts to defend their own actions.  Gov't Memo, pp. 20-23, 44-46, 49-51.

Since the court will already be considering the transcripts and other undisputed contemporaneous materials in connection with its consideration of Snyder's Motions to Dismiss, Snyder submits that the Court should also weigh the same written evidence, under the authority of *General Dynamics* and other cases previously discussed, and determine whether that evidence, if considered together with the words of the Indictment, establishes that Snyder is either not charged

with a legally cognizable attempted extortion offense or that there is no legally cognizable attempted extortion offense that could be brought against him.

### B. There Is No Justification For The Indictment's Falsified Narrative

Prosecutors fall short in their attempted defense of the Indictment's falsified narrative. First, they expressly refuse to address either Mr. Guberman's expert analysis or the carefully compiled and comprehensive exhibit that shows all of the falsifications. This Exhibit demonstrates the full extent of the falsified narrative and shows, graphically, how prosecutors employed their various falsifications. Exs. 4, 5. Second, prosecutors rationalize their deliberate omissions of essential statements by attributing preposterous meanings to their uses of phrases "Snyder responded" and Snyder "then said." Gov't Memo at 45-49. Third, they refuse to accept responsibility for their misuse of ellipses to conceal material that is essential to a truthful presentation. *Id.* at 49-51. Fourth, and most importantly, prosecutors assert that they cannot be said to have made a false and deceptive presentation because they were accurate in quoting the sentences that they chose to take from the transcript, even though they deliberately omitted sentences and statements that appear immediately before and after those sentences that were also necessary for the meaning of the quoted sentences not to be misrepresented.

#### 1. The Prosecutors Do Not Assist The Court When They Refuse To Address Either The Findings In Mr. Guberman's Expert Declaration Or The Falsifications Catalogued And Graphically Demonstrated In The Exhibit Comparing The Indictment To The Actual Transcripts

Ross Guberman, whose findings the government expressly refuses to address, is a preeminent authority on legal writing. He writes extensively on the subject and, for more than a decade, has provided training in legal writing to all new federal judges and to lawyers in a host of federal agencies and the country's largest law firms. Ex. 5, pp. 1-3; Ex. 31. Last month, Mr.

Guberman delivered a presentation on legal writing as a member of the Faculty for the Fourth Circuit's Appellate Practice Webinar, and recently, on October 5, 2021, conducted his regular legal writing training sessions for attorneys at the U.S. Justice Department.[13]

Prosecutors here have not advanced their cause by mocking Mr. Guberman as a mere hired gun, dismissing him as a person who "lack[s] understanding," and denouncing his Declaration as so unworthy of their attention that they "will not address" it.  Gov't Memo, pp. 4, 42 n.7.  The Court will find from Mr. Guberman's 20-page Declaration, however, that Mr. Guberman makes an insightful analysis of the ways in which the Indictment in this case presents a falsified narrative of the facts and circumstances of the alleged offense.  Ex. 5.  He has set out, in detail, the various devices that the prosecutors employ to misrepresent the dialogue between Snyder and UMMS representatives.  *Id.*  Those devices, Mr. Guberman explains, include "causal and temporal fabrications, together with the misleading elisions of contradictory material ... ."  *Id.,* p. 4.  Mr. Guberman also shows, through concrete examples, how the Indictment "exceeds the bounds" of permissible advocacy and "misrepresents" what happened in interchanges between Snyder and UMMS.  *Id.,* p. 10.  Mr. Guberman's study of the Indictment shows that there is every reason to conclude that the account presented in the Indictment is false.  *Id.,* p. 3.  While the government states stubbornly that it will not address Mr. Guberman's study, Snyder suggests that the Court will find that Mr. Guberman is credible and that his findings and conclusion are correct.

Mr. Guberman has also provided a Supplemental Declaration, in which he addresses the government's Opposition and comments upon the most serious deficiencies in the government's effort to defend its falsified narrative.  Ex. 33.  Specifically, Mr. Guberman explains why the Court

---

[13] The Fourth Circuit's brochure describes Mr. Guberman as "the judiciary's choice to train new federal judges."  Ex. 32, p. 3.

should reject the premise of the government's argument that as long as words quoted in an indictment physically appear somewhere in a source document, the government cannot be faulted if it uses those words to present an altogether false and misleading narrative of the conversations from which those words were taken.  *Id.* at pp. 2-4.  Mr. Guberman also finds totally unacceptable the government's claim that it is free to use ellipses in a recitation of facts in an indictment, even it if uses them to change the meaning that the speaker intended.

