Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

------------------------------ X

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| v. | : |
| **STEPHEN SNYDER,** | : |
| Defendant. | : |

Criminal No. 1:20-cr-00337-GLR

------------------------------ X

**DEFENDANT STEPHEN L. SNYDER'S
DESIGNATION OF HYBRID WITNESSES**

I.  **OVERVIEW**

The Government has summarized the charges in this case as follows:

> On October 5, 2020, the Grand Jury for the District of Maryland indicted Stephen L. Snyder ("Snyder") for attempted extortion, in violation of 18 U.S.C. §§ 1951 and 1952. *See United States v. Snyder,* 1:20-cv-00337-GLR, ECF No. 1 (hereinafter "Indictment").
>
> The charges stemmed from Snyder's attempt to extort $25 million from the University of Maryland Medical System ("UMMS") disguised as a sham consulting agreement. Specifically, from January 2018 to August 2018, Snyder threatened to launch a negative publicity campaign **falsely accusing UMMS** of transplanting diseased organs into unsuspecting poor and unsophisticated patients to generate revenue for UMMS unless UMMS paid Snyder $25 million.

United States' Omnibus Opposition To Defendant's Motions to Dismiss and Related Motions, ECF No. 70, p. 6. The Government has also asserted that the Indictment charges that Snyder threatened: to generate publicity about **his invented scandal** and to run advertising **repeating his false accusations.** *Id.* (emphasis added). The Government has also maintained that the Indictment

1

charges that Snyder went so far as to produce two television commercials that **repeated his false claims** … . *Id.* (emphasis added).

Snyder maintained in 2018, and he maintains in defense of these charges, that the evidence in this case does **not** establish that Mr. Snyder knowingly or intentionally made any false accusations against UMMS. Snyder further maintains that the evidence obtained and used by him in 2018 fully supports the conclusion that Snyder's statements about the UMMS transplantation department (operated at the University of Maryland Medical Center ("UMMC")) were true.

Even more to the point, the Government cannot prove criminal intent with respect to Snyder's statements about the UMMS program because the evidence supports and shows that Snyder believed, and asserted in good faith, that UMMS, through UMMC, falsely represented, both on the UMMC website and in personal dealings with patients, the quality of services that it provided in connection with kidney (and other organ) transplant procedures and in connection with the results that it obtained for the patients who underwent those procedures.

The evidence further supports and demonstrates Snyder's good faith belief that the University of Maryland was transplanting diseased organs (that other institutions rejected) into patients who should not have received such organs and that UMMC obtained the patients' consents to those procedures by concealing the hazards and misrepresenting the suitability of the organs and the suitability of the patients for those transplants. The evidence further supports Snyder's good faith belief that the UMMC transplantation department (or service) was in disarray and that, as a result (at least in part) of what Snyder had discovered, much of the surgical staff were either encouraged to leave UMMC or decided on their own that they did not want to be there.

The evidence also supports and establishes Snyder's good faith belief that UMMS was vulnerable to further litigation and that Snyder, through his knowledge and understanding of

2

UMMC's systemic failures and deficiencies, could provide valuable assistance in advising UMMC and UMMS about keeping on the straight and narrow and in advising UMMS in connection with claims that were likely to be brought against UMMS by others. The evidence further supports Snyder's good faith belief in the value that UMMS would derive in having Snyder as an ally, and not as an opponent, in organ transplant malpractice claims.

Much of what Snyder learned, and formed the basis for his good faith belief, came from information, including statistical results, maintained by the United Network for Organ Sharing ("UNOS"), the private non-profit organization that manages the U.S. organ transplantation system, and from the Scientific Registry of Transplant Recipients ("SRTR"), the resource operated by the Chronic Disease Research Group that provides statistical and other analytic support to the Organ Procurement and Transplantation Network ("OPTN") under contract with the United States Department of Health. Snyder's information also came from Dr. Stephen Bartlett, the Chief Surgeon at UMMC and head of the UMMC transplantation department (or service) who admitted to Snyder that UMMS was liable for fraud and punitive damages and that there were potential cases similar to those that Snyder had pursued.

The representatives of these organizations and other persons who provided the evidence establishing and supporting Snyder's good faith belief are professionals with whom Snyder interacted during the period covered by the indictment. These organizations and persons are properly described either as fact witnesses or as hybrid witnesses. The opinions that these professionals provided Snyder are important because they are part of the evidence that supported Snyder's actions. In that respect, the opinions of these professionals, whether correct or not, provided a reasonable basis for the statements and actions of Mr. Snyder during the period covered by the indictment.

