


Gregg Bernstein
Zuckerman Spaeder LLP
gbernstein@zuckerman.com
410.949.1152

ZUCKERMAN
SPAEDER

May 02, 2019

*Via Electronic & First Class Mail*

Lydia E. Lawless
Bar Counsel
Office of Bar Counsel
200 Harry S. Truman Parkway
Suite 300
Annapolis, Maryland 21401-7479

Re: File No. 2018-1929
Respondent: Stephen Snyder, Esq.

Dear Lydia:

Pursuant to your request in your March 11, 2019 letter, I write on behalf of my clients to provide additional comments and relevant documents in response to Respondent's January 4, 2019 letter to Bar Counsel.

A. **Respondent's attacks on the Complainants are misguided and counterproductive**

Before addressing some of the factual assertions made in counsel's letter, a few general comments. First, counsel (and presumably their client) are laboring under a misimpression that Complainants are somehow advocating for a particular result from Bar Counsel and the Attorney Grievance Commission ("AGC"). Respondent's counsel are highly experienced attorneys who have represented countless numbers of clients before the AGC, and they hardly need to be reminded of a lawyer's obligation to report knowing potential violations of the Rules of Professional Conduct to Bar Counsel that raise a substantial question as to that attorney's honesty, trustworthiness or fitness as an attorney. *See* Md. R. 19-308.3(a).

Complainants carefully considered their obligations under the Rule, including the definition of "know" and the comment that "[t]he term 'substantial' refers to the seriousness of the possible offense and not the quantum of evidence of which the attorney is aware." These are not easy judgments to make, but Complainants believed the potential seriousness of the conduct at issue warranted a report. Counsel's efforts to ascribe an ulterior motive to Complainants' filing of the Complaint as "a last ditch effort to silence [Respondent]," Response at 2, is little more than a

ZUCKERMAN SPAEDER LLP | WASHINGTON, DC | NEW YORK | TAM͏͏

Defendant's Exhibit
4

LYDIA E. LAWLESS
MAY 02, 2019
PAGE 2

transparent attempt to shift the focus of Bar Counsel's investigation from Respondent to Complainants. Indeed, counsel's sustained *ad hominem* attacks on the Complainants and UMMS[1] – mostly on Ms. Kinter – are for you to judge, but we observe that the grievance process will wither and die if responsible lawyers can expect this kind of vitriol when they make a report to Bar Counsel.

Equally, counsel's suggestion that Complainants and their counsel employed their "best efforts" to have Respondent criminally prosecuted is surprising given the extensive experience Mr. Graham and Mr. Weiner have as both former federal prosecutors and criminal defense lawyers. They certainly are well aware that once a criminal referral is made to law enforcement, the decisions with regard to the conduct of the investigation and the ultimate decision whether to prosecute are made by those authorities—not by the victim of the alleged criminal conduct. Their baseless assertions are nothing more than a distraction from what should be the focus of your inquiry.

Respondent's approach in his response to the Complaint is reminiscent of the argument sometimes made by prosecutors to the jury when describing the closing statement of the defense lawyer: when you're weak on the facts, attack the law; when you're weak on the law, attack the facts; and when you're weak on the law and the facts, attack the government. Much of the response is devoted to highly-charged and misleading statements about the UMMS transplant program designed to distract from the pertinent issues to be decided; *i.e.*, whether Respondent has violated any of the Rules of Professional Conduct in an attempt to extract a $25 million payment from UMMS or suffer a barrage of salacious and damaging publicity. Respondent's effort to paint a picture of a program "in turmoil" that was using inferior organs in order to increase profits reflects a profound lack of understanding as to how the UMMS transplant program operates, which is a highly effective discipline that has successfully extended the lives of many patients who had run out of options. Nor is Respondent correct in asserting that there were "wholesale departures" from the program "that resulted from [Respondent's] discoveries." Response at 3.[2]

---

[1] *See, e.g.*, Response at 3 ("shameful campaign to silence Mr. Snyder"); *id.* at 4 ("last ditch effort to throttle Mr. Snyder"); *id.* at 4 ("seeks, by its complaint, to use the disciplinary process as a weapon to ruin Mr. Snyder's career and reputation"); *id.* at 5 ("a remarkable absence of candor in the accusations they make in their Complaint Letter"); *id.* at 6-7 ("have either attempted to reconstruct conversations with Mr. Snyder after the fact, and are mistaken in their recollections, or they have deliberately attributed to Mr. Snyder statements that one or both of them knows or know that he did not make"); *id.* at 12 ("an exercise in gamesmanship"); *id.* ("Ms. Kinter's questionable conduct"); *id.* at 25 ("[t]he obvious reason for [Ms. Kinter's] omission is to perpetuate the fiction that UMMS made efforts to assure that the Sanders case and Mr. Snyder's retainer/consulting agreement were not discussed at the same meeting").

