```
           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND
```

UNITED STATES OF AMERICA     *

    V.     *   Case No. DLB-20-00337

STEPHEN L. SNYDER     *

* * * * * * * * * * * *

## DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL, OR IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL

Now comes the Defendant, Stephen L. Snyder, by his attorney, Law offices of Gerald C. Ruter, P.C. and pursuant to F.R.Cr.P. 29 moves the Court to grant a judgment of acquittal following the verdict's finding of guilt, or in the alternative, a motion for new trial pursuant to F.R.Cr.P. 33 and for reasons, says as follows:

**Factual Background**

Mr. Snyder is charged with attempted extortion, in violation of 18 U.S.C. 1951; and violations of the Travel Act, in violation of 18 U.S.C. 1952.

Following a trial by jury, Mr. Snyder was found guilty of all counts contained in the indictment.

The gravamen of the attempted extortion charge as well as the Travel Act counts that are allegations in furtherance of the alleged extortion scheme is that Mr. Snyder tried to extract from UMMS monies for himself to which he was not entitled.

1

The facts and law do not support a finding of guilt in this case.

**Rule 29 Argument**

Rule 29 motions of acquittal may be made by the defendant following the closing of the government's case. Mr. Snyder made that motion and the Court denied it. The Fourth Circuit has stated that in the event a district court denies the motion that decision will not be disturbed if, "viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982; United States v. Small, 944 F.3d 490, 499 (4th Cir. 2019).

We are mindful that, "(A) defendant who brings a sufficiency challenge faces a heavy burden, as appellate reversal on grounds of insufficient evidence is confined to cases where the prosecution's failure is clear." United States v. Clark, 842 F.3d 288, 297 (4th Cir. 2016); United States v. Palomino-Coronado, 805 F.3d 127, 130 (4th Cir. 2015). This is such a case.

The long and short of the evidence is that Mr. Snyder represented Ms. Sanders in the wrongful death of her husband when it was determined that UMMS and/or health care providers who performed the replacement of Mr. Sanders' kidney and the care he received thereafter had discharged their duties in a

negligent manner. Mr. Snyder, in performing his due diligence on this case, retained three experts, Dr. Antonio DiCarlo; Jesse Schold, Ph.D.; and Jonathan Schaub, Esq., all of whom wrote reports for Mr. Snyder and testified at trial concerning the care received by Mr. Sanders; the overall operations of the UMMS kidney transplant program at UMMS; and the efficacy of Mr. Snyder's attempt to enter into a consultancy/retainer agreement with UMMS. Taken as a whole, the expert opinions offered by these three witnesses established at trial that Mr. Sanders' care was substandard; that the UMMS kidney transplant program was substandard and may have included intentional torts; and that Mr. Snyder's attempt to enter the proposed consultancy/retainer agreement was reasonable and offered to UMMS real value to both parties should the offer have been agreed upon by both parties.

Andrew Graham, Esq., John McNutt, Esq. and Eric Yaffe, Esq., testified that Mr. Snyder had engaged them and advised Mr. Snyder as to the ethical and legal guardrails that might be in play with Mr. Snyder entering into such an agreement with UMMS. Mr. Snyder was video, and audio monitored at an August 23, 2018, meeting with UMMS officials as well as several telephone calls with representatives of UMMS. These interactions were authorized and recorded by the Federal Bureau of Investigation and the U.S. Attorney's Office. It is clear from the content of

all these interactions that Mr. Snyder would abandon his proposal if it were not possible to do so ethically and/or legally. He also consistently requested that Mr. Graham be invited to further meetings and/or discussions concerning the proposed agreement but was denied that request when he was advised that Mr. Graham's presence was not needed, when in fact, the United States Attorney's Office had advised UMMS to make sure Mr. Graham was not present at any meetings because that office did not want to have Mr. Graham's voice recorded.

Although the Court found that Mr. Snyder was not entitled to an advice of counsel jury instruction, these facts clearly demonstrate that Mr. Snyder did not harbor the requisite intent needed to commit attempted extortion or a violation of the Travel Act, both statutes requiring a knowing intent to violate the law.

