**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**STEPHEN SNYDER,**<br><br>**Defendant** | **Criminal No. GLR 20-337** |

**UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF
ACQUITTAL OR IN THE ALTERNATIVE FOR A NEW TRIAL AND
<u>OPPOSITION TO SNYDER'S MOTION TO INTERVIEW THE JURY</u>**

The United States of America, by its undersigned counsel, submits this Opposition to Defendant Stephen L. Snyder's Motion for Judgment of Acquittal or for a New Trial, ECF No. 304, and to Defendant's Motion to Interview the Jury, ECF No. 306. As explained herein, the Court should deny the Motions.

**I.    INTRODUCTION**

On November 22, 2024, a jury found Defendant Stephen L. Snyder ("Snyder") guilty of attempted extortion in violation of the Hobbs Act and guilty of seven violations of the Travel Act. ECF No. 299. The jury found that Snyder had attempted to extort the University of Maryland Medical System when he demanded that they pay him $25 million under the guise of a sham consulting agreement. Snyder stated that if he was not paid $25 million, then he would destroy the transplant department at the University of Maryland Medical Center.

Following his conviction, Snyder moved for judgment of acquittal, or in the alternative, for a new trial. As explained in detail below, the Court should deny the Motion. Snyder's Motion for Judgment of Acquittal should be denied because: (1) the Government provided the jury with ample evidence that Snyder acted with the requisite intent; (2) the Government put forth evidence that

Snyder's demand was wrongful; that is, that his demand was separate from his client's demand; and (3) the Court has already determined that this case does not fall within the litigation exception to Hobbs Act extortion that is recognized by some courts.  The Court should also deny Snyder's Motion for a New Trial because:  (1) there is no evidence that any juror saw the press coverage related to Snyder's contempt hearing or that such coverage was prejudicial; and (2) Snyder's conduct throughout trial demonstrated that he was competent to waive his right to counsel.

## II.    SUMMARY OF THE TRIAL TESTIMONY

### A.  Background

At all times relevant to the case, Snyder was an attorney licensed in Maryland who specialized in medical malpractice cases.  The University of Maryland Medical System ("UMMS") was a hospital system with hospitals located throughout Maryland.  The University of Maryland Medical Center ("UMMC") was one of the hospitals within UMMS.  UMMC is located in downtown Baltimore and includes a shock trauma unit and transplant department.  The Maryland Medicine Comprehensive Insurance Program ("MMCIP") is the captive insurance program for UMMS.

From in or around January 2018 through September 2018, Snyder threatened to launch a negative publicity campaign falsely accusing UMMS of transplanting diseased organs into unsuspecting and unsophisticated patients, unless UMMS paid him $25 million.  Snyder claimed to have arranged for *The Baltimore Sun* to run a front-page story on his invented scandal and threatened to hold a press conference and run internet advertising repeating his false accusations.  Snyder produced multiple television commercials that repeated his false claims.  While the extortionate threats arose in the context of potential claims by two clients Snyder represented who had received transplants at UMMS, Snyder repeatedly made clear that the $25 million payment

was for him personally, separate and apart from any settlement with his clients. Snyder demanded that the payment to him be disguised as a sham consulting arrangement.

### B. January 21, 2018 Settlement Conference

Snyder represented two sets of clients in 2017 and 2018, both of whom suffered an injury following transplants at UMMC. On January 21, 2018, Snyder and a lawyer representing UMMS, Sue Kinter ("Kinter"), who was the Senior Vice President for Claims, Litigation, and Risk Management for MMCIP, met for a settlement conference in the first case involving patient Latresce Bennett. Stephen Bartlett, M.D. ("Dr. Bartlett"), the Chief of Surgery at the University of Maryland Medical Center, attended the conference. During the settlement conference, Snyder asked Dr. Bartlett to step into the hallway for a private conversation. During that conversation, Snyder told Dr. Bartlett that Snyder had another client or clients who wanted to file suit against UMMS over allegations relating to kidney transplants. Snyder asked Dr. Bartlett for his personal cellular telephone number, which Dr. Bartlett provided to Snyder.

### C. March 21, 2018 Dinner

On March 21, 2018, Snyder and his fiancée and Dr. Bartlett and his wife met for dinner at the Capital Grille in Baltimore. When Dr. Bartlett and his spouse arrived, Snyder met with Dr. Bartlett privately at the bar. The maître d' delivered a file to Snyder. It contained graphic photographs of Snyder's client, Jeffrey Sanders. Snyder told Dr. Bartlett that he planned to a make a video that was "really bad." Snyder repeated several times that he felt "bad" because he and Dr. Bartlett "were friends" and that the transplant program at UMMC would be "destroyed" unless Dr. Bartlett helped Snyder obtain $25 million. Snyder told Dr. Bartlett that he wanted to become an employee of UMMS in order to obtain the $25 million. Snyder told Dr. Bartlett that if Dr. Bartlett

helped him obtain $25 million, Snyder would not use the video but that if Dr. Bartlett did not help him the video "could do a lot of damage" to UMMS and to Dr. Bartlett personally.

