IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | Case No DLB-20-337 |
| STEPHEN SNYDER | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

REPLY TO GOVERNMENT'S OPPOSITION TO MOTION FOR JUDGMENT
OF ACQUITTAL, OR IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL

Defendant Stephen Snyder, through his attorney C. Justin Brown, Brown Law, hereby replies to the Government's opposition to his motion for judgment of acquittal, or in the alternative, motion for a new trial. After winning a jury verdict against a 77-year-old *pro se* defendant, the Government now plays semantics and relies on out-of-context statements to defend its convictions. Contrary to what the Government asserts, Snyder was acting on a mandate from his client when he sought a consultancy agreement with the University of Maryland Medical System (UMMS). His actions, while forceful, lacked the criminal intent required to sustain a conviction. Moreover, because he brought *bona fide* negligence claims against the hospital, his acts were protected by the First Amendment.

For these reasons, these convictions cannot stand.

I. Rule 29 Motion

    a. *Snyder did not willfully or intentionally attempt to extort UMMS.*

The evidence presented at trial showed that Snyder never intended to extort UMMS. Instead, he sought to settle his client's legitimate wrongful death claim on the terms *she* requested – which included that Snyder become a consultant for the UMMS transplant program. The trial evidence established that, throughout his communications with UMMS, Snyder

intended and made efforts to ensure that his demands were lawful and ethical, and that he believed he was acting within the bounds of the law. Even viewing the evidence in the light most favorable to the Government, no reasonable juror could have concluded that Snyder intentionally or wrongfully sought to extort UMMS.

The facts established at trial are relatively simple: Michelle Sanders retained Snyder to pursue a wrongful death claim against UMMS.[1] There is no dispute that her claim was meritorious. Prior to retaining Snyder, Sanders had learned information about what she believed were negligent and deceptive practices by the hospital's transplant program. Snyder confirmed this through his own investigation. Thus, one of Sanders' demands for an out-of-court settlement was that Snyder would become a consultant for UMMS to ensure that what UMMS did to her husband, they would not be able to do to anyone else. As confirmed by her testimony, it was Sanders who came up with this idea and who wanted this as part of her settlement.

Snyder's actions during the time of his discussions with UMMS show that he had no criminal intent. First, Snyder admitted he had never engaged in this type of agreement before, and he sought counsel from multiple attorneys, including Andy Graham, to ensure it could be done. Following each meeting with UMMS, Snyder took steps to address or assuage concerns expressed by UMMS at the meetings. For example, when UMMS suggested his conduct could be extortionate, Snyder sent Graham an email indicating that he wanted to pursue this in a manner that was *not* extortionate. Graham read this email into the record at trial.

---

[1] Undersigned counsel is at a disadvantage when discussing the facts presented at trial – because counsel was not part of the trial. For this reason, counsel has relied on an incomplete set of "rough draft" transcripts, as well as some discovery, when making the arguments herein. Counsel has ordered "official" trial transcripts, but those were not ready prior to the time of this filing. In addition, counsel has been somewhat hampered by holiday travel and family obligations, making a January 2, 2025, deadline somewhat difficult to abide by under the circumstances.

2

This is also confirmed by the recorded calls and meetings. Snyder repeatedly stated during those recordings that he wanted to do things the right way, that he would not pursue the agreement unless he could do so ethically, and that he wanted everyone to be comfortable with the process. Snyder also expressed to Sue Kinter that, at this stage of his career, he did not want to do anything to jeopardize his career or his reputation. The Government claims these statements are self-serving, but Snyder had no idea he was being recorded. He had no reason to make spontaneous, exculpatory statements. These were sincere statements reflecting his state of mind.

