**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **Crim. No. DLB-20-0337** |
| **STEPHEN L. SNYDER,** | * | |
| **Defendant.** | * | |

**MEMORANDUM OPINION**

For decades, Maryland attorney Stephen L. Snyder represented plaintiffs in medical malpractice lawsuits against hospitals. Snyder was known as a tough negotiator and skilled trial lawyer. The slogan for Snyder's law practice, which appeared on billboards and television ads in the Baltimore area, was "Don't just sue them, Snyder them." His career took a nosedive in 2020 when he was indicted in the District of Maryland for attempting to extort $25 million from one of his longtime institutional adversaries, the University of Maryland Medical System ("UMMS"). Facing a federal indictment, this plaintiffs' attorney found himself on the defensive. Snyder retained counsel who doggedly litigated the case, attempting to have the indictment thrown out before trial. When those efforts failed, Snyder decided he was the best lawyer to defend against the charges. So, against the advice of many, Snyder waived his right to counsel and opted to represent himself at trial.

In November 2024, after a nine-day trial, a jury convicted Snyder of attempted extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, and violations of the Travel Act, 18 U.S.C. § 1952. Now, Snyder moves for judgment of acquittal or, in the alternative, a new trial. Because there is sufficient evidence to sustain Snyder's convictions and a new trial is not in the interest of justice, both motions are denied.

## I.    Background

### A.  The Indictment

On October 5, 2020, a grand jury sitting in the District of Maryland charged Stephen Snyder with attempted extortion under the Hobbs Act and violations of the Travel Act. ECF 1.

The following allegations are from the indictment. Snyder was a long-time medical malpractice lawyer in Baltimore. *Id.* ¶ 10. In 2018, Snyder threatened to launch a public relations campaign about problems he had uncovered in the UMMS organ transplant program if UMMS did not enter a "consulting agreement" with him and pay him $25 million. *Id.* ¶¶ 14–15, 39. Snyder's threatened campaign included a front-page article in *The Baltimore Sun*, stories in other national news outlets, a press conference, online advertisements, and television commercials. *Id.* ¶¶ 14, 69. Snyder made these threats to UMMS during settlement negotiations for one of his clients whose spouse had died after a kidney transplant at UMMS. *Id.* ¶¶ 12, 26. The consulting agreement Snyder proposed and the payment he demanded were separate from the settlement he sought for his client. *Id.* ¶ 39. Snyder told UMMS that by entering into the agreement, he would be conflicted out of future cases involving organ transplants, but that he would not have to do anything under the agreement. *Id.* ¶¶ 39, 63.

For the Hobbs Act violation, the indictment charged that Snyder

> willfully and knowingly, did attempt to commit extortion as that term is in defined in Title 18, United States Code, Section 1951(b)(2), and thereby would and did obstruct, delay and affect commerce and the movement of articles and commodities in commerce, as that terms is defined in Title 18, United States Code, Section 1951(b)(3), to wit, SNYDER used threats of economic harm in an attempt to obtain a $25 million payment from the University of Maryland Medical System for himself.

*Id.* at 16 (citing 18 U.S.C. § 1951).

For the Travel Act violations, the indictment charged that Snyder

> traveled in interstate commerce and used a facility in interstate commerce . . . with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, to wit: extortion in violation of Maryland Criminal Law § 3-701 (Extortion); and thereafter did perform and attempt to perform acts to promote, manage, establish and carry on, and to facilitate the promotion, management, establishment and carrying on of said unlawful activity.

*Id.* at 17 (citing 18 U.S.C. § 1952(a)(3), (b)(2)).

For several years after the indictment, Snyder, though counsel, fought these criminal charges, trying to get them thrown out before trial. Having achieved no success on that front, and for reasons not relevant here, his counsel moved to withdraw from the case. That motion was granted. With his lawyers out of the case, Snyder chose not to find other counsel. He elected to represent himself. At not one but two *Faretta* hearings, Snyder insisted that he was best suited to defend against these charges and to try this case before a jury.[1]

### B. Trial

A jury trial commenced on November 12, 2024.[2] The government introduced testimony from several UMMS personnel whom Snyder had threatened. They included Dr. Stephen Bartlett, formerly the Chief of Surgery at the University of Maryland Medical Center ("UMMC"); Dr.

---

[1] In *Faretta v. California*, the Supreme Court held that a criminal defendant has the right to proceed without counsel if they waive their Sixth Amendment right to counsel "knowingly and intelligently." 422 U.S. 806, 835 (1975). Courts hold "*Faretta* hearings" to determine whether a person is knowingly and intelligently waiving their right to counsel and able to represent themselves. *See United States v. Ziegler*, 1 F.4th 219, 228 n.4 (4th Cir. 2021) ("A *Faretta* hearing 'seeks to determine whether the accused, who is seeking to manage his own defense, understands the consequences of waiving his Sixth Amendment right to counsel and is relinquishing that right knowingly and intelligently.'" (quoting *United States v. Cohen*, 888 F.3d 667, 672 n.2 (4th Cir. 2018)).

[2] The Court provides a high-level overview of the witnesses and other evidence presented at trial. A more fulsome account of the evidence in this background section is not necessary to decide the pending motions.

DePriest Whye, CEO of the Maryland Medicine Comprehensive Insurance Program ("MMCIP"); Sue Kinter, Senior Vice President for Claims, Litigation, and Risk Management for MMCIP; Alecia Reynolds, Senior Director of Claims and Litigation at MMCIP; and Natalie Magdeburger, outside counsel for UMMS.[3] The government also introduced testimony from Snyder's former associate, Kevin Stern.

Dr. Bartlett, Dr. Whye, Kinter, Reynolds, Magdeburger, and Stern testified about a series of interactions and meetings between Snyder and UMMS personnel between January 2018 and September 2018. According to Dr. Bartlett, Snyder approached him at a January 2018 settlement conference in a case Snyder brought against UMMS on behalf of Latrice Bennett, a UMMS transplant patient. Snyder asked Dr. Bartlett to step into the hallway, told Dr. Bartlett that he had other transplant cases to bring, and asked for Dr. Bartlett's phone number. On February 10, Snyder sent Dr. Bartlett a text that said "Important meeting for your Dept and the hospital. (unless you want to come as my guest at Fisher Island, Miami." In a February 21 email, Kinter responded to a request from Snyder to meet regarding his new transplant case. She asked that Snyder not contact Dr. Bartlett without Kinter's permission. Kinter noted that she understood Snyder and Dr. Bartlett would be meeting socially for dinner and approved of the dinner as long as the conversation was casual and did not involve one of Snyder's clients. On or about March 21, Dr. Bartlett and his wife met Snyder and his significant other for dinner at the Capital Grille in Baltimore. When Snyder and Dr. Bartlett were alone at the restaurant bar, the maître d' delivered a file with graphic photographs of an organ transplant patient, and Snyder told Dr. Bartlett that he was representing a client who wanted to seek revenge against the transplant program at UMMS. He further told Dr.

---

[3] "UMMS" includes UMMC, a UMMS hospital, and MMCIP, UMMS's captive insurance program.

Bartlett that if he did not cooperate with him, Snyder was preparing to run newspaper advertisements and a television commercial about the transplant program, which would devastate the hospital and Dr. Bartlett. Snyder said he wanted the hospital to hire him in some capacity, such as through a consulting agreement, and to pay him $25 million. Throughout dinner, Snyder told Dr. Bartlett's wife that everything would be okay if her husband did what he was supposed to do. Several weeks after the dinner, Snyder followed up about his demands by text, stating, for example, "If I don't get a straight answer, I'm going to go forward full blast." Dr. Bartlett later texted Snyder, "Steve, Sue [Kinter] and I just spoke. I explained to her that we're in jeopardy for fraud and punitive damages. She understands the ball is in your court." On April 10, Snyder texted Dr. Bartlett, "The debacle at your hospital at your helm must be taken extremely seriously. Otherwise, I cannot help you."

