# EXHIBIT 1

Confidential and for only, The Honorable Deborah Boardman:

Re: Stephen L. Snyder

My name is Michael Snyder, and I am Stephen Snyder's second oldest son. I have been married to my wife, Rebecca, for 25 years and we have two children. Shelby is 23 and is a registered nurse in New York City. Zach is a junior at the University of Texas, studying business at the MaCombs School of Business. For approximately 20 years, after passing the bar in Maryland, I worked with my father and his law firm. Currently my brother Scott and I are in practice together and our firm is named The Snyder Law Group. I would imagine that few others have witnessed the decline of my fathers be well being and health and/or know him better than his children. Before I go any further, my father is a good person who has always strived to do his best, help those less fortunate and give back to his community. Yes, he was sometimes aggressive and pushed boundaries, but as a successful Plaintiffs lawyer for 50 or so years, he always fought aggressively for his clients and from what I know never had any complaints from any client.

My father has always been a great father for as long as I can remember. He was the father who was always either coaching our sport teams or was at every game. Growing up, we were always excited to hear about his cases and watch him in trial.

What has happened to my father is a true injustice and I beg you to put this chapter of his life behind him. My father grew up poor with a very demanding and tough father. He paid his own way through school, ultimately graduating law school and becoming an assistant states attorney. He then went into private practice and one of my favorite things was visiting him at the office. Before I became a lawyer and for a long time since, my father was known in this community and others as one of the best trial lawyers in the area. He knew how to connect to juries and for some reason people simply liked him. They still do. As a young lawyer, he became wealthy after a couple large cases were resolved. One of the first things he did was form a charitable trust and fund it with several millions of dollars. This money was then donated to numerous charities and organizations, including Catholic and other religious groups, schools and buildings to help support children with Cerebral palsy. In fact he donated two million dollars to the United Cerebral Palsy Association of Maryland. I was fortunate enough to sit on the board of this organization for 10 years afterwards.

When I went to law school, I was so proud that all the professors and deans knew my father. He became very involved at The University of Baltimore Law School and taught courses there for several years. He also donated one million dollars to the school to form the Stephen L. Snyder Center for Litigation Skills (I amy have the name wrong). The coolest thing for me was that he was my commencement speaker at graduation. Again, I was proud to call him my father.

After Law School I worked at my father's law firm. I originally worked under Arnold Weiner, a partner of my father at the time. I tried a few cases with my father over the years but watched several. Along with my brother Scott and several other lawyers at the firm, we participated with my father in a case against Exxon Mobil wherein we were in trial for six- and one-half months. We represented approximately 200 families whose lives were affected by a large leak of gasoline from a gas station. They had selected our firm after forming a committee and interviewing several law firms. My father got along with everyone including the lawyers and the judge. I was also involved in a major case with my father against Prudential in New Jersey where we represent approximately 300 people who were discriminated against. Again, he got along with everyone. There were many examples of my father as lead counsel in large-scale business cases. Before my time, he successfully resolved the Merry Go Round Case and others. He also won a

verdict in excess of $200,000,000 against a major company. He was able to resolve these cases wherein all the clients were satisfied and happy. Ken Feinberg, who testified at my father's trial was the mediator in the Prudential case and we really formed a good friendship with him. one day I was walking by the pay phones, and I saw that he was in a call. He called me over and handed me the phone and said say hi to Justice Breyer. That was pretty cool for me as a young lawyer.

My father really was a fantastic trial lawyer. He was humble in front of a jury and like I said earlier he was able to connect with regular people. His trail skills were amazing. He would prepare like no one else I have ever seen. Even for a deposition, he would prepare for weeks. He would always say that visual exhibits were critical, and he knew how to present them in court and get them into evidence. Everyone including the Judges were always impressed with my father at trial and so was I. I was able to witness some of the great Baltimore trial lawyers, including Billy Murphy (whose firm worked with my father on several case and whom we went up against in a Medical Malpractice trial against UMMS), Andrew Slutkin, Robert Weltchek, and the hundreds of great defense lawyers. He was the best by far.

My father is a very good person who has done so many good things for so many people. When my grandfather passed away at 62 years of age, my father bought my grandmother and her twin sister a new apartment. He took care of all their needs and visited them daily. He always pressed upon us the importance of caring for your friends and relatives. This is just one example, but he treated his friends like family as well.

The past several years have been a disaster for my father. Worse than a disaster actually, because this has cost him everything including his health. I have personally witnessed the significant decline of a man who was and still is my hero, mentor and biggest inspiration. ████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

Against the advice of everyone he chose to represent himself. Please keep in mind that this was after he paid Arnold Weiner several millions of dollars to represent him. Arnold filed numerous baseless motions and delayed this process until my father ran out of money. Arnold even made efforts to have my brother and I pay him directly for his representation of my father, which we did not. When my father could no longer pay he withdrew and coerced my father to consent to his withdraw. Arnold went from someone I admired my entire life to someone I wouldn't even say hi to. I only say this because this is how my father lost his last several millions of dollars and at least 3 years of his life.

My father's daily routine for the last 5 years has consisted of sitting in a chair in his small apartment all day watching tv. ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

Although I haven't personally seen his medical records, it is clear that he is severely depressed and even more so, anxious all the time. Aside from his mental state, his cognitive abilities have quickly gone downhill as well. This is what was most apparent to me while watching his criminal trial. I think you can agree that what we all witnessed was a man struggling in every singe aspect of trial presentation. it was

extremely painful for my family watching this both because it was a clear display of his cognitive decline, but more so because it was clear that he could not adequately represent himself. My father can be a stubborn man and as his health declined he became more and more stubborn, not listening to the advise of others. He would say that he knew his case the best and despite everyone's advice to the contrary that he was the best person equipped to represent himself.

My father would tell us that he spent day and night preparing for the trial as he had always done. I truly believe that in his mind he was preparing and that he did spend all him time getting ready, but clearly there was no amount of preparation which would have allowed him to competently represent himself. It was his choice to make but it should not ave been so.

The only thing that matters now is what is going to happen to my father. When you put him in jail for contempt the day before the Jury went out, I along with everyone else, was shocked. However, I understand that you do not know my father and did not know him before this ordeal. Understandably it appeared that his behavior was intentional and in violations of your orders. I do not fault you but if you knew my father before his decline you never would have thought his behavior was intentional and you wouldn't have put him in jail. I know that for a fact. You and I do not know each other but I know that you as a federal judge know how to be fair and that you tried your best to do this for my father. Over and over again I witnessed you attempting to assist my father with his questioning, with his presentation of evidence and with other areas in which he was struggling. I thank you for that and for your patience during all his struggles. I was so excited when you threatened to make Jerry take over. We all were. It did appear sometimes that he was doing things intentionally, but I assure you that he was not. He was struggling, worse than I had ever seen before. He had no idea how to present evidence or ask appropriate questions. Despite this, he felt his case was going well the entire time, because of his continued belief that he was still the King of Torts, he was not.

I wish that Jerry or someone else could have represented my father. My father was not emotionally, cognitively, or physically able to to so with competence. This was overly clear during the trial as you know. It was his choice to represent himself and one that I know he finally regrets and now says it was one of his biggest mistakes ever. I agree with that statement. Like they say an attorney representing themselves has a fool for an attorney. And to do so in a federal criminal trial is crazy.

Humility, embarrassment, shame, and sadness are all that my father has now. The only thing he has left is his family. Everything else is gone, including most of his friends. He rarely leaves his apartment now due to his anxiety. Almost every time I see him he cries. Seeing my father in this state is unbearable.

Please do not put my father in jail.  The life he lives now is probably even worse.  House arrest or any alternative to jail is an appropriate punishment.  At his age of almost 80 and with his cognitive and physical issues he will die if placed in a jail or facility.  There is no question that he has learned his lesson and has been punished enough. This ordeal has taken over 6 years of his life and cost him millions of dollars in legal fees.  While he might have deserved punishment for what he did, what he has gone through already is punishment enough.  His time has been served sitting in his chair in his apartment for the last 6 years waiting for his trial.  He no longer will be able to practice law and he certainly isn't starting a new career. ███████████████████████████████████████████████████████████████████████████████ Despite what was done and despite his conviction, I know that my father is not a criminal, has never been a criminal and never had an criminal intent.  I believe that his judgement was affected by his cognitive decline and that he did things he should not have done.

Also, please consider the fact that everything he did was only treats.  He never actually went on a campaign agains UMMS and never used any of the information he had obtained to cause harm to UMMS.

In closing, I thank you for reading this statement.  I sincerely hope that you also recognize that my father is in fact a good person, ███████████████████████████████████████████████████ He does not deserve to go to jail.  His family loves him, and we will all devastated if he is taken away from us.