By taking the first of those unacceptable liberties in the Indictment here, Mr. Guberman concludes, prosecutors "present an inaccurate, and not simply incomplete, picture of what the transcript reflects."  *Id.* at p. 4.  By misuse of "ellipses and partial quotations," the prosecutors "mislead the reader on key points" such as "what the transcripts show Snyder saying" about "the proposed arrangement in relation to UMMS," "about the proposed arrangement in relation to his client" and "about the role of ethics expert Andy Graham."  *Id.*

The same is true of the 31-page chart, submitted by Snyder as Exhibit 4,  that compares the allegations of the Indictment to the corresponding pages of the transcript from which isolated sentences have been plucked.  The chart shows graphically, and also explains, the myriad ways in which prosecutors falsified the most important allegations of the Indictment.  The chart contains portions of the transcript that appear immediately before and immediately after sentences that are quoted in the Indictment.  See Ex. 4.  It also contains portions of the transcript that prosecutors skipped over, and pretended do not exist when they wrote, falsely, that Snyder, after making one statement "then" made another or that prosecutors skipped over when they wrote, falsely, that Snyder "responded" to a question by a UMMS representative many pages earlier.  *Id.*  This information in graphic form, so that the Court can see it with its own eyes, demonstrates

61

persuasively how prosecutors falsified the Indictment and how they achieved undeserved and improper benefits from those falsifications.

As they did with Mr. Guberman's findings, prosecutors denigrate the highly significant evidence in the chart without addressing the falsifications that it depicts. Mistakenly and unfairly disparaging the chart as containing only a "paralegal's opinions," the prosecutors suggest that it is therefore not worthy of their attention. They declare brazenly that they "will not address it." Gov't Memo, p. 42, n.7. Prosecutors are as wrong about the author of the chart as they are about its substance. Snyder asks the Court to give the chart the careful review that its revelations deserve.

### 2.   The Government's Explanations Do Not Hold Water

The prosecutors minimize the seriousness of the falsifications by describing Snyder's Second Motion as merely a series of "editorial attacks" that charge the government with "linguistic misconduct." Gov't Memo, pp. 42, 49. The prosecutors go on to provide wholly unbelievable rationalizations for several of the falsifications. Gov't Memo, pp. 42, 44-52. Exhibit 4 exposes the falsifications for what they are, *i.e.,* a calculated series of improper devices that enable the government to change the meaning of what Snyder said and, in particular, to quote parts of statements by Snyder, while falsely representing the quoted portions to be the entire statements. Exhibit 4 demonstrates that an important purpose for these falsifications was to cleanse the narrative of Snyder's repeated explanations that he would not put his reputation at risk and would only go forward with his proposal if UMMS, after presenting to Mr. Graham any objections or reservations that it might have, did not obtain the opinion from Mr. Graham that Snyder's proposal was ethical, moral and otherwise satisfactory.

In an effort to justify its deceptive actions, the government insists that it was proper for the Indictment to allege that Snyder "responded" to a question by Kinter, even though there were seven

pages of omitted dialogue favorable to Snyder between the alleged question and the alleged response, because the word "respond," as the prosecutors chose to use it, did not mean "answer" but meant "on the same subject." *See* Gov't Memo, pp. 43-45, commenting on ¶¶ 61 and 62 of the Indictment. Through this same artifice, the government suggests that it did nothing improper when the draftsmen of the indictment quoted a statement, as if it were a response or immediate follow-up to a prior statement, when, in fact, the second statement appears in the transcript 89 pages after the first and when the statement was part of a dialogue on another topic.

Similarly, the government contends that its use of the term "Snyder then said" was not intended to have its usual meaning, as the equivalent of "next," but two entirely different meanings. At one point, the government claims the prosecutors used "then said" to mean only that the second statement came sometime later than the first – as if it were proper for someone to say, "I celebrated my 50th birthday and then I celebrated my 53rd." Any listener would know that such a statement could not be correct because, after the speaker celebrated his 50th birthday, he celebrated his 51st. Yet, the prosecutors urge – with a straight face – that this Court should accept an interpretation that, if made by a birthday celebrant, would obviously be recognized as absurd.

Even more preposterous, the government asserts that the Indictment meant something different when it alleged in Paragraph 72 that, after Snyder made the statement quoted in Paragraph 71 that his client didn't care about the amount she might recover, Snyder "then suggested" that the consulting agreement be abandoned and that UMMS pay $30 million to his client. Gov't Memo, pp. 47-49. In this instance, the government claims, the prosecutors used the words "then suggested" as the equivalent of "as a necessary consequence." *Id.* The government's assertion is altogether unbelievable because: (1) the statement in paragraph 72 was **in contradiction of** the statement in Paragraph 71, not as a consequence of it; (2) the government asks this Court to accept

that prosecutors had two different meanings in mind, neither of them the generally accepted meaning, when they used the same phrase, and in the same manner, to introduce sequential paragraphs; and (3) prosecutors' obvious purpose in using the same phrase, in all of these same contexts, was to hide the existence of intervening and explanatory dialogue that was inconsistent with, and disproved, the theory of the case that prosecutors were intent on bringing.