## II. FACT/HYBRID WITNESSES

In all probability, it should not be necessary for Snyder to designate these fact/hybrid witnesses as expert witnesses. Out of an abundance of caution, however, Snyder is designating these persons as experts because their information and opinions are of the type that an expert would ordinarily provide. The fact/hybrid witnesses whom Snyder might call as witnesses include:

### (A). Antonio Di Carlo, MD, CM, FACS, FRCSC

Dr. Di Carlo is the Chief, Abdominal Organ Transplant Surgery and Surgical Director, Kidney, Liver and Pancreas Transplantation, and Living Donation, Temple University Hospital and Chief, Transplantation, Saint Christopher's Hospital for Children, both in Philadelphia, Pennsylvania. Additional information about Dr. Di Carlo's qualifications is contained in the biography of Dr. Di Carlo on the Temple University Hospital website, a copy of which is attached as Exhibit "A" hereto.

In 2017, Dr. Di Carlo provided Snyder his opinions, and the bases for his opinions, concerning the negligence of UMMC and two of its surgeons in connection with the pancreas transplant procedure performed on L███ B███. Dr. Di Carlo observed that UMMC had found Ms. B███ to be too high a risk for the procedure in 2016 because of severe coronary disease but that, in January 2017, surgeons at UMMC nevertheless performed the surgery without having addressed her coronary disease and without having considered that she was too high a risk for the transplant procedure.

In March 2018, Dr. Di Carlo gave the opinion that the transplantation of a low quality kidney with a high KDPI score (97 of 100) into J███ S███, who was 60 years of age, was not medically justified. High KDPI kidneys are given to people who are desperate or are much older. Dr. Di Carlo also traced the history of the kidney that was transplanted into Mr. S███, including

4

a donor summary, the condition of the kidney, the cold ischemia time, the kidney biopsy and the rejections of the kidney by the other hospitals that were offered the kidney before UMMC agreed to take it. Dr. Di Carlo expressed the opinions that: placing a poor kidney with an extreme likelihood of failure into a patient such as J▉▉▉ S▉▉▉ (who had multiple comorbidities) and with a long cold ischemia time was predictive of a poor outcome; that Mr. S▉▉▉ underwent a futile transplant for no benefit; that exposing Mr. S▉▉▉ to immunosuppression for no benefit on top of two operations for complications further negatively impacted Mr. S▉▉▉; that the implanted kidney never worked in Mr. ▉▉▉ because it was an extremely poor kidney which was further compromised by a prolonged cold ischemia time for this type of kidney; and that the UMMC program exercised poor judgment in selecting this kidney and transplanting it in this patient.

Dr. Di Carlo also provided information and opinions about the systemic deficiencies and dysfunction of the UMMC transplant department (or service). Based on Dr. Di Carlo's knowledge of the poor judgments and excessive risks taken in the B▉▉▉ and S▉▉▉ cases, and on the SRTR analysis of the UMMC organ transplant program, including analysis from data available as of October 31, 2017, Dr. Di Carlo expressed the further opinions that: UMMC's waiting list mortality rates show that 50% of the candidates listed for kidney transplants at UMMC are required to wait 66.7 months for the procedure compared to 45.3 months for patients at hospitals that are UMMC's local competition; patients at UMMC are required to wait too long for their transplants and are needlessly dying while waiting; UMMC exercises poor judgment in patient selection and in listing patients who, for reasons of health, should not be transplanted; patients listed by UMMC for kidney transplants are dying at a greater rate than would be predicted by statistics and in comparison to national averages; UMMC is losing kidneys after transplant, and patients at UMMC are dying after

transplant procedures, reflecting a combination of poor kidney selection, poor intra-operative management and poor medical follow-up; 50% of the patients that UMMC lists for transplants are patients whom the rest of the country never transplants; UMMC is much more likely than other hospitals to accept kidneys that are predicted not to work as well as or as long and less likely to accept better kidneys; UMMC takes more organs from older donors and less from younger donors than other hospitals; UMMC's one-year favorable outcomes are low in comparison to one-year outcomes at other hospitals; UMMC's high first-year adult graft failure rate, far greater than should be expected, was due to bad kidneys and bad follow-up care; and a comparison of UMMC's three-year outcomes with UMMC's one-year outcomes would suggest that things have deteriorated recently.