[2] As just one example of Respondent's attempts to draw false inferences from facts in an effort to portray Complainants in a negative light, contrary to Respondent's assertions, the decision not to renew the contract of the surgeon who participated in the transplant for Ms. Bennett had nothing to do with the outcome of

6813985.1

Respondent's premise that UMMS somehow had an incentive to agree to his demand for $25 million in order to avoid the purported adverse publicity that would rain down on the Hospital if it did not accede to Respondent's demand is unsupported by the facts, but instead, represented an attempt to scare UMMS into paying money directly to Respondent. Indeed, Complainants are well aware that information regarding the UMMS transplant program may be divulged in a public setting in the event this matter proceeds to an evidentiary hearing before a Circuit Court judge. Regardless, they are firm in their belief that their professional obligations warranted a report to Bar Counsel for further investigation.[2]

Much of what Respondent alleges in his letter is based on conversations he claims to have had with Dr. Bartlett and characterizations of Dr. Bartlett's motives. These are issues that can only be resolved after you have spoken to the parties to these conversations and you (and possibly a later fact-finder) can make your own judgment as the credibility of these witnesses. For example, other than Respondent's uncorroborated statement, the assertion that it was Dr. Bartlett's idea that Respondent could become a consultant for UMMS, Response at 9-10, is not supported by the facts. Respondent never advised Ms. Kinter or anyone at their meetings that Dr. Bartlett was the person who came up with the idea of a consulting agreement; instead, his statements at the meetings shifted from a $25 million payment in settlement of the *Sanders* case to a payment to Respondent, individually, giving Complainants every reason to believe that the impetus for this consulting agreement came from Respondent. Moreover, it is not the mere suggestion of a consulting agreement that is at the heart of this Complaint; it is Respondent's threat to publicly demean and embarrass UMMS if it did not pay him $25 million.

### B.  Meetings between Respondent and Dr. Bartlett

Turning to some of the factual assertions made by Respondent, although minimally relevant to the threats made by Respondent in his meetings with Complainants, the central inconsistency raised by Respondent centers on how many private meetings Dr. Bartlett had with Respondent and what was discussed. In Complainants' original letter to Bar Counsel, only one meeting was discussed—a dinner meeting with Dr. Bartlett and Respondent, along with Dr. Bartlett's wife and Respondent's fiancée, at the Capital Grille. Respondent alleges there were three

---

this surgery. Response at 5.

[2] Respondent's threats to cause damage to the UMMS transplant program continue up to the present. *See* Response at 30 ("UMMS can now expect an onslaught of litigation that might have been avoided, and in addition, a torrent of self-perpetuating negative publicity that almost always accompanies the type of medical scandal in which UMMS will soon be embroiled.").

meetings with Dr. Bartlett: a private dinner between the two at the Capital Grille on February 15; the aforesaid dinner on March 19; and drinks at the Baltimore Country Club on March 31.

How many meetings actually occurred will be left to the fact-finder after a full investigation and interviews with the relevant parties; however, Ms. Kinter was only aware of one dinner meeting between Respondent and Dr. Bartlett on February 15, 2018, per Dr. Bartlett's email to her of the same date advising that he had been contacted by Respondent following the earlier mediation of the *Bennett* case, and Respondent had told him that he had been retained on behalf of transplant patient, Jeffrey Sanders, and further, that Respondent had information that was damaging to the transplant program and UMMS that he wanted to share with Dr. Bartlett "confidentially" over dinner in order to discuss a quiet settlement before the information was disclosed publicly. According to Dr. Bartlett's February 15 email, Ms. Kinter agreed to have Dr. Bartlett attend the dinner "to hear [Respondent] out." *See* Exhibit 1 attached, February 15 email.

Ms. Kinter and Dr. Bartlett spoke a few days later, and Dr. Bartlett told her what he and Respondent had discussed during the dinner about the *Bennett* and *Sanders* cases. Dr. Bartlett did not tell Ms. Kinter that there was any discussion of any consulting agreement involving Respondent, or that Respondent would have any professional relationship with UMMS. Dr. Bartlett also told Ms. Kinter that he and Respondent had discussed getting together again for dinner at a later date, this time with Dr. Bartlett's wife and Respondent's fiancée.