### The Wrongfulness Component

As Model Instruction 50-14 states, "(T)he term wrongful means that the defendant had no lawful right to the property he was trying to obtain and that he was attempting to obtain that property because of the victim's fear of economic loss."

Mr. Snyder's proposal did not include seeking money that he "... had no lawful right to..." The evidence showed that Mr. Snyder had represented a client (Ms. Bennett) prior to the Sanders case and settled the case for $8,500,000. Immediately

4

following that case he was retained by Mr. and Mrs. Sanders. He discovered through investigation that acts of negligence had occurred while Mr. Sanders was under the care of UMMS. Through additional investigation he discovered the operation of the UMMS transplant program had systemic problems that more than suggested that the program may very well have been and currently were operating the transplant program in such manner that could result in future causes of action that could subject UMMS to intentional tort litigation. Some of this information was known to Mrs. Sanders whose husband had since died, and it was this information that caused her to urge Mr. Snyder to seek a consultancy/retainer agreement with UMMS to make sure that what happened to her husband did not happen to anyone else at the hands of UMMS's transplant program. It was upon her urging that Mr. Snyder sought such an agreement with UMMS.

When Mr. Snyder approached UMMS personnel it was his intention to fulfill the request of his client. Mr. Snyder further intended to assist UMMS in any way UMMS desired.

As the legal representative of Ms. Sanders in a claim against UMMS and/or specific health care providers, Mr. Snyder was entitled to a fee for his services rendered in that regard. Mr. Snyder's proposal was inextricably connected to that of Ms. Sanders' claim. In other words, but for the Sanders case and Ms. Sanders' request that Mr. Snyder seek an agreement with UMMS

5

where he could assist UMMS in the very matter that brought him to its doorstep, there would have been no offer or proposal made by Mr. Snyder. Mr. Snyder's proposal was lawful, and he most certainly would have been entitled to the ultimate fee agreed upon since he was agreeing to be conflicted out of all future medical malpractice cases brought against UMMS and was prepared to perform any and all duties UMMS would require of him; therefore, he was entitled to compensation.

### The First Amendment and Extortion

In Sosa v. DIRECTTV, Inc., 437 F.3d 9123, 939-940 (9th Cir. 2006), the Ninth Circuit examined the First Amendment in the context of where speech is protected by the First Amendment's freedom of speech and press clause as well as the right to petition the government for redress of grievances.[1] A class action was brought by DirectTV customers against DirectTV after having received demand letters for failing to pay invoices that in fact, had been paid. The class filed a civil RICO claim against DirectTV alleging extortion and mail fraud as predicate acts. The district court dismissed the complaint based upon the failure to state a claim. The question before the appellate

---

[1] The Sosa decision derives its authority from two cases, Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); and United Mine Workers v. Pennington, 381 U.S. 657 (1965). These cases concern anti-trust laws but are applicable in Mr. Snyder's argument that his speech in anticipation of litigation was protected. Sosa extended the reach of the Noerr-Pennington doctrine to RICO claims where Hobbs Act extortion was alleged to be one of the predicate underpinnings to the claim. It is applicable in the contest of a direct attack on a Hobbs Act indictment

6

court was whether the First Amendment offered protection to DirectTV for "the right of the people... to petition the Government for a redress of grievances," (the "Petition Clause"). U.S. Const. amend. I. The <u>DirectTV</u> Court made it very clear that "we must construe federal statutes so as to avoid burdening conduct that implicates the protections afforded by the Petition Clause unless the statute clearly provides otherwise." *Id* 929. It is Mr. Snyder's position and the evidence showed that his speech (his demand letter, phone calls and meetings with UMMS) were undertaken lawfully.

"The use of the fear must be "wrongful." 18 U.S.C. 1951(b)((2)... It is true that the assertion of weak claims predicated on unsupported factual allegations may be said in some sense to be wrongful. Such a broad reading of the term "wrongful" is not required, however. Applying <u>Noerr-Pennington</u> statutory construction presumption, we do not believe the Hobbs Act imposes liability for threats of litigation where the asserted claims do not rise to the level of a sham." *Id* 939-940. Mr. Snyder presented evidence that his proposal was not a sham. He had reports prepared by experts, medical, statistical and legal, that demonstrated that he had more than a reasonable belief that his offer was fact based and reasonable.[2] Dr.