Later during dinner, Snyder told Dr. Bartlett's wife, "as long as your husband does what he is supposed to do, he will be okay." Dr. Bartlett tried to redirect the conversation, however, no matter what topic he and his wife tried to introduce, Snyder would return to his warning that "everything would be okay as long as your husband does the right thing."

### D. April 30, 2018 Meeting

On April 30, 2018, Snyder met with attorneys representing UMMS to discuss the Sanders case. Snyder submitted a claim on behalf of Michelle Sanders, the widow of Jeffrey Sanders. Jeffrey Sanders was a 60-year-old hemodialysis patient with comorbidities who had a kidney transplant at UMMC, experienced serious complications including amputations, and eventually died. Snyder and his associate Kevin Stern attended the meeting along with Sue Kinter, the CEO of MMCIP DePriest Whye ("Dr. Whye"), and outside counsel for UMMS Natalie Magdeburger ("Magdeburger"). Ms. Magdeburger took detailed notes of the meeting, and she subsequently wrote a formal memorandum documenting the encounter. *See* Exhibits 110 and 111. Snyder also prepared written remarks in advance of the meeting. *See* Exhibit 113. Those remarks contained the statement, "I'm here to afford an opportunity to this hospital to pay a $25 million premium TO SILENCE MICHELLE and to BURY WHAT MY INVESTIGATION HAS UNCOVERED." *Id.* at 1.

At the meeting, Snyder provided a demand letter seeking $25 million on behalf of Mrs. Sanders. Snyder told the UMMS representatives that the Sanders case created significant reputation issues for UMMS. Exhibit 110 at 1. Snyder said that it would take $25 million to silence Snyder about what he had developed in his investigation into UMMS's transplant program.

*Id.* Snyder claimed that he liked Dr. Bartlett but that he could do a great deal of damage to his reputation. *Id.* Snyder claimed that UMMS convinced unsophisticated and uneducated patients in need of a transplant into accepting diseased kidneys. *Id.*

Snyder told the UMMS representatives that he had already confirmed that *The Baltimore Sun* would write a front-page article about organ donor fraud. *Id.* at 3. Snyder told the UMMS representatives that he also planned to give a press conference and that the resulting publicity would be devastating for the hospital. *Id.*

Snyder then played a commercial he had prepared and intended to air if his demands were not met. *Id.* It stated that UMMS did not tell patients that the organs UMMS transplanted were bad organs or that UMMS accepted organs that other institutions rejected. *Id.* The commercial said that Jeffrey Sanders was told by the surgeon that transplanted his kidney that the surgeon would have transplanted the same organ into his wife but wasn't told that 250 institutions had rejected the same kidney. *Id.* The video showed images of Jeffrey Sanders with necrotic fingertips and an amputated leg. *Id.*

Snyder told the UMMS representatives that he would launch advertisements for his firm directed at transplant recipients if a deal was not struck and that he would attach an "Internet bomb" to anyone looking at UMMS's transplant site which would cause an ad for Snyder's law firm to come up on the viewer's Internet stream if the viewer looked at UMMS's site. *Id.*

Although Snyder did not reference a consulting agreement during this meeting, Ms. Magdeburger's notes stated that Snyder told the UMMS representatives that the $25 million payment was not only a settlement of the Sanders case, but was also part of a "deal" that would conflict him out of future cases and ensure confidentiality. *Id.* Dr. Whye similarly testified that there was a separate "deal" for confidentiality that was raised at the April meeting.

### E.  **Kidney Donor Profile Index**

The Kidney Donor Profile Index, or KDPI, is one measure of the expected performance of a kidney.  Kidneys with a lower KDPI are expected to have a longer life-expectancy than kidneys with a higher KDPI.  The KDPI of the kidney that was transplanted into Jeffrey Sanders was 97 out of a possible 100.  The trial evidence showed that the usage of high KDPI-kidneys is an accepted practice in the transplantation field, as kidneys with high KDPI's can enhance the life expectancy and quality of life of older patients on dialysis.

### F.  **June 22, 2018 Meeting**

On June 22, 2018, Snyder again met with representatives of UMMS, including Kinter, Magdeburger, and Alicia Reynolds ("Reynolds"), the Director of Claims and Litigation at MMCIP.  Reynolds and Magdeburger took detailed notes of the meeting.  *See* Exhibits 120, 123, and 145.  Snyder began by stating that he had found new information which made him want to increase his demand to $50 million.  Exhibit 123 at 1.  Snyder asked the UMMS representatives whether they were aware of the "Baylor case" referring to Baylor St. Luke's Medical Center, a hospital affiliated with the Baylor College of Medicine, and the effects the allegations made against their transplant program had on Baylor.  Exhibit 120 at 1.  Snyder told the UMMS representatives that Baylor almost went out of business.  *Id.*  Snyder also told Kinter that she would lose her job if Snyder went forward with his allegations against the transplant program.  *Id.* at 2.