Snyder also pushed repeatedly for UMMS to meet with Andy Graham. On multiple calls, Snyder insisted on a meeting where Graham could be present, so that any concerns could be addressed by Graham directly. When Kinter expressed concerns about an agreement that she described as one where Snyder was "really not doing anything," Snyder consulted with Graham, who clarified that Snyder *would* do things for UMMS – if they needed him, he would be there; and he would be conflicted out of any cases against them. (Aug. 24, 2018, recorded call between Snyder and Kinter). Snyder reported this back to Kinter, while continuing to suggest that UMMS meet personally with Graham to address their concerns. And even though Snyder wanted an in-person meeting (with Graham and himself present), Kinter suggested a phone call between Graham and Magdeburger alone instead; and Snyder facilitated the call. This is not something Snyder would have done if he thought he was committing a crime.[2]

---

[2] During a subsequent call, Snyder suggested getting an expert opinion (as to the viability of this type of agreement). Snyder continued pursuing the consultancy not only because it was his client's demand, but also because he believed the hospital was interested, but simply had concerns about the plan's viability. He did not know the hospital's interest was feigned, and thus he made genuine efforts to respond to their concerns.

3

The Government minimizes Graham's involvement by claiming that Graham was not familiar with the details of the agreement. Not only is this a misrepresentation of the evidence; it also entirely ignores the fact that it was the Government's own interference that prohibited Snyder from having Graham participate in the meetings with UMMS – which would have given Graham direct personal knowledge of everything that was discussed at the meetings, and would have permitted Graham to properly advise Snyder if his conduct was running afoul of the law. Snyder had to repeatedly push UMMS to speak and meet with Graham. And when UMMS finally agreed and scheduled a meeting, the Government instructed UMMS to cancel the meeting. Snyder was not keeping details from Graham, as the Government suggests. Rather, the parties had just recently begun discussing the possibility of settling Sanders' claim (including the consultancy piece), and there was no final agreement in place; thus, there were no final terms for Graham to be aware of. Indeed, Graham made it clear in his testimony that when he said he was not aware of or familiar with certain details, he was referring to final terms, agreed upon by both sides.

But, significantly, Graham testified that he knew Snyder was suggesting a consultancy; he knew that Snyder's client wanted Snyder to serve as counsel to UMMS in some capacity, where Snyder could provide some sort of quality assurance to improve the way that Sanders believed the transplant program was performing. Graham also knew that the number $25 million (spread out over 10 years) had been floated. Although the Government tried to make it seem like Snyder hid this detail from Graham, Graham made clear that he knew this number had been proposed; he simply was not aware of any final number that the parties had *agreed* to. He did not know the "terms" because, until the parties reached an agreement, there were no terms. But he testified that there was nothing wrong with what Snyder was proposing, and in fact, he provided

Snyder with a sample availability agreement – precisely of the type Snyder was proposing – for Snyder to use as a template.

The Government also accuses Snyder of operating in secret, but the evidence belies this. Snyder was meeting with multiple representatives of UMMS; he was talking to multiple lawyers; he was putting his demands down on paper; he was sending emails and text messages; and he was seeking to make a full presentation to the entire Board of UMMS. None of these are the actions of a man operating in secret. On the contrary, Snyder was putting his conduct on full display for many people. This shows that Snyder fully believed he was acting within the bounds of the law.

The Government seizes on a few statements made during settlement negotiations to suggest that Snyder's intent was improper. But the Government takes the statements out of context. It is important to keep in mind that settlement negotiations in high-stakes medical malpractice claims often involve posturing and even aggressive tactics. But when Snyder suggested that the transplant department would be destroyed or that people would lose their jobs, he was not threatening anyone; he was simply stating the very realistic potential outcome if he had to file suit on Sanders' behalf – which would have been the only alternative if the parties could not settle Sanders' claim.³ The lawsuit would have been public, and Snyder would have engaged in an advertising campaign to inform the public and find other potential plaintiffs – something that he was well within his right to do.

One very clear example of this is Snyder's call with Sue Kinter on August 20, 2018. When Snyder said Kinter could lose her job "if [the case] went south," Kinter asked what Snyder

---

³ Indeed, even without Snyder having gone public, Sanders' testimony suggested that several doctors were discharged in connection with her claim.

5

meant. He explained the natural consequences of a bad deal: if Kinter recommended to the hospital a bad course of action – as in, not settling Sanders' claim (which included the consultancy agreement) – and she "turn[ed] out" to be wrong, the hospital would be "pissed off," and she could lose her job. There was no threat; Snyder stated during this call his sincere belief that "the case" involved a "terrible set of facts," and that "the proof is in all the remedial action" the hospital was taking.[4] (Also during this call, Snyder made clear that his consultancy agreement was part-and-parcel of the settlement of Sanders' claim.)