Dr. Whye, Kinter, Reynolds, and Magdeburger testified about meetings and phone calls with Snyder that occurred between April and September 2018. On April 30, Snyder and Stern met with Dr. Whye, Kinter, and Magdeburger. The meeting concerned a claim against UMMS brought by Snyder's client Michelle Sanders. Sanders submitted the claim on behalf of her late husband who had died of complications following a kidney transplant at UMMS. At the April 30 meeting, Snyder told UMMS that they would have to pay $25 million to settle the Sanders case or else he would go on a media campaign that would include a television commercial, a story in *The Baltimore Sun*, a press conference, and online advertisements. Snyder played a video with graphic images of Sanders's husband while his health was deteriorating. Snyder told UMMS that he would go forward with this media campaign if they did not pay $25 million to settle the case and that the campaign would harm UMMS as well as Dr. Bartlett.

On June 22, Snyder and Stern met with Kinter, Magdeburger, and Reynolds. At this meeting, Snyder acknowledged that Sanders's claim was not worth $25 million. Snyder told UMMS that the hospital should settle her case for $3–5 million and pay *him* $25 million or else he would go on the media campaign he had described. He communicated that this $25 million would be separate and apart from the settlement of Sanders's case. Snyder proposed an arrangement for the $25 million under which he would work for UMMS as a consultant and be conflicted out of future cases against the transplant department. Snyder told Kinter that if UMMS did not comply with his demand, his publicity campaign would destroy the transplant program and Dr. Bartlett's career and that UMMS would fire Kinter. When asked why he demanded $25 million, Snyder said that was what UMMS had to pay him and that the demand could have been $100 million. After the June 22 meeting, UMMS contacted federal law enforcement, which began an investigation.

On June 26, Snyder called Magdeburger to discuss the proposal. He said that it was in the hospital's best interest to accelerate the process. Snyder also asked Magdeburger why she was concentrating on Sanders's case instead of his case. On June 28, Snyder and Magdeburger spoke again. Snyder again expressed that UMMS should focus on "his deal," rather than on Sanders's case. He said that his loyalties lay with the hospital to get rid of this "fiasco" and told Magdeburger to stop focusing on the minutia of Sanders's case. During a July 30 call with Magdeburger, Snyder told her that he was still working on the case; that he knew things that others did not know; and that he had shown his sincerity by keeping things quiet and forgoing another case. He also asked if Dr. Bartlett missed him. On August 7, Snyder and Magdeburger spoke again, and he asked Magdeburger if she knew what he could do to the hospital. Snyder told her he could really hurt the hospital and that he did not want to do that because he really liked Kinter and Dr. Bartlett. Magdeburger told Snyder that they had received his message and that they wanted to give Snyder

the opportunity to ask the CEO to present to the UMMS board of directors. She told Snyder that they wanted him to write down his request, why he wanted to present to the board, the message he would convey to the board, and what would happen if UMMS did not enter into the consulting agreement. Snyder told Magdeburger that he was not going to write that down and that he could not write down what he wanted to say to the board about the potential consequences for the hospital.

On August 23, Snyder and Stern met with Dr. Whye, Kinter, Reynolds, and Magdeburger. This meeting was recorded by law enforcement. At the August 23 meeting, Snyder reiterated his demand for $25 million to enter a consulting agreement and his threat to go forward with the negative media campaign if UMMS did not agree. He stated that the hospital would not have to see him for the duration of the agreement. Snyder also told UMMS that he was speaking to an attorney about the consulting agreement.

On August 27, Magdeburger spoke to a lawyer that Snyder had engaged, Andrew Graham, about the proposed consulting agreement.

On August 31, Snyder and Kinter spoke by phone. During this call, Snyder asked Kinter if the call was being recorded. Although the call was recorded, Kinter responded in the negative and said that she was "insulted" by the question.

On September 4 and 5, just before a scheduled mediation in the Sanders case, Snyder and Kinter texted about the mediation. During this exchange, Snyder asked if his lawyer, Graham, could attend a meeting scheduled for September 6 between Snyder, Kinter, Reynolds, and Magdeburger to discuss the consulting arrangement. UMMS cancelled the September 6 meeting, so Graham did not meet with Snyder and the UMMS personnel to discuss the proposed agreement.

The government also introduced contemporaneous notes taken by Reynolds and Stern during meetings between Snyder and UMMS representatives as well as legal memoranda written by Magdeburger immediately after discussions with Snyder. The jury saw video recordings of parts of the August 23 meeting between Snyder, Stern, Dr. Whye, Kinter, Reynolds, and Magdeburger, during which they discussed Snyder's proposed consulting agreement, his demands, and the consequences for not complying with his demands. The jury heard recorded phone calls between Snyder and Kinter and between Magdeburger and Graham. Other government witnesses included lawyers whom Snyder engaged to discuss the proposed consulting agreement: Graham, Eric Yaffe, and John McNutt. These lawyers testified about their discussions with Snyder regarding a possible consulting agreement with UMMS and their advice to him.

At the close of the government's case, Snyder moved for judgment of acquittal under Federal Rule of Criminal Procedure 29. For the reasons stated on the record, the Court denied the motion.

Snyder presented a defense case. His former client, Michelle Sanders, testified about her husband's kidney transplant at UMMS, his post-transplant health decline, and his ultimate death, which Sanders blamed on UMMS doctors. Sanders also testified about her attorney–client relationship with Snyder and her settlement demands of UMMS, including her request that Snyder become a consultant for UMMS. Snyder also called Jonathan Schraub, an expert witness who testified about the value of the proposed consulting agreement with UMMS; Dr. Antonio DiCarlo, an organ transplant surgeon whom Snyder had retained in the Sanders case; and Dr. Jesse Schould, a statistician whom Snyder had retained in the Sanders case to opine on UMMS transplant program statistics. Renowned attorney Kenneth Feinberg testified as a character witness. Snyder did not testify. He invoked his Fifth Amendment right against self-incrimination.

The government did not put on a rebuttal case. At the close of evidence, Snyder did not move for judgment of acquittal again.

Throughout the presentation of the evidence, Snyder struggled to double as a criminal defendant and a criminal defense attorney. Wearing both hats under any circumstances would be difficult. For Snyder, it was an extraordinary challenge. Question after question, witness after witness, and day after day, Snyder had trouble formulating questions that complied with the Federal Rules of Evidence. He asked compound and confusing questions. He assumed facts not admitted into evidence. He failed to lay a foundation. He fed witnesses the answers he wanted them to give. He attempted to tell the jury his side of the story through unsworn testimony during witness examination. He strayed into irrelevant areas, and on cross-examination, he went beyond the scope of direct. He asked leading questions of his own witnesses. He even argued with witnesses. One particularly memorable moment occurred on a Friday afternoon, when Snyder began his cross-examination of Kinter, a UMMS attorney with whom he had negotiated medical malpractice settlements for many years and whom he said he considered a friend. Towards the end of Kinter's direct examination, she was visibly upset as she recounted how Snyder had threatened her job and the institution for which she had worked for more than two decades. In Snyder's first question on cross-examination, he mockingly and abrasively asked Kinter: "Do you need to cry again before we start?" Snyder's behavior that afternoon, and throughout much of the trial, was inappropriate, unprofessional, and unbecoming of an officer of the court.