Sincerely,

Michael B. Snyder

The Honorable Deborah Boardman:


Your Honor, I am Scott A Snyder. My father is Stephen L. Snyder. I am a 49-year-old married father of three wonderful children. I have two daughters and one son. Sophia is 17, Olivia is 15, and Nathan is 13. I have been married for almost 18 years to my wonderful wife Aja. A nice story is how I met my wife. My father was in Radcliffe Jewelry store and met Aja there. She was an employee at the time. He told her that he had a son who was single and would love to introduce us. He called me from the store and told me to come there and meet her. I declined at that time. However, a day or so later I went up and met Aja. We got married 2 months later in Las Vegas. The rest is history. I have my dad to thank for introducing me to this person and thus starting a fabulous family. To this day we have a great marriage, and my children are awesome. There are so many other great stories that I could share but it would take all day to tell you.


Since I was a kid, I have been in awe of my father. He was one of a kind. I wanted to be just like him. I tried to emulate everything that he did. Although he was tough, he did have a very large heart. Maybe too big if that is possible. All my friends growing up loved him. They wanted him to be their dad. He took us away all the time. He treated all my friends on trips, to sporting events, Superbowl's all the time. I must have had 50 friends reach out to me after the verdict to say how sorry they are.


As a kid I would go to my dad's office all the time and just hang out. Sit in his office and watch him conduct business. Watch him do his thing. He was great at what he did. In my opinion he was like a god to me. He made things happen that know other lawyer could.

1

When I was around 18 years old, I remember he was working on the *Merry Go Round* case. At the time he had he had brough in several high-profile attorneys to help. One of those being his Partner at the time, Arnold Weiner. I watched how they worked together. They were tough. They were dealing with a giant accounting firm with 100's of lawyers. I'll never forget my father calling me and telling me the case had settled. At the time it was probably the biggest single settlement in the history of the state. I remember him telling me that they were mediating all day. He told me that when the defendant had reached such a high number his partners, Arnold Weiner, Bob Weltchek, Billy Murphy had to leave because they could handle the stress. He stayed on, battling for more money. As the offer kept getting larger and he kept fighting to get more. Till this day he tells me that he could have gotten twice as much as he did get. Although he was a very successful Medical Malpractice lawyer, he never had a settlement like this before.

As a young boy who really didn't know much, I thought this was the greatest thing ever. The first thing my dad did was start a charitable foundation for over $5 million dollars. Then I believe he gave the University of Baltimore law school $1 million dollars and donated over $2.5 million to Cerebral Palsy foundation. He cared more about giving to others that were less fortunate. This was an important lesson I learned at a young age.

My favorite thing to do and I know it sounds weird was to watch him in trial. There was nothing like it. When he made his opening statement, I would get goosebumps. When he crossed an adverse witness, he would turn to me and my brothers and wink, and word, "watch this." I loved watching Again I would get good bumps. I remember, in one of the giant cases, one of the lawyers on his side

2

doing the cross, went blank. Couldn't speak. My father stepped in, never had prepared for this witness, and totally won the case against this one witness.

When this whole ordeal began, he hired his ex-partner, Arnold Weiner. Mr. Weiner knew my father better than anyone and knew that he would be a tough client. Mr. Weiner took the case and worked on it for three years. It cost my father everything. He must have spent almost $3 million on his defense. The money ran dry. My father's health was quickly deteriorating. Mr. Weiner knew this and yet because of unpaid bills left. Trust me I recognize that my father is a difficult man to deal with, or at a minimal take advice but he should never have been left alone.



It was extremely difficult to watch this trial. This was a man who was a shell of his former self. A broken one. He couldn't remember names, he couldn't use technology, he couldn't ask simple questions. I can tell you your Honor, this was not for a lack of preparation, this man prepared for years. That's all he did. This was his life. He had no one, and this is a man that is hard to talk to and he doesn't listen. It was so hard to see all these other lawyers in the courtroom laugh and smile at him, as though he was a joke. During his prime they couldn't do 1/10 of what he did, Judge, nor did they accomplish 1/100 of what he did.    Your honor, I know my father very well, and I can say with 100% certainty he never intentionally

ignored your orders or did things that were admonished by you.



Every time you mentioned that he shouldn't represent himself I was praying that you would just rule that he could not. There must be a mechanism where a Judge can make that determination even if the client objects.

My parents divorced when I was 13. This was very tough on me. My dad no longer lived with me. However, what doesn't kill you makes you stronger. I still made every effort to be around him. He still took care of me. Paid for my schools, colleges and eventually law school. As a father of three I now have learned not to take that for granted. That was a special gift.

My father is a good man. He is not a criminal. Since the inception of this whole ordeal, it has been a nightmare for the entire family. We are all fractured. This has not only crippled my father's financial security but has crippled his health



4

He sits in his house all day everyday in his recliner. His own prison. He should have never in a million years represented himself. Everyone told him he was crazy to do it. ████████████████████████████████████████████████████████████████████

████████████████████████████ I sat in your court and watched you and him battle. I wanted to say to you that he doesn't know what he is doing. I wanted to say to you that when you question his motives such as strategy or questions, it wasn't intentional. He did not mean it and nor did he know he was doing it. When I saw him go to jail the night before the verdict, I went home to my family and cried in front of my kids. I felt so bad for him. I felt so bad for my kids. Nevertheless, with all the bad stuff going on with him, I tell my children about all the great stories about him that have occurred during my lifetime. They love him and think he is great. My father has a close relationship with my children. I tell them stories about him all the time. He is their favorite. He is the only grandfather they have ever known or for that matter have had. Prior to all this happening he would take my entire family to Hawaii every summer for the last decade. We would stay there for 2 weeks. He treated everyone and did everything for the kids. It was a yearly routine. The flight might be long, but the trip is well worth it. Got to create great memories for the grandchildren. I only hope we can all do it again in the future.

If you ask me if my father has been humbled by all of this, I will have to say with reasonable certainty, he has. ██████████████████████████████████████████████ ████████████████████████████████████████████████████████ It is terrible. Worst off, he is a 79-year-old sick man who is now a convicted felon. He has lost everything. There is nothing more that you can take from this man. Sending him to jail will serve no purpose. He is already in jail at his home all alone. He has nothing.

Some say that he now has a lawyer because he lost his trial. However, that's not the case. He has resigned to the fact that he can't do it anymore. He is done. That is not easy for this man. At the very least he has someone to help him, to guild him hopefully in the right direction.

My father was (and I use the past tense "was") a strong man. He could do anything. He would try any case and would never sweat it. Never got nervous. He is a shell of himself. His Judgement was clearly off during this whole process. He is a Plaintiff's lawyer, and you do not get paid if you are not successful. He is not on the clock. So sometimes you must be aggressive and passionate about your job because you do not get compensated if you're not successful. Obviously, there is a fine line that you don't cross but my father never had any criminal intent. He never made a quarter in the criminal case. In fact, he got his client five-million-dollar settlement on a one-million-dollar wrongful death cap case. If my father's intentions were so bad and his goal was to destroy Maryland, ask yourself why he would ever agree to two separate settlements WHICH HAD CONFIDENTIALITY CLAUSES.

My dad is not a bad man. Maybe he made some bad judgment calls, but he is a good person in our society who has done a lot of great things for our community and the legal profession. He has taught law class and taught a class at my high school in the past. I implore you to have mercy on him. He has lived a fine life that has served this community in a positive way. Please do not send him to jail. He will not survive.

Scott A Snyder

Date

2/11/25

6

011

Perry Snyder

████████████████████████████

To The Honorable Deborah Boardman:

I am writing this letter on behalf of my older brother Steve Snyder.  My name is Perry Snyder and I am a retired CPA and entrepreneur.  I now split my time between Baltimore in the summer and Florida in the winter.

Growing up with my brother Steve, he always had my back.  He helped me secure my first job when I was 13 and when my father had his first heart attack right before my bar mitzvah, Steve had to step up as the father figure for our family, including supporting our younger sister who was 9 at the time.  When our father died at age 62, Steve made sure our mother had everything she needed and also took care of her twin sister, who also was a widow.

Steve loves his family- his 5 children, his grandchildren and his extended family of nieces and nephews.  He would do anything in his power to help them, including when my daughter was looking for a summer internship during law school.  He helped her secure a summer associate position with a prestigious law firm in New York.

As a successful lawyer, Steve had the means to give back to the community and he did so over and over again.  As an example, he made large contributions to our synagogue, including donating a new torah, which is no small undertaking.  He has made significant contributions to the University of Baltimore Law School, the Cerebral Palsy Foundation and The Associated Jewish Charities, just to name a few.