### 3. The Government Would Have This Court Give Its Approval To A Charging Document Riddled With Half-Truths

The government's basic contention is that the Court cannot find that the prosecutors falsified the narrative in the Indictment because the prosecutors accurately quoted words of sentences that they selected and chose to quote.  So long as selected words were accurately reproduced, the government contends, it does not matter that prosecutors omitted sentences and statements necessary to make quotations accurate or that prosecutors employed a variety of other devices to take quotations out of context and weave them into a false narrative.  By this argument, the government claims that the prosecutors are entitled to use half-truths to create false and deceptive indictments.  It is well settled, however, that deception and falsification by means of half-truths is no different, in law or in fact, from any other falsification or deception.

In one of the leading cases in this area of the law, *Linden v. United States,* 254 F.2d 560, 568 (4th Cir. 1958), the Fourth Circuit rejected the identical assertion that the government makes here when it was made by a defendant seeking to escape a conviction for mail fraud:

> Deception is not necessarily confined to a direct statement of fact.  **Not words alone, but their arrangement, the manner of their display, and the circumstances in which they are used, may create an appearance which is false and deceptive,** even though the words themselves fall short of this.  **Sometimes circumstances are more eloquent than words, and they impart their meaning to the words used.**

*Id.* (emphasis added).

64

Other federal courts, following *Linden,* have reiterated this same statement and have added that "deceitful statements of half truths or the concealment of material facts" is also false and fraudulent. *Lustiger v. United States,* 386 F.2d 132, 138 (9th Cir. 1967). *See also United States v. Mason,* 41 Fed. Appx. 612, 618 (4th Cir. 2002); *United States v. Woods,* 335 F.3d 993, 998 (9th Cir. 2003); *Gusow v. United States,* 347 F.2d 755, 756 (10th Cir. 1965); *United States v. Skeddle,* 989 F. Supp. 873, 886 (N.D. Ohio 1997).

In a number of instances, the government's falsifications consist of setting forth a sentence uttered by Snyder as if it were his entire statement. Misusing rhetorical devices to suppress or conceal sentences immediately before and after the quoted sentences that materially qualify the sentences quoted, prosecutors falsely create a meaning altogether different from the transcript. "Even in the absence of a duty of disclosure," the creation of such "a false impression" is a falsification. *Ademil v. PennyMac Mortg. Inv.,* 929 F. Supp. 2d 502, 531 (D. Md. 2013) (quoting cases). *See also Universal Health Services v. United States,* 136 S.Ct. 1989, 2000 (2016) (affirming false statement on conviction; "half truths – representations that state the truth only so far as it goes, while omitting critical qualifying information – can be actionable misrepresentations."); *United States v. Bryant,* 655 F.3d 232, 249 (3rd Cir. 2011) (false statements may be effected by "half-truths or the concealment of material facts.").

The same principle applies when any lawyer or other advocate misuses ellipses to create a falsification. An ellipsis signifies that the draftsperson has omitted only words "that are obviously understood" but do not change the meaning of the words used. *See* https://unabridged.merriam-webster.com/unabridged/ellipsis.[14] Courts have not hesitated to condemn abusive uses of ellipses,

---

[14] *See also Ellipsis,* <u>Black's Law Dictionary</u> (5th ed. 1979): "Omission of words or clauses necessary to complete the construction, but **not necessary to convey the meaning."** (emphasis added); *See:* https://www.oxfordlearnersdictionaries.com/us/definition/english/ellipsis?q-ellipsis

no different from abuses by the prosecutors here, to omit material parts of statements or texts that significantly qualify quoted sentences or words and are necessary to convey the actual meaning of the author or speaker.  *See e.g., Rodriguez v. Pan American Health Organization,* 502 F. Supp. 3d 200, 233 (D.D.C. 2000) (condemning "disingenuous use of ellipses" to conceal meaning of passage from authoritative text quoted in party's brief); *United States v. Johnson,* 187 F.3d 1129, 1132, n.3 (9th Cir. 1999) ("Use of ellipses to excise relevant and decisive sections of the statute in a way that benefits the government's case is looked upon with great disfavor"); *R.R. Donnelley & Sons, Inc. v. Vanguard Transp. Systems, Inc.,* 641 F. Supp. 2d 707, 723 (N.D. Ill. 2009) (criticizing lawyer's misuse of ellipses to replace critical words in a contract); *Hallmark Hardwoods, Inc. v. Omni Wood Product, LLC,* 2011 WL 13176098, *9, n.7 (E.D. Calif., Dec. 14, 2011) (criticizing lawyers who "disingenuously and very carefully avoided" the real meaning of a cited case by "us[ing] an ellipsis to omit key language" and thereby "utterly changing the meaning of the sentence to suit their argument"); *Loeffel Steel Products, Inc. v. Delta Brands, Inc.,* 2005 WL 8178971, *2 (N.D. Ill. Sept. 8, 2005) (ellipses "are often the vehicle for misleading").