Dr. Di Carlo provided Snyder information about the disarray and turnover at the UMMC program and the further indication that kidney and pancreas transplant outcomes at UMMC were becoming worse. Dr. Di Carlo provided Snyder with the names of UMMC surgeons who were attempting to leave UMMC and were negotiating with other institutions. Dr. Di Carlo also provided information that, as late as August 2018, and apparently as a result of the exodus of surgeons, UMMC was promoting a surgeon who was not board eligible from instructor to assistant professor. Dr. Di Carlo remarked that so many surgeons and other personnel were leaving (or attempting to leave) UMMC in 2018 that it became difficult for Dr. Di Carlo to keep track of them.

As stated above, Dr. Di Carlo's opinions were based, among other things, on: his own training and expertise as an organ transplant surgeon and the head of two transplant programs; the medical records of the *B█████* and *S█████* cases; the statistical data compiled and published by the organizations that track organ transplantation programs; and the information about the troubles and problems of the UMMC program that was circulating within the medical community as a

6

result, in part, of the efforts of UMMC surgeons to get out of UMMC and secure employment elsewhere.

Dr. Di Carlo reviewed videos presented by UMMC on its website about its transplantation department (or services). The videos, he opined, would support a statement by Snyder that UMMC has a culture of taking risk and that UMMC is performing higher risk procedures in higher risk populations than other hospitals. The videos indicated that UMMC may have adopted a cowboy mentality and, as a result, and as shown on the statistics gathered by SRTR, UMMC's outcomes are suffering.

### (B).    Jesse Schold, Ph.D., M.Stat., M.Ed.

Dr. Schold is Director of Outcomes Research in Kidney Transplantation at the Cleveland Clinic, Cleveland, Ohio. Among other things, he oversees the ongoing monitoring and quality evaluation of the solid organ transplantation programs at the Cleveland Clinic. Additional information about Dr. Schold's qualifications is contained in the biography of Dr. Schold on the American Transplant Foundation website, a copy of which is attached as Exhibit "B" hereto.

Mr. Snyder consulted Dr. Schold about the poor performance of UMMC's transplant program. Dr. Schold offered opinions based, in part, on the University of Maryland Transplant Rates, January 2018 SRTR Program – Specific Report. Among other things, Dr. Schold expressed opinions that: mortality for candidates awaiting kidney transplantation for candidates on the UMMC waiting list (between 7/1/15 and 6/30/17) was higher than expected for a program such as that at UMMC; candidates for kidney transplants at UMMC (after adjustment for patient characteristics) had an approximately 38% higher risk for mortality than expected for a program such as that at UMMC and as compared to other candidates for kidney transplants at other institutions in the United States; UMMC's rate of acceptance of high quality donor kidneys is

lower than expected for a comparable program in the United States and its rates of acceptance of offers of high KDPI donors are statistically higher than expected; as of 6/13/18, 73.5% of kidneys transplanted at UMMC were low quality, high-risk kidneys, approximately 1.8 times the national proportion for transplantation of such high-risk kidneys; the one-year graft survival rates at UMMC, based on risk adjustment, are lower than expected; UMMC has a higher than expected graft failure rate (adjusted one year hazard ratio = 1.57) than expected.

      (C).    **Bruce D. Charash, MD**

Dr. Charash is a cardiologist and Fellow of the American College of Cardiology in New York City. He has been an Assistant Professor of Medicine at Cornell Medical School and Columbia University Medical School and an Associate Professor of Clinical Medicine at New York University Medical School. Additional information about his qualifications is contained in his 2018 curriculum vitae, a copy of which is attached as Exhibit "C" hereto.