As a result of this conversation, Ms. Kinter was concerned about Respondent's future contact with a member of the UMMS system who might be a potential target of future litigation (*i.e.*, in the *Sanders* case), and she emailed Respondent on February 21 as noted in counsel's letter to advise that, while Respondent and Dr. Bartlett were planning on having dinner in the future, the dinner should be limited "to causal [*sic*] conversation and does not involve any party you represent." Further, she asked him to "refrain from calling [Dr. Bartlett] without my expressed permission." Exhibit 2 attached, February 21 email. Ms. Kinter had a follow-up conversation with Respondent on February 22, 2018, and as reflected in her contemporaneous notes, Respondent informed her that he had three cases involving Dr. Bartlett and that Ms. Kinter was "playing with fire". Ms. Kinter reiterated that Respondent was not to contact Dr. Bartlett about any patient, and Respondent agreed.[4]

---

[4] The suggestion that it was Dr. Bartlett who contacted Respondent and not the other way around is somehow justifying their later interactions is immaterial. Even if true, Dr. Bartlett is not an attorney and is not subject to the rules prohibiting contact with a represented party. Regardless who initiated the later contacts, Respondent was required not to have any communication with Dr. Bartlett, *see* Md. R. 19-304.2(a) & cmt. [5] ("The Rule applies even though the represented person initiates or consents to the communication.") nor should he have attended any of the later meetings for the purpose of discussing either a settlement of the Sanders agreement or the consulting agreement he was seeking. In this regard, although not relevant, Respondent makes much of an allegation that Ms. Kinter did not send a copy of her

Ms. Kinter was unaware of any further contacts between Respondent and Dr. Bartlett, and therefore, she was indeed, "stunned," Complainants' October 22, 2018 letter at 5, when Respondent raised the idea of a $25 million payment *to him*, individually, at their meeting on June 22, 2018, particularly when his earlier written settlement demand of $25 million was to settle the *Sanders* case, and there was no discussion of any consulting agreement at the initial April 30 settlement conference in which the demand was made. Response at 16. She and Dr. Whye categorically deny that they had *any* discussions with Respondent regarding any type of consulting agreement prior to the June 22 meeting as alleged by Respondent. Response at 3.

Based on further investigation, we now believe that when Dr. Bartlett was interviewed by other UMMS outside counsel relative to this matter, he only described the later dinner on March 21.[4] The information provided by Dr. Bartlett about what transpired at the March 21 dinner was mistakenly connected to the dinner on February 15 in Complainants' letter to Bar Counsel when it appears that these discussions actually occurred at the March 21 dinner. Viewed in this light, much of Respondent's purported inconsistencies are resolved.[5] To be clear, Complainants obviously make no allegation that a no-contact instruction on February 21 applies to any meetings that occurred before that date. Whether Dr. Bartlett was covered by Rule 4.2 for contacts prior to February 21 without an instruction, and if so whether Respondent should have known it, are issues that we leave for your office to resolve.

---

[3] February 21 email to Dr. Bartlett. Response at 11-12. In fact, Ms. Kinter did send Dr. Bartlett a copy. *See* Exhibit 1.

[4] A full reading of the text exchange between Respondent and Dr. Bartlett on March 2 scheduling the March 21 dinner, Respondent's Ex. 6, reveals that it was Respondent who initially suggested that the two get together for dinner, which was after Ms. Kinter's email to Respondent asking him not to have contact with Dr. Bartlett to discuss any pending cases.

[5] Respondent claims that Complainants alleged that at the January 21, 2018 mediation in the *Bennett* case, Mr. Snyder pulled Dr. Bartlett aside to tell him that "he was also representing a second family, Jeffrey and Michelle Sanders, in connection with a second transplant injury ...." Response at p. 6. No such allegation was made. Complainants' letter states that, "Mr. Snyder told Dr. Bartlett that he had another client (or clients) who wanted to file suit against UMMS regarding allegations concerning the hospital's kidney transplant program ...." October 22, 2018 letter at 1. Complainants did not state that Respondent referenced his representation of the Sanders family in this exchange with Dr. Bartlett. Who Respondent was referring to when he spoke to Dr. Bartlett (or whether he even had any additional clients at this point or was merely puffing) is for Respondent to answer. Further, the statement in the Complaint that during the February 15 dinner, Mr. Snyder said he represented the Sanders "estate" (Mr. Sanders died on February 28) was counsel's language, not Dr. Bartlett's or Complainants'.

### C. The FBI investigation

Respondent suggests that Complainants "burie[d]" the fact of the FBI investigation "in the middle of her Complaint Letter and mention[ed], only in passing, that UMMS ... tried *but failed* to get Mr. Snyder prosecuted by either federal or State authorities." Response at 23 (emphasis in original). On the contrary, Complainants worried whether they should disclose the criminal investigations at all, but they ultimately concluded that fairness to your office and to Respondent required disclosure of the investigation, the tape recordings, and the prosecutor' decisions not to proceed. Imagine Respondent's reaction if Complainants had omitted those facts, and then your office learned during the investigation that FBI tape recordings were made of key events. Imagine further how Respondent would have reacted if Complainants simply disclosed that prosecutors had conducted an investigation, but did not disclose what they knew about the outcome. Instead, Respondent has been able to prepare his response with knowledge that tapes of the key events exist. Neither Complainants nor Respondent has access to the tapes. Complainants observe that those tapes might resolve some apparent differences in recollection about what was said during the key meeting. Complainants further observe that the best evidence of why the prosecutors did not proceed would be known by the prosecutors, themselves, and Complainants have no objection if your investigation were to lead in that direction.