---

[2] Although in the context of a mail fraud prosecution, whether a demand or proposal is reasonable is not relevant in the determination of whether the

7

Antonio DiCarlo, Jesse Schold, Ph.D., and Jonathan Schraub, Esquire, provided that testimony at trial. He sought out further legal assistance to assure himself that his proposal was both ethical and legal from Andrew Graham, Esquire, who testified that in fact such a proposal was ethical and legal if the parties agreed to its terms. The government's position in that regard was Mr. Graham did not know all the terms. The testimony made clear, however, that the terms had not yet been fully developed and that at future meetings with UMMS personnel and counsel and Board members, the details would be finalized.

The Court should grant the Rule 29 motion.

### Rule 33 Argument

The Court should grant Mr. Snyder a new trial.

### The Court should have conducted a voir dire of the jury as to possible prejudice due to publicity of the trial proceedings.

On November 21, 2024, the defense concluded its case; the Court charged the jury; and the United States and Mr. Snyder made their closing arguments. The jury was excused at approximately 5:00 p.m. without commencing deliberations. The Court left the bench shortly thereafter and announced that the parties should remain, and court would resume at approximately 5:30. When court resumed, Judge Boardman announced that she had

---

defendant harbored the intent to defraud the victim. See United States v. D'Amato, 39 F.3d 1249,1261-1262.

found Mr. Snyder in direct contempt pursuant to 18 U.S.C. 401(3) and F.R.Cr.P. 42(b). The Court imposed a one-day period of incarceration and directed that Mr. Snyder be taken into custody immediately. He was led by U.S. Marshall's out of the back of the courtroom to the lock up. Mr. Snyder spent the evening at the Chesapeake Detention Center until released the following day in court and out of sight of the jury. Thereafter, Mr. Snyder urged the Court to *voir dire* the jury panel as to whether any of them had seen any news accounts in the written media or television in the last three days. Mr. Snyder requested the three-day window so as not to accentuate the legal activities of the prior evening. The Court denied the motion stating that the jury had been instructed each evening not to read or watch any news accounts of the trial.

The trial of this case had garnered a great deal of media attention. Journalists from the Baltimore Banner and the Baltimore Sun and WBAL-TV were in attendance nearly or actually every day of the trial. Upon information and belief, the written media wrote accounts of the trial each day (perhaps on Saturday as well) and local television stations also featured accounts of the trial nearly or actually every day of the trial. The taking of an attorney who is the defendant into custody during the trial of his case in federal court is a rare occurrence indeed. In this case, based upon information and

9

belief, at least WBAL-TV aired the events as its lead story the same evening, just hours after the jurors left the courthouse and just hours before the jurors were to begin deliberating on the fate of Mr. Snyder.  Not taking a few moments to determine whether anyone of the jurors had heard this report on TV or other media platforms, and if so, determining precisely the content viewed and whether such exposure in any way affected their ability to be fair and impartial, is error.

It is axiomatic that an unbiased jury is fundamental to a fair trial.  At this time, the defendant cannot demonstrate bias given the Court's denial of his request to voir dire the jury panel.[3]  Nor can the defense presently show the need for a Remmer hearing is in order.  See United States v. Remmer, 347 U.S. 227 (1954).  Remmer involved a juror being approached during a trial of a defendant for tax fraud.  An unknown person approached the juror and suggested a favorable verdict to the defendant may prove profitable to him.  He reported it to the court.  Remmer was convicted and complained on appeal that he should have been granted a new trial due to the juror interference.  The Supreme Court reversed and remanded in favor of a hearing (now referred to as a Remmer Hearing) to determine whether the defendant had been prejudiced by that contact.  When a juror engages in

---

[3] Mr. Snyder will submit a motion seeking court approval permitting the interview of the 15 jurors who were seated on November 21 and 22, 2024, pursuant to Local Rule 107.16.