Snyder said that UMMS would have to enter into an agreement with him separate from the Sanders case.  *Id.*  Specifically, Snyder told the UMMS representatives that he wanted to enter into a consulting agreement with UMMS so that Snyder would be "conflicted out" of any future case. *Id.*  Snyder told the UMMS representatives that they should settle the Sanders case for whatever that case was worth and then pay Snyder $25 million to act as a consultant.  *Id.*  Kinter told Snyder

that she thought the $25 million was the demand for the Sanders case.  *Id.*  Snyder said that Mrs. Sanders does not "deserve" that much money for her case. Snyder stated that the $25 million was for him.  *Id.*

Snyder's associate, Kevin Stern, testified that the June 22nd meeting was the first time he had heard of the proposed consulting agreement.

Snyder told the UMMS representatives that Dr. Bartlett was in a "shit load" of trouble and that Snyder did not want to hurt him.  Exhibit 120 at 3.  Kinter told Snyder that his comments were making her very uncomfortable and that she felt like she was being threatened.  *Id.*  Kinter told Snyder that it sounded like he wanted to destroy the UMMS transplant program.  *Id.*  Snyder responded that he did not want to destroy the program but that if UMMS called his bluff, he would do what he needed to do because he was a plaintiffs' lawyer and that is what he does.  *Id.*  Snyder also wrote prepared remarks for the June meeting that contained the threat, "I like Bartlett.  I like you.  I don't want to hurt him, and I don't want to hurt the hospital."  Exhibit 117 at 5.

Snyder asked Stern, who was with him at the meeting, to play a new video Snyder had prepared and that Snyder said he would distribute if UMMS did not pay Snyder $25 million. Exhibit 120 at 3. Snyder said he was the "king of taking crazy statements people say and twisting them around" and that the video had statements in it made by members of the transplant department.  *Id.*

Kinter asked Snyder why he wanted $25 million, and Snyder said, "because that is what you have to pay me" and that it could have been "$100 million."  *Id.* at 4.  Magdeburger asked Snyder what he thought he could do to earn a $25 million consulting fee. Snyder responded, "I could be the janitor."  *Id.*  Snyder said it would be a tragedy if UMMS did not pay.  Exhibit 123 at 7.  Snyder said that Kinter would get fired and the hospital would say "how the fuck did you let

this happen" and told the UMMS representatives they were playing with fire with his client.  *Id.*  Reynolds further wrote that Snyder stated, "I don't want to do it so don't make me do it that means its not a threat b/c I don't want to do it."  *Id.* at 8.

Snyder then played the video.  It started with the words, in red, "PUBLIC SERVICE ANNOUNCEMENT" as well as an alert sound.  Exhibit 120 at 4.  It then showed a text message that Dr. Bartlett had sent Snyder on April 10, 2018, that read: "Sue and I just spoke. She understands on hook for fraud and punitive damages. Ball is in your court."[1]  *Id.*  The video then showed pictures of several doctors which the video claimed had left UMMS or had been demoted and were no longer performing surgery.  *Id.*  Dr. Bartlett was pictured with the words: "DEMOTED NO LONGER DOING SURGERY – relegated to executive work."  *Id.*

Snyder told the UMMS representatives that if they said no to his demand for a $25 million payment separate from any payment to Mrs. Sanders then he would hold a press conference, get an article placed on the front page of *The Baltimore Sun*, solicit interest in national articles, distribute commercials and launch a campaign on Google and Facebook, as well as advertise on the Internet.  *Id.* at 4-5.

Snyder's associate, Kevin Stern, also took notes during the meeting.  Stern testified that, at some point after the June meeting, Snyder asked Stern if he took notes of the June meeting.  *See* Exhibit 122.  Stern showed Snyder his notes on his laptop.  Snyder read the notes and told Stern to delete them.  Stern refused to delete them, and instead, saved additional copies of his notes in multiple places.  Stern's notes confirmed the notes and recollections of the other attendees,

---

[1] Dr. Bartlett testified that he told Sue that UMMS was on the hook for fraud and punitive damages because Snyder told him to tell her that.  Dr. Bartlett, a doctor, did not make his own assessment about the hospital's legal exposure.

8

including that the $25 million payment was separate from the Sanders claim, and that Kinter stated that she felt like she was being threatened. *Id.*

### G. August 23, 2018 Meeting

On August 23, 2018, Snyder and Stern met with UMMS representatives including Kinter, Reynolds, Magdeburger, and Dr. Whye. During the meeting, Snyder continued his threats against the hospital and Kinter, personally. Snyder continued to acknowledge that the consulting agreement was a sham, stating that he did not care if he did any work for the hospital at all.

The meeting was video and audio recorded by the FBI. Numerous clips from the August meeting were played for the jury at trial in which Snyder threatened the hospital, threatened Kinter's job, referenced scandals at other hospitals, demanded payment of $25 million to Snyder, and described the purported consulting agreement as an agreement on paper. Snyder also demanded to present his proposal directly to the UMMS board of directors.

The UMMS witnesses including Kinter, Dr. Whye, Magdeburger, and Reynolds described their genuine fear of what would happen to UMMS if Snyder proceeded with his plans. Kinter expressed apprehension over losing her job of more than twenty years. Dr. Bartlett and his spouse described their discomfort meeting with Snyder at the Capital Grille and that Snyder was unhinged.