The Government also minimizes Snyder's reliance on two experts – Dr. Schould and Dr. DiCarlo – by asserting that neither expert told Snyder "UMMS was putting 'profits over safety.'" ECF 312 at 12. The Government here is playing semantics. It may be true that neither Schould nor DiCarlo used that phrase, but this was an inevitable conclusion based on the information provided by both experts. Schould told Snyder (and testified at trial) that the UMMS kidney transplant program accepted high-risk kidneys at a rate substantially higher than transplant programs across the country, while also accepting low-risk kidneys at a rate substantially lower than other programs. He also told Snyder UMMS had a higher-than-average one-year failure rate – specifically, it had a 57 percent higher risk, as compared to the national benchmark, that either a transplant patient would die or the new kidney would fail within one year after transplant. Contrary to the Government's assertions, Schould also told Snyder – and he testified – that the kidney transplanted into Sanders was diseased.

---

[4] Similarly, when Snyder talked during this call about how Sanders' case could be harmful to UMMS's reputation, he was referencing a contemporaneous article in the Baltimore Sun discussing how scandals at an organization – in that case, the heat stroke death of a University of Maryland football player – could "tarnish" an organization's reputation. Snyder was simply speaking matter-of-factly about the potential impact of a public wrongful death suit (and an attendant marketing campaign). These were not threats.

6

And DiCarlo also gave a scathing report about the UMMS transplant program. He called the program a "cowboy program" that had a culture of performing high-risk procedures on high-risk populations. He opined that the kidney Sanders received during transplant was exceedingly likely to fail, and that there was no justification for putting such a high-risk kidney into a patient like Sanders, who was not in imminent risk of death. Thus, Snyder had ample reason to believe that he had legitimate claims of widespread negligence and fraud against the hospital, and it made sense that if he could not settle Sanders' claim out of court, he would make this information public and seek other plaintiffs.

The Government's reliance on the billing entry and testimony of Eric Yaffe, suggesting only that Snyder should "be careful" in his negotiations with the hospital, is equally misplaced because it says nothing of Snyder's state of mind at the time.

In short, the totality of the evidence shows that Snyder was seeking to effectuate his client's demands for the settlement of her claims, and he pursued them because he believed they were lawful.

      b. *The consultancy agreement was a term of the Sanders settlement, and Snyder's efforts to secure his client's demands were not wrongful.*

As an initial matter, to the extent the Government suggests that this claim should be denied because it was raised in a pretrial motion to dismiss, such an argument should be squarely rejected. This case is now in a different procedural posture, and a Rule 29 motion is governed by a different standard than that of a pretrial motion to dismiss. Now that the case has been tried, the Court is in a better position to assess the evidence, which shows that Snyder's conduct was not wrongful.

A threat to cause economic loss is not inherently wrongful, and the ability to put out bad publicity does not, in itself, make a particular demand extortionate. *See United States v. Avenatti*,

7

81 F.4th 171, 184 (2d Cir. 2023). Rather, to be wrongful, the defendant must have no lawful claim of right to the property demanded. In other words, both the demand, and the threat, must have a logical nexus to a legitimate claim. *Id*. Here, Snyder's demands were lawful because they were made in the context of attempting to settle a meritorious wrongful death claim, which included – per his client's request – that UMMS take Snyder on as a consultant. As much as the Government tries to separate the two demands, the evidence showed that Snyder's demand for a consultancy agreement was *part of* the resolution of Sanders' wrongful death claim.

As noted above, Sanders retained Snyder to pursue a wrongful death claim against UMMS, and when she and Snyder discussed a potential settlement with the hospital, one of Sanders' demands was for Snyder to work as a consultant to ensure that UMMS took appropriate remedial measures within its transplant program. The desire was memorialized in a list of demands that Sanders prepared for mediation, and which was admitted at trial as defense exhibit 216.