The Court did its level best to navigate the extremely challenging circumstances. Nearly every morning of trial, outside the presence of the jury, the Court recounted how, the day before, Snyder had violated the Federal Rules of Evidence, how he had attempted to testify without being under oath, and how he had brought up topics in front of the jury that he knew the Court had

excluded from evidence and had warned him not to bring up. At one point, the Court advised Snyder that, if he continued to violate the Court's orders, he could be found in contempt of court or the Court could revoke his pro se status. And each day, Snyder continued the same inappropriate behavior. Snyder's contempt for the judicial process, the prosecution, and certain witnesses was apparent to anyone in the courtroom. All the while, the Court tried to move the trial along as efficiently and fairly as possible and maintain the decorum and dignity of the courtroom.

On the fifth day of trial, as Snyder's misbehavior continued despite orders and admonishments, the Court imposed on him reasonable time limits for the questioning of witnesses. That was the only tactic that worked. Under the pressure of a ticking clock, Snyder generally asked questions that conformed with the Federal Rules of Evidence and, for the most part, attempted to elicit admissible evidence. He often finished his questioning before his time expired, and he never asked for additional time. As it turned out, Snyder knew how to ask appropriate questions all along.

With the evidence closed and the jury instructed, government counsel and Snyder presented closing arguments. Snyder, once again, violated the Court's orders. Egregiously so. He referred to facts that were not introduced into evidence and continued to do so even after the Court told him to stick to the facts in evidence. As he had done throughout the trial, Snyder once again tried to tell the jury his side of the story through unsworn testimony without having been subject to cross examination. Perhaps the most egregious misconduct occurred when Snyder intentionally brought up three topics the Court had excluded from evidence. In defiance of explicit, crystal-clear Court orders, Snyder twice referred by name to a former prosecutor on this case; he mentioned an FBI agent's memorandum documenting the United States Attorney's Office's 2018 decision to close the investigation; and he referred to the attorney grievance proceedings that occurred after the criminal investigation had concluded. Snyder knew those topics were off-limits. He apparently did

not care. Throughout his closing argument, the Court repeatedly sustained the government's objections. At the conclusion of argument, the Court excused the jury for the evening.

Snyder's blatant and intentional violations of the Court's orders during his closing argument could not go unpunished. The Court held a criminal contempt hearing less than an hour after the jury was excused. At the hearing, the Court found Snyder had knowingly and willfully disobeyed and resisted four Court orders and held him in contempt of court under 18 U.S.C. § 401(3). ECF 3 in *United States v. Snyder*, Crim. No. DLB-24-344 (D. Md. Nov. 22, 2024). His sentence was overnight incarceration. *Id.* The Court remanded Snyder to the custody of the United States Marshals Service to serve his sentence.

The next morning, Snyder informed the Court that WBAL, a local television station, had run a story the prior evening about the Court's contempt finding and his overnight incarceration. Snyder asked the Court to voir dire the jurors about whether they had seen any news about the case over the past three days. The Court denied the request because it had admonished the jury every day of trial not to discuss or research the case, the Court had instructed the jury to disregard any publicity about the case, there was no indication that any juror had seen the local news coverage, and questioning the jury about news coverage would run the risk of drawing the jury's attention to the coverage and spurring their curiosity.

On November 22, 2024, the jury found Snyder guilty on all counts.

Snyder timely filed a motion for judgment of acquittal, or in the alternative, a motion for a new trial. ECF 304. In further support of his motion for a new trial, Snyder filed a motion to interview jurors about whether they had seen the news about the criminal contempt finding. ECF 306. Both motions have been fully briefed. ECF 304, 306, 312, 321. No hearing is necessary. Loc. R. 105.6 & 207.1 (D. Md. 2023).

## II.    Rule 29 Motion

Snyder moves for judgment of acquittal under Rule 29. "Once a jury returns a guilty verdict, 'the court may set aside the verdict and enter an acquittal' if the court concludes that the evidence presented at trial is insufficient to sustain a conviction." *United States v. Freitekh*, 114 F.4th 292, 308 (4th Cir. 2024) (quoting Fed. R. Crim. P. 29(c)(2)). A judgment of acquittal is only proper "when the evidence is so deficient that acquittal is 'the *only* proper verdict.'" *United States v. Rafiekian*, 68 F.4th 177, 186 (4th Cir. 2023) (quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982)). "A defendant challenging the sufficiency of the evidence to support his conviction bears 'a heavy burden,'" and "[r]eversal for insufficient evidence is reserved for the rare case 'where the prosecution's failure is clear.'" *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) (first quoting *United States v. Hoyte*, 51 F.3d 1239, 1245 (4th Cir. 1995); and then quoting *Burks v. United States*, 437 U.S. 1, 17 (1978)).

"A court deciding a Rule 29 motion may neither weigh the evidence nor assess witness credibility." *United States v. Gallagher*, 90 F.4th 182, 190 (4th Cir. 2024). Instead, the court asks if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Millender*, 970 F.3d 523, 528 (4th Cir. 2020) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "The verdict must be upheld if it is supported by substantial evidence." *United States v. Briscoe*, 101 F.4th 282 (4th Cir. 2024). "Substantial evidence" is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Davis*, 75 F.4th 428, 437 (4th Cir. 2023) (quoting *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)). The Court views the evidence "in the light most favorable to the government, drawing all reasonable inferences in its favor" and "assume[s] that the jury resolved all contradictions in the

testimony in favor of the government." *United States v. Moye*, 454 F.3d 390, 394 (4th Cir. 2006) (internal citations omitted). "[W]here the evidence supports differing reasonable interpretations, the jury will decide which interpretation to accept." *Id.*

The jury convicted Snyder of attempted extortion in violation of the Hobbs Act. The Hobbs Act provides, in relevant part:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). A Hobbs Act violation involves "(1) robbery or extortion, and (2) interference with commerce." *United States v. Taylor*, 754 F.3d 217, 222 (4th Cir. 2014), *aff'd*, 579 U.S. 301 (2016). The Act defines extortion as "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). "Fear of economic harm is, of course, sufficient to sustain a Hobbs Act violation." *United States v. Billups*, 692 F.2d 320, 330 (4th Cir. 1982); *see also United States v. Iozzi*, 420 F.2d 512, 515 (4th Cir. 1970). "[T]he government's burden of proof is satisfied if it shows that the victim feared an economic harm, and that the circumstances surrounding the alleged extortionate conduct rendered that fear reasonable." *Billups*, 692 F.2d at 330.

Because Snyder was charged with attempted extortion under the Hobbs Act, the government also had to prove "culpable intent to commit the crime charged" and "a substantial step towards the completion of the crime that strongly corroborates that intent." *United States v. Neal*, 78 F.3d 901, 906 (4th Cir. 1996).

The jury also convicted Snyder of seven Travel Act violations. The Travel Act prohibits

> [t]ravel[] in interstate or foreign commerce, or use [of] the mail or any facility in interstate or foreign commerce, with intent to . . . otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity; and
>
> thereafter perfor[mance] . . . [of] an act [to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity].

18 U.S.C. § 1952(a). "[U]nlawful activity" includes "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States." *Id.* § 1952(b). The "unlawful activity" underlying the Travel Act counts was extortion under Maryland Code, Criminal Law § 3-701. The Maryland statute provides, in relevant part, that "[a] person may not obtain, attempt to obtain, or conspire to obtain money, property, labor, services, or anything of value from another person with the person's consent, if the consent is induced by wrongful use of actual or threatened . . . economic injury." Md. Code Ann., Crim. Law § 3-701(b).[4]

### A. Wrongfulness

Snyder argues there was insufficient evidence that his threats of economic harm were wrongful. He is incorrect.