I would personally describe Steve as an honest, reliable and compassionate person.  However, over the last five years his health and judgment have declined. ████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

As you may be aware, he had a stellar reputation as a trial attorney in Baltimore.  I believe that Steve believed that he was the best person to represent himself in the trial.  In the preparations for the trial and when I flew up from Florida for the trial, I personally witnessed the toll the trial had taken on him.  He could barely walk, he lost his train of thought, was very frustrated and could not remember the rules of the court.  He made a huge error in judgment by representing himself and placed himself at a huge disadvantage.  He was unaware of this mistake until it was too late and still thought of himself as that hot-shot trial attorney.  He was deeply humbled by this experience and I can assure you that if he could do it over, he would not represent himself.

I sincerely believe that Steve had a lapse in judgment in his dealings with the University of Maryland, but he absolutely meant no harm.  My brother has lost his reputation, lost his ability to practice law and earn a living, and is in declining health.  I believe he has suffered enough for his mistakes.  Your Honor, I ask for your compassion as you sentence my brother so that he can live out the reminder of his life surrounded by his family and so that he can get the healthcare and help that he desperately needs.

Respectfully submitted,

*Perry Snyder*

February 14, 2025

Re: Character Witness Statement for Stephen L. Snyder, Esquire

The Honorable Deborah Boardman:

My name is Jesse Cox. I have been an attorney in Maryland since 1994. I was employed by the Law Offices of Snyder & Snyder from 2005 through 2015. I was also employed with the Law Office of Stephen Snyder & Associates during March 2023 through December 2023. I have known Stephen L. Snyder ("Mr. Snyder") since 1988 when he married my wife's cousin Julie Dulisse.

During the period 1988 through 2025 Mr. Snyder was my best friend and a mentor with a heart of gold. I know him as a self-made and accomplished professional attorney.

In early 2000, he assisted me in gaining employment with the law firm Whiteford, Taylor & Preston, LLP.

When Mr. Snyder filed a lawsuit against ExxonMobil Corporation ("ExxonMobil") for causing the largest gasoline leak in Maryland history, he brought me in to assist his team of attorneys in prosecuting the case. Mr. Snyder assembled a team of over ten (10) fulltime attorneys plus a staff of approximately eight (8) paralegals and secretaries. This case involved the representation of over 300 plaintiffs who were exposed to MTBE and for whom the value of their homes had been significantly impacted by the gasoline leak.

During this period, I also prosecuted over fifteen (15) medical malpractice lawsuits. Except for one case, every medical malpractice was settled before trial due to Mr. Snyder's negotiations at mediation. One case, *Transcare Maryland, Inc., et al. v. Bryson Murray, et al.*, 431 Md. 225, 64 A.3d 887 (2013), involved a child who suffered brain damage when the health care providers failed to act when his endotracheal tube became dislodged blocking his airway which caused severe and permanent brain damage requiring a lifetime of medical care. Mr. Snyder settled that case for over $14 million which allowed the single mother of Bryson to provide the 24-hour care that her child required. Also, in the case *Merolynne K. Klopp, et al. vs. Johns Hopkins Health System Corp.*, et *al.*, Mrs. Klopp was caused to suffer a brain injury during the negligent performance of brain surgery. She suffered left-sided paralysis and a lifetime of medical care. Mr. Snyder was able to negotiate a settlement that provided her with the financial means to provide for her medical needs.

I attended the weddings of three of his children, and the Bar Mitzvah of his son David and Bat Mitzvah of his daughter Deanna. My family (wife Michele and two daughters, Gina and Julia) frequently went on vacations with the Snyder family. We travelled to Hawaii twice and nearly every summer vacationed in Ocean City, MD, and/or Bethany, Delaware.

Mr. Snyder's character is that of a generous and kind person, who can suffer lapses in judgment on occasion.

1

Mr. Snyder, who is Jewish, married my wife's cousin, Julie Dulisse, who attended the Catholic Church, Our Lady of Pompei (OLP). OLP was a Catholic Church in Highlandtown that began to suffer financial problems. Despite not being a Catholic, Mr. Snyder donated over $50,000.00 to paint Our Lady of Pompei (OLP).

Another instance that shows Mr. Snyder's generous nature concerns his former home in Bethany Delaware. Mr. Snyder bought a lot in Bethany that had an existing home on it. He gave the existing home to a resident who lived behind this lot. He hired a crane company to lift the home off its foundation and placed it on the lot of the resident.

Also, I was present when Mr. Snyder made a $2 million donation to the Cerebral Foundation of Maryland to support its mission to improve the lives of those suffering from cerebral palsy.

Mr. Snyder's deceased mother Elaine was an orphan, and she had a twin sister Myrtle. After his father passed away Mr. Snyder leased an apartment for both his mother and Myrtle. He supported both for several decades until Elaine's death. (Myrtle had passed before Elaine).

In March 2023, Mr. Snyder established the Law Office of Stephen Snyder & Associates. I assisted him in investigating multiple potential medical malpractice matters. However, in December 2023 I advised Mr. Snyder that I was cutting all ties to his firm. The reason is that Mr.



I know that Mr. Snyder was very troubled by this criminal proceeding. He had potential criminal charges hanging over his head for over five (5) years. He had retained a prominent attorney to represent him in a failed attempt to get the charges dismissed. He told me on many occasions that the charges made him depressed and that he was scared that he could go to jail.

Your Honor held Mr. Snyder in contempt of court and put in jail. This type of behavior is atypical for Mr. Snyder. He can be a man of passion, but from my observations of him in the courtroom he has acted in a way that was respectful to the Court. For example, the Circuit Court trial of the ExxonMobil case lasted for over five (5) weeks. During the prosecution of this case,

2

Mr. Snyder forcefully presented his clients cases, but he was never in danger of being held in contempt.

Thank you for considering this Character Witness Statement in your consideration of Mr. Snyder's sentencing.


Jesse Cox, Esquire

3

Donald and Marla Goldman

██████████

February 26, 2025

"The Honorable Deborah Boardman"
RE:    Stephen Snyder
       Sentencing Character Letter

My name is Donald Goldman. I am 76 years old and have been first a Baltimore City resident and then a Baltimore County resident my entire life. For 55 years I have been working as a real estate developer all over Maryland, Virginia, and Pennsylvania with my office located in Pikesville, Maryland.

I have known Steve Snyder and his lovely wife Julie for approximately 20 years. We have shared so many memorable times together. I consider Steve a very good friend and feel over the years that I got to know him very well. In fact, Steve's office for many years was located in the same office building as mine.

Steve was raised in a loving family with his parents, brother Perry, and sister Marla, but economically under very ordinary means. His father owned a clothing store on Eastern Avenue in Baltimore City that supported 4 brothers. I can still picture the modest attached home Steve grew up in near the Fallstaff Elementary School we both attended.

Steve is unquestionably a hardworking, self-made man which drove him to be one of the most respected and successful medical malpractice attorneys in Maryland. He was considered tough

but fair by his colleagues – always compassionate to his clients. I remember several beach vacations together with Steve and Julie and other couples when Steve would spend part of many days inside working on his current cases.

I know him to be a loyal friend and family member. His 4 sons are all lawyers and all have worked together at times in Steve's practice.

Over the years as his legal practice flourished, Steve gave back to the community in so many ways. He was one of the most generous people I ever met. His philanthropy included gifts to the Beth El Synagogue, Food for Hunger to Jewish and other faiths, University of Baltimore School of Law (i.e. The Stephen L. Snyder Center for Litigation of Advocacy), Catholic Churches, Associated Jewish Charities, Israel Bonds, and help to the less fortunate. He even bought a condo in Ocean City, Maryland for his in-laws.

Steve has been totally humbled these past several years by legal proceedings and subsequent conviction. His trademark bravado and humor is gone. When I am at dinner with him he cries and over the telephone he cries. These legal proceedings have decimated his finances and his physical and emotional wellbeing which no doubt greatly influenced his decision to represent himself in court. I have witnessed, on numerous occasions, his cognitive decline over the past several years. His behavior and decisions in court unquestionably were further influenced by the desperation he felt in his potential legal fate.

Your Honor, I am unfortunately aware that Steve has crossed the line with poor decisions and actions regarding his University of Maryland dealings. He is, however, a good man, loyal to family, friends, and the Baltimore community at large. If you are able to be very lenient in your sentencing, Steve would then have the opportunity to regain his life. Otherwise, with a prison sentence, I greatly fear that given his age (78)                                      he will die in prison a lonely and beaten man. You witnessed Steve's wife and children's presence in the courtroom as a testimony to their love and support. Please do not take Steve away from all of us who love him.

Your Honor, given Steve's declining health and cognitive issues, any compassionate sentencing that you will find in your heart and mind will be greatly appreciated and the right decision.

Thank you for your time and consideration.