The prosecutors have deliberately employed a series of wholly unacceptable and deceptive tactics when they drafted narrative portions of the Indictment, and those tactics rendered the Indictment false.  Those tactics would never be tolerated in commercial dealings among citizens, in the application of the criminal law to activities of citizens, or in any other aspect of civil or criminal litigation.  This Court should not permit the government to employ those same universally condemned tactics in such a significant legal pleading as an Indictment by a federal grand jury accusing a citizen of a federal crime.

---

(defining ellipsis as "the act of leaving out a word or words from a sentence deliberately, **when the meaning can be understood** without them." (emphasis added).

**C.**   **The Present Case Is As Different From *Avenatti* As Day Is From Night**

In its Opposition at p. 53-54, the government relies on the Southern District of New York's *Avenatti* opinion dated January 6, 2020, but does not inform the Court about the Southern District's subsequent and much more comprehensive opinion of July 6, 2021.  *See United States v. Avenatti*, 2021 WL 2809919 (S.D.N.Y. July 6, 2021).  This more recent opinion sets forth the facts and rulings in Avenatti's case and explains the government's high burden as to the "nexus" requirement.  *Id.*  When that case is analyzed in full, it confirms that, while there was no nexus between the client's claims and Avenatti's demands, the undisputed facts of the present case, in stark contrast to those in *Avenatti,* establish that there was clearly a nexus between the malpractice claims of ███████████ and Snyder's proposal for a consulting/retainer agreement for himself.

In the recent *Avenatti* opinion ignored by the government, the court articulates the high burden **on the government** to prove that there is no nexus between the defendant attorney's threat and the client's potential litigation claim.  Specifically, the court declares that a lawyer-defendant cannot claim the benefit of litigation exemption if "**the [g]overnment has shown beyond a reasonable doubt that there is no nexus between the threat of harm to property or reputation and the claim of right.**"  *Id*. at * 16 (citations omitted) (emphasis added).  In other words, the **presumption** is that **there is a protective nexus** between the lawyer's own demands and the client's objective unless the government proves otherwise beyond a reasonable doubt.

The nexus concept is relatively straight forward.  If an individual threatens litigation (even highly publicized litigation) to obtain a benefit for himself, that person is protected from prosecution by the so called "litigation exemption" to extortion statutes.  Second Memo, pp. 28-29.  Further, when a lawyer who represents a client in potential litigation seeks benefits for himself, the lawyer is also protected by the litigation exemption unless the government can prove, beyond

a reasonable doubt, that there is no nexus, *i.e.*, no connection, between the client's potential

litigation claim and the lawyer's claim for himself.  *See Avenatti*, 2021 WL 2809919 at *15-16.

The basic holding of the *Avenatti* case is that the government met its burden and proved,

beyond a reasonable doubt, that there was no nexus between Avenatti's demands and any claim,

much less a prospective litigation claim, by Avenatti's client.  The *Avenatti* opinion makes crystal

clear that the government was able to prove the absence of a protective nexus in that case precisely

because the facts that would support the existence of a nexus, all of them present here, were totally

absent from that case.  The following five categories of facts prove the point:

> **1.    Avenatti's client was complicit with Nike's wrongdoing, meaning that
> publicity and litigation were not in the client's best interests, whereas
> Snyder's client was a tort victim with a claim for a catastrophic injury,
> who had a strong interest in potential litigation and attendant publicity
> and whose claim Snyder negotiated along with the consultancy.**

Avenatti's client ("Franklin") was a youth basketball coach whose sponsorship from Nike

was terminated.  *See Avenatti*, 2021 WL 2809919 at *1-2.  His primary goal in retaining Avenatti

was to have that relationship reinstated.  *Id*. at *3.  However, Franklin was a wrongdoer who made

improper cash payments to players' families and submitted falsified invoices to Nike, allegedly at

the direction of two Nike employees.  *Id*. at *2.  As a result, Franklin never directed Avenatti to

pursue litigation against Nike on his behalf and the two never entered into a formal written

engagement for Avenatti's services.  *Id*. at *5.  This is in direct contrast to Snyder, whose clients,

██████████████████████, were victims of malpractice.  ██████ suffered an agonizing death

because UMMS transplanted a diseased and totally unsuitable kidney into his body.  His limbs and

extremities decayed and he was forced to undergo several amputations before suffering an

excruciating and unnecessary death.  ████████████████ hired Snyder to represent them under

a formal engagement agreement to pursue their claims and file suit if necessary.  Ex. 10, p. 1.