In 2017, Dr. Charash provided Mr. Snyder his opinions, and the bases for his opinions, concerning the negligence of UMMC in connection with the January 2017 pancreas transplant procedure performed on L█████ B████. Dr. Charash determined, among other things, that Mr. B█████ suffered spinal paralysis caused by an extreme drop in her blood pressure during her peri-operative care. Dr. Charash recounted that, in September 2016, while being prepared for the transplant at that time, Ms. B█████ underwent cardiac catheterization that showed total occlusion of her right coronary artery ("RCA") and her Left Circumflex Coronary Artery ("LCX"). As a result, UMMC's records stated that Ms. B█████ was classified as elevated risk for high risk surgery but she was not stented. Dr. Charash expressed the opinions: the findings from the 9/16 catheterization had highly concerning aspects concerning issues for Ms. B█████ particularly facing any type of major surgery; Ms. B█████ cardiac condition was far too unstable to permit

8

her to undergo the rigor of a major organ transplant operation (in her case, a pancreatic transplantation); Ms. B████ suffered catastrophically low blood pressures post-operatively, causing spinal infarction; and, as the UMMC surgeon would have known before they performed the transplant procedure, Ms. B████ would not be administered critical medications to raise her blood pressure because of her recent transplant.

Dr. Charash based his opinions on his experience and expertise and upon his review of the records of Ms. B████ hospitalizations that Snyder had provided him.

Respectfully submitted,

/s/
Arnold M. Weiner, Bar No. 01605
aweiner@rwllaw.com
Stuart A. Cherry, Bar No. 28012
scherry@rwllaw.com
Devon L. Harman, Bar No. 21936
dharman@rwllaw.com
RIFKIN WEINER LIVINGSTON LLC
2002 Clipper Park Road, Suite 108
Baltimore, MD 21211
Phone:  (410) 769-8080
Fax:  (410) 769-8811

*Counsel for the Defendant.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 17th day of August, 2022, copies of the within Defendant Stephen L. Snyder's Designation Of Hybrid Witnesses were served on Government counsel via email and first class mail.

/s/
Arnold M. Weiner, Bar No. 01605

EXHIBIT "A"

# TEMPLE HEALTH



### Office Locations

**Abdominal Organ Transplant Program**
Temple University Hospital – Main Campus
3401 N. Broad Street
Outpatient Building, 4th Floor
Philadelphia, PA 19140
800-TEMPLE-MED

**Temple Health Ft. Washington**
515 Pennsylvania Avenue
Fort Washington, PA 19034
800-TEMPLE-MED

Abdominal Organ Transplant Surgery

# Antonio Di Carlo, MD, CM, FACS, FRCSC

Professor, Surgery, Lewis Katz School of Medicine at Temple University

Chief, Abdominal Organ Transplant Surgery, Lewis Katz School of Medicine at Temple University

Surgical Director, Kidney, Liver and Pancreas Transplantation, and Living Donation, Temple University Hospital

Chief, Transplantation, Saint Christopher's Hospital for Children

### Specialties
Kidney Transplant, Liver Transplant, Pancreas Transplant

## About Me

### Clinical Interests

- Transplantation of liver, kidney, and pancreas
- Multivisceral transplant surgery
- Laparoscopic and single incision laparoscopic living donor nephrectomy and adrenalectomy
- Living donation for transplantation
- Liver resection
- Liver, gallbladder, bile duct and pancreas surgery
- Biliary reconstruction, adrenal surgery

**Temple Pancreas & Liver Transplant Program at St. Luke's**
St. Luke's Gastroenterology
701 Ostrum Street
Suite 201
Bethlehem, PA 18015
484-526-6545

**Temple Kidney Transplant Program at St. Luke's**
St. Luke's Nephrology Associates
834 Eaton Avenue
Suite 301
Bethlehem, PA 18018
484-526-7780

**Highlights**

Dr. Di Carlo was featured in a 6 ABC "Moves in Medicine" segment. Watch the video to learn more about **the impact of living donors to save a life**.

**Education**

- Fellowship, Transplant Surgery, University of Wisconsin Hospital and Clinics, Madison, WI
- Fellowship, Experimental Surgery (Research), McGill University, Montreal, Quebec, Canada
- Residency, General Surgery, McGill University Health Center, Montreal, Quebec, Canada
- MD, McGill University, Montreal, Quebec, Canada

**Training**

- Fellowship, Transplant Surgery, University of Wisconsin Hospital and Clinics, Madison, WI
- Fellowship, Experimental Surgery (Research), McGill University, Montreal, Quebec, Canada
- Residency, General Surgery, McGill University Health Center, Montreal, Quebec, Canada

**Board Certification**

- Surgery

**Memberships**

- Society for Surgery of the Alimentary Tract
- New England Surgical Society
- American Society of Transplant Surgeons
- Americas Hepato-Pancreato-Biliary Association Present Canadian Society of Transplantation
- The Transplantation Society
- Canadian Association of General Surgeons

**Awards and Honors**

- Top Doctors, Surgery, *Philadelphia Magazine*, 2019-2022

# Publications

**Publications**

Di Carlo A and McFadden DW. "Choledocholithiasis and Cholangitis (Chapter 49)." In: Maingot's Abdominal Operations, 12e. Eds. MJ Zinner and SW Ashley. (December 2012).