Finally, Respondent's fixation on Complainants' notes is strange. The Complaint sometimes states that certain facts are based on Complainants' notes – not to claim that the notes are superior evidence, but simply to let Bar Counsel and the office know the basis for their information. With respect to the meeting of August 23, 2018, the reference to "memory and notes" was to make sure everyone understood that Complainants did *not* have access to the tapes, which would be a record superior to memory or notes.

### D. Respondent's advice of counsel defense

The Response makes several suggestions that Respondent sought and followed his counsel's advice in connection with the events set forth in the Complaint. Of course, whether Respondent's counsel was given all relevant facts, and whether Respondent in fact followed his counsel's advice, are issues for your office to resolve. Complainants must point out, however, that the advice disclosed in the Response is not consistent with their view of the facts. The email from Respondent's counsel, John McNutt, dated June 21, 2018, and attached to the response simply provides advice as to the need to obtain the consent of the client before pursuing a consulting agreement—it says nothing about whether the attorney can threaten to publish damaging information if the hospital does not enter into the agreement. Similarly, while Mr. Graham may have told UMMS counsel that "it was permissible for Mr. Snyder to negotiate the retainer/consulting agreement if Mr. Snyder's client 'is okay with it,'" query what his opinion might be if he had known that his client was threatening to destroy the Hospital's reputation if they did not accede to his demand for $25 million. And perhaps most significantly, Mr. McNutt's recommendation was "to provide client 2/3rds of whatever funds are received from the consulting

LYDIA E. LAWLESS
MAY 02, 2019
PAGE 7

agreement, since it constitutes a form of recovery that would not have been feasible without the client's threatened lawsuit against the hospital." As the Complaint explains, Mr. Snyder suggested to the Complainants exactly the opposite: that the consulting agreement was entirely for the benefit of Mr. Snyder, and not for his client. *See* Complaint at 3.

E.     Relevant rules and law

Complainants have no intention of debating the law with Respondent; we know Bar Counsel will conduct its own research and decide whether Respondent's view of the law is persuasive. But the law does reflect to some degree on Complainant's good faith in making their report – which Respondent repeatedly attacks. Respondent focuses on Rule 8.4(b) (criminal acts) and suggests that he cannot have committed extortion. Complainants pointed out that Respondent's demand "felt extortionate" to them. The question is whether Respondent's threat to "make this a nightmare for the hospital" by publishing disparaging and damaging information about the UMMS transplant program if UMMS did not pay him millions of dollars to do nothing other than buy his silence, constitutes possible violations of state and federal criminal law, *see e.g.*, 18 U.S.C. Section 1951 (use of commerce to obtain property with consent induced by the wrongful use of threatened force) and Md. Code, Crim. Law, Section 3-701 (obtaining property with consent by use of threatened economic injury), and thereby a violation of Rule 8.4(b). The line between advocacy and extortion may be unclear at times, but it does exist, and Complainants felt like it had been crossed. In a similar situation, the United States Attorney's Office for the Southern District of New York recently initiated criminal charges against noted lawyer Michael Avenatti for attempting to extort $12-22 million from Nike in exchange for not holding a press conference to reveal damaging information regarding Nike's alleged payments to youth athletes and their parents. *United States v. Avenatti*, 19 MAG #2927 (S.D.N.Y.).

With regard to the remaining alleged violations, as to the potential violation of Rule 5.6, Complainants adhere to their statement that Respondent attempted to condition his client's settlement on his own demand to be retained by UMMS. Your office will need to resolve that factual dispute. Further, the rules governing conflicts of interest vis-à-vis Respondent's client may turn on facts that Complainants do not know, as the Complaint stated, and it is for your office to determine whether Respondent has adequately furnished those facts. Compl. at 8.
Finally, as pointed out above, *see* page 4, n.4, *infra*, Respondent's apparent view that Rule 4.2 is waivable by the client is erroneous, and his contention that Ms. Kinter engaged in a scheme to extract information from Respondent is offensive.

6813985.1

* * * *

Complainants have alleged facts that they believe, in good faith, warrant further investigation by your office to ascertain whether any of the Rules of Professional Conduct have been violated. They are available at your convenience to review the substance of their Complaint in more detail.

Very truly yours,

Gregg Bernstein

cc: John Connolly

6813985.1