10

"misconduct", even inadvertently by listening or watching or reading details, a "presumption of prejudice" is triggered.  See United States v. Harris, 881 F.3d 945, 953 (6th Cir. 2018).  The Court should have granted Mr. Snyder's motion to *voir dire* the jury.  See United States v. Seeright, 978 F.2d 842 (4th Cir. 842) where the court questioned each juror after discovering one of the jurors had done some independent investigation during jury deliberation.

This error calls for an opportunity to interview jurors or the granting of a new trial.

### Mr. Snyder was not competent to represent himself nor was he competent to waive his right to counsel

Mr. Snyder was indicted on October 5, 2020.  He was represented by counsel from October 19, 2020, to December 13, 2023.  He was self-represented as of December 13, 2023, until May 8, 2024, when present counsel was appointed as standby counsel.  As of this writing he remains self-represented.[4]

Faretta v. California, 422 U.S. 806 (1975), makes it clear that an accused has the right to represent himself.  It appears from the record that Mr. Snyder may have been provided what is commonly known as a "Faretta Hearing" on December 8, 2023, and October 30, 2024.  In each instance, Mr. Snyder elected to

---

[4] On November 29, 2024, Mr. Snyder indicated to undersigned counsel he wished to have the Court appoint me as his attorney. The Court has been advised of this by correspondence submitted in this case at ECF 303.

11

represent himself.  The purposes of a Faretta hearing include determining whether the defendant understands his right to represent himself and the pitfalls in doing so, as well as his right to secure counsel should he choose to retain counsel or have appointed counsel represent him, if appropriate and whether the defendant is competent to represent himself, competent to waive his right to counsel, as well as whether he is competent to stand trial.  See United States v. Bush, 404 F.3d 263 (4th Cir. 2005).  It is our position that Mr. Snyder's decision to represent himself was not knowingly made nor was his waiver of that right nor was he competent to stand trial nor is he competent to proceed to sentencing, by reason of a mental disorder or disease.  To waive one's right to counsel, the defendant must be mentally competent.  In Godinez v. Moran, 509 U.S. 389, (1993).  The Supreme Court considered Godinez in order to clarify the standard required to determine whether a defendant is competent to self-represent versus his competency to plead guilty.  In so doing, it found that some courts considered the issue of a defendant's choice to represent himself to be of more significance than his choice to plead guilty.  At 389, the Court held:

> "The competency standard for pleading guilty or waiving the right to counsel is the same as the competency standing for standing trial; whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree

12

>of rational understanding" and a "rational as well as factual understanding of the proceedings against him." Citing Dusky v. United States, 362 U.S. 402 (*per curiam*).

The Godinez Court stated further at 401 that:

>"We do not mean to suggest, of course, that a court is required to make a competency determination in every case in which a defendant seeks to plead guilty or waive his right to counsel. As in any criminal case, a competency determination is necessary only when a court has reason to doubt the defendant's competence."

## The Actions of Mr. Snyder

Upon information and belief, no court considered whether Mr. Snyder was competent to represent himself or whether he was competent to waive his right to counsel.[5] At each instance, the court had "reason to doubt the defendant's competence."

The following are taken from counsel's personal notes prepared during interactions with Mr. Snyder while other comments below are taken from observations during court proceedings. Counsel has received approval from Mr. Snyder to discuss some of these interactions:

Counsel first met Mr. Snyder on May 15, 2024, after being appointed as standby counsel. He was reclined on a chair, lying prone with a blanket over his body. Stacks of papers were everywhere in the immediate area where we sat. All these

---

[5] Counsel will immediately order the transcripts of the December 8, 2023, and October 30, 2024, Faretta hearings should he be appointed to represent Mr. Snyder.

13

papers, thousands of pages, were related to the prosecution of this case, and in no meaningful order. Conversation was disjointed and totally unhelpful to my understanding of what he had done or what he wanted to do or what he wished for me to do to assist him. The meeting lasted 4.7 hours and no progress of any kind had been made.

On May 18, 2024, he called me and advised me he had fallen twice in his home. I had noted significant bruising on his arms and legs at my first meeting. He advised me that he falls often in his home. He reported he had been taken to the hospital at least one time as a result of these falls.