### H. Snyder's purported reliance on medical experts.

Snyder retained two experts while representing Mrs. Sanders; an epidemiologist, Jesse Schold, Ph.D., and a transplant surgeon, Antonio DiCarlo, M.D. Both testified at trial. Dr. Schold testified that he advised Snyder about the publicly available outcome data related to the performance of the transplant department at UMMC. Dr. DiCarlo testified that he advised Snyder that he thought the donor kidney was not good fit for Mr. Sanders. Neither expert informed Snyder that UMMS was putting profits over safety or was tricking patients into receiving diseased organs.

## I.  Snyder's purported reliance on counsel.

Snyder hired lawyers from two law firms; he hired Eric Yaffe and John McNutt from Gray, Plant, Mooty and he hired Andrew Graham from Kramon & Graham.  None of the lawyers testified that they advised Snyder that he could obtain a $25 million sham consultancy by threatening to destroy the transplant department at UMMC.  Mr. Yaffe, for example, wrote in a billing entry that Snyder should "be careful" in any negotiation with the hospital.  Exhibit 124.  Mr. Yaffe testified that he gave this advice to Snyder because he was concerned that he was committing extortion. John McNutt wrote in an email to Snyder on June 21, 2018, that he should turn over two-thirds of any consulting fees to his client.  Exhibit 119.  Yet, at the meeting with UMMS the next day, Snyder never mentioned that he would turn over any amount of fee to his client.

Mr. Graham testified that he was not aware of any of the details of Snyder's negotiations with the hospital.  During trial, the Government played two portions of a recorded call between Mr. Graham and Ms. Magdeburger, which made clear that Mr. Graham had limited insight into Snyder's scheme.  *See* Exhibits 231 and 232.

### III.    RULE 29

#### A.  Rule 29 Standard

Federal Rule of Criminal Procedure 29 permits a defendant to move for a judgment of acquittal, or renew such motion, after a guilty verdict.  Fed. R. Crim. P. 29(c).  In evaluating a Rule 29 motion, a jury's verdict commands the respect of the reviewing court, *United States v. Siegelman*, 640 F.3d 1159, 1164 (11th Cir. 2011) (noting that jurors are asked to sit through "long days" of testimony and "pore over countless documents to decide what happened"), and their judgment is entitled to great deference.  *United States v. Hicks*, 368 F.3d 801, 804 (7th Cir. 2004); *United States v. Mercado*, 610 F.3d 841, 845 (3d Cir. 2010) ("We apply a particularly deferential

standard when determining if a jury verdict rests on sufficient evidence"). The task of a defendant who challenges the sufficiency of the evidence is accordingly a daunting one. *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003); *United States v. Seawood*, 172 F.3d 986, 988 (7th Cir. 1999) (a defendant making a sufficiency of the evidence challenge bears a heavy burden and faces a nearly insurmountable hurdle"); *United States v. Zambrano*, 776 F.2d 1091, 1094 (2d Cir. 1985) (such challenges are "seldom successful").

The jury's verdict must be sustained if there is substantial evidence in the record to support it. *Glasser v. United States*, 315 U.S. 60, 80 (1942); *United States v. Wilson*, 198 F.3d 467, 470 (4th Cir. 1999). In determining whether the evidence in the record is substantial, the court must view the evidence in the light most favorable to the government, drawing all reasonable inferences from the evidence in its favor. *United States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008); *United States v. Moye*, 454 F.3d 390, 394 (4th Cir. 2006); *Hicks*, 368 F.3d at 804; *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982) (the government is granted "the benefit of all reasonable inferences from the facts proven to those sought to be established"). A judgment of acquittal should be granted only if "there is *no* interpretation of the evidence that would allow a reasonable jury to find the defendant guilty . . . ." *United States v. Gomez*, 165 F.3d 650, 654 (8th Cir. 1999) (emphasis added); *Moye*, 454 F.3d at 394 (conviction can be reversed based upon insufficiency of the evidence only where the government's failure is clear); *United States v. Jones*, 735 F.2d 785, 791 (4th Cir. 1984). If *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, then the jury's verdict must be sustained. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Tresvant*, 677 F.2d at 1021. Where the evidence supports differing reasonable interpretations, it is the jury's responsibility to determine which interpretation to accept. *Moye*, 454 F.3d at 394; *Wilson*, 118 F.3d at 234.

**B. The Government proved Snyder's criminal intent.**

Snyder claims that the Government failed to introduce sufficient evidence for the jury to find that Snyder acted with the requisite criminal intent. The Government introduced ample evidence to prove that Snyder knowingly and willfully committed extortion.

Snyder specifically targeted Dr. Bartlett and segregated him from the attorneys when he first met him in January 2018. Snyder manufactured a small theatrical demonstration involving the maître d at the Capital Grille. He wrote down his threats against the hospital in scripts that he prepared prior to his meetings. Snyder kept secrets. He did not tell his associate, Kevin Stern, about the consultancy prior to the June 22nd meeting. Snyder told Eric Yaffe that the consulting agreement was the hospital's idea, which Mr. Yaffe later determined was not true. Snyder did not tell Andrew Graham any of the details of his scheme, despite telling UMMS that he had hired Graham to look into whether his threats were extortionate. Snyder said multiple times that he did not care if he performed any work in exchange for the $25 million. Snyder asked if his meetings and phone calls were recorded. In remarks that he prepared to give to the UMMS Board, he wrote, "In no way, shape, or form should it be considered as a fee to keep me quiet, i.e., hush money. That would be the result but not the premise of the financial contract engagement if asked." Exhibit 162. This statement is a transparent false exculpatory remark.