The few times that Snyder met with UMMS to discuss the proposed consultancy agreement, he was discussing Sanders' claim as a whole. Thus, when he threatened to go public if the parties could not come to an agreement, he was not referring only to the terms of the consultancy – which were largely undefined because the parties had only just begun to discuss a potential settlement. Rather, he was referring to an agreement on the entirety of Sanders' settlement demands, which – again – included the consultancy. And what Snyder made clear during these discussions was that the alternative to a settlement would be a very public wrongful death suit. He was not threatening to go public if UMMS refused to pay him $25 million; he was threatening a public lawsuit and marketing campaign if the parties could not settle Sanders'

claim; and settlement of Sanders' claim – at least at this early stage of negotiations – included a consultancy agreement.

Snyder's August 22, 2018, call with Sue Kinter demonstrates that his proposal for a consultancy was inextricably tied to the settlement of Sanders' claim. One day before Snyder was supposed to make a presentation to UMMS regarding his proposal, Kinter called Snyder to schedule mediation in Sanders' case, and Snyder suggested waiting until after the presentation. When Kinter asked why, Snyder said he needed to see how the presentation went, because it was part of Sanders' claim. Snyder conveyed that Sanders was more concerned with the hospital taking remedial action, and that she believed Snyder was the one who could make that happen. Thus, Snyder continued, the two matters were intertwined. This claim is supported by both documentary evidence showing Sanders' demands at mediation, and Sanders' own testimony that she sought Snyder out not only to pursue a wrongful death claim, but for him to become a consultant for the hospital to ensure that this would not happen to anyone again.[5]

During a subsequent call on August 25, 2018, when Kinter and Snyder were again discussing how to make the consultancy agreement happen, Snyder explained that his client (Sanders) was tough, and that mediation with her would not be pleasant. This again suggested that Snyder was discussing Sanders' claim as a whole, and that the consultancy agreement was an integral part of the settlement.

Moreover, Snyder was not merely demanding $25 million in exchange for "doing nothing," as the Government claims. It is undisputed that Snyder was proposing a long-term

---

[5] The Government makes much of the fact that Sanders did not realize that, by working for the hospital, Snyder would be conflicted out of suing the hospital on behalf of others. But Sanders' failure to appreciate this does not render wrongful Snyder's conduct. Snyder was not pursuing a relationship with UMMS to the detriment of his client or her claims; he was doing so at her urging, and in furtherance of the changes she wanted implemented at the hospital.

relationship in which he would be retained by the hospital for ten years, during which time (and potentially even thereafter) he would be conflicted out of any case against the hospital. In other words, Snyder was agreeing to forego any future claims against the hospital. Not only was this a perfectly lawful agreement – as testified to by Johnathan Schraub; this term alone represented a significant value to the hospital, at a significant cost to Snyder. Snyder was a successful malpractice attorney who had won millions of dollars in settlements. Indeed, the two malpractice claims he had against UMMS during this time – Latrice Bennett's and Michelle Sanders' – settled for a combined total of $13.5 million.[6] Thus, being paid $2.5 million per year, at the cost of not being able to bring any suit against the hospital for ten years, was of significant value to both parties.

But on top of that, in this role, Snyder was prepared to do whatever the hospital needed him to do. For instance, he would be available to advise the hospital, from the perspective of an experienced plaintiff's attorney, regarding potential litigation risks and liability issues stemming from the hospital's transplant program; he could oversee the remedial measures the hospital agreed to take in response to his malpractice claims; he could even defend the hospital against malpractice claims brought by other plaintiffs, if the hospital so chose. As testified to by Schraub, whether and to what extent the hospital chose to use Snyder's services and expertise

---

[6] Snyder apparently had knowledge of other potential cases, and in fact, it was this knowledge that prompted Dr. Bartlett to want to have dinner with Snyder. Bartlett testified that Snyder seemed to have a lot of information about other transplant cases, and he wanted to find out the extent of what Snyder knew. Further, if Snyder had gone public with Sanders' case and with his advertising campaign revealing the issues at the UMMS transplant program, it is likely he would have had even more claims to bring against the hospital.