Threats of economic harm, unlike threats of violence or force, are not inherently wrongful. *See United States v. White*, 810 F.3d 212, 224 (4th Cir. 2016). Inducing fear of economic harm is not "wrongful" when the defendant has a "claim of right" to the property. *See id.* Thus, "the use of legitimate economic threats to obtain property is wrongful only if the defendant has no claim of right to that property." *Id.* (quoting *United States v. Sturm*, 870 F.2d 769, 773 (1st Cir. 1989)). In drawing the distinction between a legitimate and an illegal economic threat, the Fourth Circuit has

---

[4] Because Maryland's extortion statute "was patterned after the Hobbs Act, and there is a dearth of Maryland case law on the meaning of the statute's 'wrongful threat' language, the federal cases interpreting similar language in the Hobbs Act are persuasive authority." *See Rendelman v. Maryland*, 927 A.2d 468, 480 (Md. App. Ct. 2007), *aff'd*, 947 A.2d 546 (Md. 2008).

looked to the Second Circuit's decision in *United States v. Jackson*, 180 F.3d 55 (2d Cir. 1999), *aff'd*, 196 F.3d 383 (2d Cir. 1999). *White*, 810 F.3d at 224. There, "the Second Circuit opined that it would not be wrongful for a club to threaten to publish the names of members with delinquent accounts if the dues were indeed owing, or for a consumer to register a public complaint about the quality of a seller's product if the product was actually defective." *Id.* at 225 (citing *Jackson*, 180 F.3d at 70–71). The Second Circuit also has explained that "even when a party demands property to which he has a claim of right, the threat used to support the demand can be extortionate if the threat itself lacks a nexus to the claim of right." *United States v. Avenatti*, 81 F.4th 171, 184 (2d Cir. 2023) (citing *Jackson*, 180 F.3d at 70 ("We do, however, view as inherently wrongful the type of threat to reputation that has no nexus to a claim of right.")). And because "in the context of a reputational threat, the wrongfulness element of extortion requires consideration of both the demand made and the threat used to support it," "[t]he wrongfulness element is satisfied if *either* the demand or the threat supporting that demand lacks a nexus to a claim of right." *Id.* at 185–86 (emphasis added).

In *United States v. Avenatti*, the Second Circuit applied the reasoning in *Jackson* to a case involving a lawyer's conduct during settlement negotiations for his client. Attorney Michael Avenatti represented a youth basketball coach in a lawsuit against the sportswear company Nike. *Id.* at 176. Nike had sponsored the coach's basketball team, and Nike employees had directed the coach to pay his players' parents and handlers with Nike funds and to conceal the payments with false invoices. *Id.* After the coach succumbed to the pressure from the Nike employees, he engaged Avenatti as his lawyer. *Id.* During settlement negotiations with Nike, Avenatti sought to obtain both a settlement for his client and a separate $15–25 million retainer for himself and an associate to conduct an internal investigation into the alleged payment scheme. *Id.* at 181. Avenatti told Nike

that if it did not pay his client a $1.5 million settlement *and* enter into the retainer agreement, Avenatti would hold a press conference about Nike's conduct and get the story reported by *The New York Times*. *Id.* at 178–79. He expressed that these actions "would take billions of dollars off the company's market cap." *Id.* at 179. Nike reported these threats to federal prosecutors, and after FBI surveillance, Avenatti was charged and convicted of attempted extortion under the Hobbs Act, among other crimes. *See id.* at 175. He appealed to the Second Circuit, arguing that there was insufficient evidence to support his attempted extortion conviction. His primary argument was that the government had not introduced sufficient evidence that his conduct was wrongful. *Id.* at 183. Avenatti argued that because he demanded the retainer agreement in connection with his client's settlement and because the demand "aligned with [his client's] objectives," his demand bore a nexus to a claim of right and was not wrongful. *Id.* at 186–87, 189.

The Second Circuit disagreed. For Avenatti to show a nexus between his demand and his client's case against Nike, the jury had to "find that he (1) reasonably believed that his retainer demand served [his client's] claims, and (2) intended to pursue a *bona fide* internal investigation of Nike." *Id.* at 187. "[T]he evidence d[id] not compel either conclusion." *See id.* First, the evidence supported a finding that "Avenatti, far from believing that his retainer demand would serve [his client's] two most important objectives, deliberately abandoned these goals in pursuing a multi-million-dollar payment for himself." *Id.* at 188. Among other evidence, the court pointed to the client's settlement demands that went unpursued, suggesting that Avenatti's proposed retainer posed an "obstacle" to those demands, and statements that suggested Avenatti "did not reasonably believe that his retainer demand would serve [his client's] interests but, rather, recognized that it served only his own." *Id.* at 189. Second, the evidence supported a finding that Avenatti did not intend to conduct a *bona fide* investigation for Nike "fairly valued" at $15–25 million and that he

sought to use the retainer as "a convenient vehicle for [himself] to receive the personal multi-million-dollar payment he was demanding from Nike to encourage his client to agree to settlement." *Id.* at 189, 198. Avenatti argued that Nike "would have charged" a similar amount for such an investigation, but the evidence showed that Avenatti "provided Nike with only the briefest description of its scope" and bargained only based "on how much and how quickly he would be paid." *Id.* at 190. And Avenatti connected the price of the retainer agreement not to his investigative services, but to his silence: "From the start, he made clear that a retainer amount of less than $10 million would not be sufficient for him to abandon his public disclosure threat." *Id.* The court reasoned that "[w]hether a payment demand made under threat of harm is extortionate depends not only on whether a party has a claim of right to some amount of money, but also on whether he has a plausible claim of right to the amount of money demanded." *Id.* at 189. Even though "the amount of Avenatti's demand was not determinative of extortion," on the evidence adduced at trial, "a reasonable jury could have found that Avenatti demanded this money not as fair compensation for a *bona fide* internal investigation of Nike, but as a payoff for his own silence." *Id.* at 189–90, 190 n.21. Thus, "a reasonable jury could conclude that Avenatti did not demand a $15-25 million retainer because he intended to conduct a *bona fide* internal investigation of Nike, much less do so in furtherance of his [client's] objectives." *Id.* at 191.

Avenatti argued in the alternative that he had a claim of right to the money demanded because state law allowed him to negotiate attorneys' fees while settling his client's claim. *Id.* at 192. This argument fared no better. "Even if it were ethically permissible for Avenatti to negotiate a settlement for his client . . . against Nike while at the same time soliciting his own retainer . . . that does not support a 'claim of right' by Avenatti to fees not yet earned or to payments under a retainer agreement not yet finalized." *Id.* at 193. Nor did the evidence suggest that he was seeking

the retainer for this purpose. Instead, "the evidence admitted a finding that what Avenatti was selling at the price of a $15-25 million retainer . . . was his forbearance on a threat to publicize information . . . injurious to Nike's reputation," a threat that "bore no nexus to a personal claim of right by Avenatti." *Id.* Thus, the Second Circuit concluded that "neither Avenatti's retainer demand nor the threat of harm with which he supported it bore a nexus to any personal claim of right to legal fees so as to preclude a jury finding of wrongfulness." *Id.*

Snyder thinks—incorrectly—that *Avenatti* helps his case. Snyder insists that, unlike Avenatti, the amount he demanded and the threats he made bore a nexus to a lawful claim of right. Snyder contends that the evidence showed he pursued the consulting agreement with UMMS at the request of his client, Sanders; that the agreement was connected to her legitimate wrongful death claim against the hospital; that the media campaign he threatened was connected to the settlement; and that the $25 million was not in exchange for his silence, but for the value he offered the hospital.