Sincerely,

Donald Goldman

# LAW OFFICE OF DAVID N. KURYK, LLC

606 Baltimore Avenue, Suite 205
Towson, Maryland 21204-4097
Tel: 410-752-7125
Fax: 410-510-1470
Email: david@kuryk.com

March 3, 2025

The Honorable Deborah L. Boardman
United States District Court for the District of Maryland - Baltimore
101 W. Lombard Street
Baltimore, MD 21201

RE:        United States vs. Stephen L. Snyder
           Case No.:    1:20-cr-00337-DLB

Dear Judge Boardman:

I am writing to you respectfully requesting leniency in the sentencing of my friend, Stephen L. Snyder, in the above-referenced matter.  I am requesting leniency, not because I have enjoyed a friendship with Steve since our teenage years, but because I believe it is a just disposition.  As Your Honor is aware, Steve is of advanced age, currently 77 years old, and suffers from significant health issues that warrant consideration for a more lenient sentence.

During the course of our friendship, Steve and I have had the opportunity to participate in a number of life cycle events.  We have enjoyed celebrating marriages, children, grandchildren, and losses over the years.  He has enjoyed a lifetime of success not limited to the courtroom.  He is a very proud father and grandfather.  He has five children, four of whom have become successful lawyers.

His personal achievements also include a number of philanthropic activities in many local, regional, and national charitable causes.  He has made significant contributions to United Cerebral Palsy of Central Maryland.  He has also been generous in his support to his alma mater, University of Baltimore School of Law, which included the establishment of the Stephen L. Snyder Center for Litigation Skills.  He has also been a very active and generous supporter of many Baltimore and national religious and charitable organizations.  He has been the recipient of a number of awards including, but not limited to, induction into the Legacy for Excellence in Litigation from the University of Baltimore School of Law.  He was named 2003 Alumnus of the Year by the University of Baltimore School of Law, as well as his support for the Juvenile Diabetes Foundation and the Center for Poverty Solutions.

There is no question about that Steve's incredibly successful legal career.  He has become one of, if not the most, recognized plaintiffs' medical malpractice attorney in Baltimore and this region.  He has been successful in a long career of difficult and challenging cases.  While Steve has always been known to be aggressive and forceful on behalf of his clients, no one has ever questioned his

019

The Honorable Deborah L. Boardman
United States District Court for the District of Maryland - Baltimore
March 3, 2025
Page 2

_____

honesty and integrity. I have also known Steve to have a reputation of honesty and good character despite the tenacity with which he seeks and usually obtains the best possible outcomes for his clients.

█████████████████████████████████ Your Honor has had an opportunity to observe the impact of these conditions as they have presented themselves during the course of these proceedings. Taking into consideration the various factors which the Court faces in imposing an appropriate sentence, I felt that I, as a friend of his for over sixty (60) years, wish to express my sincere thoughts and observations. While I am not familiar with the facts of the case, I know that Steve has had to endure the burden of the proceedings against him for approximately seven (7) years, including five (5) years since the charges were initiated against him. He has suffered in so many ways that the passage of time is a form of punishment in and of itself. Most significantly is the fact that he has lost his professional license and is unable to practice law. His professional career and reputation have been destroyed. It is my belief that the heavy toll of these proceedings has contributed to the decline in his health. His medical condition, requiring significant care and treatment would, in my opinion, make it impossible for him to survive incarceration. Furthermore, his wealth has been exhausted by having to defend these proceedings and a number of related matters. His emotional and psychological states are compromised from the years of the heavy burden of these proceedings.

Furthermore, many of the other factors in cases which would warrant incarceration are not present in Steve's case. Specifically, as far as I am aware, Steve has never had any prior criminal history. By virtue of the loss of his ability to practice law, there is no chance of reoccurrence.

To incarcerate such a person would not only be a denial of the merit and worthiness of his life, it would deprive society of the likely future benefits of his continued efforts to serve his fellow man. Rather, Steve will, I feel, be desirous of devoting his life to rebuilding the esteem he once enjoyed with his friends, family, and community.

I hope Your Honor will give him that opportunity, realizing there is no need to deter Mr. Snyder from any possible repetition of his wrongdoing and understanding that society would, in this instance, be best served by your leniency.

Very truly yours,

David N. Kuryk

DNK/var

020

LAW OFFICES

# ALAN M. FOREMAN

P.O. BOX 278
10421 STEVENSON ROAD
STEVENSON, MARYLAND 21153
(410) 336-0525
ALAN@FOREMANLAW.NET

February 23, 2025

The Honorable Deborah L. Boardman, District Judge
United States District Judge for the District of Maryland

Re: Stephen L. Snyder

Dear Judge Boardman:

With great sadness, I write on behalf of and in support of my friend and colleague at the bar, Stephen L. Snyder, as he faces sentencing for his convictions on charges of attempted extortion and violations of the Travel Act.

I am, and have been, a member of the Maryland bar since 1975. I am a former Maryland Assistant Attorney General (1979-83 under Attorney General Stephen L. Sachs) and am an internationally known expert in equine law. In these capacities, I have had an opportunity to know and work with some of the top lawyers and law firms, both nationally and internationally. I am proud of my career as a lawyer and believe that I represent the highest standards expected of our profession. In my work, *inter alia*, I serve as the national Ombudsman on behalf of the new federal Horseracing Integrity and Safety Authority, which regulates anti-doping and equine safety and welfare. In that capacity, I am frequently called upon to assist individuals who have been charged with violations that are potentially business and career ending. So, in some small capacity, I have a sense of the despair that my friend Steve Snyder is enduring.

My wife and I have known Steve and his family for over 20 years. Our youngest sons were students at Boys Latin. Our wives became active in the school and we became socially friendly, including trips to the beach and other travel. During the derecho that hit Baltimore County in 2012, we were forced to move out of our home and Steve and his wife took us in to their home until we could return. He was highly successful, a widely respected lawyer in the legal community and philanthropic. From my perspective, he was highly respected for his legal acumen, trial skills and advocacy. Although he always respected his clients' privacy, he would discuss cases and sophisticated legal theories with me and ask for my opinion. He enjoyed discussing the nuances of my practice and the differences in our work, because his was primarily in the courtroom and mine was

administrative. Of particular interest was our trial skills in differing environments. While Steve had the reputation of being an aggressive lawyer, we have always known him as a kind and generous man who became successful notwithstanding a difficult upbringing.

Needless to say, I was stunned and in disbelief when Steve was indicted. He called me and, in the course of our conversation, asked who I would recommend for him to retain as counsel. He listened. Regrettably, I did not have further conversations with him about his case and my only knowledge is what I have seen in the press and in interactions we have had with him over the past several years.

I must say unequivocally that the Steve Snyder reflected in the indictment and the Steve Snyder who represented and conducted himself at trial is unrecognizable. I ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ Principal among this was his decision to represent himself and the manner in which he conducted himself at trial, guaranteed fatal mistakes. Surely, the court sees that his was not normal or rational conduct for a distinguished member of the bar.

I can only trust that in the pre-sentencing process, Steve has been undergoing extensive mental and physical evaluations that can hopefully explain his lack of judgment and conduct. He was too good of a lawyer to have declined to his current level without some mental breakdown or impairment. The Court deserved better and so did Steve.

I cannot imagine the personal and public humiliation, and the loss of career and reputation, that Steve is experiencing and hope that the court will give this consideration in determining his punishment. Should you determine that a period of incarceration is required, I hope that he will be placed in a facility that can treat his physical and mental problems so that he can to the community to live out the rest of his life in peace.

Thank you for considering this letter on behalf of my friend.

Very truly yours,

Alan M. Foreman

February 19, 2025

The Honorable Deborah Boardman,

I have had the privilege of knowing Steve Snyder for over 15 years and was aware of his work as an attorney for more than 25 years. I met him through a mutual acquaintance, and he represented me and several of my neighbors in a lawsuit against the Exxon Corporation regarding their gasoline spill in Phoenix, Maryland. Throughout the years of involvement with this case, I had the fortune of getting to know Steve and his entire family. While most of our initial interactions were focused on the case, over time, I spent countless hours with him during the trial, and I had the opportunity to witness the man behind the attorney.

As a father of three, it was immediately apparent to me that Steve's presence in the courtroom was just one aspect of who he is. His nature as a parent and as a caring individual was just as clear as his professionalism in handling the case.

When you first meet Steve, his presence is undeniably commanding. Having met many attorneys throughout my business career, I have often wondered what set someone like Steve apart from the rest. What makes him so successful both inside and outside the courtroom? It's his remarkable character traits, including his ability to fiercely seek the truth, no matter who or what stands in his way. This is one of the qualities that makes Steve successful, but also creates adversaries who feel intimidated by him.

In my opinion, the core reason for Steve's success is his ability to uncover the truth. As an attorney, he does not shy away from digging deep and challenging people's credibility, regardless of their status. This approach is not common, and it's what truly distinguishes him from many others in the legal community.