Snyder's demands for the consultancy were always made in the context of the threatened litigation because, among other things, Snyder made clear that he would not enter into a consulting agreement without settling the ██████ case and because Snyder's threatened publicity would be attendant to the filing of the ██████ suit.  Ex. 6, pp. 97, 99-100.  Further, Snyder and UMMS discussed mediating the ██████ case at the same time that they discussed Snyder's proposed consultancy.  Ex. 6 at 25, 28-29, 50, 80-81, 92, 104, 113-15, 119.  At the outset of the mediation on September 7, 2018, Snyder and ██████ provided UMMS with a proposed term sheet in which they stated that they wanted the consulting agreement for Snyder to be an item of the settlement. Ex. 22.  ██████ withdrew her insistence that Snyder's consultancy be a formal settlement term only after UMMS gave her to understand that UMMS was going forward the following week with Snyder's consulting agreement.  Ex. 10, p. 2.

> **2.  Avenatti's client knew nothing about Avenatti's proposal for himself and Avenatti sacrificed his client's interests, whereas Snyder's client was an advocate for Snyder to be a consultant to UMMS and Snyder achieved a great success for his client.**

Avenatti used the confidential knowledge about Nike that he learned from his client to seek a large payment for himself, which at various times ranged from $15 to $25 million.  Avenatti's client knew nothing about this effort by Avenatti to negotiate benefits for himself, and, in negotiating those benefits, Avenatti sacrificed and disregarded his client's interests.  Indeed, Franklin, as a person who participated in Nike's wrongdoing, was very much opposed to the kind of press conference that Avenatti used as a tool to leverage his own personal demands.  *Id*. at *4-13; *see also id*. at *17 ("Avenatti never told Franklin … that he made such a demand to Nike, much less that Avenatti had demanded that Nike pay him and [Avenatti's co-counsel] millions of dollars to perform the internal investigation").  On the other hand, in February 2018, from the outset of Snyder's representation, ██████ asked Snyder to pursue a consulting agreement with UMMS

as part of the relief that she sought.  Ex. 10, p. 1.  Further, Snyder kept his client informed of his efforts to obtain a consulting/retainer agreement; Snyder's client knew about, and expressly endorsed, Snyder's efforts to obtain a $25 million, ten-year contract for himself; and Snyder obtained an outstanding settlement for ████████ in an amount that was at least $1.5 million more than she could possibly have obtained in court.  Ex. 10, pp. 1-2, Ex. 11, p. 5, n.2)[15]

> **3.    The publicity threatened by Avenatti was adverse to the interests of his own client and had no relationship to any litigation, whereas the publicity threatened by Snyder was publicity that would attend the filing of suit and was reasonably expectable from a plaintiff's lawyer pursuing a claim for egregious injury such as that held by his client.**

Avenatti threatened to publicize Nike's alleged wrongdoing, *i.e.*, paying off amateur athletes, without reference to his client's alleged claim for reinstatement; and the publicity would not have been in the interest of Avenatti's client because it would have destroyed the client's chances of restoring his relationship with Nike and would have sullied the client's reputation.  *Id.* at *17 ("Nor did Avenatti tell Franklin … that he intended to disclose confidential information that they shared with him – information that could damage Franklin's reputation and that of his Basketball Program – with the press").  In contrast, Snyder threatened publicity, including a press conference and a newspaper interview, that would have accompanied the filing of suit on behalf of Snyder's client; publicity of that sort regularly accompanies the filing of consequential litigation by high-profile lawyers; and plaintiffs' lawyers regularly use information about systemic failures to announce the filing of suit or to advertise for additional clients.  Second Memo, pp. 5, 28-34.

---

[15] The statutory limit for ██████ wrongful death claim was $850,000, and at most, with additional economic damages, she could have recovered $1.5 million less than she settled for.

**4.  Nike offered to make the entire payment to Avenatti's client, but Avenatti rejected it, whereas Snyder suggested that UMMS pay the entire sum to his client but UMMS rejected it.**

Avenatti refused an offer from Nike to pay directly to Avenatti's client the entire amount that Avenatti was demanding.  Avenatti refused the offer and stated that he would only entertain the payment of the entire sum to himself.  *Avenatti*, 2021 WL 2809919 at *17-19.  The Court found this to be a significant factor that militated against Avenatti's nexus assertion.  This is in stark contrast to Snyder, who offered, as an alternative to the proposed consultancy/retainer agreement, that UMMS pay $30 million directly to Snyder's client.  In this case it was UMMS, and not Snyder, who refused to consider the offer.  Ex. 3, pp. 154-55.[16]

**5.  Avenatti obtained the assistance of another lawyer to act as a confederate in the wrongdoing whereas Snyder engaged a premier ethicist whom he wanted to meet with UMMS to ensure that any arrangement between Snyder and UMMS would be ethical, moral and legal.**

Avenatti enlisted a lawyer to be his confederate, and that lawyer actively assisted Avenatti in making his demands and issuing his threats.  Indeed, the meeting between Avenatti and the attorneys for Nike took place at the office of Avenatti's confederate.  *Avenatti*, 2021 WL 2809919 at *4-8.  Snyder, on the other hand, consulted an ethics expert and tried repeatedly to have UMMS meet with the expert to determine if there was an ethical, moral and legal way to accomplish Snyder's (and his client's) objective.  *See* Argument I.C, above.