Di Carlo A, Odorico JS, Leverson GE, LA Fernandez, LT Chin, YT Becker, SJ Knechtle, JD Pirsch, AM D'Alessandro and HW Sollinger. "Long-term outcomes in simultaneous pancreas-kidney transplantation: Lessons relearned." In: JM Cecka and PI Terasaki, Eds. Clinical Transplants 2003. Los Angeles, UCLA Immunogenetics Center, 2004, pp 215-220.



**EXHIBIT "B"**

*Medical Advisory Board Bio (Schold)*

You are here: Home / Medical Advisory Board Bio (Schold)

# JESSE SCHOLD, PHD, M.STAT., M.ED.



Dr. Jesse Schold, PhD, M.Stat., M.Ed. is an Full Staff member in the Department of Quantitative Health Sciences in the Health Outcomes Reseach and Clinical Epidemiology Section and Director of Outcomes Research in Kidney Transplantation at the Cleveland Clinic in Cleveland, Ohio. He received his undergraduate training at Emory University, two Masters degrees at North Carolina State University, and a Doctorate at the University of Florida.

Dr. Schold's research interests include large database analyses, quality metrics for healthcare providers, health services research, disparities in access to healthcare and statistical and epidemiological methods. He oversees outcomes monitoring and quality evaluation of the solid organ transplantation programs at the Cleveland Clinic and has special interest in the development and use of report cards for evaluating the quality of transplant programs.

Dr. Schold has authored over 175 peer-reviewed scientific publications with primary focus in the field of organ transplantation. He has served on numerous national committees including the SRTR Scientific Technical-Advisory Committee, the OPTN Data and COIIN Advisory Committees, the AST Kidney-Pancreas and Education Committees and as an NIH Study Section Reviewer. Dr. Schold is



2019 American Transplant Foundation. All Rights Reserved. | Terms of Use | Privacy Policy

# CURRICULUM VITAE

## Bruce D. Charash, M.D.

**Born:** April 8th, 1956
New York City, NY, USA

**Education:**

Cornell University     A.B. (Chemistry)     1977

Cornell University Medical College     M.D.     1981

**Hospital Positions:**

Internship, Internal Medicine  7/81-6/82
Mount Sinai Medical Center,   Department of Medicine

Residency, Internal Medicine  7/82-6/84
Mount Sinai Medical Center,   Department of Medicine

Fellowship, Division of Cardiology  7/84-6/86
New York Hospital-Cornell Medical Center

Assistant Attending Physician  7/86-9/91
New York Hospital-Cornell  Medical Center

Chief Cardiac Care Unit, 10/91-1/31/05
Lenox Hill Hospital

Attending Physician 2/01/5-6/30/06
New York-Presbyterian Hospital

**Hospital Positions (Continued):**

Senior Attending Physician, 10/91-6/05
Lenox Hill Hospital

Attending Physician 3/06-present
Lenox Hill Hospital

Attending Physician, 05/07-present
Mount Sinai Hospital

**Academic Appointments:**

[1]

Instructor  7/86-6/87
Cornell Medical School

Assistant Professor of Medicine 7/87-7/93
Cornell Medical School

Visiting Associate Professor of Medicine 10/98-1/31/05
State University of New York Health Center at Brooklyn

Assistant Professor of Clinical Medicine 2/1/05-6/30/06
Columbia University Medical School

Clinical Associate Professor of Medicine 7/93-present
NYU Medical School

**Committees:**

Doc2Dock—Founder and Chairman of the Board (since 2005)

Children's Health Initiative—Board of Advisors (since 2002)

Clinton Global Initiative—Member 2005-present

James R. Jordan Foundation International—President (since 2008)

FEED Initiatives—Advisory Board (since 2008)

Adakum Foundation— Advisory board (since 2007)

**Licensure and Board Certification:**

New York State License Registration     7/82; Status: Active

American Board of Internal Medicine     9/84; Status Active

Cardiovascular Disease Subspecialty     11/87; Status: Active

**Memberships:**

Fellow of the American College of Cardiology

[2]