He does not drive his vehicle.

I wrote in my notepad during my July 12, 2024, meeting that Mr. Snyder was "disorganized, thoughts muddled."

On July 17, 2024, Mr. Snyder fell asleep during our meeting, and I left.

On July 26, 2024, during the morning session of the motions hearing in a sealed session Mr. Snyder advised he was receiving in-house care for disabilities; he is under the care of a psychiatrist; he is under the care of a neurologist; he is scared of falling and falls often; he is under the care of a cardiac specialist. The Court asked Mr. Snyder if he was competent, and he said he was. During the lunch break I was asked to try to find Mr. Snyder by his family. I went to three

different men's rooms on various floors and found him in a toilet stall with blood on his face and hands. He was lodged between the wall and toilet. I dragged him out into an open space and cleaned him up with cold water and hand towels and took a picture of the abrasion on his face. He had an abrasion on his hand that I did not photograph. He advised the Court he failed a memory test recently.

He advised the Court during the motions hearing that he had never read the submissions on the issue of dismissal of the indictment prepared by Arnold Weiner. I examined the very lengthy dismissal motions and government responses and defense replies, totaling hundreds of pages. I took extensive notes on the issues presented and attempted to discuss them with Mr. Snyder at our meetings prior to the motions hearing. It was clear that Mr. Snyder did not comprehend my attempt to discuss the issues presented and he admitted he had never read the submissions.

During a visit on August 15, 2024, Mr. Snyder could only discuss his opening statement in any detail. Although trial was months away, at every meeting with him he discussed his opening statement. Much of what was proposed was inappropriate and he was so advised.

Mr. Snyder was unable to prepare any motions or any written argument of any kind.

15

During all meetings, Mr. Snyder had at least one para-legal working with him on this case. At all times during meetings, he requested from one or both para-legals papers of some kind he thought needed discussing. Ordinarily, they were insignificant and not relevant to any issues in the case or were not involved in the topic being discussed at the time. Most often, the documents could not be located.

During the trial, from the beginning it was clear that Mr. Snyder was unable to properly question witnesses, either in direct or cross-examination.

Mr. Snyder was unable to comport himself in a manner the Court requested innumerable times.

Mr. Snyder sometimes shouted at witnesses or treated them in a disrespectful manner. He was unable to accept and act upon the Court's admonitions.

The Court incarcerated Mr. Snyder for his ongoing conduct throughout the trial.

These actions, most of which were witnessed by the Court personally, should have resulted in Mr. Snyder's removal as his own counsel, a right that is not absolute when abused. Respectfully, the actions that took place in front of the jury, like a bad movie, were of the nature and duration that any person's sensibilities would be shaken. It is believed and therefore averred that these actions were not volitional;

16

rather, they resulted from mental disease or disorder that needs to be evaluated. Counsel would have submitted a Motion for Competency, pursuant to 18 U.S.C. 4241. Had counsel been Mr. Snyder's attorney, such a motion would have been submitted shortly after being appointed as standby counsel.[6]

The Court should grant the Rule 33 motion.

Since counsel does not have access to most of the trial transcripts in this case, he seeks permission to supplement this Motion if needed.

          Respectfully Submitted,


          /s/ Stephen L. Snyder
          _____
          Stephen L. Snyder, Esq. *pro se*
          7307 Park Heights Avenue
          Apt. 200
          Encore Building
          Pikesville, Maryland 21208
          (443)610-7611
          Steveslaw@icloud.com


          /s/ Gerald C. Ruter
          _____
          Law Offices of Gerald C. Ruter, P.C.
          9411 Philadelphia Road, Suite O
          Baltimore, Maryland 21237
          (410) 238-8000
          Ruterlaw@verizon.net
          Standby counsel for Stephen L. Snyder

---

[6] Should counsel be appointed as counsel for Mr. Snyder, it is anticipated a motion under 18 U.S.C. 4241 will be submitted.

**Certificate of Service**

I certify that on this 6th day of December 2024, this document was electronically submitted by CM/ECF to all parties of record.

/s/ Gerald C. Ruter
_____
Gerald C. Ruter