Snyder's arguments as to his reliance on his medical experts are factually inaccurate and legally irrelevant. Factually, neither Dr. Schold nor Dr. DiCarlo told Snyder that UMMS was putting "profits over safety" and had transplanted diseased organs into unsuspecting patients. Dr. DiCarlo's draft report, which was admitted into evidence, did not even contain an allegation that UMMS failed to obtain informed consent from the patient. *See* Exhibit 307.[2] Dr. DiCarlo was not

---

[2] All exhibits are numbered consistent with their trial exhibit numbers.

asked to, and did not, provide an opinion about the safety of the UMMS transplant department as a whole. There was also no evidence that either medical expert advised Snyder that he should become a consultant for the hospital. In sum, the testimony of Snyder's medical experts was inculpatory, not exculpatory.

Legally, if Snyder's experts had advised him that UMMS was putting profits over safety, such evidence would have been more inculpatory, not less. Snyder sought to create leverage against the hospital in order to extract $25 million. If Snyder's experts advised Snyder that UMMS was putting profits over safety, then his leverage would have increased. But no amount of leverage, real or manufactured, entitled Snyder to extort UMMS. Moreover, Snyder has not provided any case law that holds that a legitimate belief that his accusations are true negates any element of extortion.

Snyder's purported reliance on his attorneys also did not prove that he lacked criminal intent. The testimony from Snyder's attorneys was inculpatory. Eric Yaffe, for example, wrote in a billing entry that Snyder should "be careful" in any negotiation with the hospital. Exhibit 124. Mr. Yaffe testified that he gave this advice to Snyder because he was concerned that he was committing extortion. John McNutt wrote in an email to Snyder on June 21, 2018, that he should turn over two-thirds of any consulting fees to his client. Exhibit 119. Yet, at the meeting with UMMS the next day, Snyder never mentioned that he would turn over any amount of fee to his client. Snyder ignored Mr. McNutt's advice because it interfered with his ability to receive $25 million. Finally, Mr. Graham testified that he was not aware of any of the details of Snyder's negotiations with the hospital. During trial, the Government played two portions of a recorded call between Mr. Graham and Ms. Magdeburger, which made clear that Mr. Graham had limited information about Snyder's scheme. The trial evidence showed that Snyder possessed the requisite

criminal intent and was not relying on any advice from an attorney. Nor did his reliance on an attorney, generally, demonstrate a good faith defense. The trial evidence showed that Snyder intentionally kept information from his attorneys in order to elicit sufficient advice that could give him cover in his negotiations with UMMS.

### C.  Snyder's demand for $25 million was wrongful.

Snyder argues that his demand for $25 million was not wrongful; that is, that he had a legitimate claim of right to the money. ECF No. 304 at 4-5. Perhaps recognizing that he himself had no legitimate claim to $25 million, Snyder argues that his proposal was "inextricably connected to that of Ms. Sanders' claim." ECF No. 304 at 5. Legally, this issue has already been resolved against Snyder. He made the same argument in his Motion to Dismiss, ECF No. 53-1 at 26, which the Court denied. Factually, the trial also proved that Snyder's proposal was not "inextricably connected" to Mrs. Sanders' claim thereby conferring upon him a legitimate claim of right to $25 million.

Mrs. Sanders' testimony showed that she did not fully understand Snyder's proposal. She testified that she wanted Snyder to become a consultant, but that the consultancy was not raised at the first meeting with Snyder. She further stated that if she had known Snyder was going to be working for the "other side" and would have been unable to help others like her, then she would never speak to him again. Her testimony showed that she did not fully understand what Snyder had proposed, and so Snyder cannot claim that his demand was inextricably connected to her case. Further, regardless of what her specific expectations were, she did not testify that she wanted Snyder to receive $25 million for doing nothing.

Mr. Yaffe also testified about a billing entry that he wrote following a call with Snyder. He wrote, "S. Snyder had suggested he may not want to advise client of any deal he strikes with

14

hospital." Exhibit 124. Snyder's consultancy could not have been "inextricably connected" to Mrs. Sanders' claim if he was keeping it a secret from her.

Snyder also stated many times over multiple conversations that his consultancy was separate from his client's claim. Magdeburger's notes, Reynolds' notes, and Stern's notes from the June 22nd meeting all state that the payment to Snyder was separate from the medical malpractice claim. Exhibit 120 at 2; Exhibit 123 at 4-5; Exhibit 122. Snyder told Ms. Magdeburger during a June 26, 2018 phone call that he "could not understand why [Ms. Magdeburger] was concentrating on 'her case' (meaning Ms. Sanders) and said it 'made no sense to him as the big case to worry about was his.'" Exhibit 125.