10

would have been entirely up to them – but Snyder was offering a real benefit and significant value as part of the consultancy agreement, and his payment terms were aligned with that value.[7]

The Government also falsely asserts that Snyder was keeping the consultancy "a secret" from Sanders. ECF 312 at 14-15. This assertion is flatly contradicted by Sanders' testimony that she wanted the consultancy, she asked for the consultancy, and she expected Snyder to get paid for the consultancy. Although she also testified that she did not realize that being employed by UMMS would prohibit Snyder from bringing cases against UMMS, this does not mean that she was misled. Snyder acknowledged that he had never entered into this type of agreement before, and he sought legal advice from two lawyers – with respect to both the lawfulness of the consultancy agreement itself, and to any potential conflict of interest with his client; and Sanders ultimately signed a written waiver of any conflict of interest. Apparently, it was never clear to anyone that Sanders expected Snyder to both work as a consultant for the hospital *and* continue to pursue claims against it. But to claim that the consultancy was kept a secret from her is a flagrant misrepresentation of the evidence. Regardless, Sanders' failure to understand the inherent conflict between Snyder acting as both a consultant to and an adversary of the hospital does not mean the consultancy was separate from the settlement of Sanders' claim.

Similarly, the notes of people who attended the meetings, indicating that the payment under the consultancy agreement was separate from the payment to Sanders, does not prove

---

[7] The Government focuses on the fact that Snyder at some point said he did not care if he did any work under the consultancy agreement. Again, the Government takes this statement out of context. Snyder said this in response to comments by UMMS representatives about his proposal. Snyder did not offer to do nothing; he made clear that the hospital could use him how they wanted to, and that he would do whatever they needed him to do. Further, this is a red herring because, as Schraub testified to at trial, even if the only benefit UMMS were to receive under the consultancy agreement was that Snyder would be conflicted out of any cases against UMMS, this was not only valuable and perfectly legal; it was also a common type of agreement.

11

anything. Yes, the payment to compensate Sanders for her loss was separate from the payment Snyder would earn for his work under the consultancy agreement (and for foregoing his right to bring other malpractice claims against the hospital); but *both* were terms of the entire settlement, and they were terms first requested by Sanders, not Snyder. Snyder sought the consultancy as part and parcel of the wrongful death claim because he believed – and the evidence confirmed – that is what Sanders wanted.

The conclusion that Snyder's conduct in this case was not wrongful is supported by the *Avenatti* case. There, the client plaintiff sought Avenatti's help to settle a claim with Nike stemming from illegal payments directed by Nike to players on the client's youth basketball team. *Avenatti*, 81 F.4th at 176-77. The client made his goals clear to Avenatti: he wanted some compensation from Nike, but more than anything, he wanted to reestablish a sponsorship relationship with Nike, to resume coaching his youth basketball team, and for Nike to terminate the employees who had directed the illegal payments. *Id*. at 177. The client provided Avenatti with documents that he considered confidential, and which he never gave permission for Avenatti to publicize. *Id*. The client specifically did not seek public disclosure of the issue with Nike, nor an investigation into the conduct by Nike, because he thought it would be "detrimental" to his goals. *Id*. at 176.

But at Avenatti's very first meeting with Nike, unbeknownst to the client, Avenatti demanded that Nike pay him a minimum of $15 million to conduct an internal investigation into corruption ($12 million of which would be deemed earned upon receipt), otherwise he would go public with the illegal payment scandal. *Id*. at 178, 180. Avenatti said that even if Nike hired other lawyers to conduct the investigation, it would still have to pay Avenatti double the amount it paid the lawyers who did the actual work. *Id*. at 178. With respect to his client's specific goals,

12

Avenatti did not even pretend to pursue them: he made no mention of firing the employees responsible for the illegal conduct; he did not seek for Nike to renew its sponsorship of the basketball team; and rather than seeking to have his client reinstated as coach of the team, Avenatti offered that his client would never work with Nike again. *Id*. at 179. Avenatti threatened to hold a press conference the very next day if Nike did not agree to his demands. When Nike asked for more time, urging that going public could be detrimental to the youth players of the team, Avenatti said, "I don't give a f—k about those kids.," and that delay would "f—k him and [his partner]." *Id*. at 179. Avenatti was ultimately convicted of extortion.