The jury found otherwise. The government introduced substantial evidence that Snyder's attempt to obtain $25 million from UMMS was wrongful.

First, there was ample evidence that Snyder's demand for $25 million was not connected to his client's claim against the hospital. Evidence showed that in discussions with UMMS, Snyder emphasized a distinction between Sanders's claim and a $25 million payment for a consulting agreement with him. Notes from the June 22 meeting indicate that Snyder said Sanders did not deserve $25 million for her case and that the $25 million was for Snyder himself. *See* Gov't Ex. 123; Trial Tr. vol. III, 147:14–25. Kinter told Snyder that $25 million was significantly above the settlement value of Sanders's case. *See, e.g.*, Gov't Ex. 122. The evidence showed that Sanders ultimately received only $5 million to settle her case. Trial Tr. vol. VI, 152:2–6. Notes from the

June 26 phone call between Magdeburger and Sanders showed that Snyder urged Magdeburger to focus on "his" case, rather than Sanders's case. Gov't Ex. 125. In the August 23 meeting with UMMS, which the FBI secretly recorded, Kinter asked Snyder whether discussing the hospital's remedial measures with Sanders would suffice for Sanders. Gov't Ex. 223. Snyder acknowledged that would help with the Sanders case, but then said: "How does that make me go away, after her case?" *Id.* There was substantial evidence from which a rational jury could find that Snyder's demand for $25 million was separate and apart from his demand to settle his client's case. Therefore, even if Sanders had a claim of right against UMMS, a rational trier of fact could find that Snyder's demand for a $25 million consulting agreement bore no nexus to Sanders's wrongful death claim against the hospital.

To be sure, Sanders testified that she wanted Snyder to enter into a consulting agreement with UMMS. Trial Tr. vol. VII, 59:17–19, 66:8–10. She said she wanted Snyder to have a consulting agreement with the hospital so that he could ensure that what happened to her husband, who died after a kidney transplant at UMMS, "would never, ever happen to anyone again," and so that Snyder could alert her if he saw certain doctors still working in the transplant department. *Id.* at 66:8–20. Yet there was evidence that Snyder was content with entering into a consulting agreement in which he never advised the hospital about anything and never set foot in the transplant department. *See* Trial Tr. vol. IV, 151:6–13 (describing how Snyder told UMMS the hospital would not have to see him for ten years). Sanders also testified that if Snyder was on "[the hospital's] side" and "couldn't help people like [her] no more," she "would never speak to [Snyder] again." Trial Tr. vol. VII, 104:12–25. But Snyder told UMMS, outside of Sanders's presence, that the consulting agreement would conflict him out of future cases against the transplant department. Trial Tr. vol. V, 130:1–14; Trial Tr. vol. VI, 18:15–19:7. A rational jury could conclude that under

the consulting agreement, Snyder would be on the hospital's side, not on the side of patients or their families. There was other evidence of Snyder's interests diverging from his client's. During the August 23 meeting, Snyder told UMMS that if it were up to Sanders, she would have filed a lawsuit against the hospital already. Gov't Ex. 222. Magdeburger testified that Snyder made it clear he had not yet filed a lawsuit in Sanders's case because he wanted confirmation that the hospital would separately pay him $25 million. *See* Trial Tr. vol. VI, 14:13–15:7. And a billing entry by Yaffe, an attorney Snyder engaged, stated that "Snyder had suggested he may not want to advise client of any deal he strikes with hospital." Trial Tr. vol. III, 262:20–21; Gov't Ex. 124, at 4. From this evidence, a jury could find that Snyder "did not reasonably believe" that the consulting agreement "would serve [his client's] interests" and that "it served only his own." *See Avenatti*, 81 F.4th at 189. There was substantial evidence from which a rational jury could find that Snyder tried to enter into a consulting agreement with UMMS that hindered, not advanced, his client's interests, and that his demand of $25 million was not connected to his client's claim against UMMS.

Snyder suggests he personally had a claim of right to compensation for his consulting services and that his demands reflected that claim of right. Yet there was evidence from which a jury could determine that the proposed agreement Snyder sought was merely a "vehicle" to obtain his own personal payout to keep him quiet. *See id.* In *Avenatti*, the court determined that Avenatti sought $15–25 million from Nike "not as fair compensation for a *bona fide* internal investigation of Nike, but as a payoff for his own silence." *Id.* at 189–90. Here, the government introduced substantial evidence that Snyder demanded $25 million not for his consulting services but for his silence. At one point, Snyder said he was not planning on doing anything to earn the $25 million payment. *See, e.g.*, Trial Tr. vol. IV, 151:6–13. He also told UMMS that $25 million is nothing to

keep him silent. *See* Gov't Ex. 126; Trial Tr. vol. V, 251:20–21. Snyder tried to rebut this evidence

by introducing the expert testimony of Schraub, an experienced attorney who has negotiated expert

consulting agreements. Schraub testified that the consulting agreement would provide value to

UMMS because Snyder, a prominent medical malpractice attorney in the community, would be

available to share his expertise with the hospital and be conflicted out of bringing cases against it.

*See* Trial Tr. vol. VI, 193:6–194:9, 196:7–21, 198:6–18. But the jury was not required to accept

Schraub's opinion. There was contrary evidence that Snyder did not offer the hospital any value.

UMMS representatives Reynolds, Kinter, and Magdeburger testified that UMMS did not want to

hire Snyder as a consultant. Trial Tr. vol. III, 165:17–20; Trial Tr. vol. IV, 141:21–142:11; *id.* at

153:4–12; Trial vol. VI, 24:5–17. And Kinter testified that Snyder would not provide any benefit

to the hospital. Trial Tr. vol. IV, 142:6–11. Kinter and Magdeburger also testified that Snyder

indicated to UMMS that, even after he received the $25 million, he still would be able to bring

some cases against the hospital under the consulting agreement.[5] *See* Trial Tr. vol. V, 130:1–14;

Trial Tr. vol. VI, 18:15–19:7. This evidence could support a finding that conflicting Snyder out of

future cases against UMMS was not worth $25 million to the hospital. A rational jury could

conclude that the $25 million was hush money and that Snyder's demand lacked a nexus to a claim

of right.

Further, there was evidence that the $25 million demand was an arbitrary figure, not tied

to any real value. *See Avenatti*, 81 F.4th at 191 n.21 ("Although the amount of Avenatti's demand

---

[5] Regardless of whether Snyder would have been conflicted out of all cases against the hospital, this evidence supports a finding that during discussions with UMMS, Snyder proposed a $25 million agreement in which he still had the capacity to bring cases against the hospital's other departments. Thus, a jury was not required to accept that, when Snyder threatened UMMS, he sought to effectuate an agreement in which he would be conflicted out of all future cases.

was not determinative of extortion, it was some evidence of his intent to the extent the demand was untethered to any claim of right." (citations omitted)). According to notes from the June 22 meeting, when Kinter asked Snyder why the agreement would cost the hospital $25 million, he said that amount was what UMMS had to pay him and that he could have made it $100 million. Gov't Ex. 120, at 4.