Since moving to California nine years ago, Steve and I have remained in touch, though I had followed the Exxon case; however, my ability to follow this current case has been difficult due to the distance. However, from what I know, Steve's dedication to helping people, especially those wronged by large corporations or medical institutions, remains unchanged.

One of Steve's most admirable qualities, which I don't believe is always visible to his adversaries, is his kindness and genuine care for others. He is particularly compassionate when helping clients who have been mistreated by large entities, like Exxon or medical institutions. Steve is someone who fights for those who are often unable to stand up for themselves.

I had the privilege of knowing an attorney named John Sandbower, who recently passed away. Mr. Sandbower successfully represented a woman who was raped on a Rouse Company property. After winning the case, the Rouse Company hired him to advise them on ways to prevent such incidents in the future. His guidance resulted in a dramatic decrease in such incidents across their properties. I believe Steve could offer similar invaluable insights to institutions like the University of Maryland, particularly in addressing their medical malpractice

023

issues. His experience and expertise in this area could help them implement proactive measures to significantly reduce incidents of malpractice, which I know currently cost the institution millions each year.

What's especially surprising is that, despite Steve's obvious qualifications, the University of Maryland has not reached out to him for assistance in preventing these issues. Instead, he faces the possibility of incarceration. It's hard for me to understand how society benefits from punishing someone like Steve, whose only goal has been to help people and seek justice. His presence has always been a force for good, both in the courtroom and in his personal life.

Steve's dedication to his family is just as evident. His sons, all of whom became successful attorneys, have clearly learned from him. I have witnessed tense negotiations between Steve and his sons, and it's clear how much he cares for them as both a father and a mentor, guiding them to become successful in their own right.

It's hard for me to imagine that Steve, now 78 years old, should be facing incarceration after a lifetime spent helping others. He has already paid a significant price for the years of legal proceedings. I truly believe that time served is all that is necessary in this case.

Having spent 38 years in recovery from alcoholism, I've seen countless people rebuild their lives after hitting rock bottom. I have helped many of them, offering compassion and insight where others might not. Steve's journey, rising from a small row house in downtown Baltimore to become a successful attorney, businessman, and father, is nothing short of inspiring. He has devoted his life to helping others, and I cannot fathom how incarcerating him would serve any purpose.

The toll this case has already taken on Steve far outweighs any punishment the court could impose. I hope that this letter helps shed light on Steve's true character—the character of a man who has always sought to do good and help others. People make mistakes, but I believe the God who forgives us all will extend that same forgiveness to Steve, whose life has already been significantly impacted by these proceedings.

Sincerely,

Bobby Babcock Jr.

████████████



February 25, 2025


The Honorable Deborah Boardman

Edward A. Garmatz United States District Courthouse

101 W. Lombard Street Baltimore MD 21201


Dear Honorable Boardman:


My name is Youssef Dahmas, and I am a Sr Messaging Engineer employed to Leidos Corporation. Over the last two and a half decades, I have supported numerous Federal agencies with their email messaging and technology integration needs. I am writing you to present my opinion of Steve Snyder, whom I have known since 2011. I have known Steve through his daughter Deanna who I met upon moving to Baltimore in 2010. Steve has become like an uncle who provides guidance, love, and support to me as a family friend.

I have been the recipient of Steve's kindness and warmth over the years. In many instances, Steve has been there to lend me advice. In my endeavor to become an entrepreneur when living in Baltimore, MD, I was prepared to acquire a business tied to a property in Highlandtown and I urgently needed critical guidance. Steve was more than willing to step in and work with me to dissect the business deal and understand the proposal in clearer terms.  Steve was quickly able to point out specific deficiencies in the deal and highlighted liabilities that were hidden and complex. Had Steve not provided his advice at that moment, I would have closed on a deal that would have presented significant financial burden and risk. In another situation, my brother passed in June of 2011 and my family was dealing with the challenges surrounding his trust for 2 years after his passing. While at a Holiday family dinner, Steve noticed I was perplexed and worried. Concerned, Steve took me aside and asked me what was wrong. I presented my dilemma involving my inheritance and challenges with my brother's trust. Very quickly, Steve simplified my concerns and provided me with helpful direction and next steps for myself and my elderly parents. His guidance assisted me in understanding a complex process that I never had any experience in. After leaving the holiday dinner, I was so grateful and relieved that Steve disambiguated the burden that I could not make sense of by presenting unclear stipulations, rights, and responsibilities. Emerging as an uncle figure, Steve's kindness and concern was crucial for me as I grew up somewhat detached from my aunts and uncles.

Aside from being kind and caring, I have observed quite a few instances of Steve's unwavering generosity to those in need. In 2014, a family friend who is a mother was experiencing acute financial and logistical hardship. I observed Steve quickly step-in and provide her with a car and financial

assistance to get her back on her feet. Many people express concern and support as friends, but Steve seemed to love and support in a way that was aligned with what one would describe as "miracle support." His kindness and dedication to family and friends stood out as unparalleled in my eyes and eyes of many others. As years passed, Steve emerged as a towering figure and example of a family man that demonstrates wide love, care, and affection. In contrast of his tough and mighty work persona, Steve's personal side is akin to the lovable bear filled with empathy, laughter, and joy. His presence is always like the lightbulb in the room.

Regrettably, these last few years have seemed to have taken a negative toll on Steve. It has been painful to observe his cognitive decline. I am utterly distressed and even perplexed that he made the decision to represent himself I often wonder if the Steve from a decade earlier would have chosen to represent himself. The sharp and witty giant has been reduced to a dull, forgetful, and aged man.

While the matter presented before you is undoubtedly a serious one, I plead with you to consider the pillar of love, support, warmth, generosity, and leadership Steve has been for many years in my life and life of many others. I pray this letter has exemplified the other side of Steve Snyder and offers you a more complete picture of his character. Finally, I want to thank you for reading this letter.

Sincerely,

*Youssef A Dahmas*

Youssef A Dahmas

## THE LAW OFFICES OF
## KENNETH R. FEINBERG PC

THE WILLARD OFFICE BUILDING
1455 PENNSYLVANIA AVENUE, N.W.
SUITE 390
WASHINGTON, D.C. 20004-1008

(202) 371-1110 (TELEPHONE)
(202) 962-9290 (FAX)

WRITER'S DIRECT DIAL NUMBER
202-962-9280
kfeinberg@feinberglawoffices.com

March 4, 2025

The Honorable Deborah L. Boardman
U.S District Court for the District of Maryland
6500 Cherrywood Lane, Suite 445
Greenbelt, MD 20770

Re:  Stephen Snyder

Dear Judge Boardman:

I write this letter on behalf of defendant Stephen Snyder who will shortly be sentenced by this Court based upon a verdict of guilty in his criminal proceeding. I have known Stephen Snyder for some 15 years and, based on personal knowledge and firsthand observation of his legal skills, can attest to his good character and commitment to his clients.

I testified as a character witness on behalf of Snyder during his criminal trial before Your Honor.

As the Court may be aware, I am an attorney engaged in the practice of mediation, arbitration and claims compensation. I was appointed by the Bush Administration to serve as Special Master in the design, implementation and administration of the Federal September 11th Victim Compensation Fund of 2001. I also served as the Obama Administration's Special Master in administering the Gulf Coast Claims Facility of 2010 following the Deepwater Horizon oil rig explosion in the Gulf of Mexico. I have been asked by numerous elected public officials and various federal and state judges to design and administer similar compensation programs in the wake of public disasters that have adversely impacted thousands of individuals.

I have also served as court-appointed mediator to help resolve various complex litigations involving mass torts, antitrust claims, contract disputes, environmental claims, and allegations of employment discrimination, among others. I have been engaged in the practice of mediation since 1984.

In 2010 I was asked by The Honorable New Jersey State Judge Brian R. Martinotti to attempt to resolve hundreds of gender and age employment discrimination cases pending in his Court against the Prudential Insurance Company, *In re Prudential Life Insurance Company of America Litigation, case no. 288 (the "Actions") (BER-L-2251-10)*. These numerous plaintiffs were represented by some six to eight

027

**2 | P a g e**

separate plaintiff attorneys, one of whom was Stephen Snyder. Because of the complexities and uncertainties of trial, plaintiff counsel were eager to settle, and mediated settlements were quickly achieved for the great majority of the individual plaintiffs.

But Stephen Snyder – convinced that his approximately 40 clients should not settle for the relatively small sums being offered by the defendant insurer – held out and was determined to take his cases to trial unless the insurer paid sums in excess of amounts offered other plaintiff lawyers who had quickly settled. As the mediator, I was impressed with Snyder's advocacy and dedication to his clients; he refused to accept quick settlement amounts and, with his experienced trial skills, demanded more advantageous settlement terms. After additional intense and extensive mediation efforts, Snyder was successful; his clients received amounts well in excess of those paid other plaintiffs.