An examination of the stark differences between the *Avenatti* and Snyder cases shows that Avenatti's demands: were made in secret, without his client's knowledge; were for the purpose of benefiting Avenatti at the expense of his client; and were totally divorced from, and directly

---

[16] In the government's Opposition here, however, the government mistakenly claims that Avenatti, the same as Snyder, suggested that all the funds be paid to his client. Gov't Memo, p. 54.  *Id*. at *17 (emphasis added).  The facts that Nike made the offer and that Avenatti refused it was significant and plain on the face of the *Avenatti* opinion.

contrary to, his client's interests.  On the other hand, everything Snyder did in this case was in furtherance of his obligations to his client, pursuant to his client's express directions and with his client's full knowledge.  Furthermore, Avenatti's client had a claim unrelated to any proposed litigation while Snyder's client hired Snyder for the purpose of instituting litigation if the matter could not be settled.  This is why the government in *Avenatti* was able to prove the lack of a nexus beyond a reasonable doubt and why, in the Snyder case, the government cannot possibly meet that heavy burden.  This is also why Avenatti and Snyder are as different as night and day – as different as illegal and legal.  There should be no Snyder case.

### D.  All Of The Counts In The Present Indictment Are Governed By The Law Of Extortion As Declared In The *Pendergraft* Case And Not In Accordance With The Second Circuit's Minority View

Recognizing that there is no credible way to challenge the nexus that allows Snyder to claim the benefit of the litigation exemption, the government attempts to keep this case alive by asking this Court to adopt a severely limited version of the litigation exemption that is contrary to the holding in *United States v. Pendergraft,* 297 F.3d 1198 (11th Cir. 2002), the leading Hobbs Act case that is followed by the courts in most jurisdictions, including this District.

The government struggles to get out from under *Pendergraft,* and from the overwhelming weight of authority that follows it, by incorrectly contending, that the court in *Pendergraft* limited the litigation exemption to circumstances where the target of the alleged extortion is a government entity.  Gov't Memo, p. 58.  The actual holding of the Court could not be clearer, and it is to the opposite effect:

> While the case before us involves a threat to sue a government, we are troubled by *any* use of this federal criminal statute to punish civil litigants. Sanctions for filing lawsuits, such as malicious prosecution, lead to collateral disputes and 'a piling of litigation on litigation without end.' … Allowing litigants to be charged with extortion would open yet another collateral way for litigants to attack one another.  The reality is that litigating

parties often accuse each other of bad faith.  The prospect of such civil cases ending as criminal prosecutions give us pause.

*Pendergraft*, 297 F.3d at 1207 (emphasis in original) (citations omitted).

The host of cases applying *Pendergraft* to threats made to private parties include *Kimberlin v. National Bloggers Club,* 2015 WL 1242763, *8 (D.Md. Mar. 17, 2015) in this District, and *State v. Rendelman,* 404 Md. 500, 519-20 (2008), the decision of the Maryland Court of Appeals interpreting the Maryland extortion statute on which Counts Two through Eight of the Indictment are based.  These cases, in addition to *Pendergraft's* own words, put the lie to the government's false contention that *Pendergraft* is only relevant to threatened or actual litigation against governmental entities.  Second Memo, pp. 28-34.  It is difficult to refrain from observing that a litigant who is confident in the soundness of his basic argument would never strain to make such an obvious mischaracterization of the leading case on the subject.

The government also mischaracterizes the vast body of authorities when it suggests erroneously that "all" courts have found that litigation threats can be wrongful.  Judge Hazel surveyed the authorities in *Kimberlin* and stated that the opposite is true.  Citing *Pendergraft* and other cases, he declared that, "A number of circuits have held that the mere act of filing a lawsuit and demanding a settlement agreement, however baseless the lawsuit or settlement demand may be, does not qualify as 'extortion' under [the Hobbs Act]."  As also explained in Snyder's Second Memo, *Pendergraft* and its progeny all provide that the litigation exemption prevents prosecution for attempted extortion based on threats to file meritless litigation, even bad faith, malicious, or sham litigation, including litigation based on threats to commit perjury or to promote fraudulent claims, and even when the threats are that the litigation will be ruinous and highly publicized.  *See* Second Memo, pp. 28-34.