American Heart Association

American Heart Association—New York Chapter

**Honorary Societies:**

Phi Beta Kappa           1977   Cornell University

Phi Kappa Phi            1977   Cornell University

Alpha Omega Alpha        1981   Cornell University Medical School

**Awards:**

David Scherf Scholarship, New York Academy of Medicine: Special Commendation: **1980**

Daniel and Elaine Sargent Fellow in Cardiology: **1985**

Greater New York Hospital Association: Outstanding Physician of the Year, New York State **2008**

Adakum Educational Foundation: Africa Humanitarian Award: **2008**

AfriMetro: Friend of Africa Award: **2010**

Doc2Dock: Surplus into Survival Award  **2011**

American Board of Cardiology: Award for Excellence: **2012**

National Academy of Medicine:  Appointment to Consultant:  **2012**

Caring Institute (Washington D.C.):  National Caring Award:   **2012**

**International Awards:**

Honorary Citizen of Benin:  **2007**

Honorary Citizen of Ghana:  **2008**

Ashanti King, Kumasi, Ghana:  Elevation to Ashanti Chief: **2008**

Ga King, Accra, Ghana:  Elevation to Ga Chief:  **2010**

Honorary Citizen of the Democratic Republic of the Congo:  **2011**

[3]

**Publications:**

**Peer-Review Journals:**

Kligfield P, Charash, B, Placek E, Sos TA: Anti-arrhythmic effect of manganese chloride in infracted dogs with observations on the dose response of heart rate and ventricular pressure.  J. Pharm Exper. Therapy 1981;219:289-295

**Charash B, Placek E, Sos TA, Kligfield P: Dose-related effects of manganese chloride on the canine electrocardiogram.  Journal of Electrocardiography 1982;15:149-152

**Charash B, Scheidt S: The controversy over transdermal nitroglycerin: an update.  Am Heart J  1986;112:207-215

Borer J, Miller D, Schreiber T, Charash B, Gerling B: Radionuclide cineangiography in acute myocardial infarction: role in prognostication.  Seminars in Nuclear Medicine  1987;17:89-94

Sauter D, Goldfrank L, Charash B:  Cardiopulmonary arrest following an infusion of calcium 2-amino ethanol phosphate.  Journal of Emergency Medicine 1990;8:717-720


**Abstracts:**

Kligfield P, Charash, B, Placek E, Sos TA:  Hemodynamic and Anti-arrhythmic effects of Manganese Chloride in the ischemic dog.  Clinical Research 1980;28:187A

Kligfield P, Charash B, Placek E, Sos Ta: Dose Related effects of manganese on the canine electrocardiogram.  Clinical Research  1981;29:215A


**Abstracts (continued):**

Kligfield P, Charash B, Placek E, Sos TA: Protective effect of manganese pre-feeding in infarcted dogs.  Clinical Research  1982;30:198A

**Charash B, Schreiber T, Miller D, Silvasi D, Kligfield P, Borer J: Inferior myocardial infarction: reperfusion not predicted by ST segment evolution. Clinical Research 1985; 33:739A

[4]

\*\*Charash B, Silverstein R, Borer J, Nachman R: Enhancement of thrombolysis by pre-mixing recombinant tissue plasminogen activator with platelets.  Clinical Research 1988;36:756A

**Chapters:**

\*\*Charash B, Fisher J: The Heart and Circulatory System.  Health and Medical Horizons, New York, MacMillen Inc.  1986;287-290

\*\*Charash B, Fisher J: The Heart and Circulatory System.  Health and Medical Horizons, New York, MacMillen Inc.  1987;285-291

\*\*Charash B, Fisher J: The Heart and Circulatory System.  Health and Medical Horizons, New York, MacMillen Inc.  1988;286-289

\*\*Charash B, Fisher J: The Heart and Circulatory System.  Health and Medical Horizons, New York, MacMillen Inc.  1989;289-294

\*\*Charash B, Scheidt S:  Nitroglycerin therapy.  Cardiovascular Drug Therapy, Saunders,  New Orleans,  1990;871-881

**Books:**

\*\*Charash, B:  <u>Heart Myths</u>, Viking  New York: Hardcover 1991

\*\*Charash, B:  <u>Heart Myths</u>, Penguin New York: Paperback 1992