Perhaps the best illustration of the separate nature of his consultancy was an exchange that he had with Ms. Kinter on August 23, 2018. Ms. Kinter asked if it would be sufficient to resolve the Sanders case and to sit down with Mrs. Sanders and explain the remedial measures undertaken by the hospital. Exhibit 223. After stating, "that would help," Snyder stated, "how does that make me go away, after her case?" *Id.*

The trial evidence proved that Snyder's claim for $25 million was separate from his client's medical malpractice case. Snyder had no legitimate claim to $25 million, and his demand for that money was wrongful under the Hobbs Act.

### D. The extortion charges do not violate the First Amendment.

Next, Snyder cites *Sosa v. DIRECTTV, Inc.*, 437 F.3d 923 (9th Cir. 2006), for the proposition that Snyder's threats were protected by his First Amendment right to seek redress from the government. Specifically, the Ninth Circuit held in *Sosa* that, "we do not believe the Hobbs Act imposes liability for threats of litigation where the asserted claims do not rise to the level of a sham." *Id.* at 939-40. Although Snyder did not cite *Sosa* in his Second Motion to Dismiss, ECF

No. 53-1 at 28-34, this argument is identical to the "litigation exception" argument that Snyder made in that Motion, which the Court rejected.[3]

In short, the Court rejected that argument for two reasons. First, Snyder could not rely upon the litigation exception because he was not the litigant, his client was the litigant. And for all of the reasons cited in the preceding section, Snyder's consultancy and threatened public relations campaign were separate from his client's legitimate assertion of medical negligence. Second, Snyder did not threaten litigation if he was not paid $25 million. He threatened a public relations campaign that would destroy the transplant department at UMMC and the careers of certain UMMS employees. Snyder reiterated at the meeting on August 23rd that addressing all of Mrs. Sanders' concerns would not "make me go away." Exhibit 223. In other words, even if the prospect of litigation had been resolved with Mrs. Sanders, then Snyder would still proceed with his campaign to damage the transplant department unless UMMS paid him $25 million.

## IV.    RULE 33

### A.  Rule 33 Standard

The Fourth Circuit has explained that to determine whether a new trial is warranted based on the weight of the evidence, "the court examines the evidence as a whole to determine whether it 'preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred.'" *United States v. Rafiekian*, 68 F.4th 177, 189 (4th Cir. 2023). "District courts should grant new trials based on the weight of the evidence only in 'rare' instances." *Rafiekian*, 68 F.4th at 186. "Merely believing that the case could have come out the other way is not enough

---

[3] *Sosa* does discuss *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002), which was the primary case Snyder relied upon in his Second Motion to Dismiss. Additionally, the Fourth Circuit has not adopted the litigation exception to extortion. Even if it had, the Court has already found that this case does not fall within that exception.

to warrant a new trial." *Rafiekian*, 68 F.4th at 186. "A district court should grant a new trial based

on the weight of the evidence 'only when the evidence weighs heavily against the verdict." *United*

*States v. Saint Louis*, 889 F.3d 145, 157 (4th Cir. 2018); *United States v. Wilson*, 118 F.3d 228,

237 (4th Cir. 1997) ("[D]istrict court should exercise its discretion to grant a new trial

'sparingly'"). Because "'determining witness credibility and weighing conflicting evidence are

the responsibility of the factfinder,' [] 'the standard for jettisoning a jury verdict in favor of a new

trial' is 'demanding.'" *Rafiekian*, 68 F.4th at 186-87 (quoting *United States v. Arrington*, 757 F.2d

1484, 1485 (4th Cir. 1985) and *United States v. Millender*, 970 F.3d 523, 532 (4th Cir. 2020))

(internal citations and some quotation marks omitted).

### B. <u>The Court did not need to voir dire the jury.</u>

Snyder argues that the Court erred in not interviewing the jurors to learn whether they saw

news reports that the Court held Snyder in contempt and ordered him to spend one night in jail.

ECF No. 304 at 9-10. Snyder is only entitled to a new trial "[i]f prejudicial evidence that was not

introduced at trial comes before the jury[.]" *United States v. Barnes*, 747 F.2d 246, 250 (4th Cir.

1984). Evidence is prejudicial if there is "a reasonable possibility that the jury's verdict was

influenced by the material that came before it." *Id.* (quoting *Llewellyn v. Stynchcombe*, 609 F.2d

194 (5th Cir. 1980)). If such prejudicial evidence has been introduced to the jury, there is a

presumption of prejudice.[4] *Id.* (citations omitted).

---

[4] This standard is similar to the *Remmer* standard related to improper contact with a juror and, in
fact, the *Barnes* language quoted above cites to *Remmer*. In *Remmer v. United States*, 347 U.S.
227 (1954), the Supreme Court held that, if there is a credible allegation of unauthorized contact
with a juror, then the defendant is entitled to: "(1) a rebuttable presumption that the external
influence prejudiced the jury's ability to remain impartial; and (2) to an evidentiary hearing to
determine 'what actually transpired' and whether the contact was harmless." *United States v.*
*Johnson*, 954 F.3d 174, 179-80 (4th Cir. 2020) (citing and quoting *Remmer*, 347 U.S. at 229).
Snyder cannot show that he is entitled to a *Remmer* hearing because there was no credible
allegation that any jury member saw any media coverage related to Snyder's contempt hearing.