In affirming his conviction, the Second Circuit found that Avenatti's demands were extortionate because they bore no nexus to his client's claim of right. Specifically, the Second Circuit found that, even if the client had a legitimate claim of right against Nike, the evidence showed (1) that Avenatti could not have reasonably believed his demands furthered his client's claims (instead, his demands were made behind his client's back, and in direct conflict with what his client wanted), and (2) that Avenatti had no intention of conducting a *bona fide* investigation. *See id*. at 187.

Here, unlike in *Avenatti*, Snyder was at all times pursuing specifically what his client asked him to pursue – settlement of her wrongful death claim *and* a consultancy agreement with the hospital. Despite the Government's assertions to the contrary, the evidence here also confirmed that Snyder, unlike Avenatti, was not seeking $25 million in exchange for doing nothing (nor did he demand that his payments would be deemed earned upon receipt; rather, he would be paid over a period of ten years). He offered to work as a consultant for UMMS, he said he would be available to them for whatever they needed, and he was foregoing his right to bring any future malpractice claims against UMMS. Snyder did not seek to rush UMMS into a

13

decision, either. The parties met over a period of months, with Snyder bringing in other lawyers to address concerns raised by UMMS, and to ensure he was doing things in a legal and ethical manner. All of this evidence compels a finding that Snyder did not act wrongfully, and this Court must grant his motion for judgment of acquittal.

      c. *Snyder's demands made in connection with the settlement of Sanders' claim are protected by the First Amendment*

Aside from not satisfying the wrongfulness element of an extortion claim, Snyder's conduct was protected by the First Amendment because he had meritorious claims against the hospital, and he was neither proposing a sham agreement nor threatening sham litigation.

Sham litigation has two components: that the claim be objectively baseless, *and* that it have an improper motive. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006). Neither of those components is present here.

The Government characterizes Snyder's demand for a consultancy agreement as a threat to go public "if he was not paid $25 million." ECF 312 at 16. But that was not the complete substance of Snyder's demands or "threats." The whole reason Snyder was in conversations with UMMS was for the purpose of attempting to settle Sanders' wrongful death claim out of court. As described above, it was in the context of those settlement discussions – and in laying out his client's terms – that Snyder sought a consultancy agreement in exchange for a $25 million payment (over the course of ten years, and in exchange for not bringing other malpractice cases against the hospital). For the reasons argued above, Snyder's demands were an integral part of his client's claim because they were the terms on which she wanted to settle her case. As far as Snyder knew and understood, Sanders would not settle if her terms – including the consultancy – were not met. Thus, suit would be the only alternative. And his threats of a public ad campaign

14

were in reference to and in connection with going public with Sanders' lawsuit, if her claim could not be settled.[8]

There is no question that Sanders' claim was <u>not</u> objectively baseless. UMMS ultimately paid $5 million to settle her claim. Furthermore, according to Sanders' testimony, UMMS also "released" multiple doctors from the transplant program and implemented remedial changes in connection with Sanders' claim.[9] There is also evidence that Snyder reasonably and legitimately believed that the malpractice within the transplant program was widespread, and that there were other potential plaintiffs with similar claims.[10] Thus, Snyder's threats to pursue Sanders' claims in court while also making the public aware of the issues within the transplant program (with an ultimate goal of additional litigation), were made in connection with and in contemplation of meritorious lawsuits.

Nor were Snyder's threats made with an improper motive. As argued above, he sought a consultancy because his client wanted him to. It is clear from the recorded conversations that Snyder saw the consultancy as one of Sanders' essential demands, and he believed that she would not agree to any settlement if that demand was not part of the package. He threatened a public ad campaign because, if he could not settle Sanders' claim, his only alternative would be to file suit. In that case, Snyder would want to inform the public of the malpractice at UMMS

---

[8] Implicit with an ad campaign is the likelihood that it would attract other potential plaintiffs with similar claims against UMMS.

[9] In testimony that would have been absolutely critical to Snyder's defense, particularly under the First Amendment, Sanders was prohibited from testifying in detail about the specific changes UMMS made. At one point, as Snyder asked Sanders about remedial measures taken at the hospital, the Court asked "How is this relevant? How is this relevant to this case at all?" Ultimately the Court did not allow much of the testimony Snyder sought on the grounds that it allegedly violated Sanders' nondisclosure agreement.