Finally, even if the jury found that conflicting Snyder out of cases was a significant value to the hospital and that Snyder had a personal claim of right to the $25 million, his threat of economic harm did not bear the requisite nexus to the claim of right. Substantial evidence at trial supported a finding that Snyder primarily threatened a negative publicity campaign—not a host of lawsuits that he would be conflicted out of if the hospital met his demands.[6] For $25 million, Snyder promised that he would not publicly tarnish the transplant program's reputation or cause economic harm to the hospital. Just as a jury could find "that what Avenatti was selling. . . was his forbearance on a threat to publicize information . . . injurious to Nike's reputation," a jury could find that what Snyder was selling was not his legal prowess, but his silence. *See Avenatti*, 81 F.4th

---

[6] Snyder argues that if he "had gone public with Sanders' case and with his advertising campaign revealing the issues at the UMMS transplant program, it is likely he would have had even more claims to bring against the hospital." ECF 322, at 10 n.6. However, the jury could conclude, based on the evidence, that he was merely asking the hospital to buy his silence to avoid negative publicity and reputational harm. His threats involved a press conference, a front-page article in *The Baltimore Sun*, and a television commercial. *See* Trial Tr. vol. IV, 125:1–17. He told UMMS that the hospital's reputation would be destroyed. *See, e.g.*, Trial Tr. vol. V, 122:5–12. He encouraged UMMS to view the case not as a lawyer, but as someone from the public. *See* Gov't Ex. 214. He suggested what happened at Baylor University, where the hospital almost went out of business after negative publicity damaged its reputation, could happen to UMMS. *See* Gov't Ex. 229; Trial Tr. vol. III, 150:7–151:8; Trial Tr. vol. VI, 20:2–8. He predicted that patients would go to Johns Hopkins instead of UMMS for treatment. Trial Tr. vol. VI, 20:15–21:3; Trial Tr. vol. III, 168:22–169:3. Snyder told Kinter that if UMMS did not pay him the money he asked for, she would lose her job and Dr. Bartlett's career would be ruined. *See, e.g.*, Trial Tr. vol. IV, 131:15–132:2, 140:15–23. Even if some aspects of Snyder's campaign would generate new business for his law firm, there was substantial evidence from which a jury could find that Snyder's campaign was aimed at ruining the hospital's reputation rather than generating more lawsuits.

at 193. Because there was ample evidence that Snyder predominantly threatened negative publicity, not lawsuits, to effectuate this agreement, a rational jury could conclude that the $25 million was not a payment to avoid his future claims against the hospital; it was a payment to avoid a public smear campaign. The same jury could find that Snyder's threats bore no nexus to a right to compensation for conflicting him out of future cases against UMMS.

There was substantial evidence from which a rational jury could find that neither Snyder's demand for a consulting agreement nor his threats to launch a negative media campaign had a nexus to a lawful claim of right. Thus, a rational trier of fact could find that Snyder's threats of economic harm were wrongful.

### B. Intent

Snyder argues that there is insufficient evidence of criminal intent to support the Hobbs Act conviction. The Court disagrees. There was sufficient evidence from which a rational jury could determine that Snyder had criminal intent.

"[I]n most cases in which state of mind is in issue . . . intent . . . can be inferred only from circumstantial evidence." *United States v. Hughes*, 716 F.2d 234, 239 (4th Cir. 1983). "Secrecy or openness in the involved transaction are clear indicators of guilty intent or its absence." *Id.* at 240 (quoting *United States v. Fin. Comm. to Re-Elect the President*, 507 F.2d 1194, 1197–98 (D.C. Cir. 1974)); *cf. United States v. Maura*, 778 F. Supp. 835, 837 (D. Md. 1991) (explaining that evidence of a defendant's secretive behavior while depositing a check "clearly establishe[d] that defendant knew that he wrongfully possessed the check").

The government presented circumstantial evidence of Snyder's criminal intent. When Snyder discussed the agreement with UMMS, he asked if they were being recorded. Gov't Ex. 211. Snyder declined opportunities to put his requests or statements in writing for hospital

leadership. Trial Tr. vol. VI, 7:2–8:1. And a billing entry by one of the lawyers Snyder consulted stated that "Snyder had suggested he may not want to advise client of any deal he strikes with hospital[.]" Gov't Ex. 124, at 4. A former associate at Snyder's firm, Stern, testified that Snyder told Stern to destroy notes from meetings with UMMS during which they had talked about the consulting agreement. Trial Tr. vol. V, 196:15–23. From this evidence, a rational jury could conclude that Snyder harbored criminal intent.

Snyder argues the evidence showed no criminal intent because he retained attorneys to advise him on the proposed consulting agreement. His lawyers testified that he asked for their advice, but there was evidence that they were not privy to the details of the proposed agreement, such as who had come up with the agreement, what Snyder would do for the hospital, or the amount he demanded. *See* Gov't Ex. 231 & 232; Trial Tr. vol. III, 283:18–284:3, 273:23–274:9. McNutt encouraged Snyder to pay two-thirds of his consulting fee to his client. *See* Gov't Ex. 119; Trial Tr. vol. III, 277:7–278:17, 282:3–5. But other evidence supported the inference that the $25 million Snyder demanded was only for him. *See, e.g.*, Gov't Ex. 120, at 5. And although there was evidence that Snyder obtained legal advice about whether he could enter into a consulting agreement with UMMS, Graham and Yaffe testified that they never advised Snyder to obtain the hospital's consent to the agreement by threatening to destroy the transplant program. Trial Tr. vol. IV, 74:14–17; Trial Tr. vol. III, 264:4–11. Snyder's lack of transparency with the attorneys he retained supported a finding of criminal intent.

Other evidence supported a finding of criminal intent. For example, in remarks Snyder prepared for a presentation to the UMMS board, he wrote, "[i]n no way, shape, or form should it be considered as a fee to keep me quiet, i.e., hush money. That would be the result but not the premise of the financial contract engagement if asked." Gov't Ex. 162, at 4. However, there was

evidence to support a finding that the $25 million "fee" was, in fact, hush money. For example, notes from the June 28 phone call between Snyder and Magdeburger show that Snyder told UMMS that $25 million is nothing to keep him silent. *See* Gov't Ex. 126; Trial Tr. vol. V, 251:1–21.

Viewing this evidence in the light most favorable to the government, a rational jury could find that Snyder had the criminal intent to extort UMMS.

### C.  The First Amendment

Snyder also argues that because he threatened legal action against UMMS, his threats are protected by the First Amendment. Some circuits have held that a threat of litigation is not extortion, or they have significantly restricted the circumstances in which such threats can rise to the level of extortion. *See, e.g.*, *United States v. Pendergraft*, 297 F.3d 1198, 1208 (11th Cir. 2002); *Sosa v. DIRECTTV, Inc.*, 437 F.3d 923, 939–40 (9th Cir. 2006). Even if the Fourth Circuit endorsed this view, it would not help Snyder. There was evidence that Snyder was threatening a host of actions that did not involve litigation. Snyder said that the media campaign he planned to embark on would harm the hospital not in the courtroom, but in the public eye. He said that patients would go to other hospitals and that people at UMMS would lose their jobs. A rational jury could conclude that Snyder made these threats in conjunction with his plan to go on a media campaign to bludgeon the hospital in the court of public opinion and that Snyder would engage in such a campaign even after the hospital settled the Sanders case. *See, e.g.*, Gov't Ex. 223 ("[H]ow does that make me go away, after her case?"). There was substantial evidence to support a finding that Snyder was not threatening merely litigation and that he was threatening to harm the hospital's

reputation through a public smear campaign, separate and apart from any pending or future litigation.[7] Snyder's threats were not protected by the First Amendment.