Judge Martinotti (who now sits as a federal district Judge in New Jersey) offered favorable comments about Snyder's commitment to his clients when a mediated settlement of his clients' claims was finally achieved.

During the course of the mediation, Snyder met with designated plaintiffs and the mediator to gauge their interest in settlement. He was sensitive, compassionate and understanding in explaining settlement options.

Snyder now confronts the consequences of his criminal conviction. Devastated, he is humbled by this turn of events and understands his exercise of bad judgment in his dealings with the University of Maryland Hospital. In my opinion, he compounded this bad judgment by deciding to proceed to trial *pro se* with adverse consequences. But these recent unfortunate events should not completely cloud a legal career with many important successful milestones. Over decades, Snyder has brought financial and emotional benefits to hundreds of plaintiff clients. In desperate need of a dedicated, unyielding legal advocate, injured victims turned to Snyder for help. He has represented his clients with zeal, competence, and sound judgment.

As the Former Chairman of the Board of the President John F. Kennedy Library Foundation in Boston, I am reminded of President Kennedy's words that "every single individual in America can make a difference." In my over 40 years of public service to our Nation, I have witnessed Stephen Snyder offering some degree of financial and emotional security to individuals in need. I wanted to make sure that the Court was aware of Stephen Snyder's many positive attributes.

Very truly yours,

Kenneth R. Feinberg

Theresa Gutierrez

February 17, 2025

The Honorable Deborah Boardman

Edward A. Garmatz United States District Court

101 W. Lombard Street

Baltimore, Maryland 21201

Dear Judge Boardman,

My name is Theresa Gutierrez, and I reside in Timonium, Maryland, with my husband, Richard. We are proud parents of two adult sons, Alexander and Steve. I have worked in the technology department at Aetna Healthcare for 30 years, and before that, I spent 13 years at USF&G and Stockard Shipping.

I am writing to you on behalf of Steve Snyder, my cousin's former husband. Steve was married to Julia Snyder for many years, and though they are no longer married, they remain remarkably close and deeply supportive of one another. Their bond is one of enduring family and friendship, and Steve has continued to be a beloved member of our extended family for over 35 years.

Julia and I grew up together in the Highlandtown neighborhood of East Baltimore, where our mothers were two of eight siblings. We were raised within walking distance of each other and attended Our Lady of Pompei School and Church. Julia and Steve met while she and I were working together at Stockard Shipping in downtown Baltimore. I had the privilege of witnessing their relationship and family grow, and I was honored to be in their wedding in 1989.

Steve, who is Jewish, always embraced the traditions of Julia's Catholic family with love and enthusiasm. He attended family gatherings for Catholic holidays, celebrating alongside Julia's relatives, including her mother, my Aunt Louise. Despite his different religious background, he was always fully engaged in family traditions, sharing meals, laughter, and stories. He would often bring his mother and her twin sister, Myrtle, to these gatherings, and they quickly formed a wonderful bond with our family. Our traditions blended seamlessly—Steve's mother and aunt adored our Italian cooking, and in return, they introduced us to some of the best Jewish dishes I have ever tasted, including brisket and matzo ball soup.

Steve has always had a larger-than-life personality, immense pride in his work as a lawyer, and a deep love for his family. Some of my fondest memories include the playful interactions between Steve and my aunts. Every Christmas or Hanukkah, they would give him gag gifts—one year, a pair of extra-large novelty boxer shorts with a ridiculous design. The look on his face was priceless, and the aunts could not

stop laughing. They also enjoyed teasing him about fashion, purposely mispronouncing designer brand names just to get a reaction. He would always correct them, but he played along, making the banter all the more enjoyable. These traditions became part of our family's cherished stories, ones we continue to share long after the aunts have passed. Steve was there for each of their funerals, mourning with us and offering his unwavering support.

Steve also had a special role in our family's "Cousin Club," which we formed to plan dinners, bus trips, and other outings. He was originally voted as the president—a title he loved. Over the years, we playfully teased him that he had been voted out, which always made him laugh while pretending to be outraged.

His generosity extended beyond family gatherings. Our Lady of Pompei Church, the heart of our childhood community, had fallen into disrepair, and Steve's generosity helped restore it. Thanks to his contributions, the church was repainted, preserving its beauty for the congregation. When I attended the final mass before the church's closing in 2024, I felt a deep sense of gratitude for what Steve had done to help maintain such an important part of our history.

To those who don't know him well, Steve's bark can seem louder than his bite. But for those of us who do, he is one of the most loyal, compassionate, and dependable people we have ever met, especially in times of hardship. He is the type of person who shows up when it matters most.

Anyone who has ever met Steve knows how much he loves his family. He is a devoted father, son, brother, uncle, and friend, and I am honored to call him family. It has been difficult to watch his health decline in recent years. He is no longer able to drive, and the sharp, vibrant character we once knew has faded under the weight of time, stress, and hardship. While we still see glimpses of the old Steve, those closest to him can see how much he struggles. He still tries to put others first, even as we all worry for him.

I respectfully ask that you consider not only his character but also his health, age, and the toll these past years have taken on him. More than anything, I pray for his well-being and peace of mind. Steve is a good man with a kind heart. His words don't always reflect the depth of his goodness, but once you know him, you see right through to the man he truly is.

Thank you for your time and consideration.

Sincerely,

*Theresa Gutierrez*

Theresa Gutierrez

# THE LAW OFFICE OF TOMEKA G. CHURCH, LLC

**711 Saint Paul Street**
**Baltimore, MD 21202**
**Tel.: (410) 307-8223**
**Fax: (410) 727-0466**
**Email: Tchurch@thechurchlawfirm.com**

February 13, 2025

The Honorable Deborah L. Boardman
U.S. District Court for the District
of Maryland
6500 Cherrywood Lane, Ste. 445
Greenbelt, MD 20770

**Re:     Character Letter on behalf of Stephen L. Snyder, Esq.**

Dear Judge Boardman:

I am a member of the Maryland Bar writing in support of Mr. Stephen L. Snyder. I have known Mr. Snyder since 2002 when he hired me as an associate attorney to work for his firm. At that time, I had five years of legal experience as a criminal defense lawyer. Mr. Snyder provided me with an opportunity to learn and practice civil litigation as a medical malpractice attorney. During the nine (9) years that I worked for Mr. Snyder, I witnessed his preparedness, tenacity, and skill as a masterful courtroom litigator. I can undoubtedly say that much of what I learned under his apprenticeship has contributed to my success as an attorney.

In addition to the respect that I have for Mr. Snyder as lawyer, I can attest to his character as a caring, thoughtful, and generous human being. During most of my employment with Mr. Snyder, I was the only African American attorney and the only female attorney in the firm. He always treated me with respect and demanded no less, and no more than any of the other lawyers in the practice. When a case was won or settled, Mr. Snyder made sure that everyone shared in the victory. Outside of work, our families have socialized together for holidays, weddings, bar mitzvahs, and various other occasions - even years after my departure from the firm.

It is difficult for me to reconcile the man that I know so dearly versus the man that stands before this Honorable Court facing sentencing. When I briefly attended part of his criminal trial, I sadly witnessed the lowest point in Mr. Snyder's career. His cognitive decline was apparent, and his behavior was atypical of the accomplished attorney who was once well-respected by the bench and by his peers. I believe that this ordeal has been humbling for Mr. Snyder and has taken a toll on him mentally and physically.

031

I am respectfully asking the Court to not look at just this one moment in time, but rather consider Mr. Snyder's long-standing contributions to the Bar, and his philanthropy over the years. Mr. Snyder is a dedicated father of five adult children, and he is a man of faith. To my knowledge, he has been a member of Beth El Congregation for over 40 years. During that time, he has made substantial contributions to Beth El, and contributions to the Catholic church attended by his former wife. As a strong believer in education, Mr. Snyder donated $1 million to his alma mater, the University of Baltimore Law School, which was used to create the *Stephen L. Snyder Center for Litigation Advocacy*. Over the years, he has also made charitable contributions to the Cerebral Palsy Foundation and the United Cerebral Palsy of Central Maryland (UCP). These are just a few examples of the humanitarian gestures that Mr. Snyder has made throughout his career. My hope is that his legacy and altruism will not be overlooked, and that leniency can be extended at his sentencing.

Thank you for your time and consideration. Please feel free to contact me if I can be of any further assistance.

Respectfully submitted,

*Tomeka G. Church*

Tomeka G. Church, Esq.

2

Veronica Rogers

Your Honor,
My name is Veronica Rogers,
I work as a housekeeper and am writing
to you today on behalf of Mr. Stephen Snyder
who I have known for 35 years. I worked
for him for all those years taking care of his
family, I raised his children, who are now adults
and I am still with the family.
I have never felt like an
employee, because I was treated like a
member of the family. Mr. Snyder cares about
me, and over the years has always made
sure that I'm okay. I have truly come to
love him very much because he cares so
much for others.
Mr. Snyder is a very good
and kind person. I witnessed on many occasions
where someone would show up who was in immediate
need of help, and he never turned him or her away.
He rendered aid in whatever capacity he could
because he is a caring person who always
shows concern for others. He is a hardworking,
self made, loyal and giving person who
loves his family very much.