The government cites cases from the Second Circuit without informing this Court that the Second Circuit applies a minority view that is at odds with the generally accepted principles, applied in the other jurisdictions, that provide absolute protection for litigation-related threats under the litigation exemption.  The Second Circuit, unlike the other jurisdictions, holds that a litigation-related threat can be "wrongful," and therefore extortionate, if the defendant cannot demonstrate that he "had a plausible claim of right to the [money or property] demanded."  *United States v. Jackson,* 196 F.3d 383, 387-388 (2nd Cir. 1999).  The cases from all other jurisdictions, including *Kimberlin* and *Rendelman* in this District and State, expressly hold that it is immaterial whether the defendant has, or believes that he has, a plausible claim of right.  The litigation exemption, as applied everywhere except the Second Circuit, applies to threats of litigation by upright citizens and by scoundrels alike.  *See* Second Memo, p. 32, n.4.

Because the Second Circuit's limitation on the litigation exemption is so at odds with the law elsewhere, this Court must disregard the holding of the *Jackson* case as well as the holdings of the District Courts within the Second Circuit that apply it.  *See, e.g., Chevron Corp. v. Donziger,* 974 F. Supp. 2d 362, 579 (S.D.N.Y. 2014), *aff'd,* 833 F.3d 74 (2nd Cir. 2016); *LaSuisse, Société D'Assurances Sur La Vie v. Kraus,* 2014 WL 361890 (S.D.N.Y. July 21, 2014).[17]

The few cases outside the Second Circuit that the government cites are easily distinguishable.  In *United States v. Curley,* 2014 WL 199948 (D. Me. Jan. 16, 2014), the court did not opine on the litigation exemption at all because the indictment did not reference litigation

---

[17] In addition to these cases, in which the Second Circuit or by District Courts within that Circuit applied the Second Circuit's severely limited version of the litigation exemption, the government also relies upon *Viacom Int'l Inc. v. Icahn,* 747 F. Supp. 205, 211-212 (S.D.N.Y. 1990).  The *Viacom* case was decided by a District Court within the Second Circuit but it is not about the litigation exemption; it concerns complaints by a target company that the defendant used threats of a stock purchase to exact business concessions.  *Id.* at 213.

and because there were no other motions that would have provided the court the opportunity to do so.  Two other First Circuit cases cited by the government are even further beside the point.  In *United States v. Sturm,* 870 F.2d 769 (1st Cir. 1989), the defendant was convicted of extortion because he demanded payment for airplane logbooks that did not belong to him and because his threat to continue withholding the logbooks diminished the value of the airplane from which they were taken.  Likewise, in *United States v. Didonna,* 866 F.3d 40 (1st Cir. 2017), where the defendant threatened to expose his former employer for selling beef of a lesser quality than advertised, the defendant never threatened to sue the employer and the court never even mentioned the litigation exemption.

The Fourth Circuit case cited by the government, *United States v. Teplin,* 775 F.2d 1261 (4th Cir. 1985), is also not on point.  The defendant there was a disbarred New York lawyer who, as a witness, testified for a surviving spouse that an agreement between the decedent and his spouse, revoking a prenuptial agreement, was valid.  Thereafter, the defendant traveled to Virginia where he met with the surviving spouse and her lawyer.  In that meeting, he threatened that, unless the surviving spouse paid him $100,000, he would tell others in the probate proceeding that the revocation agreement was false.  When prosecuted for interstate travel to commit extortion under Virginia law, he contended that, under the Virginia statute, he should be permitted to assert the defense that he was pursuing a claim of right.  The Fourth Circuit, affirming the trial judge, held that the Virginia extortion statute did not permit such a defense.  The defendant in *Teplin* was only a witness, and he did not, of course, claim that he was protected by the litigation exemption that exists for the benefit of parties, prospective parties and lawyers.  It is no surprise, then, that the case makes no mention of the litigation exception or of the meaning of the *Pendergraft* case.

The prosecutors also rely heavily on the *Godwin-Painter* case in the Southern District of Georgia, but fail to mention that six weeks after the district judge declined to dismiss the indictment, the government voluntarily dismissed the case as one that should never have been brought.  Exs. 35, 36.  In two separate opinions before the *Godwin-Painter* case was dismissed, the Magistrate Judge and the District Judge declined to dismiss the indictment because the indictment did not reference facts that would establish the litigation exemption.  *See United States v. Godwin-Painter,* 2015 WL 1375432 (S.D. Ga. Aug. 15, 2015) ("First Opinion") and 2015 WL 5838501 (S.D. Ga. Oct. 6, 2015) ("Second Opinion").   In an extended footnote, however, the Magistrate Judge warned that:

> Invoking the criminal complaint's alleged facts, defendant argues that his threats against M.T. cannot constitute extortion because he also offered to drop his malpractice suit in exchange for M.T.'s money … Adding even more heft, *United States v. Pendergraft* makes clear that "wrongful" requires both wrongful means and wrongful objective, and that threatening to file a lawsuit cannot be a wrongful means.  297 F.3d 1198, 1206 (11th Cir. 2002) … Finally, and critically, the Court can discern no reason why *Pendergraft*'s animating logic – that litigation behavior by a plaintiff, whether used as a stick (as in *Pendergraft*), or carrot (as here), cannot be "wrongful" for purposes of extortion – should not extend to attempts to leverage settlement in a case using damaging information about the other party.