Here, Snyder cannot show that prejudicial information was introduced to the jury.  Snyder

has no evidence that any juror saw the media coverage.  Snyder's assertion that one or more jurors

must have seen the media coverage is speculative.  The Court was not required to interview jurors

based on speculation that one or more of the jurors may have seen the article.  Further, multiple

media outlets covered the trial every day, one or more outlets published stories every day, and the

Court instructed the jurors on a daily basis not to do any research or view any news coverage.  The

Court read the Model Jury Instruction related to publicity prior to the jury's deliberation.  The

Court also instructed the jury before trial, during trial, and at the conclusion of the evidence that

its evaluation is limited to the documents and exhibits that are admitted into evidence and the

testimony of the witnesses.  Finally, there is no evidence that the news coverage was prejudicial,

particularly in light of the judge's instructions to the jury that its evaluation should be limited to

the evidence and testimony admitted at trial.[5]

For these reasons, the Court should also deny Defendant's Motion to Interview the Jury,

ECF No. 306.

### C.  Snyder is competent.

After being found guilty, Snyder now claims that he was not competent to represent

himself.[6]  The standard for being competent to waive one's right to counsel is the same standard

as being competent to stand trial.  *United States v. Bernard*, 708 F.3d 583, 588-89 (4th Cir. 2013)

(citing *Godinez v. Moran*, 509 U.S. 389 (1993)).  Under 18 U.S.C. § 4241(a), the court can, on its

---

[5] During voir dire, one juror stated that they saw news coverage of the case, and another juror stated that they might have difficulty not conducting independent research on their phone.  In both cases, the jurors affirmed that they would follow the Court's instructions to only consider the evidence and would be fair and impartial.  The Court did not strike either juror for cause.

[6] As explained below, the standard is not whether Snyder was competent to represent himself, but whether he was competent to waive his right to counsel.

own, or upon motion of a party, order a hearing to determine the mental competency of the defendant "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences against him or to assist properly in his defense." 18 U.S.C. § 4241(a). When determining whether reasonable cause exists to order an evaluation, the court is to consider "all evidence before it, including evidence of irrational behavior, the defendant's demeanor at trial, and medical opinions concerning the defendant's competence." *United States v. Mason*, 52 F.3d 1286, 1290 (4th Cir. 1995). The Fourth Circuit has noted that "the presence of some degree of mental illness is not to be equated with incompetence[.]" *Hall v. United States*, 410 F.2d 653, 658 (4th Cir. 1969). A defendant only needs to be competent to waive their right to counsel; they do not need to be competent to effectively represent themselves. *United States v. Ziegler*, 1 F.4th 219, 227 (4th Cir. 2021) (citation omitted).

A court's decision as to whether reasonable cause exists to order a competency evaluation is reviewed for abuse of discretion. *United States v. Banks*, 482 F.3d 733, 742 (4th Cir. 2007). The district court is in the "best position to make competency determinations, which at bottom rely not only on a defendant's behavioral history and relevant medical opinions, but also on the district court's first-hand interactions with, and observations of, the defendant" and, therefore, district courts are "appropriately afford[ed] wide latitude." *United States v. Bernard*, 708 F.3d 583, 593 (4th Cir. 2013). Further, the Court has discretion to consider, or not consider, a defense counsel's opinion as to competency. *Ziegler*, 1 F.4th at 230 (citations omitted).

The Court did not have reasonable cause at any point during these proceedings to question Snyder's competence. As for Snyder's medical records, no one has supplied any records to the Court that would indicate that Snyder is not competent.

Further, both Snyder's rationality and demeanor at trial demonstrate that he was competent. Snyder logistically executed the trial. He subpoenaed witnesses and hired paralegals. He prepared exhibits and an exhibit list. He came to court every day, mostly on-time. He spoke to the jury venire and asked questions of potential jurors. In fact, he attempted to create a rapport with the prospective jurors. He gave opening and closing statements. He cross-examined the government's witnesses and conducted direct examinations of his own witnesses. Whereas government counsel was able to divide this labor, Snyder did it all himself. He introduced documents and audio recordings into evidence. He made objections, some of which were sustained. The Court also observed that when it placed time limitations on Snyder's questioning, his questions became better and more targeted. When prompted by the Court, Snyder was able to conform his questions to the Court's rulings.

These facts are similar to *United States v. Ziegler*, 1 F.4th 219 (4th Cir. 2021) where a defendant claimed he was not competent to represent himself following a conviction. There, the Fourt Circuit stated:

> Ziegler's performance during trial only confirmed his competency. Ziegler gave an opening and closing argument, conducted far-reaching cross-examinations, introduced evidence, including three witnesses, and won several objections. . . . His apparent ability to consider strategic choices, develop a defense strategy, and operate in the courtroom is all evidence of competence to both stand trial and waive the right to counsel.

*Ziegler*, 1 F.4th 219 at 231 (citing *Perez*, 603 F.3d at 47-48).