[10] Snyder's $8.5 million settlement of Latrice Bennett's claim, which also involved an organ transplant at UMMS, supported this belief.

(which would allow him to learn of additional plaintiffs). This was not an improper motive. And finally, he sought a payment of $25 million under the consultancy because he was agreeing to forego, for at least ten years, any potential claim he might otherwise bring against UMMS (while also agreeing to provide legal advice and other services to UMMS on an as-needed basis during those ten years). This was not a sham proposal. He was giving something of real value in exchange for the payment he sought.

For all of these reasons, the demands Snyder made regarding the consultancy agreement and his threats to go public were made in connection with meritorious legal claims, and they constituted protected speech under the First Amendment.

II.     Rule 33 Motion[11]

The Government argues that Snyder's Rule 33 claim fails because he cannot show prejudice; he cannot prove the Jury was tainted by news reports of Snyder being locked up following the last day of trial. But this reasoning creates a Catch-22 that would make it impossible for virtually any litigant in this jurisdiction to prove jury bias. This is because contacting jurors is generally not permitted in this jurisdiction. Rather than engage in this type of legal sophistry, the Court should recognize the constitutional gravity of what is alleged to have happened, and permit the modest factfinding Snyder seeks.[12]

It is hard to imagine anything more prejudicial to a *pro se* criminal defendant – particularly one who is a lawyer – than being thrown in jail for contempt of court. Yet that is precisely what happened to Snyder. The question here is whether any member of the jury heard

---

[11] Snyder no longer wishes to pursue the incompetency claim raised in his motion. Thus, this section address only the issue regarding potential jury taint.

[12] Snyder previously moved the Court to permit him to contact and interview members of the Jury. ECF 306.

16

news of this, and if so, whether there is "a reasonable possibility that the jury's verdict was influenced by" the news. *United States v. Barnes*, 747 F.2d 246, 250 (4th Cir. 1984) (quoting *Llewellyn v. Stynchcombe*, 609 F.2d 194 (5th Cir. 1980)).

Anecdotally, this was a trial that garnered an extraordinary amount of media interest, highlighted by the Court's contempt finding, which was covered prominently by most local news outlets on November 21, 2024. Based on the pervasiveness of daily news, whether through traditional or social media, there is at least a reasonable probability that at least one juror was exposed to the facts of the Court's contempt order. Moreover, it would be hard to imagine that such a juror would not be affected by this information, particularly when considering the nature of this case and this defendant.

While in some jurisdictions Snyder would have had the opportunity to interview jurors after the trial and find out for himself whether the jury had been tainted, post-trial jury contact is not permitted in this district. *See* Local Rule 107.16. As such, Snyder was unable to ascertain whether the Jury had been improperly influenced, and was equally unable to meet the legal standard of proving prejudice.

The only way to correct this would be for the Court to hold this Rule 33 motion in abeyance, grant Snyder permission to interview the 15 jurors who were empaneled on November 21 and 22, and reconsider this motion once adequate facts have been developed.

III. Conclusion

This Court should either grant a new trial or set aside the guilty verdict and order an acquittal. This was a trial pitting a 77-year-old pro se defendant against two experienced federal prosecutors. It was hardly a fair contest. Much of the evidence Snyder wanted to present to the Jury was never admitted – not necessarily because it was inherently inadmissible, but because

17

Snyder lacked the legal acumen to lay the foundation that would permit admission. Despite all of this – despite one side not having a lawyer, despite an aggressive prosecution that objected at every turn, despite a Court that did its best to maintain order – the Government still failed to meet its burden and prove each element of the alleged offenses. No reasonable court should have confidence in this guilty verdict, and it must be set aside.

Respectfully submitted,

_____/s/_____
C. Justin Brown
**BROWN LAW**
233 E. Redwood St., Suite 1000C
Baltimore, MD 21202
Tel: (410) 244-5444
Fax: (410) 934-3208
brown@cjbrownlaw.com

CERTIFICATE OF SERVICE

I hereby certify that on January 2, 2025, a copy of the foregoing Reply was sent to each of the parties via CM/ECF.

_____/s/_____
C. Justin Brown