Because there was substantial evidence to support Snyder's convictions, Snyder's Rule 29 motion is denied.

## III.    Rule 33 Motion

Snyder moves for a new trial under Rule 33. "A district court may order a new trial on the defendant's motion 'if the interest of justice so requires.'" *Rafiekian*, 68 F.4th at 186 (quoting Fed. R. Crim. P. 33(a)). A defendant may move for a new trial based on newly discovered evidence or "other grounds." Fed. R. Crim. P. 33(b). Rule 33 motions "are highly disfavored motions that a court should grant only 'sparingly.'" *United States v. Ali*, 991 F.3d 561, 570 (4th Cir. 2021) (quoting *United States v. Palin*, 874 F.3d 418, 423 (4th Cir. 2017)).

Snyder argues that he is entitled to a new trial because the Court should have questioned the jury about whether they saw and were influenced by news that Snyder was held in contempt of court and incarcerated overnight. In his reply, Snyder clarifies his request: to hold the Rule 33 motion in abeyance, to grant him permission to interview the jurors who were empaneled on November 21 and 22, and to reconsider the motion after the facts are developed. ECF 321, at 17. Snyder's motions for a new trial and to interview the jurors are denied.[8]

---

[7] Because the evidence supported a finding that Snyder was threatening harm to the hospital's reputation outside of litigation, the Court does not address Snyder's argument that such lawsuits would be meritorious.

[8] In Snyder's motion for a new trial, he asserted that he was not competent to represent himself or waive his right to counsel. ECF 304, at 11–17. However, in his reply to the government's opposition, Snyder abandoned this argument. *See* ECF 321, at 16 n.11 ("Snyder no longer wishes to pursue the incompetency claim raised in his motion."). Snyder's sole ground for a new trial is the Court's refusal to question the jury about allegedly prejudicial publicity.

"[W]here prejudicial publicity is brought to the court's attention during a trial . . . the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same." *United States v. Hankish*, 502 F.2d 71, 77 (4th Cir. 1974) (quoting *Margoles v. United States*, 407 F.2d 727, 735 (7th Cir. 1969)). However, as the Fourth Circuit later clarified, the court "need not raise the question with the jurors unless under the totality of circumstances there is a 'substantial reason to fear prejudice.'" *Jones v. Wellham*, 104 F.3d 620, 629 (4th Cir. 1997) (quoting *Hankish*, 502 F.2d at 77). Indeed, asking jurors about publicity "entails a countervailing risk . . . that the existence of possibly prejudicial publicity about which no juror may have been aware would now be revealed, or, if already revealed, ascribed a greater significance than its contents actually warranted." *Id.*

The Court cannot determine the effect of any publicity on jurors unless it is aware of what the publicity is. "[T]he obligation of bringing prejudicial material to the attention of the district judge rests with defense counsel." *United States v. Crowell*, 586 F.2d 1020, 1024 (4th Cir. 1978). In *United States v. Hargrove*, the Fourth Circuit held that a defendant was not entitled to a new trial based on the trial court's refusal to question the jury regarding a newspaper article. 647 F.2d 411, 413 (4th Cir. 1981). Although defense counsel called the article "very inaccurate and highly prejudicial" and reported seeing a juror with a copy of the paper the day the article was published, counsel neither "specif[ied] in what respect it was prejudicial or tender[ed] it to the court." *Id.* The district court declined to question the jury about the article. *Id.* On appeal, the Fourth Circuit held that "[b]ecause the appellants never tendered the article to the court, they have not established an evidentiary basis for a new trial on this ground." *Id.*; *see also United States v. Pomponio*, 563 F.2d 659, 666 (4th Cir. 1977) ("[T]he party seeking an individualized inquiry into the effect of publicity [must] bring specific examples of allegedly prejudicial publicity to the attention of the trial court.

Only then can the court determine if the publicity is of a sufficiently prejudicial nature to mandate individual questioning of jurors[.]").

Snyder did not establish an evidentiary basis for the allegedly prejudicial publicity. On the morning of November 22, Snyder informed the Court he had been told that WBAL, a local television station, ran a story about him being jailed for contempt. Trial Tr. vol. IX, 5:9–12. He stated that the story "clearly would prejudice me with this jury," and he requested that the Court ask jurors if they had seen any news about the case over the last three days. *Id.* at 5:12–19. However, Snyder did not provide the television news story to the Court, and he was not specific about the nature of the news—he only said that he had heard there was some local television coverage of the Court's contempt order and its consequences for Snyder. He did not specify how the coverage, if seen by the jury, would influence their consideration of the evidence or their deliberations about his guilt or innocence. Without any specific examples of how the news coverage could influence the jury and prejudice him, the Court was not required to question the jury.

Even if Snyder had established an evidentiary basis to question the jurors, Snyder has not established a "substantial reason to fear prejudice." *See Jones*, 104 F.3d at 629 (quoting *Hankish*, 502 F.2d at 77). When determining the risk of prejudice from publicity, courts may consider not only the nature of the publicity but also the potential that a juror was exposed. *Id.* ("Under these circumstances, we cannot find abuse of discretion in the district court's determination that the risk (1) that any juror had actually read the articles, and (2) that if any had, their reading had actually prejudiced [the defendant's] case, was not substantial enough to compel raising the question with all jurors."). And "admonitions, while not *ipso facto* dispositive, [are] properly weighed in calculating risk of prejudice." *See id.* (citing *United States v. Grande*, 620 F.2d 1026, 1031 (4th

Cir. 1980) (discussing a district court's repeated admonitions not to consider publicity of the trial

and finding that "[e]ven if the article was prejudicial, we think that the district judge did not abuse

his discretion" by declining the request to question the jury about a newspaper article published

near the end of a trial)).

At the outset of the trial, the Court instructed the jury:

> You as jurors must decide this case based solely on the evidence presented here
> within the four walls of this courtroom. This means that during the trial, you must
> not conduct any independent research about this case, the matters in the case, and
> the individuals involved in the case. In other words, you should not consult
> dictionaries or reference materials, search the Internet, social media, websites, or
> blogs, or use any other electronic tools to obtain information about this case or to
> help you decide the case. Please do not try to find out information from any source
> outside the confines of this courtroom. . . . I know that many of you use cell phones,
> Smartphones, or other personal electronic devices, you use the Internet, social
> media, and you may take advantage of other electronic technological tools. You
> simply may not use them during the trial in any way related to the case.

Trial Tr. vol. II, 49:19–50:18.

Throughout the trial, the Court instructed the jury not to research the case. *E.g.*, Trial Tr.

vol. III, 284:11–12 ("Please do not talk about, research, discuss the case with anyone."). At the

close of evidence, the Court instructed the jury to disregard any publicity. Specifically, the Court

instructed:

> Your verdict must be based solely on the evidence presented in this courtroom in
> accordance with my instructions. You must completely disregard anything that you
> have heard or read on social media, online, in the press, on television, or on the
> radio. Indeed, it would be unfair and improper to consider any information that you
> did not learn here in court since other information is not evidence. In short, it would
> be a violation of your oath as jurors to allow yourselves to be influenced in any
> manner by information that did not come in the form of evidence in this courtroom.

Trial Tr. vol. VIII, 102:2–11. After jury instructions and closing arguments, the Court excused the

jury for the evening and admonished them before they left: "Do not discuss the case with anyone,

do not research the case." Trial Tr. vol. VIII, 210:22–23. The next morning, the Court again

instructed the jury: "I remind you that you may not conduct any research by using any source whatsoever to learn more about this case, the issues in the case, or anyone associated with this case." Trial Tr. vol. IX, 11:4–6.