Mr Snyder is always giving back to the community. He loves to give back, not for fame or to be recognized, but because he cares for his fellowman. He has shown a humble attitude and has suffered much from these legal proceedings. He used bad judgement in his dealings with the University of Maryland Hospital, for which he has shown a contrite spirit.

This case has taken a toll on his health. He has become forgetful and acts in a manner that does not represent the person I once knew. His physical health has declined, and he forgets to take his medicine which does not help the situation. I am a witness to all of this decline and am saddened that he is not the person I used to know.

I miss the Stephen Snyder who took care of me and also my children. If I had a family emergency, like a death in my family, he would make sure my flight was paid for and assistance for the burial. He would pay for trips for me. There are so many good things I could say, but a letter cannot say it all.

Your honor, it all comes

down to you, You have the final say, so
I am asking, please, when you make your
decision, may loving kindness and mercy
guide your decision. Your honor, I would
also like to thank you for taking the time
to read this letter.

Sincerely,
Veronica Rogers.



February 14, 2025

The Honorable Deborah Boardman
Edward A. Garmatz United States District Courthouse
101 W. Lombard Street
Baltimore MD 21201

Dear Honorable Boardman:

My name is Catherine Ann Zoppo, and I have had the honor of serving the City of Baltimore for 50 years. I have spent my entire career at City Hall and am currently employed as a Real Estate Agent II in the Department of Real Estate under Bill Henry, the Comptroller. I write to you today to offer my perspective on Steve Snyder, whom I have known since 1985 when he began dating—and later married—my first cousin, Julia Dulisse-Snyder. Over the decades, Steve has evolved from a relative by marriage into a truly cherished member of our family, consistently offering support, warmth, and guidance through every milestone and challenge.

I have witnessed Steve's admirable character through countless acts of generosity and kindness. One memorable example is his selfless work on Our Lady of Pompei Catholic Church—a vital sanctuary for our community in Highlandtown. At a time when the church's interior was in desperate need of repair, Steve stepped in and arranged for the entire interior to be repainted and even renovated the vestibule of the church's rectory. Our Lady of Pompei has always served as a safe haven in a neighborhood that has faced its share of challenges and deterioration over the years. By restoring its beauty, Steve not only revitalized a cherished community landmark but also renewed hope and pride among residents—impacting the lives of many who might have never even known him personally. It is also significant to note that although Steve is not of the Catholic faith, he was moved by his desire to support his family and their community.

In another instance that has left a lasting impression on me, following my mother's passing in 1995, Steve demonstrated profound kindness by covering the expenses for a repast dinner for over 100 people during our time of grief. He also went out of his way to purchase a car for my father—a tangible reminder of how deeply he cares about our family's well-being.

Beyond these gestures, Steve has enriched our lives in more personal ways as well. I fondly recall the vacations he arranged for me and my sons, which not only offered us cherished time together but also demonstrated his commitment to nurturing strong family bonds. These trips stand as enduring reminders of the genuine care and generosity that define his character.

Steve is also an incredible father. His children are his world, and I have seen firsthand the profound impact he has had on his sons and daughter. Each of his children has grown into a remarkable, accomplished adult who cherishes their father. Their successes and the deep bond they share are a living testament to the love, guidance, and stability that Steve has provided throughout their lives.

Steve's personal journey is equally noteworthy. After being told at City College that he was "most likely not to succeed," he defied expectations and built a formidable reputation as one of Baltimore's top malpractice attorneys. His tenacity and unwavering work ethic earned him both respect and, admittedly, envy from his peers. An article in the Baltimore Sun once described him as "the lawyer other lawyers love to hate," a testament to the formidable determination he brings to every challenge.

Regrettably, I must also share that in recent years I have noticed significant changes in Steve's health and demeanor. Since the onset of his legal troubles, his memory has noticeably faltered, and his judgment seems impaired—traits that are uncharacteristic of the composed, determined man I have known all my life. I observed these changes firsthand during his trial, where the Steve Snyder in the courtroom was markedly different from the steadfast family man who has always been our rock.

While I understand the seriousness of the matter before you, I respectfully ask that you consider the many years of positive contributions Steve has made to his family and the community. His actions reflect a man of integrity, generosity, and resilience—a man who has always placed family and community first. I hope this letter has given you a glimpse into Steve Snyder, the person, beyond the challenges he now faces.

Thank you for taking the time to read my letter and for considering my perspective on his character.

Sincerely,

*Catherine Ann Zoppo*

Catherine Ann Zoppo

The Honorable Deborah Boardman

Your Honor

  My name is Stephen A. Geppi, and I am the Owner/Publisher of Baltimore Magazine, the nations oldest city magazine, having been established in 1907, and am also the longest tenured owner of such, since 1994. I am also the owner of Diamond Comic Distributors, the world's largest distributor of English language comic books, as well as a number of other related pop culture companies (see partial list below). I have known Steve Snyder for (  ) years and am writing you to attest to his character as a friend and prominent attorney. Steve and I have had a long and very cordial relationship, with both of us having a deep love for the city of Baltimore, and the State of Maryland. In my many years of knowing Steve, I have always found him to be a person of utmost integrity and character. It is well documented his success as a self-made man, who is extremely hard working, honest, and highly respected. I recall once calling him on behalf of 2 different fund-raising organizations, asking him to contribute to one or the other, if possible. Before I even said who they were, he volunteered to contribute to both, which surprised and confirmed to me, what most already knew about his generosity. When I first heard he was accused of extortion, I was shocked, and immediately felt then, as I still do now, there must be some mistake. This is a guy I would trust with my kids lives, so surely there must be another side to this accusation. Nonetheless, I realize he was convicted of such and feel strongly, any potential punishment, should keep in mind who he truly is, and has been his whole life, a good and decent family man, who would never knowingly do anything like what he has been accused of doing. That said, perhaps he used poor judgment, which everyone, including myself, has been apt to do on different occasions. Therefore, I humbly submit to you, whatever sentencing is being contemplated, be measured by the overwhelming stellar record he has established firmly as an honest man, who is a great father and defender of justice in his practice as an attorney. I can only hope, if I were a victim of what I know he and most other informed persons, including myself, consider to be a misjudged verdict, he will at the very least be measured by his overall life's record of decency and honesty. There is no way, in my mind, Steve would ever intentionally try to extort anyone. He is just too honest and intelligent to ever do that. In conclusion, I guess, at the risk of being redundant, particularly because I want to be very clear about the man I know to have such integrity, he be treated fairly, as I know Your Honor is certain to do, and let him continue being the asset to the community he has always been. Any incarceration of him, in my humble opinion, would constitute the equivalent of one not deserving of the alleged crime. I hope I have not in anyway led you to believe I am overstating who I know him to be, and if I have, I apologize for doing so, but I hold integrity and honesty as the highest form of character, and when I see the potential for someone who has spent a lifetime earning it being questioned, I can't help but to emphasize my feelings about it, and so I hope you see it that way. Thank you in advance for giving my message your time and attention. I truly appreciate the workload you must have, and I trust you will do whatever you feel is right and appropriate, all things being considered.

Sincerely

Steve Geppi

Owner/Publisher of Baltimore Magazine
CEO of Diamond Comic Distributors, Inc. (and affiliates)
Alliance Game Distributors, Inc.
Gemstone Publishing

Diamond Select Toys
E. Gerber Products
Hake's Americana
CGA

**Edward B. Whitman III and Anne Macsherry Whitman**

███████████████████████

March 18, 2025

The Honorable Deborah Boardman

Your Honor,

We are writing to provide insight into Steve Snyder's character based on my personal relationship with Steve and his family, a relationship that began with the relationship of our sons who were classmates. This relationship began in 2005 and continues today.

I graduated from Towson University and received an MBA from Loyola. I have been involved professionally in leadership roles at several large corporations including PHH and GE, both NYSE companies with significant emphasis on ethical behavior. My wife graduated from Loyola and has worked at a local private boys' school for 27 years.

We know Steve very well personally but less so professionally though his reputation is well known. We have been fortunate to be invited to his house for dinner on several occasions and seen them on and off as our relationship has evolved. The Snyder family was very generous and welcoming to our son. They generously included him in many family vacations including a ski trip to Colorado, a vacation in Hawaii, numerous trips to sporting events, and countless lunches, dinners, overnights. Entrusting a young son to another family for trips like these is not taken lightly, and we can say that we never doubted that he would experience the love and care they showed their own son and daughter. Additionally, despite the considerable expense associated with these activities and our offers to contribute, the offer was always firmly declined. Their warm generosity continues to be greatly appreciated.