> Admittedly, this case presents a somewhat different situation than *Pendergraft* because Godwin-Painter alleges that he threatened to go public with information about M.T. *and* offered to drop his malpractice suit in exchange for money … as compared to the more typical situation, like *Pendergraft*, where a party makes a threat or offer (but not both) to induce action by the other side.  *See, e.g., Pendergraft*, 297 F.3d at 1206.  That difference, however, does not undermine any of the policy rationales driving the decision in *Pendergraft* and applicable here.

First Opinion, *5, n.7.  The District Judge, while adopting the report of the Magistrate Judge, was not prepared to accept *Pendergraft* but reserved decision for another day.  Second Opinion, *2.

Six weeks after the District Judge's ruling, the government moved to dismiss the indictment in *Godwin-Painter* "in the interests of justice."  Ex. 35.  The next day the District Judge entered an Order granting the Motion and dismissing the Indictment.  Ex. 36.  While the facts of

the entire criminal case occurred in the context of a legal malpractice case that the defendant had brought against his former lawyer, who was the alleged victim, the government claimed, in its dismissal motion, that it had just learned that the defendant had an advice of counsel defense.  Ex. 35.  The previous opinions of the Magistrate Judge and the District Judge were both based on the narrow ground of the sufficiency of the allegations of the indictment, but lurking in the background had been the unasked question of the propriety of the omissions from the indictment when it was written.

Instead of citing cases from a Circuit that applies standards for the litigation exemption far different and more restrictive, than those that apply here, the government should have focused its attention on cases that control the charges of the Indictment in this case.  Notably, the government makes only a passing reference to *State v. Rendelman,* the Maryland case that governs Counts Two through Eight of the Indictment.   Gov't Memo, p. 58.   The government should candidly acknowledge that *Rendelman* adopts the same view of *Pendergraft* that Snyder advances in this case, and it should not shrink from the fact that, because of the nexus between Snyder's proposal and █████ claims, Snyder is entitled to the same protections that the litigation exemption provided the defendants in *Pendergraft* and *Rendelman.*  Anything less is a disservice to this Court.

## REQUEST TO EXCEED PAGE LIMITATION

In this Consolidated Reply, Snyder addresses the government's Opposition to Snyder's four motions and requests for relief.  Instead of separate replies, which under the local rules would have been twenty pages in length, Snyder submits this single Reply that does not exceed that total page limit. *See* Local Rule 105.3. For the same reasons that the government advanced when it sought permission for its Omnibus Opposition, Snyder requests permission to exceed the page limit for this Consolidated Reply rather than separate this single filing into four separate filings.

## **CONCLUSION**

For the reasons previously advanced and amplified herein, Snyder respectfully requests that this Court: (1) grant Snyder's Request for Hearing and schedule a hearing on Snyder's Motions at the Court's early convenience; (2) grant Snyder's Motion to Compel Government to Produce *Brady* Information; (3) grant Snyder's First Motion to Dismiss Indictment With Prejudice; and (4) grant Snyder's Second Motion to Dismiss Indictment With Prejudice.

Respectfully submitted,

_____/s/_____
Arnold M. Weiner, Bar No. 01605
aweiner@rwllaw.com
Stuart A. Cherry, Bar No. 28012
scherry@rwllaw.com
Devon L. Harman, Bar No. 21936
dharman@rwllaw.com
RIFKIN WEINER LIVINGSTON LLC
2002 Clipper Park Road, Suite 108
Baltimore, MD 21211
Phone:  (410) 769-8080
Fax:  (410) 769-8811

*Counsel for the Defendant.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of October, 2021, copies of the within Consolidated Reply Of Stephen L. Snyder, Defendant, To Government's Opposition To (1) Snyder's First Motion To Dismiss Indictment, (2) Snyder's Motion To Compel Production Of Brady Information, (3) Snyder's Second Motion To Dismiss Indictment And (4) Snyder's Summary And Statement For Prompt Hearing, were served on Government counsel via ECF electronic filing.  A paper copy of the within Memorandum will be hand-delivered to the Clerk's Office, Attn: Judge Russell, U.S. District Court for the District of Maryland, 101 W. Lombard Street, 4th Floor, Baltimore, MD 21201.


_____/s/_____
Arnold M. Weiner, Bar No. 01605