While Snyder frequently ran afoul of the Court's orders and the rules of evidence, his conduct was still intentional and strategic. For example, Snyder tried to testify through his questioning of witnesses. He would ask a witness, "did you know . . ." and then supply his own self-serving version of the events. This was intentional because he was not going to testify but he needed to get his version of events in front of the jury.

As to some evidence that the Court excluded, Snyder tip-toed around the issue to imply the facts that the Court otherwise excluded.  As to other evidence that the Court excluded, Snyder ignored the Court and attempted to elicit the testimony anyway.  Often, the evidence and arguments that Snyder attempted to improperly elicit related to arguments that his lawyers made in either the Attorney Grievance Commission investigation or in the motions to dismiss filed in this case.

Snyder saved his most egregious violations for his closing argument.  As the Government stated on the record, this was strategic because Snyder was likely assuming that the Court and the Government would not seek a mistrial at the end of trial.

Snyder's physical limitations do not speak to his competence, and his physical limitations did not otherwise impact the trial.  Mr. Ruter reported that Snyder fell asleep during one of his meetings, but Snyder never fell asleep at trial.  Rather, Snyder was animated, attempted to develop a rapport with some witnesses, and made quips at others.  Snyder apparently did not read many of the filings in the case; however, Snyder does not claim that he cannot read.

Judge Sullivan also conducted two hearings prior to trial, one on December 8, 2023, ECF No. 167, and one on October 30, 2024, to ensure that Snyder understood the consequences of representing himself.  During both hearings, Judge Sullivan explained to Snyder the risks of representing himself.  Snyder acknowledged those risks but maintained that he was the best lawyer to try the case.

After trial, the Court scheduled another attorney inquiry hearing on December 10, 2024 when Snyder requested to be represented by counsel.  *See* Memorandum Opinion, ECF No. 308. At the hearing, Snyder did not raise a competency issue as that term is defined in 18 U.S.C. § 4241. Instead, Snyder said that he did not appreciate that his conduct at trial would give rise to disputes

with the trial judge. *Id.* at 2. In further discussion that bears similarity to this case, the Fourth

Circuit stated in *Ziegler*:

> Ziegler contends that his grandiose statements about his legal acumen, his combative approach to witnesses, his bizarre questions and theories, ***and his arguments with the court*** should have raised red flags. We disagree. Many great trial lawyers are combative and a bit full of themselves, if not outright narcissists. And "persons of unquestioned competence have espoused ludicrous legal positions." *United States v. James*, 328 F.3d 953, 955 (7th Cir. 2003). Section 4241(a) does not require a competency hearing any time a defendant is combative, conceited, or committed to a "frivolous legal strategy." *Banks*, 482 F.3d at 743; *see also Perez*, 603 F.3d at 47–48.

*Ziegler*, 1 F.4th at 231 (emphasis added).

Judge Sullivan denied Snyder's request, finding that new counsel "would cause

tremendous delay and undermine the fair administration of justice." ECF No. 308 at 3. Although

Judge Sullivan was not adjudicating the pending Motion, he did note his own observations about

Snyder's competency based on Snyder's conduct over three hearings. *Id.* at 4-5 n. 2. Judge

Sullivan stated as follows:

> Without exception, Snyder has been able to engage with the Court's inquiries, present his arguments, and request relief from the Court. Snyder has had no difficulty answering the substance of the Court's questions and has always demonstrated an understanding of the nature of the proceedings and the charges against him, his role as a self-represented defendant, the role of the Government counsel, the role of defense counsel in general, and the role of judge and jury. Every decision that the undersigned has observed Snyder make was a strategic one aimed at convincing the presiding judge that the charges against him should be dismissed or that the jury should find him not guilty. And at every hearing, Snyder has reminded the Court of his outstanding reputation as a plaintiff's attorney, a reputation that he insists is well-earned and based on his ability to "uncomplicate the complicated." Snyder's legal strategy in this case may have been ill-thought and unsuccessful, but it was still a strategy formed by a legally competent defendant (who himself is an attorney). In the view of the undersigned, Snyder has been legally competent at all times because he has always been able to understand the nature and consequences of the proceedings against him and to properly mount a defense (with and without the assistance of counsel).

*Id.* Judge Sullivan's observations of Snyder are consistent with Snyder's conduct during trial. Snyder's trial strategy, while unsuccessful, was always strategic and intentional.

For all of these reasons, the Court did not abuse its discretion by failing to order a competency evaluation for Snyder. At no time was there reasonable cause for the Court to believe that an evaluation was necessary.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny ECF Nos. 304 and 306.

Respectfully submitted,

Erek L. Barron
United States Attorney

_____/s/_____
Matthew P. Phelps
Evelyn L. Cusson
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed, first class mail, to the Defendant at the address below. A copy of the filing was also emailed to the Defendant at the email addresses indicated below.

Stephen L. Snyder
7307 Park Heights Avenue, Apt. 200
Encore Building
Pikesville, Maryland 21208

steveslaw@icloud.com
ssnyder@litigationteam.com

_____/s/_____
Matthew P. Phelps
Assistant United States Attorney