Snyder can only speculate that jurors disregarded the Court's repeated admonitions and instructions. *See Penry v. Johnson*, 532 U.S. 782, 799 (2001) ("We generally presume that jurors follow their instructions."). Speculation is not enough. There is no indication that any juror disobeyed the Court's instructions not to research the case and to disregard any publicity they might have seen. Snyder has not established a substantial reason to fear prejudice.

Finally, Snyder's courtroom behavior in front of the jury caused the publicity he now complains about. Courts are reluctant to find prejudice from publicity when adverse coverage is caused by the defendant's own voluntary misconduct during trial. *See King v. United States*, 434 F. Supp. 1141, 1148 (N.D.N.Y. 1977), *aff'd*, 576 F.2d 432 (2d Cir. 1978); *cf. Illinois v. Allen*, 397 U.S. 337, 350 (1970) (Brennan, J., concurring) ("To allow the disruptive activities of a defendant like respondent to prevent his trial is to allow him to profit from his own wrong" when "he has been fully and fairly informed that his conduct is wrong and intolerable, and warned of the possible consequences of continued misbehavior."). In *King v. United States*, the court distinguished prejudicial publicity generated by the defendant's "own voluntary acts" from other adverse news coverage. 434 F. Supp. at 1148. During a weekend trial recess, King apparently threw a hand grenade into the living room of an FBI agent involved in the investigation. *Id.* at 1143. Law enforcement arrived on the scene and a shoot-out ensued, injuring King. *Id.* When court reconvened on Monday, defense counsel moved to question the jury about whether they were aware of the weekend's events. *Id.* The trial court denied the motion. *Id.* After the Second Circuit affirmed King's conviction and the Supreme Court denied certiorari, King petitioned for habeas

corpus relief. *Id.* He asked the court to vacate his conviction in part because the jury was potentially exposed to prejudicial publicity about the bombing and shooting. *Id.* The Northern District of New York denied the petition. The *King* Court explained that defendants "may not, through their own actions, provoke and benefit from a mistrial." *Id.* at 1148. "[E]ven if King could demonstrate that the jury had been exposed to publicity concerning the attempted bombing and resultant shooting," because "the prejudicial effect of news coverage [was] indisputably generated by his own voluntary acts of criminal misconduct during the course of his trial," King was not entitled to relief. *Id.* at 1147–48.

Snyder caused the Court to hold him in contempt of court, and any news coverage of the criminal contempt proceedings was generated by Snyder's own misconduct during trial. During closing argument, Snyder mentioned three topics that the Court had excluded from evidence and that he knew had been excluded. Snyder also attempted to give unsworn testimony before the jury in direct violation of the Court's repeated orders not to. He had been warned about the court's contempt power. Nevertheless, Snyder knowingly and willfully disobeyed the Court's orders. After the jury was excused for the day, the Court found him in contempt of court and imposed overnight incarceration. If the media reported the legal consequences of Snyder's courtroom behavior, Snyder has no one to blame but himself. To grant a new trial under these circumstances would allow Snyder "to profit from his own wrong." *Allen*, 397 U.S. at 350 (Brennan, J., concurring).

The Court properly denied Snyder's request to question the jury about whether they saw any news coverage about the contempt of court finding and his incarceration. Snyder is not entitled to a new trial on this ground.

## IV.    Request to Interview Jurors

Snyder asks for permission to interview the jury panel now to see if they saw any news coverage about the contempt finding. *See* ECF 306. Snyder asserts that he is entitled to the presumption of prejudice that arises when there has been "private communication, contact, or tampering . . . with a juror during a trial about the matter pending before the jury[.]" *See Remmer v. United States*, 347 U.S. 227, 229 (1954). When a defendant "present[s] a 'credible allegation' that 'an unauthorized contact was made,' and that the contact 'was of such a character as to reasonably draw into question the integrity' of the trial proceedings," the defendant is entitled "to a rebuttable presumption that the external influence prejudiced the jury's ability to remain impartial" and "to an evidentiary hearing to determine 'what actually transpired' and whether the challenged contact was harmless." *United States v. Johnson*, 954 F.3d 174, 179 (4th Cir. 2020) (first quoting *Barnes v. Joyner*, 751 F.3d 229, 243–44 (4th Cir. 2014); and then quoting *Remmer*, 347 U.S. at 229). At an evidentiary or "*Remmer* hearing," "the government bears the burden of rebutting the presumption of prejudice by showing that there was 'no reasonable possibility' that the jury 'was influenced by an improper communication.'" *Id.* at 180 (quoting *United States v. Basham*, 561 F.3d 302, 319 (4th Cir. 2009)). "The hearing can occur at any time when the potential taint is discovered, during trial or post-verdict." *Sweeney v. Graham*, No. 22-6513, 2025 WL 800452, at *9 (4th Cir. Mar. 13, 2025) (citing *Barnes*, 751 F.3d at 244).

*Remmer*'s presumption of prejudice does not apply here. "Unlike extraneous juror contact, a juror's reading or hearing news accounts about a criminal trial is not presumptively prejudicial." *Riner v. Edwards*, 7:07CV00455, 2008 WL 4388788, at *19 (W.D. Va. Sept. 26, 2008). Even if *Remmer* did apply to trial publicity, Snyder has not shown that any juror was actually exposed to the publicity. Snyder has not presented a "credible allegation" of unauthorized contact with a juror,

and he is not entitled to a *Remmer* hearing or a presumption of prejudice. *See Johnson*, 954 F.3d at 179.

Snyder admits that he has not made the requisite showing for a *Remmer* hearing—he asks to interview the jury panel so that he may make such a showing. "Requests to impeach jury verdicts by post-trial contact with jurors are disfavored." *United States v. Gravely*, 840 F.2d 1156, 1159 (4th Cir. 1988). When there are allegations of "improper outside influences," the Fourth Circuit "require[s] a 'threshold showing of improper outside influence' before a party c[an] interview jurors." *United States v. Birchette*, 908 F.3d 50, 58 (4th Cir. 2018) (quoting *Gravely*, 840 F.2d at 1159); *cf. United States v. Fumo*, 639 F. Supp. 2d 544, 553 (E.D. Pa. 2009) ("Recalling the jurors . . . without valid justification[] [would] open[] the door to jury harassment, undermine the finality of the jury verdict, inhibit the frankness of jury deliberation, and ultimately create uncertainty in the entire jury process."), *aff'd*, 655 F.3d 288 (3d Cir.), as amended (Sept. 15, 2011). All Snyder has alleged is that a local news station ran a story about the Court's judgment of contempt and that "[b]ased on the pervasiveness of daily news, whether through traditional or social media, there is at least a reasonable probability that at least one juror was exposed to the facts of the Court's contempt order." ECF 321, at 17. Pure speculation is insufficient to show improper outside influence affected the jurors' ability to remain impartial. Because Snyder has not made a showing of outside influence on the jury, the Court denies his request to interview jurors.

The Court did not err when it refused to question the jury about whether they saw any news coverage about the contempt finding. Snyder is not entitled to a new trial on this basis, and he may not conduct post-verdict interviews of the jury. His Rule 33 motion for a new trial is denied, and his request to interview jurors is denied.

### V.    Conclusion

For the foregoing reasons, Snyder's motion for judgment of acquittal or, in the alternative, a motion for a new trial, ECF 304, is denied. Snyder's motion to interview the jury panel, ECF 306, is also denied. A separate order follows.


Date: March 28, 2025

                                   Deborah L. Boardman
                                   United States District Judge