Some might struggle to understand how the profile of the man I know personally can be so opposite of his professional profile. Knowing his as I do, I know that he is man of fierce passion and drive. This goes for his personal, family, and professional life. His case profiles are usually associated with representing the "small guy" taking on a big corporation, frequently cases that others might not take. While not an attorney, I do not believe these cases would be winnable without Steve's passion for justice. Certainly, his successes have resulted in considerable financial success, but only a fraction of what he has provided for his clients. So, while his reputation is one thing, I believe if you interviewed his successful clients, they would sing his praise.

We are not intimate with his current legal situation but have called him many times to offer our support and encouragement, something for which he has been most grateful. Our son continues his relationship with his son, and we have followed his situation indirectly in this manner though our concern has been over Steve personally. We are therefore not writing in regard to any guilt or innocence, but regarding his future. We are therefore hopeful that you will include these thoughts as you contemplate his future:

- We know Steve personally as a family man for 20 years.  Steve is a good man. He is passionate about whatever he does, but his passion has always been for the benefit of others whether personally or professionally.
- His high-profile cases were very public for him professionally, but his clients are the ones who have benefited the most.  When considering his professional career and contributions, focus on those he has benefitted.
- Whatever mistake he may have made, he has already suffered considerably.  He has been barred from doing the work for which he has passion, and he has been shamed in front of his family, friends, and profession.
- I am not sure of his age, but Steve's remaining years are declining, and I know this has taken a significant toll on him. Indirectly, I know he is a beaten man, and it has affected his health.

For all of these reasons, we strongly urge that you consider releasing Steve back to his friends and family so that he can live out his remaining years with them and them with him.

Thank you for your consideration.


Sincerely,


Edward B. Whitman III

Anne Macsherry Whitman

**Mary Ann Lorenzo**



**TO: The Honorable Deborah Boardman**

**RE: Steve Snyder Character Letter**

Your Honor,

My name is Mary Ann Lorenzo, and I have lived in the Maryland since 1942. Prior to my retirement, my husband and I owned several dinner theaters throughout the State of Maryland. I have had the pleasure of knowing Mr. Steve Snyder for over 20 years, as he was married to a family friend.

In my opinion, Steve is a good man, known for his kindness and genuine care for others. I have seen his generosity firsthand, particularly when our Lady of Pompeii Catholic Church needed to be painted. Without hesitation, Steve wrote a check to support the church's needs. This is just one example of his willingness to help the community.

Over the years, I have observed Steve to be an extremely good husband, father, and friend. He has consistently demonstrated integrity and reliability. His word is his bond, and I have always trusted his character.

I also wish to speak to Steve's current state. He has expressed deep humility and sorrow over the legal proceedings he is currently facing. It is clear to me that he is suffering from the strain these events have placed upon him. Over the last few years, I have noticed a decline in his cognitive decision-making and memory.

In light of all that has transpired, I believe the good that Steve has done in his lifetime far outweighs the situation he is in now. He has lived a life of service to others, and I believe this should be taken into account when considering his character.

Thank you kindly for your time and consideration.

Sincerely,

*Mary Ann Lorenzo*

Mary Ann Lorenzo

042

John W Davis II, JD



February 10, 2025

The Honorable Deborah Boardman
Edward A. Garmatz United States Courthouse
101 West Lombard Street
Baltimore, MD 21201

Re: Character Reference for Steve Snyder

Dear Judge Boardman,

I am writing to provide a character reference for Steve Snyder, a man I have known for 18 years. Our relationship has been one built on mutual respect, shared values, and personal experiences as grandfathers, with Steve being the paternal grandfather of our three grandchildren and myself the maternal grandfather. Over the years, with me being African American and Steve being Jewish, I have had the privilege of being a part of his family's important milestones, including attending two Brit Bats, one Bris, two Bat Mitzvahs, and one Bar Mitzvah, standing beside Steve as we celebrated with our loved ones in front of the wider Jewish community.

Steve's generosity has always been a cornerstone of his character. He has been a major contributor to his alma mater, the University of Baltimore Law School, as well as to local private schools and his synagogue. Beyond financial contributions, Steve is a man who gives of himself. He is an active participant in his family's life, always present during holidays, birthdays, and special occasions, and his love for his family is evident in his constant engagement and involvement.

Over the past five years, I have witnessed a profound change in Steve, both physically and mentally. This trial has taken a devastating toll on him, and the decline in his mental and physical health is undeniable. ███████████████████████████████████████████ Steve spent literally millions of dollars on his defense team, early on during these proceedings, only to later fire the team and represent himself, a singularly bad decision in a string of bad decisions that likely impacted the outcome of his trial. This is not the Steve we all know. ████████████████████████████████████████ These are not the behaviors of an actor or someone seeking sympathy; they are the unmistakable signs of someone who has been physically and mentally broken by the weight of this ordeal.

Steve firmly believed in the integrity of his actions and was convinced that what he was doing was both legal and necessary. I am intimately familiar with the legal world, having served as a former federal prosecutor and Major Crimes Chief during the Clinton Administration's War on Drugs, and as a professor of free speech, ethics, and argumentation at George Mason and Howard Universities. Over the years, I have had numerous discussions with Steve, his sons, his colleagues, and legal associates about a wide array of legal matters. While I will not comment on the specifics of his case, I will unequivocally state that Steve is an honest man who believed in his cause.

As a former federal prosecutor and someone deeply familiar with the law, I understand the importance of accountability, and while I recognize the verdict in this case, I feel compelled to share that the Steve Snyder I know is not the one defined by the "Snyder them" public image he may have crafted. He is not the persona that has been portrayed in the media, nor should that image be a defining factor in this court's decision. The man I know is someone who fought for justice his entire life, even when it was unpopular or difficult. His tenacity, grit, and insight earned him recognition as one of the country's "Super Lawyers."

The fall from grace that Steve has experienced is heartbreaking. Once a respected figure in the legal community, Steve is now facing personal and professional devastation. His financial collapse, the likely loss of his legal career, and the damage to his reputation have taken a severe toll on his family, who are now watching a once-strong man deteriorate before their eyes.

In light of the profound toll this process has already taken on Steve, I ask the court to show mercy in its sentencing. This man, a first-time offender, has already endured more punishment than many could bear. The impact of these proceedings on his mental and physical well-being is evident, and I believe that further punishment is not necessary, as he has already suffered significantly.

Thank you for your time and consideration.

Sincerely,

"John W Davis II, JD"
CEO, QuantumPath.ai / CEO, Pelican Fly, LLC

February 14, 2025

The Honorable Deborah Boardman

My name is Michele Cox, and I am a Post Closer in the mortgage industry. I am the cousin of Julia Snyder who was married to Steve and that is when he became a part of our family.

I have known Stephen Snyder for nearly 40+ years, and he is a very close friend of mine. My husband Jesse Cox myself  and my family, Julie and Steve spent much time together, vacationing, attended dinners, family gathering, this closeness allowed me to see Steve in various settings not only as a lawyer but as kind compassionate family man along with his sense of humor, we always enjoyed our time together. He had a nickname for me "Mashug" which means crazy, and we would always laugh about it.

He would give back to the community, an example is he had the entire Our Lady of Pompei

church painted, a catholic church where we all grew up and attended, yet he's not Catholic

which in my heart shows his character of being a generous man. I most definitely consider him to be one of the good guys, hardworking and striving to be the best as a prominent attorney to win cases for his clients like no other that I have witnessed.

Yes, Steve has been convicted of a crime but has been humbled by the turn of events

leading up to this conviction and has suffered from these legal proceedings. I strongly feel

that he should not have to endure the humiliation of being sentenced to jail. Please consider giving him community service, especially since his health has declined.

I respectfully request that the court take into consideration Steve's long-standing

commitment to serve his clients and the impact he has had on the community and the

positive impact he has had on, not only his clients but on his friends and family.


Thank you for your time and consideration.

Sincerely,

Michele Cox



**Justin Brown <brown@cjbrownlaw.com>**

---

## Character Letter on Steve Snyder

**stanley segall** ████████████>                          Wed, Feb 26, 2025 at 8:58 AM
To: "brown@cjbrownlaw.com" <brown@cjbrownlaw.com>

---

**From:** stanley segall ████████████

**Subject:** Character Letter on Steve Snyder

The Honorable Deborah Boardmann:  I am Steve Snyder's brother-in-law.   I have known Steve Snyder for 60 years.  He has always been a kind, generous, thoughtful, intelligent, caring, and helpful person to all.  Recently Steve has had poor health and financial difficulties.  Please be understanding that Steve needs to get well and take care of future health issues.  Everyone who knows Steve would say same the thing concerning his wonderful character and good heart.  Very Truly Yours, Stanley Segall